## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **TUBOS DE ACERO DE MEXICO, S.A.; AND TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION,** |
| **Plaintiffs,** |
| **v.** |
| **UNITED STATES,** |
| **Defendant.** |

**Court No. 25-00221**

**Before:  Unassigned**

## PUBLIC VERSION

**Business Proprietary Information has been deleted from Pages 4-5, 8, and 13-14.**

## COMPLAINT

Plaintiffs, Tubos de Acero de Mexico, S.A. ("TAMSA") and Tenaris Global Services (U.S.A.) Corporation ("TGS USA"), by and through counsel, bring this Complaint against the United States, and allege as follows:

## DETERMINATION TO BE REVIEWED

1.    Plaintiffs contest certain aspects of the final results issued by the U.S. Department of Commerce, International Trade Administration ("Commerce"), in its first administrative review of the antidumping duty ("AD") order on oil country tubular goods ("OCTG") from Mexico ("First Review").  The contested determination was published in the *Federal Register* as *Certain Oil Country Tubular Goods from Mexico:  Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42933 (Sept. 5, 2025) ("*Final Results*").

## JURISDICTIONAL STATEMENT

2.    This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), which confers on the U.S. Court of International Trade jurisdiction to review final determinations issued by Commerce under Section 516A(a)(2)(A) and (B)(iii) of the Tariff Act of 1930, as

amended (the "Act") (19 U.S.C. § 1516a(a)(2)(A)and (B)(iii)).  Plaintiffs have complied with the notice requirements of 19 U.S.C. § 1516a(g)(3)(B).

## NAME AND STANDING OF PLAINTIFFS

3.    Plaintiffs in this action are TAMSA, a foreign producer and exporter of subject merchandise; and TGS USA, a United States importer of subject merchandise.  Plaintiffs are interested parties, as defined in 19 U.S.C. § 1677(9)(A) and (C), who actively participated in the administrative review that resulted in the contested determination.  Plaintiffs therefore are entitled to commence this civil action pursuant to 28 U.S.C. § 2631(c) and 19 U.S.C. § 1516a(d).

## TIMELINESS OF THIS ACTION

4.    Commerce published the *Final Results* in the *Federal Register* on September 5, 2025.  *See* 90 Fed. Reg. 42933.  Because Mexico is a free trade area country, Plaintiffs were required to notify Commerce and relevant parties of their intent to commence judicial review within 20 days of publication of the *Final Results*.  *See* 19 U.S.C. § 1516a(g)(3)(B).  Plaintiffs filed and then served the notice of intent to commence judicial review on all interested parties, including Commerce, the United States Secretary of the United States-Mexico-Canada Agreement ("USMCA") Secretariat, and the Mexico Secretary of the *Tratado entre Mexico, Estados Unidos, y Canada* ("TMEC") Secretariat, on September 25, 2025, which is the 20-day deadline.  *See* Letter from White & Case LLP to Sec'y Desai and Sec'y Reyes, *Certain Oil Country Tubular Goods from Mexico:  Final Results of Antidumping Duty Administrative Review; 2022-2023 – Notice of Intent to Commence Judicial Review* (Sept. 25, 2025).

5.    The time limit to commence an action before this Court began to run on October 6, 2025, the 31st day after the publication of the *Final Results* in the *Federal Register*.  *See* 19 U.S.C. § 1516a(a)(5)(A).  Plaintiffs commenced this action by filing a summons with this Court on October 8, 2025, which is timely because it was filed 31 days after September 25.  *See* 19 U.S.C.

§ 1516a(a)(2)(B); 19 U.S.C. § 1516a(a)(5)(A).  In accordance with 19 U.S.C. § 1516a(a)(2)(B), Plaintiffs timely filed this Complaint on November 6, 2025, within 30 days after filing of the Summons.

## STANDARD OF REVIEW

6.    This Court reviews final results issued by Commerce pursuant to 19 U.S.C. § 1675 to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  In addition, this standard of review has been recognized to encompass the arbitrary and capricious standard established under the Administrative Procedure Act.

## STATEMENT OF FACTS

7.    Commerce initiated the First Review on December 29, 2023.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 90168, 90170 (Dec. 29, 2023).  Commerce's period of review ("POR") was May 11, 2022 through October 31, 2023.

8.    On March 12, 2024, Commerce issued an initial antidumping questionnaire to TAMSA.  Letter from Commerce to TAMSA, *Administrative Review of the Antidumping Duty Order on Oil Country Tubular Goods from Mexico:  Initial Questionnaire* (Mar. 12, 2024).  On April 2, 2024, TAMSA filed its response to Section A of the questionnaire.  *See* Letter from White & Case LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico:  Response to Section A of the Questionnaire* (Apr. 2, 2024) ("Section A Response").

