**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |  |
|---|---|---|
| TUBOS DE ACERO DE MEXICO, S.A., ET AL., | ) | |
| Plaintiffs, | ) | |
| and | ) | |
| UNITED STATES STEEL CORPORATION, | ) | |
| Consolidated Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES | ) | Consol. Ct. No. 25-00221 |
| Defendant, | ) | |
| and | ) | |
| UNITED STATES STEEL CORPORATION, ET AL., | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| TUBOS DE ACERO DE MEXICO, S.A., ET AL., | ) | |
| Consolidated Defendant-Intervenors. | ) | |

**ORDER**

Upon consideration of the Rule 56.2 motion of Consolidated Plaintiff United States Steel Corporation, supporting memorandum of law, all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

**ORDERED**, that United States Steel Corporation's Rule 56.2 Motion for Judgment on the Agency Record is **GRANTED**; and it is further

**ORDERED**, that the final results of the United States Department of Commerce set forth in *Certain Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42,933 (Sept. 5, 2025), and the accompanying Issues and Decision Memorandum and calculation memoranda, is remanded for disposition in a manner consistent with the opinion of the Court.

Consol. Ct. No. 25-00221

**SO ORDERED.**

Date: _____        Signed:_____
        New York, New York                        Claire R. Kelly, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |
|---|---|
| TUBOS DE ACERO DE MEXICO, S.A., ET AL., <br> Plaintiffs, <br> and <br> UNITED STATES STEEL CORPORATION, <br> Consolidated Plaintiff, <br> v. <br> UNITED STATES <br> Defendant, <br> and <br> UNITED STATES STEEL CORPORATION, ET AL., <br> Defendant-Intervenors, <br> and <br> TUBOS DE ACERO DE MEXICO, S.A., ET AL., <br> Consolidated Defendant-Intervenors. | Consol. Ct. No. 25-00221 |

**CONSOLIDATED PLAINTIFF UNITED STATES STEEL CORPORATION'S
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade (the "Court"), Consolidated Plaintiff United States Steel Corporation hereby moves for judgment on the agency record in the above-referenced action. For the reasons set forth in Consolidated Plaintiff's Memorandum of Law in Support of Their Rule 56.2 Motion for Judgment on the Agency Record, Consolidated Plaintiff requests that this Court hold that the final results of the U.S. Department of Commerce ("Commerce") set forth in *Certain Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42,933 (Sept. 5, 2025), and the accompanying Issues and Decision Memorandum and calculation memoranda, is unsupported by substantial evidence on the administrative record and

otherwise not in accordance with law, and that the Court therefore remand these final results to

Commerce for disposition in a manner consistent with the opinion of the Court.

*      *      *

Respectfully submitted,

/s/James E. Ransdell

James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave. NW, Suite 300
Washington, DC 20037
Phone: (202) 567-2321
Fax: (202) 567-2301
Email: jransdell@cassidylevy.com

*Counsel for United States Steel Corporation*

April 16, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TUBOS DE ACERO DE MEXICO, S.A., ET AL.,<br><br>Plaintiffs,<br><br>and<br><br>UNITED STATES STEEL CORPORATION,<br><br>Consolidated Plaintiff,<br><br>v.<br><br>UNITED STATES<br><br>Defendant,<br><br>and<br><br>UNITED STATES STEEL CORPORATION, ET AL.,<br><br>Defendant-Intervenors,<br><br>and<br><br>TUBOS DE ACERO DE MEXICO, S.A., ET AL.,<br><br>Consolidated Defendant-Intervenors. | Consol. Ct. No. 25-00221<br><br>**NONCONFIDENTIAL VERSION**<br><br>Confidential Information Removed from Brackets on Pages i-ii, 2, 4-7, 11-12, 19-28, and 31-43. |

**MEMORANDUM OF LAW IN SUPPORT OF CONSOLIDATED PLAINTIFF UNITED STATES STEEL CORPORATION'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave. NW, Suite 300
Washington, DC 20037
Phone: (202) 567-2321
Fax: (202) 567-2301
Email: jransdell@cassidylevy.com
*Counsel for United States Steel Corporation*

Dated:   April 16, 2026

*Confidential Information Removed From Brackets*

NONCONFIDENTIAL VERSION

**Table of Contents**

Page

STATEMENT PUURSUANT TO RULE 56.2 .................................................................. 1

    A.   Administrative Determination Under Review ................................................. 1

    B.   Issues Presented ............................................................................................. 2

    C.   Request for Relief .......................................................................................... 2

STATEMENT OF FACTS ............................................................................................ 2

I.    Commerce Relies on CONNUMs to Ensure Probative Price Comparisons .......................... 2

II.   Tenaris' Addition of *Ad Hoc* Basket Categories to the "Threading" Field Distorted the Dumping Comparison ................................................................. 6

III.  Commerce's *Final Results* Fail to Understand or Address the Distortion ........................... 10

SUMMARY OF ARGUMENT ...................................................................................... 12

ARGUMENT ............................................................................................................. 14

I.    Standard of Review ..................................................................................................... 14

II.   Tenaris' Reliance on *Ad Hoc* Basket Categories for Pipe Threading Was Incompatible with Commerce's Statutory Duty to Select a "Fair" Benchmark Sale ........... 15

    A.   Absent a "Fair" Benchmark, Commerce's Dumping Analysis Fails Its Statutory Function   .................................................................................... 15

    B.   Accurate CONNUM Coding Is a Prerequisite for Identifying "Fair" Comparisons ................................................................................................. 17

         1.   CONNUM Codes Represent Physical Characteristics ........................... 17

         2.   Creating an Ad Hoc CONNUM Code Is a Two-Part Assertion—Physical Sameness with All Products Assigned the Same Code; Physical Differences with All Products Assigned Different Codes .................................. 19

    C.   Tenaris Mexico Failed to Provide Information to Substantiate that its *Ad Hoc* CONNUM Codes Permitted Commerce to Identify "Fair" Comparisons .................... 20

         1.   Tenaris Mexico's First Supplemental Questionnaire Response Confirmed that Code [   ] Was Distortive and Failed to Provide any Evidence for Code [   ]   ............................................................................ 21

i

i.    Tenaris' Documentation Established that Ad Hoc Basket Code [      ] Violated the First Rule — Requiring Physical Sameness of Products Assigned the Same Code...................................................................... 21

ii.   Tenaris's First Supplemental Questionnaire Again Omits Documentation Related to Products Coded as [     ] and Fails to Establish Compliance with the First or Second Rule.................................... 24

2.    Tenaris Mexico's Second Supplemental Questionnaire Response Confirmed that Code [     ] Was Distortive and Otherwise Relied on Non-Physical Differences............................................................................................ 25

i.    Even After Commerce's Second Supplemental Questionnaire, Tenaris Failed to Provide Any Documentation Related to Certain Threading Types Assigned Code [     ]........................................................................... 25

ii.   Tenaris' Documentation Established that Ad Hoc Basket Code [     ] Violated the First Rule — Requiring Physical Sameness of Products Assigned the Same Code...................................................................... 26

iii.  Tenaris' Documentation Established that Ad Hoc Basket Codes [     ] and [     ] Violated the Second Rule — Requiring Physical Distinction Among Products Assigned Different Codes ............................. 27

iv.   Distinctions in [
                              ] Are Not Physical Distinctions and Cannot Justify Tenaris' Distortive CONNUM structure....................................................... 28

D.    Despite the Defect in Tenaris Mexico's Reporting, Commerce Took No Corrective Measures; Consequently, the *Final Results* are Unlawful and Unsupported by Substantial Evidence ......................................................................... 29

1.    Commerce's Final IDM Manifestly Fails to Address Tenaris' Noncompliance with the First Rule and Otherwise Relies on Conclusory Assertions      ................................................................................................... 29

2.    Commerce's Additional Analysis Memorandum Confirms the Defects in the Final IDM ............................................................................................... 322

i.    Commerce's Additional Discussion of Threading Types Coded [     ] Is Incomplete and Otherwise Confirms that Physically Different Threading Types Were Assigned the Same Code........................................ 33

ii.   Commerce's Discussion of Threading Types Coded [     ] Fails to Address their Physical Characteristics; Record Documentation Confirms Violation of the First and Second Rules ...................................... 35

III. Commerce's Acceptance of Tenaris' *Ad Hoc* Basket Categories Is Unlawful and Unsupported by Substantial Evidence; On Remand the Court Should Order Commerce to Reconsider Application of Facts Otherwise Available with an Adverse Inference ........................................................................................................... 39

    A.   Commerce's *Final Results* Fail to Address Significant Arguments ............................. 40

    B.   Commerce's Application of the Second Rule in this Administrative Review was Inconsistent and Arbitrary ...................................................................... 411

    C.   The Foregoing Deficiencies in Commerce's Analysis Led it to Overlook Material Gaps in the Administrative Record .............................................................. 42

CONCLUSION................................................................................................................... 43

## Table of Authorities

Page(s)

Statute

19 U.S.C. § 1516a(b)(1)(B) ................................................................................14

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................40

19 U.S.C. § 1675(a)(2)(A) ........................................................................... 15, 39-40

19 U.S.C. § 1677(25) .........................................................................................36

19 U.S.C. § 1677(35)(A) ....................................................................................15

19 U.S.C. § 1677a ..............................................................................................16

19 U.S.C. § 1677b(a) ......................................................................................2, 16

19 U.S.C. § 1677b(a)(1)(B)(i) ........................................................................16, 36

19 U.S.C. §§ 1677b(c) .......................................................................................16

19 U.S.C. §§ 1677b(e) .......................................................................................16

19 U.S.C. § 1677e ..............................................................................................25

19 U.S.C. § 1677e(b)(1)(A) ......................................................................... 8, 10-11

19 U.S.C. § 1677(16)(A) ...............................................................................16, 36

19 U.S.C. § 1677f(i)(3) ......................................................................................40

19 U.S.C. § 1677f(i)(3)(A) .................................................................................15

Tariff Act of 1930 .............................................................................................15

