**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TUBOS DE ACERO DE MEXICO, S.A. and TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, <br><br> Plaintiffs, <br><br> and <br><br> UNITED STATES STEEL CORPORATION, <br><br> Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> UNITED STATES STEEL CORPORATION, ET AL., <br><br> Defendant-Intervenors. | Consol. Court No. 25-00221 |

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs Tubos de Acero de Mexico, S.A. ("TAMSA") and Tenaris Global Services (U.S.A.) Corporation ("TGS USA") hereby move for judgment on the agency record with respect to their complaint challenging the final results issued by the U.S. Department of Commerce ("Commerce") in the first administrative review of the antidumping duty order on Oil Country Tubular Goods ("OCTG") from Mexico covering the period of review from May 11, 2022 to October 31, 2023. *See Certain Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42933 (Dep't Commerce Sept. 5, 2025) ("Final Results").

As set forth in the accompanying brief in support of this motion, Plaintiffs respectfully move for the Court to hold that the contested portions of the Final Results are not supported by substantial evidence and are otherwise not in accordance with law. Plaintiffs further move for the Court to remand this matter to Commerce for disposition consistent with the order and opinion of the Court.

A proposed order is attached.

Respectfully submitted,


/s/ Gregory J. Spak

Gregory J. Spak
Kristina Zissis
Luca Bertazzo
Matthew W. Solomon
C. Alex Dilley

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Tubos de Acero de Mexico, S.A. and Tenaris Global Services (U.S.A.) Corporation*

April 16, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TUBOS DE ACERO DE MEXICO, S.A. and TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, <br><br> Plaintiffs, <br><br> and <br><br> UNITED STATES STEEL CORPORATION, <br><br> Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> UNITED STATES STEEL CORPORATION, ET AL., <br><br> Defendant-Intervenors. | Consol. Court No. 25-00221 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> **Business Proprietary Information deleted from Pages 1-2, 5-6, 11, 14-28, 30, 42-43** |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory J. Spak
Kristina Zissis
Luca Bertazzo
Matthew W. Solomon
C. Alex Dilley

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

April 16, 2026

**TABLE OF CONTENTS**

I.    STATEMENT PURSUANT TO USCIT R. 56.2(c)..................................................1

    A.    Administrative Determination Sought to Be Reviewed ...........................1

    B.    Questions Presented and Summary of Argument......................................1

        1.    Was Commerce's change of practice between the original
           investigation and the First Review, rejecting and recoding one product
           characteristic code TAMSA reported in field TYPE, supported by
           substantial evidence and otherwise in accordance with law?......................1

        2.    Was Commerce's decision to reject as new factual information
           portions of TAMSA's case brief supported by substantial evidence
           and otherwise in accordance with law when the rejected portions were
           based on information already on the record?...............................................2

        3.    Was Commerce's decision to deny TAMSA a constructed export price
           offset in the final results, after granting such an offset in the
           preliminary results, supported by substantial evidence and otherwise
           in accordance with law?.............................................................................3

        4.    Was Commerce's use of the modified differential pricing
           methodology supported by substantial evidence and otherwise in
           accordance with law?................................................................................3

II.    STATEMENT OF FACTS .......................................................................................4

III.    STANDARD OF REVIEW ......................................................................................8

IV.    ARGUMENT..........................................................................................................11

    A.    Commerce's Decision to Recode Field TYPE was Arbitrary, Unsupported
        by Substantial Evidence, and was not in Accordance with Law ...........................11

        1.    Legal Framework.....................................................................................11

        2.    Commerce Failed to Justify Changing the Coding in Field TYPE from
           the Coding Verified and Approved in the Investigation............................14

        3.    Commerce Failed to Consider the Record Evidence in the Underlying
           Review Supporting the Coding in Field TYPE.........................................18

        4.    Commerce's Change to the Field TYPE Coding Yields Distorted
           Matching and Margin Results Contrary to the Requirement that
           Commerce Calculate Dumping Margins as Accurately as Possible.........25

i

B. Commerce's Rejection of Certain Information in TAMSA's Case Brief as New Factual Information was Arbitrary, Unsupported by Substantial Evidence, and was not in Accordance with Law ...................................................28

C. Commerce's Decision to Deny TAMSA a CEP Offset in the *Final Results* was Unsupported by Substantial Evidence and was not in Accordance with Law ...........................................................................................................31

  1. Legal Framework.................................................................................31

  2. Commerce Failed to Explain its Change in Course from the Preliminary Results and Original Investigation........................................32

D. Commerce's Use of the Modified Differential Pricing Methodology was Arbitrary, Unsupported by Substantial Evidence, and not in Accordance with Law ...........................................................................................................34

  1. Legal Framework.................................................................................35

  2. Commerce's Decision to Implement the New Modified Differential Pricing Methodology in the First Review was Arbitrary and Contrary to Law ............................................................................................36

  3. Commerce's Two-Percent "Price Difference" Test Is Inconsistent with the Best Interpretation of the Statutory Requirements for Invoking the Exception and Using the A-to-T Price Comparison Method.....................38

   a. Commerce's Two-Percent Difference Test is Contrary to the Plain Language of the Statute .......................................................38

   b. The Two-Percent "Price Difference" Test Is Contrary to Congress' Intent to Require a "Case-by-Case" Analysis. ..............41

  4. Commerce's Elimination of the Mixed Method Was Arbitrary and Not Required by the Federal Circuit's Remand Instructions............................44

V. CONCLUSION AND RELIEF SOUGHT ........................................................47

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allegheny Ludlum Corp. v. United States,*
112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ........................................................9, 20, 44

*Arch Chems., Inc. v. United States,*
33 C.I.T. 954 (2009) ........................................................................................................33

*Atlantic Sugar, Ltd. v. United States,*
744 F.2d 1556 (Fed. Cir. 1984) ........................................................................................9

*Bohler Bleche GmbH & Co. KG v. United States,*
324 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ..................................................................12

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ....................................................................................................39

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,*
419 U.S. 281 (1974) ........................................................................................................10

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ....................................................................................................9, 45

*Celik Halat ve Tel Sanayi A.S. v. United States,*
557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ..................................................................10

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ..........................................................................................................9

*Chr. Bjelland Seafoods A/S v. United States,*
19 C.I.T. 35 (1995) ............................................................................................................9

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971) ........................................................................................................10

*Consol. Bearings Co. v. United States,*
412 F.3d 1266 (Fed. Cir. 2005) ......................................................................................10

*Fagersta Stainless AB v. United States,*
577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008) ............................................................13, 17

*Garg Tube Export LLP v. United States,*
740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) ..................................................................41

*Godaco Seafood Joint Stock Co. v. United States,*
    435 F. Supp. 3d 1342 (Ct. Int'l Trade 2020) ................................................30

*Huaiyin Foreign Trade Corp. v. United States,*
    322 F.3d 1369 (Fed. Cir. 2003) ..................................................................9

*Hyundai Steel Co. v. United States,*
    319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) ................................................34

*Jacobi Carbons AB v. United States,*
    365 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) ................................................42

*Jiangsu Jiasheng Photovoltaic Tech. v. United States,*
    28 F. Supp. 3d 1317 (2014) ..............................................................11, 18

*La Molisana S.p.A. v. United States,*
    138 F.4th 1353 (Fed. Cir. 2025) .................................................................12

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244 (2024)...............................................................9. 38, 39

*Manchester Tank & Equip. Co. v. United States,*
    483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ................................................12

*Marmen Inc. v. United States,*
    134 F.4th 1334 (Fed. Cir. 2025) ........................................................ passim

*Mitsubishi Heavy Indus. v. United States,*
    97 F. Supp. 2d 1203 (Ct. Int'l Trade 2000) ................................................13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ......................................................................10, 45

*NSK Ltd. v. United States,*
    217 F. Supp. 2d 1291 (Ct. Int'l Trade 2002) ................................................12

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990) .................................................................13

*Shandong Dongfang Bayley Wood Co. v. United States,*
    375 F. Supp. 3d 1339 (Ct. Int'l Trade 2019) ................................................10

*Shikoku Chemicals Corp. v. United States,*
    795 F. Supp. 417 (Ct. Int'l Trade 1992) ......................................................33

*SKF USA Inc. v. United States,*
    263 F.3d 1369 (Fed. Cir. 2001) .................................................................11

*SKF USA, Inc. v. United States*,
   537 F.3d 1373 (Fed. Cir. 2008) ..................................................................13, 17

*Star Fruits S.N.C. v. United States*,
   393 F.3d 1277 (Fed. Cir. 2005) ..........................................................................10

*Stupp Corp. v. United States*,
   5 F.4th 1341 (Fed. Cir. 2021) .............................................................................45

*Stupp Corp. v. United States*,
   2025 U.S. App. LEXIS 9616 (Fed. Cir. 2025) ...............................................7, 14

*SunEdison, Inc. v. United States*,
   179 F. Supp. 3d 1309 (Ct. Int'l Trade 2016) .....................................................34

*Sunpower Corp. v. United States*,
   179 F. Supp. 3d 1286 (Ct. Int'l Trade 2016) .....................................................33

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ..............................................................................................9

*USX Corp. v. United States*,
   655 F. Supp. 487 (Ct. Int'l Trade 1987) ..............................................................9

*Wheatland Tube v. United States*,
   755 F. Supp. 3d 1304 (Ct. Int'l Trade 2025) .....................................................31

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013) ..........................................................................13

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2)(A) ......................................................................................................10

19 U.S.C. § 1516a(b)(1)(B)(i) ..........................................................................................8

19 U.S.C. § 1673d(a)(4) .................................................................................................40

19 U.S.C. § 1677(16) ......................................................................................................12

19 U.S.C. § 1677b(a) ......................................................................................................11

19 U.S.C. § 1677b(a)(1) ..................................................................................................11

19 U.S.C. § 1677b(a)(6)(C)(ii) .......................................................................................13

19 U.S.C. § 1677b(a)(7)(B) ............................................................................................33

19 U.S.C. § 1677f-1(d)(1)(A) .........................................................................................35

19 U.S.C. § 1677f-1(d)(1)(B) .................................................................................35, 38

19 U.S.C. § 1677m(a) ...........................................................................................28, 29

19 U.S.C. § 1677m(e) .................................................................................................29

19 U.S.C. § 1677m(f) ..................................................................................................29

19 C.F.R. § 351.104(a)(2)(i) ......................................................................................29

19 C.F.R. § 351.106 ....................................................................................................40

19 C.F.R. § 351.224(g) ...............................................................................................41

19 C.F.R. § 351.301 ....................................................................................................29

19 C.F.R. § 351.302(d) ..........................................................................................29, 30

19 C.F.R. § 351.403(c) ...............................................................................................40

19 C.F.R. § 351.411 ....................................................................................................13

19 C.F.R. § 351.412(f) ................................................................................................31