9.    In its Section A Response, TAMSA provided support for a constructed export price ("CEP") offset.  *See id.* at A-18-A-26, Exhibit A4.  Specifically, under the statute and its regulation, Commerce will grant a CEP offset where, *inter alia*, normal value ("NV") is compared to CEP and is determined at a more advanced level of trade than the level of trade of CEP.  *See* 19 U.S.C. § 1677b(a)(7)(B); 19 C.F.R. § 351.412(f).

10. Consistent with Commerce's questionnaire instructions, TAMSA submitted qualitative evidence supporting the granting of a CEP offset in its Section A Response, including narrative explanations and supporting documentation to demonstrate that TAMSA provided significant selling functions at higher levels of intensity to its home market customers (*i.e.*, determining NV) than it provided at the constructed level of trade for U.S. sales to its affiliated importer and reseller TGS USA (*i.e.*, determining CEP). *See* Section A Response at A-18-A-26, Exhibit A4. Likewise, in accordance with Commerce's questionnaire instructions, TAMSA explained that it would provide the requisite quantitative support in its responses to Sections B and C of Commerce's questionnaire. *Id.* at A-25. In the investigation, Commerce had granted TAMSA a CEP offset based on the exact same type of qualitative and quantitative evidence.

11. On April 25, 2024, TAMSA filed its response to Sections B, C, and E of Commerce's questionnaire. *See* Letter from White & Case LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico: Response to Sections B, C, and E of the Questionnaire* (Apr. 25, 2024) ("Sections B, C, E Response"). In that response, TAMSA coded field TYPEH/U reported on its sales and cost databases consistent with the coding that was verified and approved by Commerce in the investigation. This approach involved adding two codes for products that are distinct from code 1 (tubing), code 2 (casing), code 3 (green pipe), and code 4 (coupling stock), the four categories of codes in Commerce's questionnaire. *See* Sections B, C, E Response at B-15-B-16, C-15-C-16, Exhibit C4. Those distinct products are (1) [                    ], coded as [  ], and (2) [          ], coded as [  ]. *See, e.g., id.* at B-15.

12. Consistent with its statement in the Section A Response, TAMSA also provided in its Sections B, C, and E Response quantitative support for a CEP offset. This support included the calculation of higher indirect selling expenses incurred by TAMSA for sales to home market

customers, and reported in field INDIRSH, than such expenses that it incurred for sales for the U.S. market and reported in field DINDIRS1U. These higher indirect selling expenses reflected the greater number of services provided at a higher level of intensity than the services provide to TGS USA for U.S. sales. *See id.* at B-66-B-67, C-67, Exhibits B19, C20.

13. On August 6, 2024, Commerce issued a supplemental questionnaire covering all five sections of TAMSA's initial questionnaire response (*i.e.*, Sections A, B, C, D, and E). *See generally* Letter from Commerce to TAMSA, *Administrative Review of the Antidumping Duty Order on Oil Country Tubular Goods from Mexico: Supplemental Questionnaire* (Aug. 6, 2024) ("Supplemental Questionnaire"). The Section A portion of the supplemental questionnaire requested additional information regarding TAMSA's reported selling functions, in relation to TAMSA's request for a CEP offset. *See id.* at 6-7. No other portions of the supplemental questionnaire addressed TAMSA's selling functions or request for a CEP offset. *See generally id.* On August 27, 2024, TAMSA submitted its response to the Section A portion of Commerce's supplemental questionnaire and provided the additional information requested. *See* Letter from White & Case LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico: Response to Section A of the Supplemental Questionnaire*, at 13-19 (Aug. 27, 2024) ("Supplemental Section A Response").

14. Commerce's supplemental questionnaire also contained in Question 11(A) an instruction for TAMSA to recode [                                    ] from code [ ] to code 1 or 2. *See* Supplemental Questionnaire at 8. In response to a request from TAMSA for clarification regarding Commerce's request to recode TYPE, Commerce confirmed that TAMSA was required to recode products with code [ ] in field TYPE, but asked that TAMSA identify these products "separate from other products" on its databases" and "add a variable, if necessary." *See* Letter from White

& Case LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico: Request for Clarification or Reconsideration of Certain Questions in the First Supplemental Questionnaire* (Aug. 8, 2025); Letter from Commerce to TAMSA, *Administrative Review of the Antidumping Duty Order on Oil Country Tubular Goods from Mexico: Request for Clarification or Reconsideration of Supplemental Questions*, at 2 (Aug. 28, 2024) ("Commerce's Clarification Letter").