Regulations

19 C.F.R. § 351.411(b) .......................................................................................18

Court Decisions

*Ad Hoc Coal. of Am. SAP Producers v. United States,* No. 23-00010, 2024
WL 1007524 (Ct. Int'l Trade Mar. 1, 2024) ..................................................17

*Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351
(Ct. Int'l Trade 2020) .................................................................................17, 40

*Dongkuk S&C Co., Ltd. v. United States*, 134 F.4th 1320 (Fed. Cir. 2025) ................................. 37

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ............................................. 15

*Ghigi 1870 S.p.A. v. United States*, 547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021) ........................................................................................ 19

*Itochu Bldg. Prod. Co. v. United States*, 2017 WL 2438835 (Ct. Int'l Trade 2017) ........................................................................................ 29

*La Molisana S.p.A. v. United States*, 633 F. Supp. 3d 1266 (Ct. Int'l Trade 2023) ................................................................................ 17, 18

*Loper Bright Ent. v. Raimondo*, 144 S. Ct. 2244 (2024) ................................... 14

*Mannesmannrohren-Werke AG v. United States*, 120 F.Supp.2d 1075 (Ct. Int'l Trade 2000) .................................................................... 37

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ........................................................................................ 15

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ................................................................. 14

*Navneet Educ. Ltd. v. United States*, 2023 WL 9018387 (Ct. Int'l Trade Dec. 29, 2023) ....................................................................... 17

*NEXTEEL Co. Ltd. v. United States*, 355 F.Supp.3d 1336 (Ct. Int'l Trade 2019) ................................................................................ 36, 37

*NMB Sing. Ltd v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ............................... 15

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001) ........................................................................................ 18

*Peer Bearing Co.–Changshan v. United States*, 587 F. Supp. 2d 1319 (Ct. Int'l Trade 2008) .................................................................... 29

*Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944) ................................... 14

*Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) .................................................................... 29

*Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358 (Fed. Cir. 2014) ................................................................................ 18, 38

*Union Steel v. United States*, 713 F.3d 1101 (Fed. Cir. 2013) .................................. 17

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ........................................ 14

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98 (Fed. Cir. 2022) ...................................................................................................17, 38

Administrative Determinations

*Certain Oil Country Tubular Goods From Mexico: Preliminary Results and Recission, In Part, of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 96,638 (Dec. 5, 2024) .................................................................9

*Certain Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42,933 (Sept. 5, 2025) ...........................................................................................1, 12

Other Administrative Materials

ITA Policy Bulletin 92.2 (July 29, 1992) ...................................................18

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1..........................................................................16

Other Legislative Materials

USCIT Rule 56.2 .............................................................................................1

NONCONFIDENTIAL VERSION

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff United States Steel Corporation ("U. S. Steel") submits the following memorandum of law in support of its motion for judgment on the agency record. A fundamental component of the antidumping analysis conducted by the U.S. Department of Commerce ("Commerce") is the assignment of "Control Numbers" or "CONNUMs" to products sold in each market. This allows Commerce to compare the price of physically similar products in each market. In this administrative review, Tenaris changed the "Threading" field of Commerce's CONNUM structure by introducing *ad hoc* codes. U. S. Steel submitted documentation and argument establishing that these *ad hoc* codes distorted the antidumping comparison by grouping physically dissimilar thread types under basket categories. This deficiency persisted despite Commerce providing multiple supplemental opportunities to cure. Yet, instead of acknowledging the gap in the administrative record and rejecting Tenaris Mexico's *ad hoc* additions to the Threading field, Commerce proceeded to use Tenaris Mexico's proposed modifications in the dumping calculation. This acceptance by Commerce, and resulting determination not to rely upon facts otherwise available or apply an adverse inference, was arbitrary, unsupported by substantial evidence on the record, and otherwise contrary to law.

## STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determination Under Review

This action contests the final results of Commerce's first antidumping administrative review in the OCTG from Mexico antidumping proceeding. *Certain Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42,933 (Sept. 5, 2025) (P.R. 136), and accompanying Issues and Decision Memorandum (P.R. 134) ("Final IDM") and final calculation memoranda (C.R. 367) (together collectively, the "*Final Results*").

*Confidential Information Removed From Brackets*

### B. Issues Presented

1.  Where Tenaris Mexico introduced two *ad hoc* product characteristic codes for OCTG threading and failed to substantiate the physical characteristics of the basket of different threading types grouped under each new CONNUM code, was Commerce's reliance on Tenaris Mexico's threading codes supported by substantial evidence?

2.  Where Tenaris Mexico thrice failed to explain and document how the products to which Tenaris Mexico assigned *ad hoc* threading codes were both physically similar to other products assigned the same threading code and physically distinct from products assigned different threading codes, did a gap exist in the administrative record?

### C. Request for Relief

Consolidated Plaintiff requests that this Court hold Commerce's *Final Results* unlawful and otherwise unsupported by substantial evidence to the extent challenged herein, and remand Commerce's determination with instructions to reject the *ad hoc* codes ([          ]) that Tenaris Mexico introduced into the Threading field of its product characteristic reporting and apply facts otherwise available with an adverse inference with respect to the threading characteristics of products assigned *ad hoc* code [          ].

## STATEMENT OF FACTS

### I. Commerce Relies on CONNUMs to Ensure Probative Price Comparisons

Dumping occurs when a company sells a product in the United States at a price that is lower than a fair benchmark value, termed "normal value." The statutorily preferred methodology for making this analysis is to compare the price at which a given product was sold in the United States to the price at which a materially identical product was sold in the respondent's home market. *See* 19 U.S.C. § 1677b(a). Commerce utilizes "Control Numbers" or CONNUMs (described in further detail below) to determine which product sold in the home market is most like a given product sold in the U.S. market. The assignment of accurate CONNUMs is fundamental to Commerce's dumping calculation. If done correctly, it enables

Commerce to benchmark each U.S. price against the price for a physically similar product sold in the home market. If done incorrectly, it causes Commerce to benchmark U.S. prices against the price for a completely different product, an exercise that fundamentally fails to answer the statutory question—was the U.S. price below a fair benchmark?

Here, consistent with Commerce's usual practice, its process of categorizing OCTG product sales began with the initial questionnaire, which instructed Tenaris Mexico to assign a CONNUM to each OCTG sale in both the U.S. and Mexican markets. Initial Questionnaire (Mar. 12, 2024) ("Initial Questionnaire") (P.R. 14) at B-8, C-6. A single CONNUM is a concatenation of several different fields. Each field corresponds to a distinct category of physical characteristics that is relevant to the product at issue; here, OCTG. *See id.* at B-8 to B-12, C-6 to C-11. Because CONNUMs are used to ensure fair comparisons between sales in the United States and Mexico, the CONNUM structure is identical for both markets.

For OCTG, each CONNUM concatenates ten separate fields. In hierarchical order of importance these are: (1) Seamless or Welded; (2) Type; (3) Grade; (4) Coupling; (5) Upset End; (6) Threading; (7) Nominal Outside Diameter; (8) Length; (9) Heat Treatment; and (10) Nominal Wall Thickness. *Id.* Within each of the ten CONNUM fields, a respondent will select from among a list of numerical codes. *See id.* Each numerical code represents a commercially significant physical distinction within that field's overarching category.  *See id.*

Most relevant here, respondents are instructed to report one numerical code within the Threading field that establishes whether the ends of the OCTG pipe are threaded and, if so, the type of threading applied. *Id.* at B-9 to B-10, C-8. The five default numerical codes associated with the Threading field are reproduced in the following excerpt from Commerce's initial questionnaire:

*Confidential Information Removed From Brackets*

**FIELD NUMBER 3.6:**      **Threaded**

      FIELD NAME:      THREADU

      DESCRIPTION:      Whether or not ends are threaded, and type of threading

                     10 = Not threaded
                     40 = Short thread
                     45 = Long thread
                     50 = Buttress thread
                     55 = Extreme Line/Integral Joint Thread

*Id.* at C-8.

The first default numerical code (10) represents unthreaded OCTG. The remaining four default numerical codes (40, 45, 50, 55) each represent a different type of American Petroleum Institute ("API") standard threading described in the "5CT Specification." *See, e.g.*, [

]. As can be seen from the following API 5CT Specification excerpts, one can easily see the physical difference between these default thread types, *e.g.*, a "short" versus a "buttress" thread. *See* [                                    ].

4

*Confidential Information Removed From Brackets*

NONCONFIDENTIAL VERSION

Zooming in on the [                               ], for example, it helps to also explain some

terminology. If we look at the [                                                    ], there are

[                                                                    ]. [

]. The shape of both the [

] can vary for different threading types, and it is the shape of these [                    ]

that physically distinguishes one threading type from another.

5

*Confidential Information Removed From Brackets*

It is theoretically possible to introduce additional numerical codes within the Threading field, but any nonstandard numerical code must be supported by factual information on the administrative record. Therefore, Commerce's initial questionnaire instructs that respondents should "describe in detail what distinguishes {any additional} type of thread from each of the other additional types and from each of the {five default} types listed above, and provide supporting documentation to evidence such differences" "{f}or each additional type of thread." Initial Questionnaire (P.R. 14) at B-10, C-8.

## II.  Tenaris' Addition of *Ad Hoc* Basket Categories to the "Threading" Field Distorted the Dumping Comparison

A respondent can distort Commerce's dumping calculation by reporting CONNUM information that does not accurately represent products' physical characteristics. For example, assigning the same code to two products with a different physical characteristic may cause Commerce to benchmark the U.S. price against a physically dissimilar product. Conversely, assigning different codes to two products that share a given physical characteristic may cause Commerce to disregard a viable benchmark for a fair U.S. price. Both types of error are implicated here and distorted Commerce's *Final Results*.