19 C.F.R. § 351.414(b)(1) ...........................................................................................35

19 C.F.R. § 351.414(b)(3) ...........................................................................................35

19 C.F.R. § 351.414(c)(1) ...........................................................................................35

## ADMINISTRATIVE DETERMINATIONS

*Certain Circular Welded Carbon Steel Pipes and Tubes From Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016,*
    82 Fed. Reg. 55093 (Dep't Commerce Nov. 20, 2017) ....................................27

*Certain Frozen Warmwater Shrimp from Ecuador: Final Results of Antidumping Duty Administrative Review,*
    74 Fed. Reg. 47201 (Dep't Commerce Sept. 15, 2009) ...................................24

*Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review; 2020-2021,*
    87 Fed. Reg. 40503 (Dep't Commerce July 7, 2022) ......................................13

*Certain New Pneumatic Off-the-Road Tires from China,*
    73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008) ...................................39

*Certain Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023,*
90 Fed. Reg. 42933 (Dep't Commerce Sept. 5, 2025) .............................................. passim

*Certain Oil Country Tubular Goods from Mexico: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022-2023,*
89 Fed. Reg. 96638 (Dep't Commerce Dec. 5, 2024) .............................................. passim

*Certain Oil Country Tubular Goods From the Republic of Korea: Negative Preliminary Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances and Postponement of Final Determination,*
79 Fed. Reg. 10480 (Dep't Commerce Feb. 24, 2014) .....................................................15

*Light-Walled Rectangular Pipe and Tube from Mexico,*
73 Fed. Reg. 35,649 (Dep't Commerce June 24, 2008) .....................................................39

*Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances,*
87 Fed. Reg. 59041 (Dep't Commerce Sept. 29, 2022) .....................................................32

## LEGISLATIVE MATERIALS

*Statement of Administrative Action to the Uruguay Round Agreements Act,*
H.R. REP. NO. 103-316, vol. 1 (1994).................................................................................36

## OTHER MATERIALS

*Alternatives to the Use of Cohen's d; Request for Comment,*
90 Fed. Reg. 21,277, 21,278  (Dep't Commerce May 19, 2025) .....................................37

OXFORD ENGLISH DICTIONARY, https://www.oed.com, accessed on Mar. 20, 2026.....................39

**PUBLIC VERSION**

## I.    STATEMENT PURSUANT TO USCIT R. 56.2(C)

### A.    Administrative Determination Sought to Be Reviewed

Plaintiffs Tubos de Acero de Mexico, S.A. ("TAMSA") and Tenaris Global Services (U.S.A.) Corporation ("TGS USA") contest certain aspects of the final results issued by the U.S. Department of Commerce, International Trade Administration ("Commerce") in the first administrative review of the antidumping duty ("AD") order on oil country tubular goods ("OCTG") from Mexico ("First Review").  The contested determination was published in the *Federal Register* as *Certain Oil Country Tubular Goods from Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42933 (Dep't Commerce Sept. 5, 2025) ("Final Results") (P.R.136)[1]; *see also* accompanying *Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order: Certain Oil Country Tubular Goods from Mexico; 2022-2023* (Sept. 2, 2025) ("Final IDM") (P.R.134).

### B.    Questions Presented and Summary of Argument

1.    **Was Commerce's change of practice between the original investigation and the First Review, rejecting and recoding one product characteristic code TAMSA reported in field TYPE, supported by substantial evidence and otherwise in accordance with law?**

No.  Without explanation (but with significant consequences), Commerce changed the product-coding methodology it used and verified in the investigation by collapsing two fundamentally different products into the same TYPE code.  Specifically, Commerce rejected TAMSA's use of code [ ] for [                    ] ([                    ]) and instead required these products to be recoded as tubing (code 1) or casing (code 2).  In doing so,

---

[1] Citations to the administrative record indicate the public record document numbers ("P.R.XX") and confidential record document numbers ("C.R.XX").

Commerce ignored record evidence demonstrating that [                    ] are physically and commercially distinct from tubing and casing, including data showing that [        ] have [                    ] prices and costs.  The products are made in different production facilities with [                ] as [       ] to produce [                        ], and this additional production process at a separate facility accounts for the [      ] costs.

By recoding, Commerce violated the statutory requirement to "determine current margins as accurately as possible."  Proper product matching and price/cost comparisons are at the heart of calculating accurate dumping margins.   Normally, Commerce's difference in merchandise ("DIFMER") test will prevent products in each market with very different costs from matching because it requires that the variable cost difference between the products not exceed 20 percent.  However, Commerce's recoding change prevented the proper operation of the DIFMER test under the circumstances in the review.    Commerce's recoding of TYPE resulted in the assignment of inappropriate surrogate costs (*i.e.*, casing and tubing costs) rather than surrogate costs for the most similar product (*i.e.*, [                        ]).  This improper assignment altered the DIFMER test to cause, rather than prevent, distortive matches, yielding inaccurate margins.

Commerce's decision in this review to change the approach used in the investigation by recoding the products at issue in the TYPE field as casing or tubing was arbitrary, unsupported by substantial evidence, and not in accordance with law.

> **2.     Was Commerce's decision to reject as new factual information portions of TAMSA's case brief supported by substantial evidence and otherwise in accordance with law when the rejected portions were based on information already on the record?**

No.  Commerce's decision to reject and treat as new factual information ("NFI") certain portions of TAMSA's case brief that pertained to Commerce's recoding of code [  ] in field TYPE

2

was arbitrary, not supported by substantial evidence and otherwise not in accordance with law. The rejected information was not NFI, but instead reflected information already on the record.

### 3. Was Commerce's decision to deny TAMSA a constructed export price offset in the final results, after granting such an offset in the preliminary results, supported by substantial evidence and otherwise in accordance with law?

No. Commerce's decision to deny TAMSA a constructed export price ("CEP") offset in the final results, after granting TAMSA a CEP offset in the preliminary results, was not supported by substantial evidence and otherwise not in accordance with law.

### 4. Was Commerce's use of the modified differential pricing methodology supported by substantial evidence and otherwise in accordance with law?

No. Commerce's decision to use a modified differential pricing methodology announced in a post-preliminary analysis and used in the Final Results was arbitrary, unsupported by substantial evidence, and not in accordance with law. Although Commerce claimed to introduce the methodology in response to two decisions by the Court of Appeals for the Federal Circuit ("Federal Circuit") in unrelated cases, those court cases remain pending, and any change is inappropriate until they are final. The two-percent "price difference" threshold Commerce substituted for the Cohen's $d$ test is contrary to the statutory requirement that prices "differ significantly," is inconsistent with Congress's directive that Commerce conduct a case-by-case analysis, and finds no support in the record. Commerce's elimination of the mixed method and reduction of the ratio test threshold from 66 to 33 percent exceeded the scope of the Federal Circuit's remand instructions, which addressed only the Cohen's $d$ test and contemplated the continued use of a hybrid methodology.

PUBLIC VERSION

## II.    STATEMENT OF FACTS

Commerce initiated the First Review for the POR May 11, 2022 through October 31, 2023 on December 29, 2023. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 90168, 90170 (Dep't Commerce Dec. 29, 2023) (P.R.4).

Commerce issued an antidumping questionnaire to TAMSA. *See* Commerce's Questionnaire (Mar. 12, 2024) (P.R.14). In its response to Section A, TAMSA provided support for a CEP offset. *See* TAMSA Section A Response at A-18-26, Exhibit A4 (Apr. 2, 2024) (C.R.11-40; P.R.25-30).

TAMSA submitted qualitative evidence to support a CEP offset to demonstrate that TAMSA provided selling functions at higher levels of intensity to its home market customers (*i.e.*, determining NV) than it provided at the constructed level of trade for U.S. sales to its affiliated importer and reseller TGS USA (*i.e.*, determining CEP). *See* Section A Response at A-18-A-26, Exhibit A4. TAMSA explained it would provide quantitative support in its Sections B and C responses. *Id*. at A-25.

In its Sections B and C responses, TAMSA provided quantitative support for a CEP offset. *See* TAMSA Sections B, C, E Response (Apr. 25, 2024) (C.R.44-123; P.R.36-41). This included higher indirect selling expenses incurred by TAMSA for sales to home market customers in field INDIRSH than the expenses incurred for U.S. sales in field DINDIRS1U. *See id*. at B-66-67, C-67, Exhibits B19, C20.

TAMSA also coded field TYPEH/U consistently with the coding Commerce used and verified in the investigation. This involved adding two codes for different products not covered by the four codes in Commerce's questionnaire (*i.e.*, code 1 (Tubing), code 2 (Casing), code 4 (Green Tube), and code 9 (Coupling Stock)). *See* Sections B, C, E Response at B-15-16, C-15-

16, Exhibit C4.  The added codes are:  [                                        ], coded as [ ]; and [                    ],

coded as [  ].  *See, e.g., id.* at B-15.

Commerce issued a supplemental questionnaire.  *See* Commerce's Supplemental

Questionnaire (Aug. 6, 2024) (C.R.150; P.R.57).  The Section A portion requested additional

information regarding TAMSA's reported selling functions.  *See id.* at 6-7.  TAMSA provided the

information requested.  *See* TAMSA Supplemental Section A Response at 13-19 (Aug. 27, 2024)

(C.R.154-182; P.R.65).

Commerce's supplemental questionnaire also contained in Question 11(A) an instruction

to recode field TYPE code [ ] to code 1 or 2.  *See* Supplemental Questionnaire at 8.  This reflected

Petitioners' deficiency comments.  *See* Petitioners' Deficiency Comments at 2 (May 24, 2024)

(C.R.147; P.R.49).  TAMSA requested that Commerce reconsider its request for recoding TYPE.

*See* TAMSA's Request for Clarification at 4-5 (Aug. 8, 2024) (C.R.151; P.R.58).  Commerce

confirmed that TAMSA was required to recode products with code [ ], and asked that TAMSA

identify these products "separate from other products" on its databases and "add a variable, if

necessary."  *See* Commerce's Clarification Letter at 2 (Aug. 28, 2024) (C.R.183; P.R.67).

TAMSA complied with Commerce's recoding request and added variable "SUBTYPE" to

identify the products being recoded.  *See* TAMSA Supplemental Sections B-E Response at 2-7,

Exhibits Supp. BC1-Supp. BC4 (Sept. 17, 2024) (C.R.193-284; P.R.75).  TAMSA also explained

that the recoding was inconsistent with Commerce's approach in the investigation and provided

narrative and documentary evidence justifying the initial coding.  TAMSA explained that the

products are physically and commercially different from casing and tubing.  *See id.*  Commerce

also required TAMSA to report [             ], which TAMSA coded [  ] in field TYPE.  *See id.* at 7.

5

PUBLIC VERSION

Petitioners filed pre-preliminary comments arguing that Commerce should (1) reject TAMSA's TYPE and SUBTYPE coding; and (2) decline to grant a CEP offset. *See* Petitioners' Pre-Preliminary Comments at 7-11, 31-40 (Oct. 22, 2024) (C.R.323-324; P.R.85).