15.  In its supplemental response, TAMSA complied with Commerce's recoding request and added a variable "SUBTYPE" on its sales and cost databases in order to enable Commerce to identify the products that were being recoded.  *See* Letter from White & Case LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico:  Response to Sections B-E of the Supplemental Questionnaire*, at 2-7, Exhibits Supp. BC1-Supp. BC4 (Sept. 17, 2024) ("Supplemental Sections B-E Response").  In addition, TAMSA explained that the recoding was inconsistent with the approach in the investigation and provided supporting narrative and documentation to demonstrate that the coding used in both the investigation and in response to the initial questionnaire in the First Review was appropriate to distinguish products that are physically and commercially different products from casing and tubing that are used for different purposes, as reflected in differences in pricing and costs.  *See id.*

16.  On October 22, 2024, Petitioners filed pre-preliminary comments arguing that Commerce should depart from its approaches in the investigation, including by (1) rejecting TAMSA's TYPE coding and its inclusion of a SUBTYPE variable; and (2) declining to grant TAMSA a CEP offset. *See* Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, *Oil Country Tubular Goods: Petitioners' Comments in Advance of Commerce's Preliminary Results*, at 7-11, 31-40 (Oct. 22, 2024).

17.  On December 5, 2024, Commerce published the *Preliminary Results* and calculated a preliminary margin of 30.38 percent for TAMSA.  *See Certain Oil Country Tubular Goods from Mexico: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 96638 (Dec. 5, 2024) ("*Preliminary Results*") and accompanying unpublished Preliminary Decision Memorandum ("*PDM*").

18.  In the *Preliminary Results*, Commerce used the recoded field TYPE, thereby rejecting TAMSA's coding of TYPE described in its initial narrative response and reported on its initial sales and cost databases.  Commerce also excluded the variable SUBTYPE described in TAMSA's supplemental narrative response and reported on its supplemental sales and cost databases.  *See PDM* at 7; Memorandum from Tyler Weinhold to The File, *Administrative Review of the Antidumping Duty Order on Oil Country Tubular Goods from Mexico: Preliminary Analysis Memorandum for Tubos de Acero de Mexico, S.A.*, at 2 (Nov. 29, 2024) ("*Preliminary Analysis Memorandum*").

19.  In addition, in the *Preliminary Results*, Commerce rejected Petitioners' argument and granted TAMSA a CEP offset based on the record in the administrative review.  *See PDM* at 9-11.

20.  Finally, in the *Preliminary Results*, Commerce used the Cohen's *d* test in the first stage of its differential pricing analysis.  *See Preliminary Analysis Memorandum* at 4-5.  Commerce next applied the "ratio test" to "assess{} the extent of the significant price differences."  *PDM* at 6.

21.  In doing so, Commerce found that 46.48 percent of TAMSA's U.S. sales (by value) passed the Cohen's *d* test, and purported to find "a pattern of prices that differ significantly among purchasers, regions or time periods" because "the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales."  *Id.* at 7; *Preliminary Analysis Memorandum* at 4-5.

22.  In the second stage of its analysis, Commerce determined that the A-A method cannot account for such differences. *PDM* at 7.  Accordingly, Commerce applied the mixed alternative method ("mixed method") (applying the A-T comparison method to U.S. sales passing the Cohen's *d* test and the A-A comparison method to all other U.S. sales) and calculated the preliminary dumping margin of 30.38 percent. *See Preliminary Analysis Memorandum* at 5.

23.  On December 9, 2024, Commerce tolled the deadline to extend the date of issuance of the final results in the administrative review by 90 days. *See* Memorandum from Abdelali Elouaradia to The Record, *Tolling of Deadlines for Antidumping and Countervailing Duty Proceedings* (Dec. 9, 2024) ("Tolling Memorandum").

24.  TAMSA and Petitioners filed case briefs on March 10, 2025, and TAMSA resubmitted its case brief on June 4, 2025 in response to Commerce's request to remove alleged new factual information (see paragraph 28 below).  TAMSA argued, among other issues, that Commerce's preliminary program generated inappropriate matches and distortive margin results due to Commerce's change in the preliminary program (*i.e.*, eliminating TAMSA's reported product characteristics coding distinguishing [                                    ] from casing and tubing).

25.  Commerce's change was contrary to its approach in the investigation and the record evidence demonstrating that different coding was necessary because, compared to casing and tubing, these products have different physical characteristics and commercial differences, are produced in a different production facility, and have different production costs.  Letter from White & Case LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico:  Resubmission of Case Brief*, at 8-11 (June 4, 2025) ("TAMSA's Resubmitted Case Brief").  Moreover, due to Commerce's product coding change, Commerce's computer program assigned inappropriate surrogate costs to the recoded products that were sold but not produced during the POR, because

they are tubing and casing costs, rather than the costs of the products. *See id*. at 12-15. This altered the results of the difference in merchandise ("DIFMER") test and led to inappropriate matches between U.S. sales and home market sales. *See id*. at 12-15. TAMSA proposed that, to avoid these distortive results, Commerce could reinstate the original TYPE coding, use the SUBTYPE coding, or correct the assignment of surrogate costs for the products sold but not produced during the POR. *See id*. at 15-17.

26.  In their case brief, Petitioners argued, among other issues, that Commerce should depart from its approach in the investigation and the *Preliminary Results* and should not grant TAMSA a CEP offset in the *Final Results*. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico:  Petitioners' Case Brief*, at 36-47 (Mar. 10, 2025).