Tenaris Mexico coded some of its home market and U.S. OCTG sales using default Threading codes. *See* Tenaris Mexico Initial Sections BCE Questionnaire Response (Apr. 26,

*Confidential Information Removed From Brackets*

2024) (C.R. 44-123) ("Tenaris Mexico BCE QR") at B-19, C-19, Exhibit C4. Tenaris Mexico also created two additional, nonstandard Threading codes: [     ] was a basket category for all threading [          ] Tenaris, whereas [     ] was a second basket category for all threading [          ] third parties. *Id.* Tenaris Mexico assigned these nonstandard codes to certain home market and U.S. OCTG sales. *Id.* However, contrary to the instructions in Commerce's initial questionnaire, Tenaris Mexico did not describe what physically distinguished the thread types falling within each basket category from each of the five default Threading codes. *See id.* Also contrary to Commerce's initial questionnaire instructions, Tenaris Mexico did not describe what physically distinguished the thread types coded [     ], the first nonstandard basket category, from the thread types coded [     ], the second nonstandard basket category. *See id.* Finally, Tenaris Mexico did not establish that the thread types within each basket category were physically similar to the other thread types coded within that same basket category. *See id.* Indeed, initially, Tenaris Mexico did not even provide a list of which thread types were coded within each of the nonstandard basket categories.

U. S. Steel submitted comments describing the deficiencies in Tenaris Mexico's reporting and requesting, *inter alia*, that Commerce solicit the missing Threading information. Petitioners' Initial Sections BCE Questionnaire Response Deficiency Comments (May 24, 2024) (C.R. 147) at 6-7. Commerce thereafter issued a supplemental questionnaire to Tenaris Mexico requesting that, as originally instructed, "for each additional type of thread, describe in detail what distinguishes that type of thread from each of the other additional types and from each of the existing threading types, and provide supporting documentation to document such differences," in addition to several related inquiries. Commerce First Supplemental Questionnaire (Aug. 6, 2024) (C.R. 150) at 8-9.

Over a month later, after having received four separate extensions of time, Tenaris Mexico submitted a response to this portion of Commerce's supplemental questionnaire. *See* Tenaris Mexico First Supplemental Questionnaire Response (Sept. 18, 2024) (C.R. 193-284) at 13-20, Ex. Supp. BC6. Again, Tenaris Mexico failed to provide even a single document establishing that the products coded under Tenaris Mexico's additional, nonstandard Threading codes were both physically different from products assigned all other numerical codes, and physically similar to products assigned the same numerical code. *See id.* Tenaris Mexico's narrative explanation was limited to a statement indicating that Tenaris Mexico proposed to code together "all proprietary connections from third (*i.e.*, unaffiliated) parties." *Id.* at 14. The only descriptive explanation Tenaris Mexico provided to justify this grouping was that "{i}n terms of their physical characteristics (*i.e.*, threading), these connections are not threaded within TAMSA or Tenaris-related facilities and are sent to thread at a third party and when finished invoiced to the customer." *Id.* at 14. But this quirk of Tenaris Mexico's production flow is not a characteristic that is physically discernible in the final product.

Before Commerce's *Preliminary Results*, Plaintiff observed that, even after two specific requests from Commerce, Tenaris Mexico had failed to place factual information necessary to substantiate its use of nonstandard Threading codes on the administrative record. Petitioners' Pre-Preliminary Comments (Oct. 22, 2024) (C.R. 323) at 11-17. Plaintiff asked that Commerce neutralize the distortion caused by Tenaris Mexico's unsupported Threading reporting by applying facts otherwise available with an adverse inference ("AFA") to products assigned a nonstandard Threading code. *See id.*; 19 U.S.C. § 1677e(b)(1)(A). Plaintiff also requested that Commerce obtain supplemental information from Tenaris Mexico concerning the breakout of thread types lumped together under each nonstandard Threading code. *See* Petitioners'

NONCONFIDENTIAL VERSION

Comments on Deficiencies in Tenaris' First Supplemental Questionnaire Response (Oct. 17, 2024) (C.R. 322) at 3-6. Commerce's *Preliminary Results* did not address these issues. *See Certain Oil Country Tubular Goods From Mexico: Preliminary Results and Recission, In Part, of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 96,638 (Dec. 5, 2024) (P.R. 95), and accompanying Issues and Decision Memorandum (Nov. 29, 2024) ("Prelim IDM") (P.R. 90) and Preliminary Analysis Memorandum (Nov. 29, 2024) (C.R. 326) (together collectively, the "*Preliminary Results*").

Instead, after the *Preliminary Results*, Commerce issued a second supplemental questionnaire, yet again requesting that Tenaris Mexico, "describe in detail what distinguishes {any additional} type of thread from each of the other types of…threading" as Tenaris Mexico had not "fully described the {proposed} thread types" in its first two responses. Commerce Second Supplemental Questionnaire (Feb. 5, 2025) (C.R. 336) at 4. Commerce also requested that Tenaris Mexico explain "in detail" why its proposed thread type groupings were appropriate. *Id.*

Tenaris Mexico's response asserted that that Tenaris Mexico's nonstandard, basket category Threading codes were "{c}onsistent with its approach in the investigation, which was verified and approved by Commerce." Tenaris Mexico Second Supplemental Questionnaire Response (Feb. 19, 2025) (C.R. 337-347) at 1. Yet, Tenaris Mexico did not provide the information repeatedly requested by Commerce in this review. It otherwise reasserted that the nonstandard basket category codes are necessary "due to the different physical characteristics in the products," but failed to describe what those different physical characteristics are or provide any documentation for certain affected thread types. *See id.* at 3-6.

9

NONCONFIDENTIAL VERSION

**III.  Commerce's *Final Results* Fail to Understand or Address the Distortion**

Plaintiff's administrative case brief argued that Tenaris Mexico had been provided repeated opportunities to provide explanation and documentation in response to the exact same question; yet, Tenaris Mexico failed to provide even the bare minimum to substantiate its addition of nonstandard basket category Threading codes or its treatment of the thread types assigned to the basket categories as both physically similar to other thread types assigned the same code and physically distinct from thread types assigned a different code.  Petitioners' Case Brief (Mar. 10, 2025) (C.R. 350) at 9-21. Plaintiff argued that Tenaris Mexico's nonstandard reporting was unreasonable and distorted Commerce's model matching program. *Id.* Plaintiff again requested that Commerce apply AFA, pursuant to 19 U.S.C. § 1677e(b)(1)(A), to fill the gap in the administrative record left by Tenaris Mexico's continued failure to substantiate its Threading reporting with record evidence. *Id.* at 21-24.

In particular, Plaintiff argued the following:

a)      Commerce's questionnaire instructions and settled practice require respondents to justify the addition of new CONNUM codes based on physical distinctions, which is why Commerce added specific instructions to ensure that any proposed additions to the default Threading codes would be supported by evidence establishing that thread types categorized thereunder were physically similar to each other and physically different from thread types assigned all other Threading codes. *Id.* at 9-11.

b)      After disclosing the addition of new Threading codes in response to Commerce's initial questionnaire, Tenaris Mexico persistently failed to provide evidence that the new codes had been used to categorize thread types based on commercially significant physical differences (from thread types categorized under other Threading

codes) and similarities (with thread types categorized under the same Threading code). *Id.* at 12-21.

        c)     Tenaris Mexico failed to provide adequate documentation or explanation of the physical characteristics of third-party proprietary threads. *Id.* at 17-21. Indeed, Tenaris Mexico failed to provide <u>any</u> documentation for some thread types. *Id.* at 17-18. What documentation Tenaris Mexico did submit merely reinforces the conclusion that its approach of lumping thread types together in nonstandard basket categories yields distortive comparisons unrelated to the products' physical characteristics. *Id.* at 18-21. For example, it demonstrates that certain thread types assigned to the new codes are [                                    ] and that certain thread types categorized under the first new code are [

                    ]. *Id.* It also demonstrates that the thread types categorized under each of the new codes are [

              ]. *Id.*

Commerce's *Final Results* continued to accept Tenaris Mexico's nonstandard basket category Threading codes. Final IDM at 5. Commerce did not, however, discuss any of the evidence (or absence thereof) on the record of this administrative review, instead relying solely on the conclusory statement that "The record in this review demonstrates there are differences in physical characteristics between the two different categories of proprietary thread types and standard thread types, making them unique and not interchangeable with each other." *Id.* Commerce offered no explanation for reaching this conclusion with respect to certain "proprietary" thread types that were [

11

]. *See id.*

Moreover, Commerce overlooked half of Plaintiff's argument, which was not limited to whether each category was physically distinct from the rest, but also concerned whether the thread types being lumped together under each nonstandard basket category were physically distinct *from one another*, such that coding them as physically identical would not be distortive. *See* Petitioners' Case Brief at 11. Commerce never addressed this issue. *See* Final IDM at 5.

Similarly, Commerce found that "no necessary information {is} missing from the record that would warrant application of facts available under section 776(a) of the Act," but espoused this conclusion without having discussed any of Tenaris Mexico's questionnaire responses or explained how the information provided constituted a complete response to the questions posed. Final IDM at 5. Again, Commerce failed to meaningfully engage with the substance of Plaintiff's argument. *See* Petitioners' Case Brief at 21-24.

Commerce's *Final Results* calculated a weighted average *ad valorem* dumping margin of 26.10 percent for Tenaris Mexico. 90 Fed. Reg. at 42,934. Had Commerce refused to accept Tenaris Mexico's unsupported reporting for the Threading field, Commerce would have calculated a higher dumping margin.