In the Preliminary Results, Commerce calculated a 30.38 percent margin for TAMSA. *See Certain Oil Country Tubular Goods from Mexico: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 96638 (Dep't Commerce Dec. 5, 2024) ("Preliminary Results") (P.R.95), and accompanying Preliminary Decision Memorandum ("PDM") (P.R.90).

Commerce granted TAMSA a CEP offset, and used the recoded field TYPE, thereby rejecting TAMSA's coding of TYPE in its initial responses, and excluded SUBTYPE. *See* PDM at 7, 9-11; Commerce's Preliminary Analysis Memorandum at 2 (Nov. 29, 2024) (C.R.326; P.R.93).

Commerce also used the Cohen's *d* test in the first stage of its differential pricing analysis. *See* Preliminary Analysis Memorandum at 4-5. In the second stage of its analysis, Commerce applied the mixed alternative method ("mixed method") (applying the A-T comparison method to U.S. sales passing the Cohen's *d* test and the A-A comparison method to all other U.S. sales). *See* Preliminary Analysis Memorandum at 5.

TAMSA and Petitioners filed case briefs on March 10, 2025, and TAMSA resubmitted its case brief on June 4, 2025 in response to Commerce's request to remove alleged NFI. TAMSA argued that Commerce's preliminary program generated inappropriate matches and distortive margin results due to Commerce's change to coding field TYPE in the preliminary program (*i.e.*, eliminating TAMSA's reported product characteristics coding distinguishing [

6

] from casing and tubing).  TAMSA Resubmitted Case Brief at 8-11 (June 4, 2025) (C.R.354-355; P.R.119).

Petitioners argued that Commerce should deny TAMSA a CEP offset.  Petitioners' Case Brief at 36-47 (Mar. 10, 2025) (C.R.350; P.R.110).

TAMSA and Petitioners filed rebuttal briefs.  TAMSA highlighted that Petitioners' case brief arguments regarding the CEP offset were identical to those raised by the Petitioners in their pre-preliminary comments and in the original investigation – and in both the investigation and in the Preliminary Results, Commerce had granted a CEP offset.  TAMSA Rebuttal Brief at 31-36 (Mar. 17, 2025) (C.R.353; P.R.112).  Petitioners addressed TAMSA's argument regarding TYPE and requested that Commerce reject TAMSA's brief, alleging that it contained NFI.  Petitioners' Rebuttal Brief at 4-14 (Mar. 17, 2025) (C.R.352; P.R.111).

Commerce requested that TAMSA refile its case brief to remove certain alleged NFI.  *See* Commerce's Rejection Memorandum (June 3, 2025) (P.R.117).  TAMSA complied, noting that the alleged NFI "was based solely on information on the record of the review."  *See* TAMSA Resubmitted Case Brief, Cover Letter at 2-3.

On July 18, 2025, Commerce adopted a new "differential pricing" approach following the decisions of the Federal Circuit in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) and *Stupp Corp. v. United States*, 2025 U.S. App. LEXIS 9616 (Fed. Cir. 2025) (non-precedential), which held unreasonable the use of the Cohen's *d* test when that test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variances, and sufficiently numerous data.  The Federal Circuit remanded the matter to Commerce in each case.  *See* Commerce's Post-Preliminary Memorandum at 1, 3, n.7 (July 18, 2025) (P.R.124).

Commerce's newly-developed methodology included two changes to the differential pricing analysis. First, Commerce introduced a new two-percent threshold in place of the Cohen's *d* test (*i.e.*, the "price difference test"). *See id.* at 3. It also discontinued use of the "mixed method" and reduced the threshold for applying the A-T method from 66 percent to 33 percent. *See id.* at 2. Commerce calculated a post-preliminary dumping margin of 42.65 percent – a 40.39 percent increase from TAMSA's preliminary dumping margin. *See id.* at 4.

Commerce requested comments on the new methodology. *See* Briefing Schedule Memorandum (July 22, 2025) (P.R.129). TAMSA argued the review was not the appropriate proceeding to adopt a new methodology and that the methodology is contrary to the statute and to the Federal Circuit's remand instructions. TAMSA Post-Preliminary Case Brief at 8-19 (July 29, 2025) (C.R.366; P.R.130). Petitioners filed a rebuttal brief. *See* Petitioners' Post-Preliminary Rebuttal Brief (Aug. 1, 2025) (P.R.131).

On September 5, 2025, Commerce published the Final Results and calculated a final margin of 26.10 percent for TAMSA. *See* Final Results and accompanying Final IDM. Commerce continued to reject TAMSA's reported TYPE and SUBTYPE coding; reversed its preliminary decision to grant a CEP offset; and continued to use its new differential pricing analysis. See Final IDM at 13-16, 19-22, 23-28; Commerce's Final Analysis Memorandum at 8-11 (Sept. 2, 2025) (C.R.367; P.R.137).

## III.    STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an AD proceeding, the Court "shall hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law …." 19 U.S.C. § 1516a(b)(1)(B)(i).

PUBLIC VERSION

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). For a determination to be supported by substantial evidence, there must be a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ("taking into account *the entire record …*") (emphasis added)). "{I}t is … well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int'l Trade 2000). Moreover, a determination based on inadequate reasoning or conjecture cannot survive the "substantial evidence" standard of review. *See Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citing *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987)).

In determining whether an agency's decision is "in accordance with law," the court "must exercise {its} independent judgment in deciding whether an agency has acted within its statutory authority …." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). If a statute is ambiguous, the court must "use every tool at {its} disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 400. The court "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 412-13 (overruling the deferential statutory interpretation framework established in *Chevron, U.S.A., Inc. v. Natural Resources*

**PUBLIC VERSION**

*Defense Council, Inc.*, 467 U.S. 837 (1984)). If the agency's interpretation of the law "is not the

best, it is not permissible." *Id.* at 400.

The Administrative Procedure Act prohibits an agency from acting in a manner that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). The Federal Circuit has found that there is an abuse of discretion where Commerce's

decision "is based on an erroneous interpretation of the law, on factual findings that are not

supported by substantial evidence, or represents an unreasonable judgment in weighing relevant

factors." *See Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citing

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)). This Court has found

an agency acted in "an arbitrary and capricious manner if 'it entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise.'" *Shandong Dongfang Bayley Wood Co. v. United States*, 375 F.

Supp. 3d 1339, 1344 (Ct. Int'l Trade 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The agency must "articulate a satisfactory explanation for its action," and the court shall

"consider whether the decision was based on a consideration of the relevant factors." *Motor

Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Bowman Transportation, Inc. v. Arkansas-Best

Freight System, Inc.*, 419 U.S. 281, 285 (1974); *Citizens to Preserve Overton Park v. Volpe*, 401

U.S. 402, 416 (1971)). The court will find an abuse of discretion where "the decision … represents

an unreasonable judgment in weighing relevant factors." *See, e.g., Celik Halat ve Tel Sanayi A.S.

v. United States*, 557 F. Supp. 3d 1348, 1357 (Ct. Int'l Trade 2022) (citations omitted). This Court

has also found that "where the agency is vested with discretion to set the procedure by which it

administers its governing statute, the court reviews such decisions for abuse of discretion … In abuse of discretion review, 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" *Jiangsu Jiasheng Photovoltaic Tech. v. United States*, 28 F. Supp. 3d 1317, 1323 (2014) (quoting *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)).

## IV.    ARGUMENT

### A.    Commerce's Decision to Recode Field TYPE was Arbitrary, Unsupported by Substantial Evidence, and was not in Accordance with Law

In the original investigation, Commerce established a model match hierarchy and accepted TAMSA's addition of two codes in field TYPE ([  ] for the [                                    ] and [  ] for [            ]) that distinguished them from the products covered by the existing four codes in the questionnaire, which do not cover [                ].  Commerce's decision in the First Review to require TAMSA to change code [  ] in field TYPE to 1 or 2 departs from its practice in the investigation, fails to consider record evidence of commercially significant physical differences, and is contrary to the statutory requirement for Commerce to calculate dumping margins as accurately as possible.

#### 1.    Legal Framework

In order to determine if U.S. sales are made at less than fair value, the statute directs Commerce to make a "fair comparison" between the export price ("EP") or CEP for U.S. sales and NV.  19 U.S.C. § 1677b(a).  Normal value is the price at which a "foreign like product" is sold in the comparison market.  19 U.S.C. § 1677b(a)(1).  The statute defines the term "foreign like product" to be used for comparisons, in order of preference, as "identical" followed by "similar" merchandise:

(A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—
    (i) produced in the same country and by the same person as the subject merchandise,
    (ii) like that merchandise in component material or materials and in the purposes for which used, and
    (iii) approximately equal in commercial value to the subject merchandise.

(C) Merchandise—
    (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
    (ii) like that merchandise in the purposes for which used, and
    (iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16); *NSK Ltd. v. United States*, 217 F. Supp. 2d 1291, 1299 (Ct. Int'l Trade 2002) ("Section 1677(16) establishes a descending hierarchy of preferential modes that Commerce must select for matching purposes").

To identify the merchandise suitable for matching, Commerce designs a hierarchical model-match methodology:

> In order to ensure an apples-to-apples comparison of sales in the U.S. and home markets, Commerce establishes a set of product criteria, from most to least important, to identify identical and similar products. Within each of these criteria, the distinct characteristics are given different numeric values which, when listed next to each other, constitute the "control number" or "CONNUM" for that "model" or "type." In other words, the CONNUM is a number designed to reflect the "hierarchy of certain characteristics used to sort subject merchandise into groups" and allow Commerce to match identical and similar products across markets.

*See Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1312 n.3 (Ct. Int'l Trade 2020) (quoting *Bohler Bleche GmbH & Co. KG v. United States*, 324 F. Supp. 3d 1344, 1347 (Ct. Int'l Trade 2018)). The Federal Circuit and this court have recognized that "Commerce will not modify its model-match methodology unless 'compelling reasons' exist to do so." *See La Molisana S.p.A. v. United States*, 138 F.4th 1353, 1359 (Fed. Cir. 2025) (citing *SKF*

12

*USA, Inc. v. United States*, 537 F.3d 1373, 1377-80 (Fed. Cir. 2008)); *see also Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1276 (Ct. Int'l Trade 2008). Moreover, the Federal Circuit has held that such "compelling reasons … would exist when that methodology results in comparison of subject merchandise and foreign like products that have commercially significant physical differences." *La Molisana*, 138 F.4th at 1359. It also held that "the basic purpose of the statute," and Commerce's administration of it, is to "determine current margins as accurately as possible." *See id.* (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990))).