27.  TAMSA and Petitioners filed rebuttal briefs on March 17, 2025. In its rebuttal brief, TAMSA addressed all of the issues raised by Petitioners, including their argument against Commerce's granting TAMSA a CEP offset in the *Preliminary Results*. Letter from White & Case LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico:  Rebuttal Brief*, at 31-36 (Mar. 17, 2025). TAMSA highlighted that Petitioners' case brief arguments regarding the CEP offset were identical to those raised by the Petitioners in their pre-preliminary comments and in the original investigation – and in both cases (*i.e.*, in the investigation final determination and in the *Preliminary Results*), Commerce had granted a CEP offset. *See id.* In their rebuttal brief, Petitioners addressed TAMSA's argument regarding TYPE and requested that Commerce reject TAMSA's brief, alleging that it contained new factual information. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico:  Petitioners' Rebuttal Brief*, at 4-14 (Mar. 17, 2025).

28.  On June 3, 2025, the day before the hearing and nearly three months after TAMSA filed its case brief, Commerce requested that TAMSA refile its case brief by June 4, 2025 to remove certain alleged new factual information, stating that it "has determined that TAMSA's Case Brief contains untimely new factual information not previously contained on the record of this review." Memorandum from Mariela Ruiz to The File, *Rejection of Case Brief of Tubos de Acero de Mexico, S.A.* (June 3, 2025) ("Rejection Memorandum").  On June 4, 2025, TAMSA refiled its case brief. *See* TAMSA's Resubmitted Case Brief.  In the cover letter, TAMSA stated:  "We note that the information that Commerce requested be removed from TAMSA's case brief was based solely on information on the record of the review.  We respectfully disagree that this information is new factual information.  Nevertheless, we have fully complied with Commerce's instructions." *Id.*, Cover Letter at 2-3.

29.  The next day, on June 5, 2025, Commerce held a public hearing, at which the parties addressed all of the issues in their case and rebuttal briefs.  Counsel for Plaintiffs also addressed Commerce's request to resubmit the case brief.  Hearing Transcript, *Public Hearing, In the Matter of: the Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from Mexico, June 5, 2025* (June 12, 2025).

30.  On June 25, 2025, Commerce extended the deadline for the *Final Results* by 60 days, until September 2, 2025.  *See* Memorandum from Dana S. Mermelstein to Alex Villanueva, *Extension of Deadline for Final Results of Antidumping Duty Administrative Review* (June 25, 2025) ("Final Results Extension Memorandum").

31.  On July 18, 2025, Commerce applied a new "differential pricing" approach in this review and in all other pending cases following the decisions of the Court of Appeals for the Federal Circuit ("Federal Circuit") in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) and

*Stupp Corp. v. United States*, 2025 U.S. App. LEXIS 9616 (Fed. Cir. 2025) (non-precedential), which held it unreasonable to use the Cohen's *d* test when that test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variances, and sufficiently numerous data; and remanded the matter to Commerce in each case. *See* Memorandum from Erin Kearney to Scot Fullerton, *Post-Preliminary Analysis of the Administrative Review of Certain Oil Country Tubular Goods from Mexico; 2022-2023*, at 1, 3, n.7 (July 18, 2025) ("Post-Preliminary Memorandum").

32.   The new methodology included two changes to the differential pricing analysis.  First, Commerce introduced a new two-percent threshold in place of the Cohen's *d* test (*i.e.*, the "price difference test").  *See id*. at 3.  The second change, which pertains to the ratio test rather than the Cohen's *d* test, and thus, was outside the scope of the Federal Circuit's remand instructions), discontinued the use of the "mixed method" as a potential alternative comparison methodology and reduced the threshold for applying the A-T method from 66 percent to 33 percent.  *See id*. at 2.

33.   Due to the change, including the discontinuation of the mixed method and establishment of a new 33 percent threshold for the ratio test, Commerce applied the A-T comparison method to all of TAMSA's U.S. sales, and calculated a post-preliminary dumping margin of 42.65 percent – a 40 percent increase from TAMSA's preliminary dumping margin.  *See id*. at 4.

34.   Commerce established a briefing schedule for the parties to provide comments on the new methodology.  *See* Memorandum from Tyler Weinhold to The File, *Briefing Schedule for Post-Preliminary Analysis* (July 22, 2025).  On July 29, 2025, TAMSA filed a case brief arguing that the pending First Review was not the appropriate proceeding or time to adopt a new methodology and that Commerce's new methodology is contrary to the statute and to the Federal Circuit's

remand instructions. Letter from White & Case LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico: Case Brief on Differential Pricing Analysis in Post-Preliminary Analysis*, at 8-19 (July 29, 2025) ("TAMSA's Post-Preliminary Case Brief"). On August 1, 2025, Petitioners filed a rebuttal brief in response to TAMSA's case brief. Letter from Cassidy Levy Kent (USA) LLP to Sec'y Commerce, *Oil Country Tubular Goods from Mexico: Petitioners' Post-Preliminary Rebuttal Brief* (Aug. 1, 2025).