## SUMMARY OF ARGUMENT

The logic, structure, and plain text of the antidumping statute require Commerce's dumping analysis to measure each U.S. sale against a benchmark sale for a physically similar product, to determine both *whether* and *how much* dumping has occurred. (**Section II.A**) Commerce's longstanding practice is to implement this mandate through the assignment of a CONNUM or Control Number to every sale of subject merchandise (in the U.S. market) and foreign like product (in the home market). The OCTG CONNUM has ten fields, each

12

corresponding to an overall physical characteristic (*e.g.*, Field 6: Threading) and every code within a given CONNUM field corresponds to a different possible manifestation (*e.g.*, plan end pipe versus API buttress threading). Here, Tenaris Mexico proposed to modify the Threading field by adding new *ad hoc* codes. (**Section II.B.1**)

For Commerce to accept Tenaris Mexico's proposed modifications, the record must establish that the new *ad hoc* Threading codes will continue to follow two rules. *First*, the Threading of all products assigned a given Threading code is physically similar to the Threading of all other products assigned that same Threading code. *Second*, the Threading of all products assigned a different Threading code are physically different from the Threading of all products assigned different Threading codes. (**Section II.B.2**) Commerce gave Tenaris Mexico several opportunities to create an administrative record necessary to establish that its proposed modifications complied with both the first and second rules. However, Tenaris Mexico was never able to do so. (**Section II.C**)

Yet, instead of acknowledging the gap in the administrative record and rejecting Tenaris Mexico's unsubstantiated *ad hoc* reworking of the Threading codes, Commerce proceeded to use Tenaris Mexico's proposed modifications in the dumping calculation. This was unlawful insofar as subjecting U.S. sales to comparison against benchmarks for products with unknown physical characteristics fails to honor the statutory mandate to ensure a "fair comparison."  Commerce's acceptance of Tenaris Mexico's proposed additions was also unsupported by substantial evidence insofar as Commerce failed to address whether Tenaris Mexico had satisfied the First Rule (*i.e.*, physical sameness within a given Threading code) and Commerce's conclusions with respect to the Second Rule (*i.e.*, physical difference between Threading codes) were contradicted by record evidence. (**Section II.D**)

NONCONFIDENTIAL VERSION

The foregoing defects render Commerce's *Final Results* unlawful and unsupported by substantial evidence. (**Section III**) Plaintiffs ask this Court to remand Commerce's *Final Results* to address these defects, reject Tenaris Mexico's proposal to introduce new *ad hoc* Threading codes, and recalculate a dumping margin that is not distorted by the new *ad hoc* Threading codes.

## ARGUMENT

### I.    Standard of Review

This Court will "hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  To determine whether Commerce's interpretation of a statue is "in accordance with law," *Loper Bright Ent. v. Raimondo*, 144 S. Ct. 2244, 2271 (2024), instructs courts reviewing administrative determinations to discern the statute's "best meaning" by "deploying its full interpretive toolkit."  Under this general rule, courts may not "defer" to the administrative interpretation, although the "thoroughness" and "validity" of Commerce's legal analysis may confer the "power to persuade," *see id.* at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Next, the Court's substantial evidence review examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  Substantial evidence is "more than a scintilla" and "must take into account whatever in the record fairly detracts from its weight." *Id*. at 477, 488.  The substantial evidence standard also requires Commerce to "articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983).  Substantial evidence review essentially requires the Court to

14

determine whether the evidence and reasonable, evidence-based inferences support Commerce's findings. *See Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

In addition, Commerce's determination "must include 'an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties who are parties to the investigation or review.'" *NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009) (quoting 19 U.S.C. § 1677f(i)(3)(A)).  Where "the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation and explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## II.    Tenaris' Reliance on *Ad Hoc* Basket Categories for Pipe Threading Was Incompatible with Commerce's Statutory Duty to Select a "Fair" Benchmark Sale

### A.    Absent a "Fair" Benchmark, Commerce's Dumping Analysis Fails Its Statutory Function

The Tariff Act of 1930, as amended, aims to relieve U.S. industries injured by dumping. Dumping occurs when "the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). Commerce's statutory obligation in an antidumping administrative review is to determine the margin or amount of dumping for each entry of subject merchandise in the United States during the period of review. 19 U.S.C. § 1675(a)(2)(A). Export prices and constructed export prices (together collectively, "U.S. prices") are the subject analyzed. These are measured against a benchmark—normal value—to ascertain the amount of dumping (if any) that occurred.

Because this benchmarking exercise would reveal nothing meaningful about U.S. prices were the benchmark itself flawed, the normal value statute expressly requires "a fair

15

comparison." 19 U.S.C. § 1677b(a).[1] "In order to achieve a fair comparison," *id.* § 1677b(a), the statutorily preferred benchmark is "the price at which the foreign like product is first sold…for consumption in the exporting country…in the ordinary course of trade…," *id.* § 1677b(a)(1)(B)(i); *see also* Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, vol. 1, 820 (describing this as "the preferred method for identifying and measuring dumping").[2]  In turn, the preferred "foreign like product" is "{t}he subject merchandise and other merchandise which is *identical in physical characteristics…*" 19 U.S.C. § 1677(16)(A) (emphasis supplied); *see also* SAA at 820 (noting that "the term 'foreign like product' is substituted for 'such or similar merchandise'" without "intend{ing} to affect the meaning" and otherwise characterizing "select{ing} and adjust{ing} normal value to avoid or adjust for differences between sales which affect price comparability" as how to "achieve…a fair comparison"); SAA at 842 ("In determining the comparability of sales…Commerce will consider factors it deems appropriate, such as the physical characteristics of the merchandise…"). Taken together, the statute makes sales of physically identical products in the exporting market the archetypical normal value benchmark for determining whether a given U.S. sale has been dumped.

---

[1] Similar language does **not** appear in the U.S. price section of the statute. *See* 19 U.S.C. § 1677a. That omission comports with the logic of the antidumping statute, which takes U.S. prices as-is. The point is to test *all* U.S. prices—whatever their character—against *fair* benchmarks. By doing so, Commerce reveals whether each U.S. price was fairly traded (*i.e.*, at or above a fair benchmark) or unfairly traded (*i.e.*, below a fair benchmark).

[2] Different methodologies not relevant here apply in cases involving, *e.g.*, non-market economy countries and non-viable home markets. *See* 19 U.S.C. §§ 1677b(c), (e).

NONCONFIDENTIAL VERSION

**B.    Accurate CONNUM Coding Is a Prerequisite for Identifying "Fair" Comparisons**

1.    *CONNUM Codes Represent Physical Characteristics*

To ascertain which sales in each market are physically identical (or similar) in commercially relevant respects, Commerce relies on "control numbers" or CONNUMs. Each CONNUM field addresses a physical characteristic. It is well-settled in agency practice, regulations, and judicial determinations that each code within a given CONNUM field (*e.g.*, Threading) reflects physical differences among subject merchandise. *E.g.*, *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 102, 107–08 (Fed. Cir. 2022) ("A particular CONNUM roughly corresponds to a particular product defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding. Commerce defines CONNUMs by identifying key physical characteristics of the subject merchandise that are commercially meaningful in the United States marketplace and have an impact on costs of production.…CONNUM-specific data is essential for the accurate calculation of costs due to the variations in physical characteristics of the merchandise.") (emphasis supplied, internal quotations omitted); *Union Steel v. United States*, 713 F.3d 1101, 1104 (Fed. Cir. 2013) (When averaging normal values in the dumping analysis, "Commerce…group{s} together sales of merchandise for purpose of price comparability based upon physical characteristics, referred to as "models," and assigns a control-number called 'CONNUM.'"); *Ad Hoc Coal. of Am. SAP Producers v. United States*, No. 23-00010, 2024 WL 1007524, at *11 (Ct. Int'l Trade Mar. 1, 2024) ("ITA defines product control numbers in order to capture those physical characteristics that have a meaningful impact on costs or prices."); *La Molisana S.p.A. v. United States*, 633 F. Supp. 3d 1266, 1269 (Ct. Int'l Trade 2023) ("CONNUMs are comprised of digits, and each digit is a "code" for a physical characteristic of the product."); *Navneet Educ. Ltd. v. United States*, 2023 WL 9018387, at *7 (Ct. Int'l Trade Dec. 29, 2023) ("Federal regulations require the agency

to 'consider only differences in variable costs associated with the physical differences.'")
(quoting 19 C.F.R. § 351.411(b)); *see also* ITA Policy Bulletin 92.2 (July 29, 1992) (prohibiting
ITA from attributing price or cost differences related to "extraneous factors" to physical
differences). Here, consistent with this overarching understanding of how CONNUMs work,[3]
Commerce added specific instructions to the Threading field at Petitioners' request, requiring
respondents to supply evidence justifying the creation of new codes by reference to actual
physical characteristics. *See* Initial Questionnaire (P.R. 14) at B-10, C-8.

Minor physical differences may be disregarded, "if those minor differences are not
commercially significant." *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372,
1384 (Fed. Cir. 2001). Ascertaining whether differences are indeed commercially insignificant
"is a fact-intensive inquiry." *La Molisana*, 633 F. Supp. 3d at 1271. Like all factual inquiries, the
administrative record must be adequate to facilitate the analysis. "{R}espondents {must} provide

---

[3] Importantly, and as U. S. Steel argued in its case brief in the underlying proceeding, Commerce
denotes the commercially significant physical differences through individual codes in each
CONNUM field, and expects production costs to vary accordingly—not the other way around.
"{P}rice and cost differences alone are an insufficient basis for changing {Commerce's} model
match methodology." *SAP Producers*, 2024 WL 1007524, at *7. When respondents have
reported data based on considerations other than physical differences, Commerce has rejected
such attempts as untethered to "physical characteristics that would drive costs" and been
affirmed by the Federal Circuit. *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358,
1366 (Fed. Cir. 2014) (affirming Commerce's rejection of respondent's reporting where the
respondent "argued that several variables other than physical characteristics accounted for the
cost differences between the CONNUM pairs, including whether the CONNUM (1) was
produced at a certain factory (because one factory is more efficient than the other); (2) generated
more or less waste; (3) required more or less colors, ink, or solvents; (4) was produced in smaller
or larger quantities; (5) was produced off-line or on-line; and (6) required transparent or colored
bags" and Commerce nevertheless "maintained its position that allocating costs based on
physical characteristics is most certainly the primary factor in a cost analysis" and concluding
that "Commerce in fact acknowledged {respondent}'s argument that its conversion costs varied
because of, inter alia, whether a CONNUM was produced in larger or smaller quantities, but
properly determined that production quantities were not physical characteristics that would drive
costs.") (emphasis supplied, internal quotations omitted).