To ensure a fair comparison, the statute provides for an adjustment to NV for differences in physical characteristics between the foreign like product and the merchandise exported to the United States. *See* 19 U.S.C. § 1677b(a)(6)(C)(ii), *see also* 19 C.F.R. § 351.411. Where the foreign like product is not identical to the subject merchandise, Commerce adjusts NV for the "'difference in cost attributable to the difference in physical characteristics' – the difference in merchandise ('difmer') adjustment." *See Mitsubishi Heavy Indus. v. United States*, 97 F. Supp. 2d 1203, 1205 n.4 (Ct. Int'l Trade 2000) (citing Import Policy Bulletin 92.2 (July 29, 1992)). Where the variable cost difference between the products in each market exceeds 20 percent, Commerce considers that they "cannot be considered similar" under the statute and "cannot reasonably be compared." *See* Import Policy Bulletin 92.2; *see also Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 40503 (Dep't Commerce July 7, 2022), accompanying Issues and Decision Memorandum at 12-13.

PUBLIC VERSION

**2.      Commerce Failed to Justify Changing the Coding in Field TYPE from the Coding Verified and Approved in the Investigation**

In the original investigation, Commerce verified and accepted TAMSA's use of code ([  ]) to identify [                                ] in field TYPE and included this code in the CONNUMs used for model matching to calculate the final dumping margin.  In the First Review, TAMSA used the identical coding Commerce relied on in the investigation, including code [ ] in field TYPE. However, Commerce required TAMSA to recode [ ] as a 1 or 2.  The Final Results fail to justify the change, and instead acknowledge that the recoding was a departure from the investigation – while also attempting to claim that TAMSA, rather than Commerce, changed the coding.  This assertion is plainly contradicted by the record of the First Review, which confirms that Commerce's recoding change was arbitrary, and not supported by substantial evidence or in accordance with law.

Commerce's questionnaire in this proceeding includes ten product characteristics that comprise the CONNUM used for model matching in descending order of importance.  *See* Commerce's Questionnaire at B-8-12.  The TYPE field, which distinguishes different "types" of OCTG products, is the second most important product characteristic in the hierarchy.  The questionnaire includes four codes in field TYPE:  1; 2; 4; and 9:

FIELD NUMBER 3.2:      **Type**

FIELD NAME:      **TYPEH**

DESCRIPTION:      **Casing, Tubing, Green Tube, or Coupling Stock**

1 = Tubing
2 = Casing
4 = Green Tube
9 = Coupling Stock

14

*See* Commerce's Questionnaire at B-8-12.  The TYPE field was not introduced by Commerce in this case; it was used in prior OCTG cases.  *See, e.g., Certain Oil Country Tubular Goods From the Republic of Korea: Negative Preliminary Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances and Postponement of Final Determination*, 79 Fed. Reg. 10480 (Dep't Commerce Feb. 24, 2014), accompanying Preliminary Decision Memorandum at 10 (Feb. 14, 2014) ("OCTG Korea PDM") ("The Department identified ten physical characteristics to be used to define unique CONNUMs (welding, *type*, grade, coupling, upset end, threading, nominal outside diameter, length, heat treatment, and nominal wall thickness)") (emphasis added).  As Commerce recognizes, at the start of the investigation TAMSA requested that Commerce [                                                                                ] from the scope of the order.  *See* Final Analysis Memorandum at 9-10 (citing Petitioners' May 9, 2024 RFI Submission at Exhibit 7, Part 7-B (May 9, 2024) (C.R.139-140; P.R.43-44)).  Commerce decided not to exclude the products, and TAMSA proposed that they be distinguished by different codes within the TYPE field, and neither Commerce nor any other party objected.

Thus, it was natural and completely reasonable for TAMSA to use the same coding in this First Review.  At Petitioners' urging, Commerce instructed TAMSA to recode TYPE [  ] products to treat them as tubing or casing by assigning them code 1 or 2.  *Compare* Petitioners' Deficiency Comments at 2 *with* Supplemental Questionnaire, Question 11.  Commerce did not require any change to the other code that TAMSA added (code [  ] for [        ]).  *See* Supplemental Questionnaire.  Given that TAMSA reasonably took the same approach to coding TYPE that Commerce accepted and verified in the investigation, TAMSA requested that Commerce reconsider its request for recoding TYPE.  *See* TAMSA's Request for Clarification.  Commerce nevertheless instructed TAMSA to recode products with code [  ] in field TYPE, and asked that

15

TAMSA identify these products "separate from other products" on its databases and "add a variable, if necessary." *See* Commerce's Clarification Letter at 2. Although TAMSA recoded to comply with Commerce's instructions and added variable "SUBTYPE" to enable Commerce to identify the products being recoded, TAMSA reiterated that the recoding was inconsistent with the investigation coding and provided supporting narrative and documentation to demonstrate that code [ ] was necessary to distinguish products that are physically and commercially different from casing and tubing. *See* Supplemental Sections B-E Response at 2-7. Commerce required TAMSA to report [    ], and TAMSA reported them using code [ ], Commerce did not object. *Id.* at 7.

Commerce concedes that it verified and accepted TAMSA's use of code [ ] in the investigation by recognizing that "Commerce did not request a change to TAMSA's reporting of TYPEH/U for [    ] and [      ]," and "certainly verified the accuracy of TAMSA's responses{.}" *See* Final Analysis Memorandum at 11. Although Commerce's statement necessarily recognizes that the recoding in the First Review represents a change from the investigation, Commerce fails to provide any "compelling reason" to depart from the coding in the investigation. Instead, Commerce attempts to dismiss the relevance of accepting code [ ] in the investigation by claiming that "Commerce's verification reports are factual, not decisional documents, and Commerce did not explicitly address the appropriateness of TAMSA's re-coding of the TYPEH/U model match criteria in the decision memoranda or other documents accompanying the preliminary or final determinations." *Id.*

Commerce's explanation is wrong and misses the point. Commerce did not "address the appropriateness" of code [ ] because it was not contested by any interested party in the investigation and it was accepted and used by Commerce after seeking information and verifying it. Indeed, documents from the investigation confirm that Commerce considered the issue of

coding in field TYPE before accepting it.  Commerce asked TAMSA to justify its use of codes [  ] and [  ]: "Please describe in detail how [                                    ] that TAMSA sold to its home market customers are similar with, and different from, tubing, casing, green, or coupling stock pipe in product characteristics."  *See* TAMSA's RFI Response at Exhibit 1 at 3-4 (May 16, 2024) (C.R.145; P.R.47).  In response, TAMSA explained that [

            ] are different from the other products and stated that it continued to use code [  ] in field Type for [                          ] and code [  ] for [            ].  *See id.*  As Commerce recognizes, after seeking further information, it verified and accepted the coding.  Final Analysis Memorandum at 11.

Even though Commerce admits in the Final IDM that the coding changed in the investigation, it paradoxically accuses TAMSA of "revis{ing} the CONNUM structure by adding codes to field TYPEH/U," asserts that "we are not required to re-work the existing model-match criteria for individual respondents after the model match criteria and codes have been established," and states that Commerce may only make changes where "'compelling reasons to do so' exist." Final IDM at 20-21 (citing *Fagersta Stainless*, 577 F. Supp. 2d at 1276; *SKF USA, Inc.*, 537 F.3d 1373).  As the record confirms, TAMSA neither "revised the CONNUM structure" or coding, nor did it request that Commerce "re-work the criteria or coding" or "make changes" to coding. Rather, as TAMSA plainly stated in its initial response, it followed the identical approach to coding in field TYPE that Commerce approved in the investigation.  Moreover, Commerce's purported explanation for recoding – *i.e.*, to address TAMSA's "revisions" to the structure – is further undermined by the fact it only instructed TAMSA to eliminate code [  ], not code [  ] for [        ].  *See* Supplemental Questionnaire at 8.  Commerce's decision is arbitrary because it

fails to address its inconsistent position between recoding [ ] for [                    ] and not recoding the added codes for [            ] (code [ ]), or for [        ] (code [ ]).

The record demonstrates that Commerce changed the product coding and provided no explanation. Commerce accuses TAMSA of revising the coding when in fact TAMSA just followed the approach Commerce verified and approved in the investigation. Commerce's action is arbitrary because, even though it recognizes that it accepted the coding in the investigation, it provides "insufficient reasons" for departing from the product coding used to calculate the dumping margins in the investigation, and fails to explain its inconsistent treatment of the coding of field TYPE. *See Jiangsu Jiasheng*, 28 F. Supp. 3d at 1323. Commerce's decision to change was unsupported by substantial evidence and not in accordance with law.

### 3. Commerce Failed to Consider the Record Evidence in the Underlying Review Supporting the Coding in Field TYPE

Commerce failed to consider the record evidence confirming that the products at issue should be coded [ ] in field TYPE to account for commercially significant physical differences. Instead, Commerce inappropriately ignored the TYPE field as if it serves no purpose and merely speculated that another field, [            ], addresses differences between [                    ] and casing and tubing.

The First Review record demonstrates that [                    ] have "commercially significant physical differences," which are reflected in the costs and prices of those products when compared to casing and tubing, that justifies coding them differently in field TYPE. *See Bohler*, 324 F. Supp. 3d at 1349-54; *La Molisana*, 138 F.4th at 1359. These differences, which translate into different prices and costs, include the [

**PUBLIC VERSION**

]. *See* Supplemental Sections B-E Response

at 3.

Below are the points TAMSA provided on the record demonstrating the differences between the products.

<u>Different Uses</u> - [

]. *See id.* at 4.  In contrast, casing is used as "the structural retainer for the walls of the well" and tubing is "installed inside a larger-diameter casing." *See id.* (quoting *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Invs. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381, at 7 (November 2022)).

<u>Separate Production Facilities</u> - [

], at TAMSA's separate [                    ] production plant.  *See id.* at 4-5, Exhibit Supp. BC3.  Casing and tubing are the [                              ] to make [

]. *See id.*  It makes sense that, where one product is [                    ], and this must be done at a [                ], the two products cannot be considered the [      ], and should be distinguished by more than simply the [        ] field.

[      ] *versus* [      ] *for* [        ] - The [

] at the [              ] plant, whereas for casing and tubing [                        ] per the API 5CT specifications.  *See id.* at 5, Exhibit Supp. BC4.  [

]. *See id.*

<u>Different Prices</u> - As shown in the data and invoices provided, the commercial conditions and prices are different for the products.  *See id.* at 4-5, Exhibit Supp. BC4.  [

19

**PUBLIC VERSION**

] command several times [        ] prices than casing and tubing because they are [

].

*See id.* at 5-6, Exhibit Supp. BC4 (data showing differences in [        ] and corresponding [

] plus sample invoices for representative sales of each

product confirming the data and showing [        ] size [                    ] and a

[            ] by [    ] percent for the [        ] compared to the [        ]).

  <u>*Different Costs*</u> – [                    ] incur much [        ] production costs than

casing or tubing, as shown in the comparative total costs of manufacturing ("TOTCOMs") in this

review (the TOTCOM for [                    ] than for tubing and [

] than for casing).  *See id.* at 6, Exhibit Supp. BC4.

  In its Final IDM, Commerce does not consider this record evidence, but merely claims that

"TAMSA has failed to explain why the products are physically distinct from the characteristics of

other products which would be classified under the same codes under the existing model match

criteria{,}" and that it "is not enough to point out that some products … have different

commercially significant costs, prices, or uses as other products with the same CONNUMs."  Final

IDM at 21.  These statements confirm that Commerce simply dismissed the record evidence.