35. On September 5, 2025, Commerce published the *Final Results* and calculated a final margin of 26.10 percent for TAMSA. *See Final Results* and accompanying unpublished Issues and Decision Memorandum ("*Final IDM*"). In the *Final Results*, Commerce addressed eleven issues. *Final IDM* at 2. In relevant part to this Complaint, Commerce continued to reject TAMSA's reported TYPE and SUBTYPE coding; reversed its preliminary decision to grant a CEP offset; and continued to use its new differential pricing analysis. *See id.* at 13-16, 19-22, 23-28; Memorandum from Tyler Weinhold to The File, *Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from Mexico: Final Analysis Memorandum for Tubos de Acero de Mexico, S.A.*, at 8-11 (Sept. 2, 2025) ("*Final Analysis Memorandum*").

36. After publication of the *Final Results*, TAMSA timely filed this appeal to this Court.

## STATEMENT OF CLAIMS

### COUNT ONE: PRODUCT CHARACTERISTIC TYPE CODES

37. Plaintiffs hereby incorporate by reference paragraphs 7-36 of this Complaint.

38. Under 19 U.S.C. § 1677b(a)(1)(A), Commerce compares the export price ("EP") or constructed export price ("CEP") for U.S. sales to NV, the price at which a "foreign like product" is sold in the comparison market, to determine if the U.S. sales are made at less than fair value. In 19 U.S.C. § 1677(16)(1)(A), the statute defines the "foreign like product" starting, in order of preference, with merchandise that is identical in physical characteristics with the subject

merchandise, followed by merchandise that is similar. In order to identify the merchandise that is suitable for making comparisons, Commerce "designs a 'model-match' methodology consisting of a hierarchy of certain characteristics used to sort merchandise into groups," and "{e}ach group is then assigned a control number ('CONNUM'), used to match home market sales with U.S. sales." *See Bohler Bleche GmbH v. United States*, 324 F. Supp. 3d 1344, 1347 (Ct. Int'l Trade 2018).

39. In the initial response, TAMSA used the exact model match methodology and product characteristic coding that Commerce verified and accepted in the investigation, which included two codes for field TYPE added by TAMSA in the investigation (*i.e.*, code [  ] for [

] and code [  ] for [                ]). *See* Sections B, C, E Response at B-15-B-16, C-15-C-16, Exhibit C4. In a supplemental questionnaire, Commerce required TAMSA to eliminate one of the two codes added in field TYPE (*i.e.*, code [  ]), even though that code distinguished certain products (*i.e.*, [                      ]) that are physically and commercially different from casing and tubing, and instructed TAMSA to replace the code with two codes from the questionnaire for tubing (code 1) or casing (code 2). *See* Commerce's Clarification Letter at 2. In its supplemental questionnaire response, TAMSA complied with Commerce's request to replace the code, but demonstrated that using the initial code of [  ] was appropriate because [

] are physically and commercially different from casing and tubing with significant price and cost differences. *See* Supplemental Sections B-E Response at 2-7, Exhibits Supp. BC1-Supp. BC4. As provided for in Commerce's supplemental questionnaire, TAMSA also added the variable SUBTYPE to enable Commerce to identify these products. *Id.*

40. Contrary to its approach in the investigation, Commerce used the recoded TYPE field and also did not use the SUBTYPE field to differentiate the products, thereby treating as casing and

tubing products that the record established were significantly different from casing and tubing. *See Final IDM* at 20-22; *Final Analysis Memorandum* at 8-11. By using the recoded TYPE field for these products, Commerce improperly failed to account for "commercially significant physical differences, which are reflected in the costs and prices of those products." *Bohler*, 324. F. Supp. 3d at 1349-54. Accordingly, Commerce's recoding of field TYPE was arbitrary, unsupported by substantial evidence, and was not in accordance with law.

41. Commerce's decision to use the recoded TYPE field also yielded an unreasonable comparison, distorting both product matching and the resulting margins. In 19 U.S.C. § 1677b(a)(6)(C)(ii), the statute provides for an adjustment to NV for differences in physical characteristics between the foreign like product and subject merchandise. *See* 19 U.S.C. § 1677b(a)(6)(C)(ii), *see also* 19 C.F.R. § 351.411. To determine whether there is a reasonable basis for comparing non-identical merchandise, Commerce tests each U.S. CONNUM to identify which home market CONNUMs have a variable cost difference, based on production costs incurred during the POR, within 20 percent of the U.S. CONNUM total cost of manufacturing (*i.e.*, the DIFMER test), and, therefore, would be available for matching. *See Mitsubishi Heavy Indus. v. United States*, 97 F. Supp. 2d 1203, 1205 n.4 (Ct. Int'l Trade 2000) (citing Import Policy Bulletin 92.2 (July 29, 1992)); *see also* Commerce's Final Margin Program.