18

a compelling reason to change the model-match criteria by presenting their proposed modifications and supporting evidence to Commerce during the administrative process." *La Molisana*, 633 F. Supp. 3d at 1272. This is necessary so that Commerce may "ma{k}e findings on the proposed modifications to the methods based on substantial record evidence." *Ghigi 1870 S.p.A. v. United States*, 547 F. Supp. 3d 1332, 1334 (Ct. Int'l Trade 2021).

2. *Creating an* Ad Hoc *CONNUM Code Is a Two-Part Assertion—Physical Sameness with All Products Assigned the Same Code; Physical Differences with All Products Assigned Different Codes*

Given that Commerce's dumping margin calculation program relies on CONNUMs to match physically similar products for benchmarking purposes, a respondent distorts Commerce's dumping calculation by reporting CONNUM information that does not accurately represent products' physical characteristics. *See, e.g.*, Final Analysis Memorandum (C.R. 367) at Attachment D, PDF p. 326. To begin with, Commerce may erroneously test a U.S. sale against a home market benchmark for a physically different product if the two products sold were incorrectly assigned the same CONNUM code. Equally problematic, Commerce may erroneously fail to test a U.S. sale against a home market benchmark for a physically similar product if the two products sold were incorrectly assigned different CONNUM codes. To avoid this, all CONNUM codes assigned to all products in the home and U.S. markets must be true and consistent representations of each product's physical characteristics.

As applied to this case, Tenaris Mexico could not sustain its proposed addition of two new Threading codes **unless** the administrative record substantiates the following factual propositions:

For proposed *ad hoc* Threading code [    ]:

1. *First Rule*: Physical differences among the various different thread forms grouped under code [    ] are insignificant; and

19

Confidential Information Removed From Brackets

2. *Second Rule*: Each of the various thread forms assigned Threading code [      ] are physically different from all other thread forms assigned other Threading codes.

For proposed *ad hoc* Threading code [      ]:

1. *First Rule*: Physical differences among the various different thread forms grouped under code [      ] are insignificant; and

2. *Second Rule*: Each of the various thread forms assigned Threading code [      ] are physically different from all other thread forms assigned other Threading codes.

As explained below, Tenaris Mexico failed to substantiate the foregoing propositions of fact, which are necessary for Commerce to reasonably and lawfully adopt Tenaris Mexico's proposed approach.

### C.   Tenaris Mexico Failed to Provide Information to Substantiate that its *Ad Hoc* CONNUM Codes Permitted Commerce to Identify "Fair" Comparisons

Tenaris Mexico added code [      ] to the Threading field, a basket category for <u>all</u> threading [                                          ] Tenaris. Tenaris also introduced [      ] to the Threading field, a second basket category for <u>all</u> threading [

] third parties. Sections B and C of Commerce's initial questionnaire <u>each</u> instructed Tenaris Mexico to "describe in detail what distinguishes {any additional} type of thread from each of the other additional types and from each of the types listed above, and provide supporting documentation to evidence such differences" "{f}or each additional type of thread." Tenaris Mexico BCE QR (C.R. 44-123) at 19.  But Tenaris Mexico offered no description of the physical characteristics of the various types of thread encompassed within each new basket category, nor did Tenaris' initial questionnaire response provide a single document establishing how threading assigned to each code was physically distinct from existing codes under the Threading field.

20

*Confidential Information Removed From Brackets*

1. *Tenaris Mexico's First Supplemental Questionnaire Response Confirmed that Code [     ] Was Distortive and Failed to Provide any Evidence for Code [     ]*

Commerce's first supplemental questionnaire recognized this glaring omission and instructed Tenaris Mexico, in relevant part, as follows:

> You have proposed to add nonstandard threading codes (Field 3.7, THREADH/U) which merely reflect differences in [                                      ]. Specifically, you added code [     ] for [                                      ] and code [    ] for [                                   ]. Commerce's Initial Questionnaire instruct, "{f}or each additional type of thread, describe in detail what distinguishes that type of thread from each of the other additional types and from each of the types listed above, and provide supporting documentation to evidence such differences."
>
> A. As originally instructed, if you intend to introduce nonstandard threading codes in Field 3.7 THREADH/U, then for each additional type of thread, describe in detail what distinguishes that type of thread from each of the other additional types and from each of the existing threading types, and provide supporting documentation to document such differences.

Commerce's First Supplemental Questionnaire (C.R. 150) at Q.12.A. Tenaris Mexico's response continued to overlook code [     ] and what documentation Tenaris Mexico did provide merely confirms that proposed code [     ] encompasses [                                  ], including "the [                          ] and the [

                                                     ]." Tenaris Mexico's First Supplemental Sections B&C Questionnaire Response (Sept. 18, 2024) (C.R. 193-284) at 14 ("Tenaris 1SB/CQR").

i. *Tenaris' Documentation Established that Ad Hoc Basket Code [     ] Violated the First Rule — Requiring Physical Sameness of Products Assigned the Same Code*

The First Rule, requiring physical sameness among products assigned the same code, was manifestly violated. Diagrams of Tenaris's [                     ] demonstrate that the various thread types Tenaris Mexico has lumped together under code [

                                                     ].  Three examples illustrate the problem.

21

*Confidential Information Removed From Brackets*

NONCONFIDENTIAL VERSION

*First*, several [

]. *See*

Tenaris 1SB/CQR (C.R. 193-284) at Ex. Supp. BC6.

*Second*, other [

]. *See id*.

22

*Confidential Information Removed From Brackets*

NONCONFIDENTIAL VERSION

*Third,* still other [

]. *See id.*



Each of these [

]. Indeed, Tenaris itself reports that [                    ] differ

greatly from [                    ]. Tenaris 1SB/CQR (C.R. 193-284) at 16. Yet, Tenaris

assigned code [    ] to all [        ] varieties, thus introducing distortion into Commerce's margin

program, causing the program to erroneously treat [                    ] Threading types as

physically identical for purposes of identifying fair benchmark comparisons. Tenaris' reporting

violates the First Rule.

In contrast to the many different threading varieties lumped together within Tenaris' *ad hoc* basket category, Commerce's default Threading codes provide different codes for physically distinct products, as can be seen below:



Notably, Commerce's default Threading hierarchy includes multiple codes *despite* every default Threading type (40, 45, or 50) having the *same* [                                    ], *i.e.*, [

                                    ]. *See* Tenaris 1SB/CQR (C.R. 193-284) at Ex. Supp. BC6. Simply put, [                                                    ] does not render physically dissimilar products identical. Yet, Tenaris has coded [

                                    ] CONNUM code. Plainly, this reporting distorts both the model matching program and Tenaris Mexico's cost reporting.

      ii.   *Tenaris's First Supplemental Questionnaire Again Omits Documentation Related to Products Coded as [      ] and Fails to Establish Compliance with the First or Second Rule*

As regards proposed code [      ], Tenaris Mexico's first supplemental questionnaire response again failed to provide even a single document establishing any physical difference between the thread type or types coded [      ] and thread types assigned other codes under field THREADH/U.  Tenaris Mexico's narrative explanation was also limited to the following:

---

4 Note that while the CONNUM code hierarchy uses the terminology "short thread" (THREADH/U 40) and "long thread" (THREADH/U 45), each of these refers to a [
      ]. *See, e.g.*, Tenaris AQR at Ex. A-35 [

                                    ]).

*Confidential Information Removed From Brackets*

NONCONFIDENTIAL VERSION

> TAMSA included in code [   ] all proprietary connections from third (*i.e.*, unaffiliated) parties. In terms of their physical characteristics (*i.e.*, threading), these connections are not threaded within TAMSA or Tenaris-related facilities and are sent to thread at a third party and when finished invoiced to the customer.

Tenaris Mexico 1SB/CQR (C.R. 193-284) at 14.

> As explained above, code [   ] was used for [                                           ].
> As Tenaris [         ] manufacture these (they are [                                 ])
> and does [                          ], TAMSA coded it separate from, [
>                    ], based on [
>                    ].

Tenaris Mexico 1SB/CQR (C.R. 193-284) at 18. None of the foregoing constitutes record

evidence of how third-party proprietary threads are <u>physically</u> distinct from all of the other

thread types covered by other Threading codes, while also being physically identical to one

another.

      2.    *Tenaris Mexico's Second Supplemental Questionnaire Response Confirmed that Code [    ] Was Distortive and Otherwise Relied on Non-Physical Differences*

            i.   *Even After Commerce's Second Supplemental Questionnaire, Tenaris Failed to Provide <u>Any</u> Documentation Related to Certain Threading Types Assigned Code [    ]*

Recognizing that it would be arbitrary for Commerce to permit the creation of new

Threading codes based on the foregoing, and although not required by 19 U.S.C. § 1677e,

Commerce gave Tenaris Mexico a <u>third</u> chance to correct its reporting in a post-preliminary

supplemental questionnaire.  Commerce instructed Tenaris as follows:

> You do not seem to have fully described the [                              ] thread types reported under code [   ]. As originally instructed, for each type of [
>          ] threading, describe in detail what distinguishes that type of thread from each of the other types of [                     ] threading, from each of the preexisting threading types, from each of the [                    ] threading types.
>
> Provide catalogues for each thread type reported under code [   ].
>
> Explain in detail why it is appropriate to report each of the various types of [                        ] threading under a single code.