Commerce is converting the commercial-significance inquiry into an impossible standard that

allows it to dismiss demonstrated physical, cost, price, or use differences without engaging in their

relevance to price comparability.  Commerce's "failure to consider or discuss this record evidence"

that "provides significant support for" the conclusion that these products are different and should

be coded differently renders its decision to recode unsupported by substantial evidence.  *Allegheny*

*Ludlum*, 112 F. Supp. 2d at 1165.

**PUBLIC VERSION**

Likewise, in the Final Analysis Memorandum, Commerce fails to engage with the information that TAMSA submitted other than to selectively excerpt product descriptions in Exhibit Supp. BC2 to attempt to support its claim that [          ] is the only relevant characteristic to distinguish the products. *See* Final Analysis Memorandum at 8-9. Commerce misleadingly cites a portion of the [          ] description: "TAMSA specifies that [          ] are '[

] … [

].'" Final Analysis Memorandum at 9. The full description is: [

]. Supplemental Sections B-E Response at Exhibit BC2 (emphasis added). The omitted language is important because it explains why [          ] are different products from casing and tubing. The [          ] is why they have different uses, require further production steps that result in more costs, and are sold at a [     ] price on a per metric ton basis because they enable drillers to [

]. Commerce excerpts the description of [          ] as follows: "the record also specifies [          ] as '[          ]." Final Analysis Memorandum at 9. Again, the full description is different, stating that [          ] are [

]. *See* Supplemental Sections B-E Response at Exhibit Supp. BC2. As with [          ], the [

] and specific purpose explain why they require a further [          ] in a [

] that results in [     ] costs and [          ] prices.

21

**PUBLIC VERSION**

Commerce uses these arbitrarily edited partial excerpts, and ignores the record evidence as a whole, to justify its decision that these products should be considered the same TYPE. Commerce speculates that, once TYPE is ignored, the only difference between these products and casing and tubing is the [        ]. *See* Final Analysis Memorandum at 9 ("otherwise identical [        ] are treated as physically [        ]"). Commerce concludes that "The physical characteristic [        ] is identified in field [        ]," and "{t}herefore, the existing model match criteria and codes address all of the physical differences between different [        ] of both [        ] and [        ] on the one hand and [        ] on the other." *Id.* Commerce is the one that recoded field TYPE and then claimed that the recoding shows that the products are the same TYPE, and it simply ignores the record evidence demonstrating that field [        ] does not prevent inappropriate matches.

Commerce failed to address TAMSA's concern that the coding in field [        ] has limited implications for matching due to its low ([        ]) place in the model match hierarchy. *See* TAMSA Resubmitted Case Brief at 11. The inclusion of a [        ] field does not address the fact that [        ] are a fundamentally different type of product from casing and tubing. Field [        ] only has codes for casing, tubing, and coupling stock, not [        ], consistent with the limited coding in field TYPE for those products:

**FIELD NUMBER [        ]**

    **FIELD NAME:**    [        ]

    **DESCRIPTION:**    [        ]

                [

22

**PUBLIC VERSION**

]

The [                    ] are only for casing and tubing and no codes are provided for [                    ].
*See* Supplemental Sections B-E Response at 7-9.  Consistent with the approach used in the
investigation, to address this deficiency, TAMSA "included new codes to identify [

]" and explained that these "codes identify lengths that are [

]."  *See* Sections B, C, E
Response at B-21.  In other words, the [        ] variable – and its relatively unimportant place in
the hierarchy – makes perfect sense when the only "TYPE" of OCTG product being considered is
casing, tubing and coupling stock, each of which has its own TYPE code.  It is insufficient when
the products are not designated as a separate TYPE.  Imagine if coupling stock did not have its
own TYPE code; having a separate [          ] code would be insufficient to prevent a comparison
with casing and tubing, which we should all be able to agree would be absurd.  The same is true
with [                    ].

While Commerce focused on field [          ], it treated field TYPE as superfluous even
though this characteristic, unlike field [          ], has a significant role in model matching as the
second most important criterion.  In the investigation, TAMSA proposed code [ ] in field TYPE
to adapt this field to properly define for model matching the different "types" of products it
produced and sold, and Commerce accepted this coding.

The review record confirms that code [ ] is consistent with the purpose of field TYPE,
which is to distinguish different "types" of OCTG products and different types of subject
merchandise.  Industry standards and OCTG producers such as Tenaris treat [

] as different "types" of products from casing and tubing.  For example, the industry standard

23

for OCTG, API 5CT, separately identifies these products. *See, e.g.,* Section A Response at Exhibit A35 ("[

]"). Likewise, in the normal course of business, TAMSA treats them as different "types" of products in its product coding system. *See* Section A Response at Exhibit A34 (showing that the product codes, including the [                    ] codes (the first part of the product code) are different for [

]. Consistent with the industry standards and TAMSA's product coding, field TYPE distinguishes between different "types" of OCTG products and code [ ] is appropriate for differentiating [                          ] as different types of products from casing and tubing.

Commerce's decision to recode field TYPE failed to consider the record evidence that additional coding was necessary to distinguish the products at issue because the existing coding was inadequate. Based on the documented price and cost differences on the record of the review, coding [                          ] differently in the TYPEH/U field is consistent with this Court's precedent and Commerce practice. *See, e.g., Bohler*, 324 F. Supp. 3d at 1349-54 (failure to account for "commercially significant physical differences, which are reflected in the costs and prices of those products" by using "a single CONNUM" is neither "reasonable, supported by substantial evidence on the record," nor "otherwise in accordance with the law"); *Certain Frozen Warmwater Shrimp from Ecuador: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 47201 (Dep't Commerce Sept. 15, 2009), accompanying Issues and Decision Memorandum at 45 ("Because of the observed significant price and cost differences {between products} by recoding … we obtain greater accuracy in comparing the foreign like product to the

24

single most similar U.S. product, consistent with section 771(16)(B) of the Act {and} accordingly we have made the requested change to the {coding}"). Therefore, Commerce's decision to recode was unsupported by substantial evidence, and was not in accordance with law.

     **4.**     **Commerce's Change to the Field TYPE Coding Yields Distorted Matching and Margin Results Contrary to the Requirement that Commerce Calculate Dumping Margins as Accurately as Possible**

In its case brief, TAMSA alerted Commerce that its inappropriate recoding of field TYPE yielded distortive preliminary margin results and proposed options for Commerce to correct this unlawful outcome. Due to Commerce's recoding, the program assigns [                                    ] that were sold but not produced during the POR surrogate costs that are inappropriately [    ] because they are tubing and casing costs rather than the costs of the most similar products, other [                          ]. This assignment of costs alters the results of the DIFMER test that hinges on whether differences in variable costs are sufficient to preclude matching, which changes the product matches and consequently the dumping margins.

TAMSA explained that Commerce's program assigns surrogate costs to products sold but not produced during the POR in [              ] of the Analysis of Comparison Market Sales Program. *See* TAMSA Resubmitted Case Brief at 12. In the case of [                          ], because Commerce recoded them 1 or 2 rather than [ ] in field TYPE, they are assigned the [        ] surrogate costs of tubing or casing rather than the [        ] surrogate costs of the most similar products, [                          ]. *See id.* In contrast, on its cost database, TAMSA had reported the surrogate costs assigned to products sold but not produced during the POR that takes into account the product coding that distinguishes [                      ] from other products. *See id.*

**PUBLIC VERSION**

Next, Commerce's program runs the test for each U.S. CONNUM to identify which home market CONNUMs have a variable cost difference within 20 percent of the U.S. CONNUM total cost of manufacturing ("DIFMER test"), and, therefore, would be available for matching, which is in part 6 of the Margin Calculation Program. *See id.* However, due to Commerce's recoding of the CONNUM, Commerce's preliminary program assigned casing and tubing surrogate costs to sales of [                    ]. *See* TAMSA Resubmitted Case Brief at 13. The variable costs assigned by TAMSA and by Commerce's program are set out in the Attachment to TAMSA's brief. *See id.* at Attachment. Although Commerce improperly rejected a portion of TAMSA's Attachment and the related narrative explanation as untimely filed NFI, the remaining portion of the Attachment shows the costs assigned by TAMSA and by Commerce's program. *Id.* Reviewing these two sets of costs shows that the costs assigned by Commerce's program after recoding (*i.e.*, casing and tubing costs) are [              ] the costs assigned by TAMSA based on proper coding (*i.e.*, [                    ].

As this Court has recognized, "{u}nder the Department's '20% Rule,' a DIFMER greater than 20 percent creates a presumption that two products are not 'similar.'" *See Bohler*, 324 F. Supp. 3d at 1351. However, the DIFMER test did not operate "normally" in the underlying review due to Commerce's recoding. The program assigned [                    ] that were sold but not produced during the POR surrogate costs that are inappropriately [    ] because they are tubing and casing costs rather than the costs of [                    ]. *See* TAMSA Resubmitted Case Brief at 8, Attachment. The surrogate costs that TAMSA reported for similar products are the appropriate surrogate costs, not the ones that are generated after Commerce changed the coding to pretend that different types of products are identical. Commerce's assignment of costs changes the DIFMER test results and leads to distortions. *Id.* In past cases,

26

Commerce has stated that "{i}t is the Department's practice in assigning surrogate costs (where a respondent did not produce a product during the reporting period) to use the most similar product available in establishing those surrogates, as long as it does not lead to distortions." *See Certain Circular Welded Carbon Steel Pipes and Tubes From Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 82 Fed. Reg. 55093 (Dep't Commerce Nov. 20, 2017), accompanying Issues and Decision Memorandum at 10.

TAMSA offered Commerce three solutions to avoid inappropriate matches and inaccurate margins. Commerce rejected each of them. TAMSA explained that the best solution to correct this (*i.e.*, "First Option") was to use TAMSA's code [ ] in TYPE to distinguish the products and assign the correct surrogate costs, just as TAMSA had done on its cost database. *See* TAMSA Resubmitted Case Brief at 16-17. The "Second Option" was a variation on the first that used the SUBTYPE field to distinguish the products. *See* TAMSA Resubmitted Case Brief at 17.

As an alternative (*i.e.*, "Third Option"), TAMSA proposed that Commerce could assign the surrogate costs that TAMSA submitted for the most similar products ([

]) rather than for casing and tubing, which Commerce had done in past cases such as *Welded Carbon Steel Standard Pipe and Tube Products from Turkey*. *See* TAMSA Resubmitted Case Brief at 16 & n.38. Commerce dismissed this option as "also unwarranted." Final Analysis Memorandum at 10. However, Commerce incorrectly attempts to distinguish Commerce's approach in *Welded Pipe* by claiming that [                    ] and casing and tubing are "identical" products:

> However, as far as the established model match criteria (*i.e.*, the CONNUMs) are
> concerned, [                ] is identical to [            ] or other [        ] with the
> same [      ] code and [                    ] is identical to [            ] or other
> [      ] with the same [        ] code, and identical CONNUMs reflect all physical
> differences deemed by Commerce in the LTFV investigation to have commercial
> significance. Thus, Commerce's approach in *Welded Carbon Steel Standard Pipe*

27

*and Tube Products from Turkey,* being concerned with surrogate costs from similar, not identical products, is easily distinguished from our approach to calculating average costs for [            ] or [                ] and physically identical [                ].