42. Here, in order to perform the DIFMER test, surrogate costs were required for certain products sold but not produced during the POR, which included [                    ]. For these products, TAMSA used the initial coding in the TYPE field (code [  ]) and reported on its cost database surrogate costs based on the production of similar product types. *See TAMSA's Resubmitted Case Brief* at 12; Commerce's Final Margin Program. In contrast, as a result of Commerce's recoding of the TYPE field, Commerce's margin program assigned surrogate costs

for these products based on the production of casing and tubing. *See* TAMSA's Resubmitted Case Brief at 12; Commerce's Final Margin Program.

43.  Due solely to the program's assignment of inappropriate surrogate costs as a result of changing the TYPE code, these products passed the DIFMER test and became available for matching to U.S. sales of casing and tubing, thereby yielding distortive matches. Once Commerce recoded field TYPE, its use of the distortive surrogate costs assigned by the program for products sold but not produced during the POR resulted in inaccurate margins, and therefore was unsupported by substantial evidence, and was not in accordance with law.  "{A}n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." *La Molisana S.p.A. v. United States*, 138 F.4th 1353, 1361 (Fed. Cir. 2025) (internal quotation marks and citations omitted).

## COUNT TWO:  NEW FACTUAL INFORMATION

44.  Plaintiffs hereby incorporate by reference paragraphs 7-36 of this Complaint.

45.  The statute and Commerce's regulations impose time limits on the submission of factual information. *See* 19 U.S.C. § 1677m(a), (e); 19 C.F.R. § 351.301.  Commerce must provide an explanation of the reasons for not accepting information. *See* 19 U.S.C. § 1677m(f); 19 C.F.R. § 351.302(d).  In addition, Commerce's regulations define the record of proceedings in 19 C.F.R. § 351.104.

46.  In its case brief, TAMSA submitted factual information in an Attachment, in support of the argument that "Commerce's revised CONNUM coding in the preliminary program results in inappropriate matches and must be corrected."  TAMSA's Resubmitted Case Brief at 13-15, Attachment.  TAMSA cited to the source documents on the record for this information. *Id*. at Attachment.

47. Commerce rejected TAMSA's case brief and required TAMSA to resubmit its case brief after removing certain information from the Attachment and related narrative discussion that Commerce stated, without explanation, it had determined was "untimely new factual information." Rejection Memorandum at 1. TAMSA resubmitted its case brief, explaining that it respectfully disagreed that the information was new factual information. TAMSA's Resubmitted Case Brief, Cover Letter at 2-3.

48. Commerce's rejection of certain information in TAMSA's case brief as new factual information was arbitrary, unsupported by substantial evidence, and was not in accordance with law.

### COUNT THREE: CONSTRUCTED EXPORT PRICE OFFSET

49. Plaintiffs hereby incorporate by reference paragraphs 7-36 of this Complaint.

50. Under 19 U.S.C. § 1677b(a)(7)(B) and 19 C.F.R. § 351.412(f), Commerce will grant a CEP offset where a respondent demonstrates that NV is determined at a more advanced level of trade than the level of trade of CEP. Commerce does so where the respondent demonstrates such difference through documentation "that includes both a 'qualitative' and 'quantitative' analysis" to 'find that a . . . CEP offset is warranted.'" *See, e.g.*, *Wheatland Tube v. United States*, 755 F. Supp. 3d 1304, 1309-10 (Ct. Int'l Trade 2025) (citation and internal brackets omitted).

51. In the original investigation, TAMSA provided quantitative and qualitative evidence supporting a CEP offset, and Commerce granted TAMSA a CEP offset. *See Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 Fed. Reg. 59041 (Sept. 29, 2022), accompanying Issues and Decision Memorandum at 11-18. TAMSA provided the exact same type of qualitative and quantitative evidence in the First Review. Compare *id*. with Section A Response at A-17-A-26, Exhibit A4; TAMSA Sections B, C, E Response at B-66-B-67, C-67, Exhibits B19, C20; Supplemental Section

A Response at 13-19.  Indeed, Commerce preliminarily granted TAMSA a CEP offset in the *Preliminary Results*.  *PDM* at 9-11.  Yet, in the *Final Results*, Commerce reversed course and denied TAMSA a CEP offset.  *Final IDM* at 13-16.

52.  Commerce made this change despite the fact that nothing in the record had changed and no interested party raised any new arguments regarding the CEP offset since the Preliminary Results.  Although "Commerce has the flexibility to change its position from the preliminary to the final results," it must "explain{} the basis for the change" and demonstrate that "its decision is supported by substantial evidence and in accordance with law."  *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1343 (Ct. Int'l Trade 2018) (citation omitted).  Here, it did not do so.  "An agency determination . . . is *ipso facto* unreasonable, and . . . arbitrary when it . . . treats similar situations in dissimilar ways."  *SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316 (Ct. Int'l Trade 2016) (citations, internal quotations, and brackets omitted).