NONCONFIDENTIAL VERSION

>Explain in detail why it is appropriate to report each of the various types of [                    ] threading under a single code.

>Explain in detail why it is appropriate to report [                    ] threading under a separate code from [                ] threading.

Post-Preliminary Supplemental Questionnaire to Tenaris Mexico (Feb. 5, 2025) (C.R. 336) at 4.

As an initial matter, Tenaris Mexico's response failed to provide documentation for

[                        ] covered by code [    ], and Tenaris Mexico provided no narrative

description whatsoever. *See* Tenaris Mexico's Response to Post-Preliminary Supplemental

Questionnaire (Feb. 19, 2025) (C.R. 337-347) at 3 ("Tenaris Post-Prelim SQR"). Tenaris Mexico

made no representation that it attempted to obtain this information from its supplier. *See id.*

>ii.    *Tenaris' Documentation Established that Ad Hoc Basket Code [    ] Violated the First Rule — Requiring Physical Sameness of Products Assigned the Same Code*

As with Tenaris's *ad hoc* basket code [    ], under which Tenaris combined all

[                                        ], *see* **Section II.C.1.i**, *supra*, Tenaris' *ad*

*hoc* basket code [    ] violates the First Rule, which requires that products assigned the same

code be physically similar. For example, Tenaris coded both [

                                        ], erroneously treating these

[            ] as physically identical to each other. *See* Tenaris Post-Prelim SQR at Ex. 2

([

            ]). By coding these threading types with obvious physical differences under [    ],

Tenaris's *ad hoc* adjustment of the Threading field contravenes the entire purpose of having

CONNUM codes, *i.e.*, grouping products based on the similarity of their commercially

significant physical features.

*Confidential Information Removed From Brackets*

iii. *Tenaris' Documentation Established that Ad Hoc Basket Codes [     ] and [     ] Violated the Second Rule — Requiring Physical Distinction Among Products Assigned Different Codes*

The documentation provided in Tenaris' second supplemental questionnaire response

otherwise reinforces the conclusion that lumping thread types together based on [

] violates the Second Rule, requiring physical distinction among products

assigned different codes, thus yielding distortive comparisons.  Indeed, comparing

documentation provided in connection with the thread types assigned code [     ] against

documentation provided in connection with thread types assigned code [     ] demonstrates

[

]. To illustrate, Tenaris Mexico coded [

] under [     ] and coded [

] under [     ]. *Compare* Tenaris Post-Prelim SQR at Ex. 2

([                                                                                    ]),

*with* Tenaris 1SB/CQR (C.R. 193-284) at 16, Ex. Supp. BC6 ([

]).

*Confidential Information Removed From Brackets*

NONCONFIDENTIAL VERSION

As is readily apparent from the images and [

], these two product types are physically similar to each other. Thus, the logic of

Commerce's CONNUM coding requires, *e.g.*, that the [                    ] be assigned the same

Threading code. Tenaris's contrived separation of such products under different codes has

distorted Commerce's selection of fair benchmarks.

iv.   *Distinctions in [*
*] Are Not Physical Distinctions and Cannot Justify Tenaris'*
*Distortive CONNUM structure*

In defense of its distortive approach, Tenaris invokes considerations that are irrelevant for

CONNUM coding purposes, *i.e.*, unrelated to commercially significant physical distinctions in

the products sold during the POR.  Tenaris claims that it has followed the same approach in this

POR as in the original investigation, *see* Tenaris Mexico 1SB/CQR (C.R. 193-284) at 13, but the

record of this administrative review is not remotely the same, *see* OCTG Inv. Final IDM at 20

(stating that "TAMSA's business records indicate that each of these two thread types is unique

and they are not interchangeable with each other because of their differences in physical

characteristics" and citing, *e.g.*, Exhibit C4 of Tenaris Mexico's initial questionnaire response as

well as Exhibit B6 to Tenaris Mexico's March 23, 2022, supplemental questionnaire response),[5]

nor did Commerce proffer any analysis of the foregoing issues during the original investigation,

nor is there anything on this administrative record to establish that the threadforms reported

under codes [                                    ] were identical in both segments.  Moreover, no

---

[5]  That evidence, which included a "listing of each type of [                              ] coded [    ] and [                        ] coded [    ]" is not on this record. *See* Letter from Tenaris Mexico, "Submission of Factual Information to Rebut Petitioners' May 9, 2024 Factual Submission" (May 16, 2024) at Exs. 1-2 (providing certain narrative excerpts, but none of the supporting exhibits). Nor are any of the verification exhibits from the investigation on this record.

verification occurred in this administrative review. Tenaris also speaks generally of differences in "performance," *see, e.g.*, Tenaris Post-Prelim SQR at 4, but this is both unsubstantiated with any specifics and beside the point as the CONNUM characteristic is not "performance," it is "Threading."

The problems of Tenaris Mexico's attempted reliance on non-specific basket categories for which it failed to provide supporting documentation are entirely of its own making. Each segment of a proceeding is decided on its own record, not the record that might have existed if Tenaris Mexico had resubmitted certain allegedly relevant evidence. *E.g.*, *Itochu Bldg. Prod. Co. v. United States*, 2017 WL 2438835 at *5 n.11 (Ct. Int'l Trade 2017) ("this evidence was not submitted in the instant review, and 'each administrative review is a separate segment of proceedings with its own unique facts.'") (quoting *Peer Bearing Co.–Changshan v. United States*, 587 F. Supp. 2d 1319, 1325 (Ct. Int'l Trade 2008)); *Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1285 n.22 (Ct. Int'l Trade 2020) ("each administrative review is a separate segment of an antidumping proceeding and each with its own, unique administrative record. A determination must be supported by substantial evidence based on that administrative record."). Commerce's acceptance of a fact- and evidence-specific modification in the investigation does not *ipso facto* permit the same modification to be perpetuated based on different facts and an absence of evidence in this administrative review.

**D.**    **Despite the Defect in Tenaris Mexico's Reporting, Commerce Took No Corrective Measures; Consequently, the *Final Results* are Unlawful and Unsupported by Substantial Evidence**

1.    *Commerce's Final IDM Manifestly Fails to Address Tenaris' Noncompliance with the First Rule and Otherwise Relies on Conclusory Assertions*

Although Petitioners detailed the foregoing issues for Commerce's awareness and requested that Commerce find a gap in the administrative record and apply an adverse inference,

*see* Petitioners' Case Br. (C.R. 350) at 1-2, 9-24, Commerce's *Final Results* took no steps to remedy the distortion and completely ignored half of the issue.  The entirety of Commerce's Final IDM analysis is reproduced below:

> We find that TAMSA has submitted on the record of this administrative review the factual information to substantiate the physical characteristics that were verified in the less-than-fair-value (LTFV) investigation. The record in this review demonstrates there are differences in physical characteristics **between the two different categories of proprietary thread types and standard thread types, making them unique and not interchangeable with each other**. Therefore, we find it appropriate to continue to treat these two categories of proprietary thread types as distinct from each other and from standard thread codes, as we did in the investigation. Accordingly, we have not made changes to thread codes from the *Preliminary Results*.
>
> **We also find that TAMSA fully cooperated with our request for information regarding third-party proprietary thread types**. Thus, there is no necessary information missing from the record that would warrant application of facts available under section 776(a) of the Act, let alone facts available with an adverse inference under section 776(b) of the Act. Thus, we continue to rely on TAMSA's reported thread codes for these final results.

Final IDM (P.R. 134) at 5 (internal citations omitted) (emphasis supplied).

There are three major defects. Any would, by itself, require remand. *First*, Commerce's has completely failed to address the First Rule (*i.e.*, all products assigned the same Threading code must have Threading that is physically similar to all other products assigned the same Threading code). Commerce does not even assert that the rule is inapplicable; rather, it omits the consideration altogether.

*Second*, Commerce appears to intimate that the investigation verification reports and verification exhibits on which those reports rely are on the record of this administrative review. *See* Final IDM at 21 & n.20; Final Analysis Memo at 7-8 & n.12. That is not accurate. Rather, Commerce is relying on a summary characterization of its verification findings from its final analysis memorandum in the original investigation. *See* Tenaris Rebuttal Factual Information Submission (May 16, 2024) (C.R. 141-144) ("Tenaris RFI") at Ex. 4, p.3-5.  The excerpt on

*Confidential Information Removed From Brackets*

which Commerce relies does not constitute substantial evidence for Commerce's conclusions of fact with respect to the products coded [      ] or [    ] in this administrative review, because the report does not establish which threading types were coded under [      ] or [      ] in the investigation.

Tenaris' *labels* for its broad basket categories remained the same between the investigation and first administrative review—code [                                              ] and code [                                    ]. But nothing on the record of this administrative review demonstrates that Tenaris sold identical *thread types falling within each basket category* during both the investigation and the first administrative review. To illustrate, assume that [                            ] thread types A, B, and C were sold during the period of investigation, and were thus assigned Threading code [      ]. Then assume that [                        ] thread types C, D, and E were sold during the first administrative review period, and were likewise assigned Threading code [      ]. While code (     ]) and the label ([                              ]) remained the same, the mix of products coded thereunder changed completely. Conclusions with respect to A, B, and C would not necessarily hold true with respect to C, D, and E. Commerce's final analysis memorandum from the original investigation only names one Tenaris proprietary thread type and doesn't mention any specific third-party thread type. *See* Tenaris RFI at Ex. 4, p.4 (C.R. 141-144). Because Tenaris created broad basket categories ostensibly referencing a variety of threadforms, *see, e.g.*, Tenaris AQR at Ex. A37 (C.R. 11-40) (Between the Tenaris "Premium Connections Catalogue" and IPSCO connections catalogue, listing over 200 pages of [                      ] threading types [                        ]), Commerce cannot reasonably assume that whatever group of threading types may

have been present during the investigation were identical to the threading types present during the first administrative review.