Commerce's statement is inaccurate in two respects. First, Commerce fails to take responsibility for its role in attempting to force the products to be treated as "identical" by recoding the TYPE field. Second, Commerce merely speculates that it is possible to achieve "identical" products based on [        ]. However, the issue TAMSA raised was the flawed DIFMER test result, which is only an issue when products are ***not*** identical. Commerce ignores the record evidence of the production-related and commercial realities that confirm these products are not identical, and that [        ] is defined differently for these products.

Therefore, Commerce's recoding of field TYPE and its use of the surrogate costs assigned by the program impermissibly resulted in inaccurate margins contrary to the purpose of the statute, and Commerce's administration thereof. *See La Molisana,* 138 F.4th at 1361. Accordingly, Commerce's decision to recode TYPE was unsupported by substantial evidence and was not in accordance with law.

### B.    Commerce's Rejection of Certain Information in TAMSA's Case Brief as New Factual Information was Arbitrary, Unsupported by Substantial Evidence, and was not in Accordance with Law

Commerce improperly rejected certain information in TAMSA's case brief related to Commerce's recoding of field TYPE and the assignment in the preliminary program of inappropriate surrogate cost CONNUMs to sales of [                        ]. Commerce failed to address TAMSA's explanation that the information was not NFI, but instead was based on information already on the record. *See* TAMSA Resubmitted Case Brief at 13, Attachment.

The statute and Commerce's regulations impose time limits on the submission of factual information by parties for Commerce to consider in reaching a determination. *See* 19 U.S.C. §

28

**PUBLIC VERSION**

1677m(a), (e); 19 C.F.R. § 351.301.  If Commerce decides not to accept information, "it shall, to the extent practicable, provide to the person submitting the information a written explanation of the reasons for not accepting the information." *See* 19 U.S.C. § 1677m(f); 19 C.F.R. § 351.302(d) (Commerce will provide "to the extent practicable, written notice stating the reasons for rejection").  In addition, Commerce's regulations define the record of proceedings, and provide that it will not use material that is rejected in making any determination.  *See* 19 C.F.R. § 351.104(a)(2)(i).

In its case brief, TAMSA submitted factual information in an Attachment in support of the argument that "Commerce's revised CONNUM coding in the preliminary program results in inappropriate matches and must be corrected."  TAMSA Resubmitted Case Brief at 13-15, Attachment.  TAMSA cited to the source documents on the record for the information in the Attachment.  *Id.* at Attachment.  Commerce rejected TAMSA's case brief stating that it "has determined that TAMSA's Case Brief contains untimely new factual information not previously contained on the record of this review."  Rejection Memorandum at 1.  Commerce permitted TAMSA to refile its case brief after removing the information from the Attachment and related narrative discussion that Commerce "determined" was NFI.  Rejection Memorandum at 1; Final IDM at 2 n.9.  TAMSA resubmitted its case brief as instructed, explaining that it "respectfully disagreed" that the information Commerce identified was NFI because "the information that Commerce requested be removed from TAMSA's case brief was based solely on information on the record of the review."  TAMSA Resubmitted Case Brief, Cover Letter at 2-3.  The column headings in TAMSA's resubmitted Attachment confirm that the two source documents are both on the record of the review:  (1) The TAMSA cost of production database "tamsacop02" for the

29

"Submitted Surrogates"; and (2) Commerce's preliminary margin program ([                    ] of Analysis of Comparison Market Program). *See* TAMSA Resubmitted Case Brief at Attachment.

This Court has upheld Commerce's findings that briefs contain NFI when "the documents did not merely summarize prior-submitted information, but provided new reporting methodologies, substantive revisions to margin calculations, and new explanations of formulas." *See Godaco Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342 (Ct. Int'l Trade 2020). That is not the case with the information at issue in TAMSA's case brief, which was <u>entirely</u> based on the previously-submitted information. Moreover, Commerce's rejection letter, and its subsequent documents for the Final Results, fail to provide an explanation for finding the information was NFI, as required by the statute and regulations. *See* 19 U.S.C. § 1677m(f); 19 C.F.R. § 351.302(d).

When rejecting the original BPI and public versions of the case brief, Commerce stated that it "will retain a copy of these documents on the official record solely for the purpose of establishing and documenting the basis for rejecting the document and will not consider the untimely new factual information in making its final determination in this administrative review." Rejection Memorandum at 2. These documents can be found in the administrative record indices as C.R.348-349 and P.R.109. TAMSA's position remains that a review of these documents would not "establish" or "document" the basis for rejecting the document.

The Court can easily determine the derivative nature of the information improperly rejected by Commerce by reviewing the rejected document and comparing it to the document that Commerce required TAMSA to re-file. The missing information is a clear derivation of information on the record; it is not new information. Calling this new information is akin to

rejecting a column that shows for the first time a value of 4, while the information on the record clearly established the component values of 3 and 1.

Commerce's improper rejection of information from the record in TAMSA's case brief as NFI without providing an adequate explanation was arbitrary, unsupported by substantial evidence, and was not in accordance with law.

### C. Commerce's Decision to Deny TAMSA a CEP Offset in the *Final Results* was Unsupported by Substantial Evidence and was not in Accordance with Law

In the *Preliminary Results* of the instant administrative review, consistent with its approach in the original investigation, Commerce preliminarily granted TAMSA a CEP offset after finding that the qualitative support and the "quantitative metrics" provided by TAMSA "demonstrated the differences in the selling expenses incurred for its home market sales and for its export sales …." PDM at 11. Yet Commerce changed its approach in its Final Results and denied TAMSA the CEP offset it had found was warranted in the Preliminary Results on the basis of "insufficient quantitative support." Final IDM at 15. Commerce offered no explanation for its reversal in course from the Preliminary Results and its approach in the original investigation, nor was TAMSA on notice that the information Commerce found acceptable in the Preliminary Results could be deemed "insufficient" in the Final Results.

#### 1. Legal Framework

Pursuant to 19 U.S.C. § 1677b(a)(7)(B) and 19 C.F.R. § 351.412(f), Commerce will grant a CEP offset where normal value ("NV") is compared to CEP and is determined at a more advanced level of trade than the level of trade of CEP. *See* 19 U.S.C. § 1677b(a)(7)(B); 19 C.F.R. § 351.412(f). Commerce requires the respondent to demonstrate the difference in the levels of trade in the two markets through documentation "that includes both a 'qualitative' and 'quantitative' analysis to 'find that a … CEP offset is warranted.'" *See, e.g., Wheatland Tube v.*

31

*United States*, 755 F. Supp. 3d 1304, 1309-10 (Ct. Int'l Trade 2025) (citation and internal brackets omitted).

### 2.    Commerce Failed to Explain its Change in Course from the Preliminary Results and Original Investigation

TAMSA provided the exact same type of qualitative and quantitative evidence in the instant administrative review that was presented in the original investigation. *Compare Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 Fed. Reg. 59041 (Dep't Commerce Sept. 29, 2022), accompanying Issues and Decision Memorandum at 11-18, *and* Section A Response at A-17-A-26, Exhibit A4; TAMSA Sections B, C, E Response at B-66-67, C-67, Exhibits B19, C20; Supplemental Section A Response at 13-19. TAMSA modeled its CEP offset submission in this administrative review on its submission in the original investigation precisely because Commerce granted TAMSA a CEP offset under nearly identical circumstances and based on the same type of qualitative and quantitative evidence provided in the original investigation. Based on the evidence that TAMSA presented, and in accordance with its past practice, Commerce found in the Preliminary Results that "TAMSA provided quantitative support for its {level of trade} claims," leading Commerce to preliminarily grant TAMSA a CEP offset. *See* PDM at 11.

Commerce's stated explanation for denying TAMSA a CEP offset in the Final Results was, in relevant part, because "there is insufficient quantitative support for TAMSA's claimed differences in levels of intensity for selling functions performed in both markets." *See* Final IDM at 14-15. Commerce made no effort in its Final Results to explain its change in course from the Preliminary Results. In fact, TAMSA is not aware of an evidentiary basis that *would* have supported Commerce's change in position between the Preliminary Results and Final Results, because the record did not change. Commerce did not request any additional information from

32

TAMSA about TAMSA's claimed CEP offset during this time. Commerce offered TAMSA no notice prior to issuing the Final Results that its previously acceptable quantitative support for the CEP offset was "insufficient."

Moreover, no interested party raised any new arguments regarding the CEP offset. Petitioners made nearly identical arguments in their case brief that they already had made in their Pre-Preliminary comments. *Compare* Petitioners' Case Brief at 36-47 *with* Petitioners' Pre-Preliminary Comments at 31-40. Commerce had the benefit of reviewing those same comments when preparing the Preliminary Results, at which time it found that TAMSA had adequately supported its CEP offset claim. *See* PDM at 11. Petitioners' same comments made in their case brief added nothing new to Commerce's deliberations for the Final Results. Nevertheless, Commerce reversed course in its Final Results and denied TAMSA the CEP offset. *See* Final IDM at 15.

In similar situations, the courts have found that Commerce's explanations for a change in course from past precedent is unsupported by substantial evidence, particularly where – as here – a respondent relied on Commerce's past practice. *See, e.g., Sunpower Corp. v. United States*, 179 F. Supp. 3d 1286, 1307 (Ct. Int'l Trade 2016) (finding remand necessary where Commerce did not address or explain its inconsistent application of country-of-origin rule applied to solar cells). In *Arch Chems., Inc. v. United States*, this Court found remand necessary where Commerce accepted sales documentation provided by a respondent to substantiate claimed by-product offsets in the original investigation and the preliminary results of the first administrative review but changed course and denied the by-product offset in the final results of the first review. *See Arch Chems., Inc. v. United States*, 33 C.I.T. 954, 963-64 (2009) (citing *Shikoku Chemicals Corp. v. United States*, 795 F. Supp. 417, 421 (Ct. Int'l Trade 1992)). As in the case of *Arch Chems., Inc.,*

Commerce failed to "notify {TAMSA} precisely what information it expect{ed} {TAMSA} to produce" to conduct its CEP offset analysis. *See id.* at 961-62 (directing Commerce, on remand, to provide the respondent with sufficient opportunity to submit documentation relevant to the methodology Commerce employs in its by-product analysis).