53.  Here, not only was Commerce dealing with "similar situations" across the original investigation and the First Review, but it was also dealing with the same factual record between the *Preliminary Results* and the *Final Results*.  Accordingly, Commerce's denial of a CEP offset in the *Final Results* was unsupported by substantial evidence and was not in accordance with law.

### COUNT FOUR:  MODIFIED DIFFERENTIAL PRICING METHODOLOGY

54.  Plaintiffs hereby incorporate by reference paragraphs 7-36 of this Complaint.

55.  The statute provides that Commerce may compare the weighted average of the NVs to the EPs or CEPs of individual transactions (the "average-to-transaction" method) rather than to the weighted average of the EPs or CEPs (the "average-to-average" method) to determine whether U.S. sales are sold at less than fair value where "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" and "the administering authority explains why such differences cannot be taken

into account using a method described in paragraph (1)(A)(i) or (ii)." 19 U.S.C. § 1677f-l(d)(l)(B); *see also* 19 C.F.R. § 351.414(b)(3).

56.  In the *Preliminary Results*, Commerce used the Cohen's *d* test to perform an analysis of price differences to determine which method to use.  See *PDM* at 6-7; *Preliminary Analysis Memorandum* at 5.  Based on the results of the Cohen's *d* test, Commerce found a patten of price differences, and, because it determined the average-to-average method could not account for such differences, it applied the "mixed alternative method" to calculate a weighted average dumping margin of 30.38 percent for TAMSA (*i.e.*, the average-to-transaction method was applied to U.S. sales that passed the Cohen's *d* test, and the average-to-average method was applied to sales that did not pass the test).  *See PDM* at 6-7; *Preliminary Analysis Memorandum* at 5.

57. On July 18, 2025, in its post-preliminary analysis, Commerce applied a "modified differential pricing methodology" and, claiming it was complying with the Federal Circuit's decisions in *Marmen* and *Stupp*, discontinued use of both the Cohen's *d* test and the mixed method. *See* Post-Preliminary Memorandum at 1, 3 n.7.  Using the new approach, and making no other changes, Commerce determined the average-to-transaction method was appropriate and calculated a new preliminary margin for TAMSA of 42.65 percent, a 40 percent increase from the margin calculated in the *Preliminary Results*.  The use of this new approach likewise increased the cash deposit rate and assessment rate calculated in the *Final Results*.

58.  Commerce claimed that it applied the new approach to comply with the Federal Circuit's holding, but, as Commerce itself recognized in its request for comment on alternatives to the Cohen's *d* test, it was "not required" to make a change because the Federal Circuit's decision was "not final and conclusive."  *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21277, 21278 (May 19, 2025).  Commerce's decision to suddenly use an untested new

calculation methodology that was not court-approved at a late stage in the proceeding, rather than continuing to use the Cohen's *d* test or using the average-to-average method, was arbitrary and punitive to TAMSA.

59.   In place of the Cohen's *d* test, Commerce introduced a new two-percent threshold (*i.e.*, the "price difference test").  *See* Post-Preliminary Memorandum at 3.  The use of a mere two-percent threshold is inconsistent with the statutory requirement that prices "differ significantly" and with Commerce's own interpretation of what is considered "significant."  Moreover, the use of a two-percent threshold in all cases is not consistent with the "case-by-case" approach mandated by the Statement of Administrative Action, or with Commerce's statement in the Post-Preliminary Memorandum regarding "application of the differential pricing analysis on a case-by-case basis." *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 842-43 (1994); Post-Preliminary Memorandum at 2.  Commerce failed to address the case-specific arguments TAMSA raised in its brief regarding why the use of two-percent threshold is not appropriate based on the record of the First Review.  *See* TAMSA's Post-Preliminary Case Brief at 15;  *Final IDM* at 25-28.

60.   Commerce also discontinued the use of the "mixed method" as a potential alternative comparison methodology and reduced the threshold for applying the average-to-transaction method from 66 percent to 33 percent.  *See* Post-Preliminary Memorandum at 2.  This is contrary to the Federal Circuit's decisions, which instruct that on remand Commerce must discontinue the use of the Cohen's *d* test under certain circumstances, and provide for the continued use of the mixed or "hybrid" method.  *See Marmen,* 134 F.4th at 1348 ("On remand, Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here"); *Stupp*, 2025 U.S. App. LEXIS 9616 ("We vacate the judgment of the Trade

Court and remand for that court to remand to Commerce, which may re-perform a differential pricing analysis without relying on Cohen's *d* . . . . On remand, Commerce has discretion to do as SeAH wishes, but it also has the opportunity, if it prefers, to re-perform a differential pricing analysis without using Cohen's *d*, which may result in the use of the average-to-transaction comparison or a hybrid methodology").

61.  Commerce's modified differential pricing methodology was arbitrary, unsupported by substantial evidence, and not in accordance with law.