*Third*, Commerce's conclusions with respect to both the threading characteristics and Tenaris Mexico's supposed compliance with Commerce's information requests are devoid of any meaningful, substantive analysis to explain why Commerce chose to overlook the myriad ways in which Tenaris' *ad hoc* basket categories violated the Second Rule, *see* **Section II.C**, *supra*, all of which were presented to Commerce administratively. Indeed, later in the Final IDM, Commerce correctly applied the Second Rule to reject Tenaris' attempt to add new codes to a different CONNUM field (Field 2, "Type"), stating that "Commerce instructed TAMSA to remove these codes, based on record evidence that the proposed additions do not represent OCTG products that are physically distinct from existing OCTG types." Final IDM at 20. Commerce's failure to similarly reckon with the absence of physical distinction among certain products coded [    ] and certain products coded [    ] created an arbitrary failure to apply the Second Rule.

2.    *Commerce's Additional Analysis Memorandum Confirms the Defects in the Final IDM*

Commerce's Final IDM references additional analysis of proprietary information in its accompanying analysis memorandum. *See* Final IDM at 5 n.22. However, far from curing the incompleteness of Commerce's Final IDM, the additional detail provided in Commerce's analysis memorandum merely confirms that Commerce acted unreasonably and unlawfully in accepting Tenaris Mexico's *ad hoc* CONNUM codes without modification.

i. *Commerce's Additional Discussion of Threading Types Coded [    ] Is Incomplete and Otherwise Confirms that Physically Different Threading Types Were Assigned the Same Code*

Regarding products coded [     ], Commerce first inaccurately states that [

] were the only [                        ] thread types sold during the review

period. Final Analysis Memo at 6. In fact, Tenaris reported selling [        ] additional

[                    ] thread types: [

].[6] Tenaris 1SB/CQR (C.R. 193-284) at 17, Ex. Supp. BC5, p.74, 78.

Commerce's Final Analysis Memo thus fails to analyze [            ] of the thread types grouped

under basket category [     ] for compliance with either the First or Second Rule. As explained,

assignment of a CONNUM code is an assertion of fact about the physical characteristics of a

product. *See* **Section II.B.2**, *supra*. Here, Commerce's acceptance of Tenaris' Threading code

was arbitrary because Commerce never even considered the product's physical characteristics.

*See* Final Analysis Memo at 6-7.

Available record evidence indicates that the unaddressed threading types should have

been differently coded. *First*, unanalyzed thread type [     ] is merely a type of

[                  ] and may have more appropriately been coded [    ]. *Second*, the physical

aspects of [         ] unanalyzed thread types ([                    ]) do not appear anywhere in

the administrative record. Tenaris' questionnaire response mentions that the [        ] thread types

are applied to [                                ], Tenaris 1SB/CQR (C.R. 193-284) at 17,

_____

[6] There is no evidence on the record that all of these [                  ] thread types were addressed in Commerce's investigation verification report.

*Confidential Information Removed From Brackets*

Ex. Supp. BC7 p.6, but there is an entirely different CONNUM category for [

], *see* Initial Questionnaire (P.R. 14) at [        ]. That is irrelevant to the type of

threading, and double-counting [            ] in both the [                ] CONNUM field and

the "Threading" CONNUM field would be distortive, a point that Commerce elsewhere correctly

recognized in reversing Tenaris' attempts to double-count [

].[7] Neither Tenaris' narrative nor its supporting

documentation describes the shape of these [        ] unknown thread types, so the record does not

appear to provide *any potential* basis for accepting Tenaris's coding of these [            ] thread

types.

As for the [                        ] thread types that Commerce did consider ([

]), Commerce focuses solely on "the *differences* in physical characteristics"

and thereby confirms that grouping these three together flatly violates the First Rule (same code,

physical sameness). Final Analysis Memo at 6 (emphasis supplied). Commerce first

characterizes [        ] threads as "similar to a [                ]" (having a [

]) with a [                            ]. *Id.* at 6.[8] Commerce appears

to conflate   [                ] threads with [

---

[7] Specifically, Commerce reasoned that Tenaris' coding of [                            ] was
distortive because, "as far as the established model match criteria (*i.e.*, the CONNUMs) are
concerned, [            ] is identical to [            ] or other [        ] with the same
[      ] code and [            ] is identical to [            ] or other [        ] with the same
[      ] code, and identical CONNUMs reflect all physical differences deemed by Commerce in
the LTFV investigation to have commercial significance."  Thus, Tenaris was not justified in
changing the codes within the CONNUM hierarchy to distinguish physical differences between
products which are already adequately accounted for by the existing model matching criteria,
namely [                    ]). Final Analysis Memorandum (C.R. 367) at 10-11.

[8] Commerce otherwise references aspects of the [                    ], which are fundamentally
irrelevant to CONNUM coding unless it imparts a physical characteristic, in which case the
physical characteristic itself is what warrants consideration.

*Confidential Information Removed From Brackets*

] threads, *see id.* at 6, but all [        ] are different, *see, e.g.*, Tenaris 1SB/CQR at Ex. Supp. BC5, p.64, 74, 78. By contrast, [        ] threads have a [

        ]. In Commerce's words, the

[        ] threads "differ greatly from" [              ]. Final Analysis Memorandum (C.R. 367) at 7. Finally, [        ] threads are likewise "different from [              ]" because [        ] threads [                              ]. *Id.* These characteristics also [                    ] threads as well. *See id.* On its face, Commerce's acceptance of a [

              ] is unreasonable and distorts benchmark selection. *See id.* It is also arbitrary insofar as Commerce's initial questionnaire prescribes different codes for relatively minor physical differences (*e.g.*, short round API threading (code 40) vs. long round API threading (code 45), *see, e.g.*, Initial Questionnaire at C-8, yet has permitted Tenaris Mexico to lump [              ] thread types under a single *ad hoc* basket category (code [      ]). Commerce cannot reasonably treat like situations so differently.

ii. *Commerce's Discussion of Threading Types Coded [      ] Fails to Address their Physical Characteristics; Record Documentation Confirms Violation of the First and Second Rules*

Commerce opens its discussion of third-party proprietary threads coded [      ] by observing that they were "only sold in the home market." Final Analysis Memorandum (C.R. 367) at 7-8. The market of sale is not a physical characteristic. As Commerce itself recognized later in the Final IDM, "{i}t is not enough to point out that some products which would ordinarily be given the same {CONNUM} code…have different commercially significant costs, prices, *or uses* as other products within the same CONNUMs." Final IDM at 21 (emphasis supplied). Rather, the respondent must "explain why the products are *physically distinct* from the

35

Confidential Information Removed From Brackets

characteristics of other products which would be classified under the same codes…" *Id.* (emphasis supplied). Commerce correctly recognized this governing principle, but arbitrarily departed from it by treating market-of-sale as somehow physically manifest in pipe threading. Given the ease with which a respondent could characterize physically similar models as "solely for the home market," treating market-of-sale as a *de facto* physical distinction is particularly prone to abuse.

It also violates the statute. Benchmark prices are supposed to be selected from among sales of the "foreign like product." 19 U.S.C. § 1677b(a)(1)(B)(i).  That concept expressly includes "other merchandise which is identical in physical characteristics," not only "subject merchandise" that is sold in the United States. 19 U.S.C. § 1677(16)(A); *see also id.* § 1677(25) (defining "subject merchandise" as in-scope products). To the extent that market-of-sale formed the basis for Commerce's acceptance of Tenaris' code [      ], Commerce has deviated from the statutory standard, and its determination should be remanded.

Commerce otherwise acknowledges that "description{s}" of code [      ] thread types are generally "limited," excusing the defect "due to the specifications being third-party proprietary." Final Analysis Memo at 7. Yet, Commerce seriously understates the problem. [              ] thread types combined under basket category [      ], [

]) have neither supporting documentation nor even a bare narrative description. *See* Tenaris Post-Prelim SQR at 3. The substantial evidence standard requires more than ***nothing***, *e.g.*, *NEXTEEL Co. Ltd. v. United States*, 355 F.Supp.3d 1336, 1347 (Ct. Int'l Trade 2019) ("Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"), and when Tenaris proposes revisions to the CONNUM structure, the burden falls on Tenaris to create the administrative record necessary to support

those revisions, *see, e.g.*, *Mannesmannrohren-Werke AG v. United States*, 120 F.Supp.2d 1075, 1085 (Ct. Int'l Trade 2000) (Respondents "ha{ve} the burden of creating an adequate record."). Commerce erred in mischaracterizing the record as containing information that it does not.

As for the [                                    ] thread types coded [      ], Commerce was evidently hindered by Tenaris' "limited" descriptions. Instead of identifying or discussing *any* specific physical characteristic, Commerce simply asserts that "TAMSA provided additional catalogues…the related purchase order and cost analysis, and an explanation being physically different and not compatible with existing codes." Final Analysis Memo at 7; *see also id.* at 8 (repeating production cost considerations). As support, Commerce summarily cited all Threading-related parts of Teanaris' post-preliminary supplemental questionnaire response. *See id.* at 7 n.10 (citing Tenaris Post-Prelim SQR at 3-9, Exs. 2-3).