Here, not only was Commerce dealing with "similar situations" across the original investigation and the First Review, but it was also dealing with the same factual record between the Preliminary Results and the Final Results. *See SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316 (Ct. Int'l Trade 2016). Although "Commerce has the flexibility to change its position from the preliminary to the final results," it must "explain{} the basis for the change" and demonstrate that "its decision is supported by substantial evidence and in accordance with law." *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1343 (Ct. Int'l Trade 2018) (citation omitted). Here, it did not do so. "An agency determination … is *ipso facto* unreasonable, and … arbitrary when it … treats similar situations in dissimilar ways." *SunEdison, Inc.*, 179 F. Supp. 3d at 1316. Accordingly, consistent with this Court's past decisions, TAMSA respectfully requests that the Court find that Commerce's denial of TAMSA's CEP offset is unsupported by substantial evidence and was not in accordance with law.

**D. Commerce's Use of the Modified Differential Pricing Methodology was Arbitrary, Unsupported by Substantial Evidence, and not in Accordance with Law**

In the Preliminary Results, Commerce applied the Cohen's *d* test as part of its differential pricing analysis. However, in its Post-Preliminary Analysis, Commerce abandoned that methodology in favor of a new, modified differential pricing approach, citing the Federal Circuit's decisions finding Cohen's *d* to be unlawful in *Marmen* and *Stupp*. As these two cases remain pending before the court, Commerce's adoption of the modified methodology was premature,

34

unnecessary, and unfair.  Given that *Marmen* and *Stupp* have not yet been resolved, their ultimate outcome will likely determine the appropriate replacement for the Cohen's *d* test.  In any event, Commerce's modified methodology is unlawful on its merits.  The two percent "price difference" threshold introduced in the new approach fails to satisfy the requirements set forth in the statute.  Equally problematic, Commerce did not conduct a case-specific analysis grounded in the record developed during the First Review, as required by the statute.

### 1.    Legal Framework

The statute and regulations require that Commerce normally use an A-to-A price comparison method to calculate the dumping margin, which involves a comparison of "the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise …."  19 U.S.C. § 1677f-1(d)(1)(A); *see also* 19 C.F.R. § 351.414(b)(1), (c)(1).  The statute provides an exception to this rule if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time{,}" and "the administering authority explains why such differences cannot be taken into account using' the A-to-A method (or a Transaction-to-Transaction method).  19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added); *see also* 19 C.F.R. § 351.414(b)(3).  If both conditions are met, Commerce may use an A-to-T price comparison method, which involves a comparison of "the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise."  19 C.F.R. § 351.414(b)(3).

The Statement of Administrative Action ("SAA") requires that "in determining whether a pattern of significant price differences exists, Commerce will proceed on a case-by-case basis,

because small differences may be significant for one industry or one type of product, but not for another." H.R. Doc. No. 103-316, at 842-43 (1994).

**2.    Commerce's Decision to Implement the New Modified Differential Pricing Methodology in the First Review was Arbitrary and Contrary to Law**

Commerce's decision to introduce an entirely new differential pricing methodology at the post-preliminary stage of the underlying review was arbitrary and contrary to established principles of administrative fairness. Changing methodologies retroactively at the eleventh hour of a review that had been fully briefed and argued on the merits months earlier is arbitrary, unfair, and inconsistent with the public policy of encouraging market participants to comply with the antidumping law. Any methodology that Commerce applies should be confirmed by *Marmen* and *Stupp* before it is applied, as appropriate, in any remand involving the First Review.

In the *Preliminary Results*, Commerce employed its normal differential pricing methodology, using the Cohen's *d* test and "ratio test." *See* PDM at 6-7; *Preliminary Analysis Memorandum* at 5. Commerce applied the mixed alternative method ("mixed method") (applying the A-T comparison method to U.S. sales passing the Cohen's *d* test and the A-A comparison method to all other U.S. sales) and calculated a preliminary dumping margin of 30.38 percent. *Preliminary Analysis Memorandum* at 5. Approximately eight months later, Commerce introduced a modified differential pricing methodology purportedly in response to the Federal Circuit's decisions in *Marmen* and *Stupp*, both of which held it unreasonable to use the Cohen's *d* test when applied to data that do not satisfy the statistical assumptions of normal distribution, equal variances, and sufficiently numerous data. *See* Memorandum To: Scot Fullerton; From: Erin Kearney; Subject: *Post-Preliminary Analysis of the Administrative Review of Certain Oil Country Tubular Goods from Mexico; 2022-2023*, at 2 (July 18, 2025) ("Post-Preliminary Memorandum")

(C.R.356; P.R.124). The new methodology made two changes to the prior analysis: (1) it replaced the Cohen's *d* test with a new two-percent "price difference test"; and (2) it discontinued the use of the "mixed method" as an alternative comparison methodology and reduced the threshold for applying the A-T method from 66 percent to 33 percent (a change that pertains to the ratio test rather than the Cohen's *d* test, and thus was outside the scope of the Federal Circuit's remand instructions). *See* Post-Preliminary Memorandum at 3. As a result, Commerce applied the A-T comparison method to all of TAMSA's U.S. sales and calculated a post-preliminary dumping margin of 42.65 percent – a 40.39 percent increase from TAMSA's preliminary margin. Post-Preliminary Memorandum at 4. In the Final Results, Commerce continued to apply the modified differential pricing methodology. Final IDM at 26.

Commerce claimed that it changed its differential pricing analysis in order to "comply with" the Federal Circuit's directives in *Marmen* and *Stupp*. *See* Post-Preliminary Memorandum. However, as Commerce itself acknowledged, it was under no obligation to do anything in response to the Federal Circuit decisions. *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277, 21,278 (Dep't Commerce May 19, 2025) ("*Request for Comments*") (noting that *Marmen* and *Stupp* were "not final and conclusive, as there is a possibility of rehearing and/or appeal" and that "there is no requirement for specific agency action in response to this decision at this time"). Both *Marmen* and *Stupp* remain in active remand proceedings; the new methodology therefore has not been validated by the court. Once confirmed, it would need to be applied to the specific facts and record at issue in the First Review.

An agency acts arbitrarily when it "entirely fail{s} to consider an important aspect of the problem" or "offer{s} an explanation for its decision that runs counter to the evidence before the agency." *Shandong*, 375 F. Supp. 3d at 1344. Here, Commerce failed to articulate a satisfactory

37

explanation for abandoning a methodology that had governed the entire review, failed to account for TAMSA's reliance on Commerce's methodological approach, and offered a justification – compliance with non-final court decisions that imposed no obligation to act – that runs counter to Commerce's own contemporaneous acknowledgment that "there is no requirement for specific agency action in response to this decision at this time." *See Request for Comments*, 90 Fed. Reg. at 21,278. Any methodology that Commerce applies should be confirmed by *Marmen* and *Stupp* before it is applied, as appropriate, in any remand involving the First Review.

> 3.    **Commerce's Two-Percent "Price Difference" Test Is Inconsistent with the Best Interpretation of the Statutory Requirements for Invoking the Exception and Using the A-to-T Price Comparison Method**

Commerce's two-percent "price difference" test is contrary to the best interpretation of the statute's requirements for invoking the exception and applying the A-to-T price comparison method for two reasons. First, Commerce's two-percent "price difference" test is contrary to the plain language of the statute which requires that prices "differ significantly" among purchasers, regions, or periods of time for Commerce to apply the A-to-T price comparison method. Second, Commerce's application of a rigid two-percent "price difference" threshold in all administrative proceedings contravenes the legislative intent behind the statute, which envisioned a case-by-case approach to Commerce's differential pricing analysis, as described in the SAA.

> a.    **Commerce's Two-Percent Difference Test is Contrary to the Plain Language of the Statute**

The statute permits Commerce to use the A-T method only where there is a pattern of prices that "differ significantly" among purchasers, regions, or time periods. 19 U.S.C. § 1677f-1(d)(1)(B). Commerce's two-percent price difference test does not satisfy this statutory standard.

Under *Loper Bright*, this Court may not simply defer to Commerce's reasonable interpretation of the statutory term "significantly" but instead must use all available interpretive

**PUBLIC VERSION**

tools to independently determine the statute's best meaning. *See Loper Bright*, 603 U.S. at 400, 412-13 ("{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and whether the agency's interpretation reflects "the best reading of the statute").

Courts "normally interpret a statute in accord with the ordinary public meaning of its terms at the time of its enactment," and courts routinely rely on dictionary definitions to determine a term's ordinary meaning. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). The Oxford English Dictionary defines "significantly" as "sufficiently great or important to be worthy of attention; noteworthy; consequential, influential" – as well as "noticeable, substantial, considerable, large." "Significant," OXFORD ENGLISH DICTIONARY, accessed on Mar. 20, 2026, available at https://www.oed.com/dictionary/significant_adj?tab=meaning_and_use#22826154. Commerce's two-percent price threshold fails to indicate that prices differed significantly based on the plain meaning of the term "significantly." Accordingly, Commerce's interpretation of the phrase "differ significantly" under the new "price difference" test is contrary to the plain meaning of the statute.

Commerce's own practice confirms that two percent is not a threshold of significance. Commerce already considered and rejected the use of a two-percent threshold to determine whether a price difference is "significant" when it previously discarded the "P/2" test in favor of the "*Nails*" test, which preceded the Cohen's *d* test. *See Light-Walled Rectangular Pipe and Tube from Mexico*, 73 Fed. Reg. 35,649 (Dep't Commerce June 24, 2008) ("While petitioners advocate the use of two percent as the threshold for measuring significance of price differences … the Department did not adopt or establish the two-percent test"); *Certain New Pneumatic Off-the-Road Tires from China*, 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008) ("The P/2 test relies on a

single, bright-line price threshold of two percent to define targeted dumping that does not account for price variations specific to the market in question"). Commerce's attempt to resurrect the very threshold it once deemed inadequate is arbitrary and unexplained.

Commerce's two principal analogies in defense of the two-percent threshold are equally unavailing. First, Commerce points to the arm's-length test under 19 C.F.R. § 351.403(c), which finds affiliated-party prices are not at arm's length if they differ by more than two percent from unaffiliated customers' prices. Final IDM at 27. The purpose of the arm's-length test, however, is not to assess whether prices are "significant" in a targeted dumping sense, but instead to determine whether affiliated-party sales are made in the ordinary course of trade such that they can be used to calculate normal value. This is an entirely different inquiry.

Second, Commerce analogizes to the two-percent *de minimis* threshold for antidumping margins in investigations, reasoning that if a two-percent weighted-average margin is "significant enough" to trigger an affirmative LTFV determination, then a two-percent price difference is "significant" for section 777A(d)(1)(B)(i) purposes. Final IDM at 27-28. This analogy fails: the *de minimis* rule is used for a different purpose. Two percent is the threshold Commerce uses to conclude in an investigation that a dumping margin is so low as to be "*de minimis*" – meaning it should be "disregarded." *See* 19 U.S.C. § 1673d(a)(4); 19 C.F.R. § 351.106. It is a floor below which any finding of dumping is too insignificant to matter; it says nothing about how large a variation in individual U.S. prices must be to reveal a pattern of targeted pricing behavior of the kind Congress intended the A-T method to address. A margin that is, by statutory definition, too trivial to support an affirmative less-than-fair-value ("LTFV") finding cannot simultaneously serve as the benchmark for identifying a commercially "significant" pricing differential. Commerce cannot have it both ways.