### COUNT FIVE:  THE REVIEW EXCEEDED 545 DAYS (18 MONTHS)

62.  Plaintiffs hereby incorporate by reference paragraphs 7-36 of this Complaint.

63.  In 19 U.S.C. § 1675(a)(3), the statute imposes time limits for issuing preliminary and final results in administrative reviews.  The statute provides:

> The administering authority shall make a preliminary determination under subparagraph (A), (B), or (C) of paragraph (1) within 245 days after the last day of the month in which occurs the anniversary of the date of publication of the order . . . for which the review under paragraph (1) is requested, and a final determination under paragraph (1) within 120 days after the date on which the preliminary determination is published.  If it is not practicable to complete the review within the foregoing time, the administering authority may extend that 245-day period to 365 days and may extend that 120-day period to 180 days.  The administering authority may extend the time for making a final determination without extending the time for making a preliminary determination, if such final determination is made not later than 300 days after the date on which the preliminary determination is published.

Therefore, the statute establishes a maximum time for issuing final results of 545 days, which is equivalent to 18 months.

64.  November 30, 2023 was the last day of the anniversary month for the review.  Commerce both tolled and extended the deadline to issue the final results on September 2, 2025.  *See* Tolling Memorandum; *see also* Final Results Extension Memorandum.  The difference between these dates, a total of 642 days, exceeded the time limit in the statute by 97 days.

65.   The tolling and extending of the deadline had consequences.  Commerce did not apply the modified differential pricing methodology in cases until July 2025.  See TAMSA's Post-Preliminary Case Brief at 5 n.10 (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 30050 (July 8, 2025), accompanying Issues and Decision Memorandum (Barcode 4786488-02)).  Therefore, if Commerce had issued its results only within the extended time limits permitted by the statute (*i.e.*, by May 28, 2025), it would not have applied the modified differential pricing methodology, which substantially increased the final margin that became the cash deposit rate, as well as the assessment rate.

66.   Accordingly, Commerce's extension of the deadline for the *Final Results* was inconsistent with the statutory requirement to complete reviews within 545 days (*i.e*., 18 months) of the last day of the anniversary month, and, therefore, was not in accordance with law.

## **PRAYER FOR RELIEF**

Wherefore, for the foregoing reasons, Plaintiffs request that this Court:

(a) Hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law with respect to the claims advanced by Plaintiffs in this Complaint;

(b) Remand this matter to Commerce with instructions to issue revised final results consistent with the Court's decision; and

(c) Provide such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Kristina Zissis
Ron Kendler
Matthew W. Solomon
Cristina Cornejo


WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel for Tubos de Acero de Mexico, S.A.
and Tenaris Global Services (U.S.A.)
Corporation*

Date: November 6, 2025

## <u>NOTICE TO INTERESTED PARTIES</u>

**TUBOS DE ACERO DE MEXICO, S.A.; TENARIS GLOBAL SERVICES (U.S.A.)**
**CORPORATION v. UNITED STATES**
**CIT Court No. 25-00221**

   I, Gregory J. Spak of the law firm White & Case LLP, hereby certify that on November 6, 2025, pursuant to CIT Rule 3(f), I notified all interested parties who were a party to the proceeding below, by mailing copies of the public version of the foregoing Complaint by certified mail, return receipt requested:

**<u>On behalf of: Borusan Pipe U.S., Inc., PTC Liberty, and Welded Tube USA</u>**
Roger B. Schagrin, Esq.
SCHAGRIN ASSOCIATES
900 7th Street, NW
Suite 500
Washington, DC 20001
Phone: 202-223-1700
Email: rschagrin@schagrinassociates.com

**<u>On behalf of: United States Steel Tubular Products, Inc.</u>**
Thomas M. Beline, Esq.
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20037
tbeline@cassidylevy.com

                /s/ Gregory J. Spak
                Gregory J. Spak

## CERTIFICATE OF SERVICE

I, Gregory J. Spak of the law firm White & Case LLP, hereby certify that on November 6, 2025, copies of the public version of the foregoing Complaint were delivered to the following parties by certified mail, return receipt requested:

**UPON THE UNITED STATES:**
Attorney-in-Charge
International Trade Field Office
U.S. Department of Justice
Commercial Litigation Branch
National Courts Section
Room 346
26 Federal Plaza
New York, NY 10278

Jeanne Davidson
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

**UPON THE DEPARTMENT OF COMMERCE:**
Kelly R. Welsh
General Counsel
U.S. Department of Commerce
Mail Stop 5875 HCHB
14th and Constitution Avenue, NW
Washington DC 20230

John D. McInerney
Chief Counsel
Office of the Chief Counsel for Trade Enforcement and Compliance
International Trade Administration
U.S. Department of Commerce
1401 Constitution Ave., NW
Washington, DC 20230

_____/s/ Gregory J. Spak_____
Gregory J. Spak