To begin with, production costs are not physical characteristics. *See, e.g.*, *Dongkuk S&C Co., Ltd. v. United States*, 134 F.4th 1320, 1329-1330 (Fed. Cir. 2025) (affirming Commerce's adjustment to steel plate costs to counteract "a cost distortion unrelated to the physical {CONNUM} characteristics of the products"); *NEXTEEL*, 355 F. Supp. 3d at 1361 ("Commerce will normally adjust the reported costs in order to reflect the costs that are based only on the physical characteristics."). Indeed, Commerce's reliance on production cost differences as a basis for accepting Tenaris' introduction of new codes to the Threading CONNUM field stands in direct contrast with Commerce's correct rejection of Tenaris' attempt to introduce new codes to the Type CONNUM field. In the latter scenario, Commerce confirmed that "different commercially significant costs" were ***insufficient*** and only "physical{} distinct{ion}" could justify modification. Final IDM at 21. Commerce's opposite approach vis-à-vis the Threading CONNUM field defeats a major purpose of going through the trouble of creating a CONNUM

37

*Confidential Information Removed From Brackets*

code, rather than simply relying on a company's existing model numbers. That is to prevent respondents from contriving distinctions among physically similar products in order to allocate costs away. *See, e.g.*, *Xi'an Metals & Minerals*, 50 F.4th at 108 ("Commerce 'explained that CONNUM-specific reporting yields data more specific to the costs of the subject merchandise than standard GAAP records.'"); *Thai Plastic Bags*, 746 F.3d at 1366 (affirming Commerce's rejection of respondent's reporting where the respondent "argued that several variables other than physical characteristics accounted for the cost differences between the CONNUM pairs…"). Here, treating cost differences as an *ipso facto* justification for modifying the CONNUM structure flips that rationale on its head.

As for the remaining material cited by Commerce, only the [            ] contain any description of the physical characteristics—*i.e.*, shape—of the threading. *Compare* Tenaris Post-Prelim SQR at Ex. 2 ([                    ]), *with id.* at 3-9 (vaguely claiming that thread types coded [    ] are "physically different" and have "improved performance," but providing no detail or discussion of their shape). These [            ] demonstrate, however, that even the [      ] thread types with some record documentation differ significantly from one another. There are at least [      ] distinct groups: [

                                                                    ].[9]

Yet again, the record demonstrates that Commerce's acceptance of Tenaris' basket category [    ] violates the First Rule (same code, physically alike). Moreover, allowing Tenaris to

---

[9] A [                    ] resembles [
                              ], as in the diagram on the right. *See* Tenaris Post-Prelim SQR at [                        ].

NONCONFIDENTIAL VERSION

separate [                                                    ] would violate the

Second Rule (different code, physically different) as well.

Finally, Commerce invokes its final analysis memorandum from the investigation. Final

Analysis Memo at 7-8 & n.12 (citing Tenaris Mexico Rebuttal Factual Information Submission

(May 16, 2024) (C.R. 141-144) at Ex. 4, p.4). As explained in **Section II.D.1**, *supra*, that

memorandum is not probative because it contains no indication of what specific third-party

proprietary threading types were being considered. As is apparent from the [                ]

threading [                     ] available on the record of this administrative review, such

products vary considerably in their characteristics. Thus, Commerce's vague conclusions about

unspecified "unique" product characteristics of an unknown basket of products from the original

investigation are untethered to the products sold during this administrative review period and

cannot control Commerce's assessment of the record evidence in this segment of the proceeding.

In sum, Commerce's analysis fundamentally fails to engage with the physical

characteristics of the third-party threading types coded [     ] and thus fails to establish that

Tenaris' *ad hoc* basket category satisfies both the First and Second Rules. Tenaris'

documentation is both incomplete and demonstrates that, at a minimum, the First Rule (same

code, physically same) and Second Rule (different code, physically different) are violated in

multiple ways under code [     ].

### III. Commerce's Acceptance of Tenaris' *Ad Hoc* Basket Categories Is Unlawful and Unsupported by Substantial Evidence; On Remand the Court Should Order Commerce to Reconsider Application of Facts Otherwise Available with an Adverse Inference

The Court should remand Commerce's treatment of Tenaris's *ad hoc* Threading codes.

Commerce failed to address significant arguments concerning the ways in which Tenaris's *ad*

*hoc* basket categories violated the First Rule (**Section III.A**). Otherwise, Commerce's limited

Confidential Information Removed From Brackets

analysis arbitrarily and inconsistently applied the Second Rule, by treating non-physical distinctions as a basis for reorganizing the CONNUM structure while allowing different codes to be assigned to threads of the same basic shape (**Section III.B**). Finally, Commerce's deficient analysis incorrectly failed to discern material gaps in the administrative record with respect to how the threading types assigned to *ad hoc* basket categories should be coded (**Section III.C**). The Court should order Commerce to reconsider its approach in the light of the foregoing, and make clear that Commerce may apply an adverse inference to fill any gap in the administrative record.

### A.    Commerce's *Final Results* Fail to Address Significant Arguments

Commerce must support its determinations with substantial record evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). In addition to requiring Commerce to identify record support for its findings, the standard "obligate{s Commerce} to respond to those arguments made by interested parties that bear on issues material to Commerce's determination." *Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351 (Ct. Int'l Trade 2020); *see also* 19 U.S.C. § 1677f(i)(3). Here, Commerce fell short of this standard by overlooking Plaintiffs' arguments concerning how each of Tenaris' *ad hoc* basket categories ([            ], respectively), violated the First Rule by combining various physically distinct products under a single code. Had Commerce considered Plaintiffs' arguments, it would have recognized that Tenaris' coding distorted Commerce's statutorily required benchmarking analysis, such that continuing to use Tenaris' *ad hoc* codes would be unlawful. Remand is necessary for Commerce to address these significant concerns in the first instance.

*Confidential Information Removed From Brackets*

NONCONFIDENTIAL VERSION

**B.    Commerce's Application of the Second Rule in this Administrative Review was Inconsistent and Arbitrary**

The statutory framework requires that CONNUM codes reflect physical characteristics, and this is Commerce's longstanding practice. *See* **Section II.B**, *supra*. Thus, in rejecting Tenaris's attempt to restructure the "Type" field of the CONNUM code by introducing a separate code [                    ] based on physical characteristics already captured by other CONNUM codes, Commerce correctly recognized that physical distinctions are a *sine qua non* of assigning any given product a code that differs from other products. Commerce's acceptance of Tenaris' *ad hoc* Threading codes arbitrarily deviates from this well-established principle. *First*, Commerce overlooked the complete absence of record evidence establishing the physical characteristics of [

] and [

]. Plainly, Commerce did not require demonstrated physical distinction when it did not require evidence of physical characteristics in the first place.  This inconsistency in approach was arbitrary and contrary to statutory requirements.

*Second*, Commerce declined to discuss available record evidence concerning the physical characteristics of [

]. *See* **Section II.D**, *supra*. Scrutiny of the available evidence concerning these thread types demonstrates that they are simultaneously [

]. In other words, their coding violates both the First and Second Rule. Yet, Commerce arbitrarily declined to actually analyze their physical characteristics.

*Third*, in lieu of any discussion of the physical characteristics of any model of third-party threading, Commerce instead cited distinctions based on the market of sale and production costs

41

*Confidential Information Removed From Brackets*

NONCONFIDENTIAL VERSION

in endorsing Tenaris' creation of basket category [      ] for third party proprietary threading types. These non-physical aspects are no basis for finding two products to be physically different or worthy of a distinct CONNUM code. Indeed, the statutory benchmarking exercise expressly contemplates consideration of products sold only in the home market as a benchmark, so long as the product is physically the same. And a major basis for Commerce's practice of assigning CONNUM codes is to avoid allocating away costs for products that are physically alike. Treating cost differences as a *de facto* physical characteristic amounts to greenlighting cost manipulation. Commerce expressly—and correctly—disclaimed the relevance of such ancillary considerations in its analysis of the Type CONNUM field and its disparate treatment of the Threading CONNUM field was arbitrary.

On remand, the Court should instruct Commerce to correct these inconsistencies and failures to analyze the record.

### C. The Foregoing Deficiencies in Commerce's Analysis Led it to Overlook Material Gaps in the Administrative Record

Commerce repeatedly brought to Tenaris' attention that its reliance on basket Threading categories based on [                                  ] may violate the First and Second Rules and provided Tenaris with two supplemental opportunities to create a record necessary to justify its approach. Tenaris failed to do so. *See* **Section II.C**, *supra*. Yet, because Commerce's *Final Results* did not address Plaintiff's arguments concerning the distortion caused by lumping together physically dissimilar products under a single code and because Commerce failed to assess the physical characteristics of each individual thread type lumped together under Tenaris' *ad hoc* basket categories, Commerce did not consider related gaps in the administrative record. Most fundamentally, this includes the absence of usable Threading codes for products coded [          ] that would ensure physically similar Threading is coded together and ***not*** assigned

*Confidential Information Removed From Brackets*

NONCONFIDENTIAL VERSION

the same code as physically different Threading. It also includes the absence of record evidence concerning the physical characteristics of several thread types coded [          ].

Put differently, Commerce failed to meaningfully explain its determination that these reporting deficiencies did not constitute a gap in the administrative record; the conclusory determination espoused in Commerce's *Final Results* is thus unsupported by substantial evidence and contrary to law. Moreover, insofar as Commerce's determination not to apply an adverse inference was premised on Commerce's erroneous failure to discern the gap in the administrative record, Commerce's determination not to apply an adverse inference was likewise unsupported by substantial evidence and contrary to law. The Court should thus instruct Commerce to reconsider both determinations on remand.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court hold Commerce's *Final Results* to be unlawful and unsupported by substantial evidence in the respects challenged herein, and order remand for Commerce to correct its arbitrary reliance on Tenaris Mexico's flawed *ad hoc* Threading codes.

*       *       *

43

NONCONFIDENTIAL VERSION

Respectfully submitted,

/s/James E. Ransdell

James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Ave. NW, Suite 300
Washington, DC 20037
Phone: (202) 567-2321
Fax: (202) 567-2301
Email: jransdell@cassidylevy.com
*Counsel for United States Steel Corporation*

April 16, 2026

44

**Certificate of Compliance with Chambers Procedures 2(B)(2)**

The undersigned hereby certifies that the foregoing memorandum of law contains 12,094 words, exclusive of the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ James E. Ransdell
James E. Ransdell