Commerce also invokes *Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355, 1366 (Ct. Int'l Trade 2024), for the proposition that the statute "affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences." Final IDM at 26-27. Commerce's reliance on this case is misplaced. The court's statutory interpretation analysis in *Garg Tube*, in which it upheld Commerce's use of the Cohen's *d* test in its differential pricing analysis, was overruled by the Federal Circuit's opinion in the Remand Order.

In contrast, Commerce's regulations and practice have provided guidance regarding a threshold that *can* be considered "significant." Commerce has established that a 25-percent difference is "significant" in a number of contexts, including the standard for what constitutes a ministerial error warranting correction, the basis for finding that a foreign market is experiencing "high" inflation, and the justification for using quarterly costs rather than annual average costs. *See* 19 C.F.R. § 351.224(g); Commerce's Questionnaire at A-11 ("If in any month during the period of review the annual inflation rate in the foreign market was in excess of 25 percent, please contact the official in charge …"). The two-percent threshold is a far cry from the 25-percent standard Commerce has considered "significant" in other contexts. Commerce's use of a two-percent threshold was unsupported by substantial evidence and not in accordance with law.

### b.    The Two-Percent "Price Difference" Test Is Contrary to Congress' Intent to Require a "Case-by-Case" Analysis.

Commerce's "price difference" test also contravenes Congress's intent to require Commerce to determine whether significant price differences exist on a case-by-case (*i.e.*, industry-specific) basis. *See* SAA at 842-43. When applied on a case-specific basis, the two-percent threshold is demonstrably inappropriate based on the underlying record.

Commerce's post-preliminary memorandum acknowledged the case-by-case requirement, yet the two-percent threshold Commerce used is a rigid, across-the-board rule that applies

41

identically regardless of the industry, the product, or the market. *See* Post-Preliminary Memorandum at 2 ("Commerce will continue to evaluate its approach in this area based on comments received in this administrative review and the application of the differential pricing analysis on a case-by-case basis …"). While Commerce asserts that its "meaningful difference" test "provides additional tailoring of the differential pricing analysis to the specifics of each respondent," applying a single fixed percentage to every respondent, in every industry, is not "tailoring," and does not constitute a case-by-case approach. Final IDM at 28. Rather, it presumes that the same price variation is equally significant regardless of product, market, or pricing structure. As this Court has recognized, "numbers are not 'large' or 'significant' in a vacuum; in order to consider whether such descriptors reasonably apply, the numbers must be placed in context." *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323, 1332 (Ct. Int'l Trade 2019).

Commerce contends that parties have not demonstrated how to identify and quantify the "normal" variance that might exist among prices in the U.S. market, but this observation turns the inquiry upside down. *See* Final IDM at 28. It is Commerce's burden, not the respondent's, to establish that the conditions of section 777A(d)(1)(B) are met before resorting to the A-T method. Commerce's analysis fails to provide any explanation that justifies using the two-percent threshold for this case or for prices of the OCTG industry.

TAMSA provided sample U.S. net price transactions for a specific CONNUM in Commerce's margin output for its post-preliminary analysis, which demonstrated that the [

]. *See* TAMSA Post-Preliminary Case Brief at 15 (citing Commerce's Post-Preliminary Analysis for TAMSA, "Margin Output" BPI Release (C.R.362)). In other words, the threshold is being

triggered not by any pattern of targeted dumping behavior, but by ordinary [

].

Moreover, TAMSA demonstrated that, over the course of the period of review, the U.S. dollar/Mexican peso exchange rate fluctuated by eight percent from its lowest to highest point, which has a direct impact on the net price calculation to the extent that logistics expenses are denominated in Mexican pesos. *Id.* Accordingly, peso-denominated expenses may vary by eight percent depending on timing alone, which carries through directly to the net price calculation. This eight-percent exchange rate fluctuation calls into question the use of a two-percent threshold.

In addition, TAMSA demonstrated that TGS USA's U.S. sales prices are tied to [

]. Section A Response at A-32. For [        ], a [

]. *Id.* The

[

]. *Id.* TGS USA's sales prices therefore [                     ].

Commerce failed to address any of these record-specific arguments. Its sole response to TAMSA's case-specific showing was to observe that "no party attempted to demonstrate how Commerce could identify and quantify the so-called 'normal' variance that might exist among prices in the U.S. market." Final IDM at 28. This statement ignores the fact that TAMSA pointed to specific, quantifiable record evidence demonstrating that the two-percent threshold would be triggered by [                    ] and currency fluctuation inherent to its [

], neither of which reflects the targeted dumping behavior the statute is designed

43

to address. Commerce's failure to engage with this record evidence renders its approach unsupported by substantial evidence. *See Allegheny Ludlum,* 112 F. Supp. 2d at 1165.

**4.     Commerce's Elimination of the Mixed Method Was Arbitrary and Not Required by the Federal Circuit's Remand Instructions**

Commerce's discontinuation of the mixed method and reduction of the ratio test threshold from 66 percent to 33 percent was not a replacement for the Cohen's *d* test. The ratio test is an entirely separate step in the differential pricing analysis and was not the subject of the Federal Circuit's remand instructions in either *Marmen* or *Stupp*.

The Federal Circuit's remand instructions in *Marmen* are express and narrow: "On remand, Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here." *Marmen,* 134 F.4th at 1348. In *Stupp*, the court similarly instructed: "We vacate the judgment of the Trade Court and remand for that court to remand to Commerce, which may re-perform a differential pricing analysis without relying on Cohen's *d*." *Stupp*, 2025 U.S. App. LEXIS 9616. The *Stupp* court went further, explicitly endorsing the mixed method as an acceptable outcome of the remand process: "On remand, Commerce has discretion to do as SeAH wishes, but it also has the opportunity, if it prefers, to re-perform a differential pricing analysis without using Cohen's *d*, which may result in the use of the average-to-transaction comparison or a hybrid methodology." *Id.* at n.1.

Commerce's justification for eliminating the mixed method – that it was "introduced … in connection with the Cohen's *d* test," *see* Final IDM at 26 – is a post-hoc rationalization that finds no support in the Federal Circuit's decisions, which offer no criticism of the mixed method whatsoever, and in fact expressly contemplate its continued use. The instruction to Commerce in *Marmen* and *Stupp* is to address the Cohen's *d* test, not to discard the entirety of the methodological framework the courts otherwise left undisturbed.

44

**PUBLIC VERSION**

Moreover, Commerce's unjustified elimination of the mixed method effectively results in a reduction from 66 percent to a new low 33 percent ratio threshold. In prior *Stupp* litigation, Commerce justified its use of the 33 and 66 percent cutoffs, and the Federal Circuit found Commerce's selection of those thresholds to be a "reasonable choice" specifically because, in the 33-to-66 percent range, Commerce applied only the mixed method, which "provid{es} a better fit, minimizing both the assessment of antidumping duties that are too high and the assessment of duties that are too low." *Stupp Corp. v. United States*, 5 F.4th 1341, 1355 (Fed. Cir. 2021). Commerce provides no justification for why that rationale no longer applies and why it is now appropriate to apply the full A-T method when only 33 percent of sales "differ significantly."

Commerce contends that discontinuing the mixed method "enhances the ability to address masked dumping" and "aligns more closely with the statutory text." Final IDM at 26. These conclusory statements are insufficient. Commerce must "articulate a satisfactory explanation for its action" and demonstrate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Burlington Truck Lines*, 371 U.S. at 168. Commerce's conclusory assertion that eliminating the mixed method "enhances the ability to address masked dumping" and "aligns more closely with the statutory text" provides neither – particularly given that the Federal Circuit had previously endorsed the mixed method as a reasonable approach and expressly contemplated its continued use on remand. Commerce has provided no reasoned basis for concluding that applying the A-T method to 100 percent of a respondent's sales when only 34 percent of those sales exceed the price difference threshold somehow "aligns more closely" with a statute that permits A-T application only where prices "differ significantly." Its approach was arbitrary and must be rejected.

**PUBLIC VERSION**

In sum, Commerce's modified differential pricing methodology suffers from multiple legal defects: it was adopted before the Federal Circuit's decisions in *Marmen* and *Stupp* are final, undermining TAMSA's reliance on a methodology that had governed the entire review. The two-percent "price difference" threshold is contrary to the statutory requirement that prices "differ significantly," is inconsistent with Congress's directive that Commerce conduct a case-by-case analysis, and finds no support in the record of the First Review – where logistics cost variations and currency fluctuation were sufficient to trigger the threshold. Finally, Commerce's elimination of the mixed method and reduction of the ratio test threshold to 33 percent exceeded the scope of the Federal Circuit's remand instructions, which expressly contemplated the continued use of a hybrid methodology. Any methodology that Commerce applies should be confirmed by *Marmen* and *Stupp* before it is applied, as appropriate, in any remand involving the First Review. For all of the foregoing reasons, Commerce's use of the modified differential pricing methodology in the Final Results was arbitrary, unsupported by substantial evidence, and not in accordance with law.

**PUBLIC VERSION**

## V.    CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, Plaintiffs respectfully request that the Court:

1)  Enter judgment in favor of Plaintiffs;

2)  Remand this matter to Commerce to issue revised final results in conformity with the

    Court's decision; and

3)  Grant Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted,


/s/ Gregory J. Spak
Gregory J. Spak
Kristina Zissis
Luca Bertazzo
Matthew W. Solomon
C. Alex Dilley

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Tubos de Acero de Mexico, S.A.*
*and Tenaris Global Services (U.S.A.)*
*Corporation.*


Date:  April 16, 2026

**CERTIFICATE OF COMPLIANCE**

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers procedures.  The word count for Plaintiffs' Rule 56.2 Brief, as computed by the White & Case word processing system (Microsoft Word 2016), is 13,871.

/s/ Gregory J. Spak

Gregory J. Spak

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TUBOS DE ACERO DE MEXICO, S.A. and TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION,<br><br>        Plaintiffs,<br>and<br><br>UNITED STATES STEEL CORPORATION,<br><br>        Consolidated Plaintiff,<br>v.<br><br>UNITED STATES,<br><br>        Defendant,<br>and<br><br>UNITED STATES STEEL CORPORATION, ET AL.,<br><br>        Defendant-Intervenors. | Consol. Court No. 25-00221 |

**ORDER**

Upon consideration of Plaintiffs' motion for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this Court, the Court, having reviewed the papers and pleadings on file herein, and after due deliberation, it is hereby:

**ORDERED** that Plaintiffs' motion is granted; and it is further

**ORDERED** that this matter is remanded to the United States Department of Commerce for disposition consistent with the Court's final opinion.

**SO ORDERED.**

Dated: _____, 2026             _____
New York, New York                      Claire R. Kelly, Judge