**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TUBOS DE ACERO DE MEXICO, S.A., ET AL.,<br>Plaintiffs,<br>and<br>UNITED STATES STEEL CORPORATION,<br>Consolidated Plaintiff,<br>v.<br>UNITED STATES<br>Defendant,<br>and<br>UNITED STATES STEEL CORPORATION, ET AL.,<br>Defendant-Intervenors,<br>and<br>TUBOS DE ACERO DE MEXICO, S.A., ET AL.,<br>Consolidated Defendant-Intervenors. | Consol. Ct. No. 25-00221 |

**ORDER**

Upon consideration of the Rule 56.2 motion of Consolidated Plaintiffs Tubos de Acero de Mexico, S.A. and Tenaris Global Services (U.S.A.) Corporation (together collectively, "Tenaris"), supporting memorandum of law, all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

**ORDERED**, that Tenaris' motion is denied; and it is further

**ORDERED**, that the challenged decision of the U.S. Department of Commerce is sustained in all respects challenged by Tenaris.

Date: ______________________
New York, New York

Signed:__________________________
Claire R. Kelly, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TUBOS DE ACERO DE MEXICO, S.A., ET AL., Plaintiffs, | |
| and | |
| UNITED STATES STEEL CORPORATION, Consolidated Plaintiff, | |
| v. | |
| UNITED STATES Defendant, | Consol. Ct. No. 25-00221 |
| and | **PUBLIC VERSION** |
| UNITED STATES STEEL CORPORATION, ET AL., Defendant-Intervenors, | Confidential Information Removed from Square Brackets on Pages i, 4-7, 10, 13, 17-18, 20-31, and 36. |
| and | |
| TUBOS DE ACERO DE MEXICO, S.A., ET AL., Consolidated Defendant-Intervenors. | |

**UNITED STATES STEEL CORPORATION, ET AL.**
**RESPONSE IN OPPOSITION TO TENARIS'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Roger B. Schagrin
Luke A. Meisner
Nicholas C. Phillips*
**SCHAGRIN ASSOCIATES**
900 Seventh Street NW, Suite 500
Washington, D.C. 20001
Phone: (202) 516-5257
Email: rschagrin@schagrinassociates.com
*Counsel to Benteler Steel & Tube, et al.*

*Only admitted in New York. Practice limited to matters before federal courts and agencies.

James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday
**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Ave. NW, Suite 300
Washington, DC 20037
Phone: (202) 567-2321
Email: jransdell@cassidylevy.com
*Counsel for United States Steel Corporation*

Dated: October 9, 2026

# Table of Contents

Page

STATEMENT PURSUANT TO RULE 56.2 .......... 1

A. Administrative Determination Under Review .......... 1

B. Issues Presented .......... 1

C. Request for Relief .......... 2

STATEMENT OF FACTS .......... 2

I. The "Facts" for Purposes of Judicial Review Are Based on the Administrative Record, which is Unique to Each Segment of a Proceeding .......... 2

II. Original Investigation .......... 3

III. First Administrative Review .......... 6

A. TYPE Coding .......... 6

B. CEP Offset .......... 8

C. Differential Pricing .......... 11

SUMMARY OF ARGUMENT .......... 13

ARGUMENT .......... 16

I. Standard of Review .......... 16

II. Commerce's Rejection of Tenaris' Ad Hoc TYPE Code for [ ] Was Lawful and Supported by Substantial Evidence .......... 17

A. Recognizing the Absence of Record Support, Tenaris Attempts to Hold Commerce to a Standard that Tenaris Itself Could Not Satisfy .......... 17

B. Commerce's Rejection of Tenaris' Ad Hoc TYPE Code Was Supported by Substantial Evidence .......... 19

C. Tenaris Makes Several New Arguments for the First Time on Appeal—These Were Not Exhausted, and Do Not Change the Analysis .......... 22

D. The Alternative "Characteristics" Tenaris Emphasizes Are Non-Physical .......... 25

E. Commerce Rejected Tenaris' Proposal to Introduce Inaccuracy Via Surrogate Cost Selection .......... 27

1. Tenaris' Adjustment to Surrogate Cost Selection Would Override Commerce's CONNUM Characteristic Hierarchy ..... 27

2. Commerce Reasonably Rejected Tenaris' Failure to Justify Modifying the Surrogate Cost Selection Process ..... 29

III. Commerce Correctly Rejected Tenaris' Untimely New Calculations; the Rejected Material Was Immaterial to Commerce's Analysis ..... 31

IV. Commerce Reasonably Found that Tenaris Was Not Entitled to a CEP Offset that Tenaris Did Not Carry its Burden to Substantiate ..... 32

A. Tenaris Had Adequate Notice and Opportunity to Submit a Compliant Quantitative Analysis in Support of its CEP Offset Request ..... 32

1. Commerce Reasonably Changed Its Position in Response to Newly Considered Arguments ..... 33

2. Tenaris Had Adequate Opportunity to Support Its CEP Offset Request ..... 35

B. Tenaris Has Waived Any Substantial Evidence Challenge to Commerce's CEP Offset Analysis ..... 37

V. The *Final Results* Used a Reasonable Differential Pricing Methodology ..... 37

A. Commerce Was Justified in Modifying its Differential Pricing Analysis ..... 38

B. Commerce's Price Difference Test Used a Lawful Threshold for "Significance" ..... 40

C. Commerce's Decision to Discontinue the "Mixed Method" is Reasonable ..... 45

CONCLUSION ..... 48

**PUBLIC VERSION**

# Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1516a(b)(1)(B)(i)....3, 16

19 U.S.C. § 1516a(b)(2)(A)....3

19 U.S.C. § 1673b(b)(3)....42

19 U.S.C. § 1673b(c)(1)....5

19 U.S.C. § 1673d(a)....5

19 U.S.C. § 1673d(a)(4)....42

19 U.S.C. § 1677(16)(A)....29

19 U.S.C. § 1677b(a)....29

19 U.S.C. § 1677b(a)(1)(B)(i)....29

19 U.S.C. § 1677b(a)(7)(B)....33

19 U.S.C. § 1677b(b)....27

19 U.S.C. § 1677f-1(d)....45, 46

19 U.S.C. § 1677f-1(d)(1)(B)....39, 40

19 U.S.C. § 1677f-1(d)(1)(b)(ii)....42

28 U.S.C. § 2637(d)....22, 43

Regulations

19 C.F.R. § 351.104....3

19 C.F.R. § 351.104(a)(6)....42

19 C.F.R. § 351.224(e)....43

19 C.F.R. § 351.224(g)....43

19 C.F.R. § 351.301....31

19 C.F.R. § 351.301(c)(5)....10, 36

19 C.F.R. § 351.301(c)(6)(iii) ........................................ 38

19 C.F.R. § 351.401(b)(1) ........................................ 34

19 C.F.R. § 351.403(c) ........................................ 41

19 C.F.R. § 351.414 ........................................ 45

Court Decisions

721 F. App'x 993 (Fed. Cir. 2018) ........................................ 3

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 616 F. Supp. 2d 1354 (Ct. Int'l Trade 2009) ........................................ 33

*Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) ........................................ 2, 3

*Am. Express Co. v. United States,* 262 F.3d 1376 (Fed. Cir. 2001) ........................................ 19, 41

*Arch Chemicals, Inc. v. United States*, 33 C.I.T. 954 (2009) ........................................ 34

*Consolo v. Federal Maritime Comm'n*, 383 U.S. 607 (1966) ........................................ 16

*Corus Eng'g Steels, Ltd. v. United States*, 27 C.I.T. 1286 (2003) ........................................ 34

*CS Wind Vietnam Co. v. United States*, 219 F. Supp. 3d 1273 (Ct. Int'l Trade 2017) ........................................ 3

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) ........................................ 23

*FCC v. NextWave Pers. Commc'ns, Inc.,* 537 U.S. 293 (2003) ........................................ 17

*Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) ........................................ 39

*Government of Canada et al. v. United States*, 2026 WL 2161176 (Ct. Int'l Trade July 27, 2026) ........................................ 40, 42

*Huvis Corp. v. United States v. United States*, 525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) ........................................ 17

*La Molisana S.p.A. v. United States*, 138 F.4th 1353 (Fed. Cir. 2025) ........................................ *passim*

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ........................................ 46

*Luoyang Bearing Co. (Group) v. United States*, 450 F. Supp. 3d (Ct. Int'l Trade 2020) ........................................ 22

*Marmen Inc. v. United States,* 134 F.4th 1334 (Fed. Cir. 2025)........................................... *passim*

*Marmen Inc. v. United States*, 2026 WL 1726609 (Ct. Int'l Trade June 15, 2026) ........................................................................................................................2, 39, 40

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)..............................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29 (1983) ...........................................16

Navneet Educ., 2023 WL 9018387..............................................................................................27

*NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019).............................31

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ...........................................................................24

*Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002) ..................................................36

*NTSF Seafoods Joint Stock Co. v. United States*, 2022 WL 1375140 (Ct. Int'l Trade Apr. 25, 2022)...................................................................................................32

*Qingdao Sea–Line Trading Co., v. United States*, 766 F.3d 1378 (Fed. Cir. 2014) ..........................................................................................................................3, 17

*Shandong Mach. Imp. & Exp. Co. v. United States*, 33 C.I.T. 810 (2009) ....................................3

*Soc Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ............................................................................................................45

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) .................31, 32, 36

*Stupp Corp. v. United States*, 2025 WL 1178392 (Fed. Cir. 2025)..................................... *passim*

*Stupp Corp. v. United States, Slip Op. 26-113 (U.S. Ct. Int'l Trade Sept. 15, 2026) ..............................................................................................................................47*

*Sunpower Corp. v. United States*, 179 F. Supp. 3d 1286 (Ct. Int'l Trade 2016) ..............................................................................................................................34

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994)...............................................................................................................16

*Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358 (Fed. Cir. 2014) ..............................................................................................................................26

*Toyo Kohan Co., Ltd. v. United States*, 2026 WL 1459170 (Ct. Int'l Trade May 22, 2026)......................................................................................................39, 40, 41

*Tri Union Frozen Prods., Inc. v. United States*, 163 F. Supp. 3d 1255 (2016) ............................31

*Union Camp Corp. v. United States*, 22 C.I.T. 267 (1998) ....................3

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98 (Fed. Cir. 2022) ....................29

Administrative Determinations

*Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (May 19, 2025)....................11

*Certain Lined Paper Products From India: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 17,989 (Mar. 29, 2022) ....................27

*Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 73 Fed. Reg. 40,480 (July 15, 2008) ....................43

*Certain Oil Country Tubular Goods From Mexico: Preliminary Results and Recission, In Part, of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. at 96,639 (Dec. 5, 2024) ....................12, 32, 40

*Certain Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42,933 (Sept. 5, 2025).................... *passim*

*Circular Welded Non-Alloy Steel Pipe From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 26,401 (June 6, 2019) ....................42

*Large Diameter Welded Pipe From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 6,362 (Feb. 27, 2019) ....................41, 42

*Large Diameter Welded Pipe From Canada: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 71,580 (Nov. 23, 2022) ....................28

*Notice of Final Determination of Sales at Less Than Fair Value: Light-Walled Rectangular Pipe and Tube from Mexico*, 73 Fed. Reg. 35,649 (June 24, 2008) ....................43

*Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 60,205 (Nov. 1, 2021) ....................3

*Oil Country Tubular Goods From Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg 59,054 (Sept. 29, 2022) ....................35

*Oil Country Tubular Goods From Argentina: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 97,596 (Dec. 9, 2024) ....................34

*Oil Country Tubular Goods From Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28,808 (May 11, 2022)....................4

*Oil Country Tubular Goods From Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 Fed. Reg. 59,041 (Sept. 29, 2022)....................6

*Passenger Vehicle and Light Truck Tires From Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 28,563 (May 27, 2021) ....................19, 20

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766 (Mar. 25, 2024) ....................38

*Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 82 Fed. Reg. 49,179 (Oct. 24, 2017) ....................30

<u>Other Administrative Materials</u>

Black's Law Dictionary (12th ed. 2024)....................19, 25, 41

J. Cohen, Statistical Power Analysis for the Behavioral Sciences (2d ed. 1988) ....................11

Merriam-Webster.com ....................19, 41

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040 ....................16, 44

**PUBLIC VERSION**

On behalf of Defendant-Intervenors, United States Steel Corporation, Benteler Steel & Tube Corporation, Borusan Pipe U.S., Inc., PTC Liberty Tubulars LLC, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc ("Defendant-Intervenors"), we hereby respond in opposition to the motion for judgment on the agency record and accompanying brief filed by Tubos de Acero de Mexico, S.A. ("TAMSA") and Tenaris Global Services (U.S.A.) Corporation (together collectively, "Tenaris") in the above-captioned action. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, ECF Doc. 49 (Apr. 16, 2026) ("Tenaris Br."). For the reasons discussed below, Defendant-Intervenors respectfully request that this Court reject Tenaris' challenge to the U.S. Department of Commerce's ("Commerce") final results of the first antidumping administrative review ("AR1") of oil country tubular goods ("OCTG") from Mexico and sustain Commerce's final results in all respects challenged by Tenaris.

## STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Determination Under Review

Tenaris contests the final results of OCTG from Mexico antidumping AR1. *Certain Oil Country Tubular Goods From Mexico*, 90 Fed. Reg. 42,933 (Sept. 5, 2025) (AD AR Final) (P.R. 136), and accompanying Issues and Decision Memorandum (P.R. 134) ("Final IDM"); Final Analysis Memorandum for Tubos de Acero de Mexico, S.A. (C.R. 367) ("Final Analysis Memo"), and computer programs (C.R. 367-375) (collectively, "*Final Results*").

### B. Issues Presented

1. Where Tenaris waived its opportunity to request a CONNUM change when the unified default hierarchy was fixed during the original investigations, did Tenaris identify "compelling reasons" for introducing an *ad hoc* code to account for a single physical characteristic already reflected elsewhere in the CONNUM (**Section II**)?

2. Where Tenaris submitted new calculations in its administrative case brief, did Commerce reasonably reject the same as untimely new factual information (**Section III**)?

3. Where Tenaris twice failed to explain the quantitative link between its selling expense data and the "intensity" level reported for each selling activity, did Commerce reasonably deny a constructed export price ("CEP") offset the first time it considered parties' arguments concerning the same (**Section IV**)?

4. Where Tenaris voluntarily submitted factual information concerning Commerce's use of the Cohen's *d* methodology, and the Federal Circuit thereafter held Cohen's *d* to be unlawful, did Commerce act reasonably in adopting a new methodology after providing notice and an opportunity for comment (**Section V.A**)?

5. Was a ±2% threshold for price differences that this Court upheld in *Toyo Kohan* and *Marmen Second Remand* reasonable where the threshold comports with statutory definitions for *de minimis* dumping margins as well as Commerce's regulatory standards for testing arm's length sales (**Section V.B**)?

6. Does the law require Commerce to provide for a "mixed methodology" dumping calculation and, if not, did Commerce reasonably discontinue this methodology after adopting a new threshold for price differences (**Section V.C**)?

### C. Request for Relief

Defendant-Intervenors request that this Court deny Tenaris's motion for judgment on the agency record and sustain Commerce's *Final Results* in all respects challenged by Tenaris. [1]

## STATEMENT OF FACTS

### I. The "Facts" for Purposes of Judicial Review Are Based on the Administrative Record, which is Unique to Each Segment of a Proceeding

Antidumping "proceedings" are divided into individual "segments," *e.g.*, the original investigation, an administrative review, a scope inquiry, etc. Every segment has a separate administrative record. Although this appeal concerns the *Final Results* of AR1, Tenaris relies extensively on characterizations of the original investigation, treating the two segments as a

[1] U. S. Steel raises separate challenges in its own Motion for Judgment on the Agency Record, ECF Doc. 45 (Apr. 16, 2026).

unified continuum. This contravenes the "fundamental premise of periodic administrative reviews that each 'administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.'" *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1357 (Fed. Cir. 2016) (quoting *Qingdao Sea–Line Trading Co., v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)); *see also CS Wind Vietnam Co. v. United States*, 219 F. Supp. 3d 1273, 1286 (Ct. Int'l Trade 2017) (applying the *Qingdao* principle as between investigation and administrative review), *aff'd*, 721 F. App'x 993 (Fed. Cir. 2018); *Union Camp Corp. v. United States*, 22 C.I.T. 267, 272 (1998) ("Commerce must base its decision upon an administrative record….Here, the record on review for this issue contained different information than the initial investigation.").

To be sure, the parties placed certain original investigation documents on the AR1 record. These documents, as well as Commerce's Federal Register publications and decision memoranda, are part of the AR1 "administrative record" and may inform the Court's substantial evidence review of the challenged AR1 determination. *See* 19 U.S.C. §§ 1516a(b)(1)(B)(i), (b)(2)(A); 19 C.F.R. § 351.104. However, the segments and their records are otherwise distinct, and "it is well settled that the record for judicial review should ordinarily not contain material from separate investigations…" *Shandong Mach. Imp. & Exp. Co. v. United States*, 33 C.I.T. 810, 821 (2009) (internal quotation marks omitted).

## II. Original Investigation

At the OCTG investigation's outset, Commerce asked parties, including Tenaris, to comment on both the investigation's scope and the structure of the antidumping CONNUM field ("product characteristics"). *Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation*, 86 Fed. Reg. 60,205, 60,206 (Nov. 1, 2021) (Initiation Notice). This notice-and-comment process is unique and consequential because it establishes a single, unified, default

CONNUM hierarchy ***before*** initial questionnaires are issued in OCTG proceedings for multiple subject countries, *i.e.*, Argentina, Mexico, and Russia. *See id.*

Tenaris submitted scope comments, in which it argued, *inter alia*, that Commerce should modify the scope description to exclude [ ]. *See* Petitioners' RFI to Tenaris' Initial BCEQR (May 9, 2024) (C.R. 139-140) ("Petitioners' BCEQR RFI") at Ex. 7-A. Commerce ultimately confirmed that [ ] are in-scope. *See id.* at Ex. 7-B. On the same day that scope comments were submitted, Tenaris submitted CONNUM characteristic comments. *See Oil Country Tubular Goods From Mexico*, 91 Fed. Reg. 28,808 (May 11, 2022), and accompanying Preliminary Decision Memorandum ("PDM") at 2 n.8 ("Inv. PDM"). Tenaris did not request any change to the TYPE field to account for [ ].

After considering interested parties' comments, Commerce finalized a CONNUM structure, which was adopted in the initial questionnaires for parallel antidumping investigations on OCTG from Argentina, Mexico, and Russia and intended for use in subsequent administrative reviews of each order. *See* Inv. PDM at 2; DOC Initial Questionnaire (Mar. 12, 2024) (P.R. 16) ("DOC IQR") at B-8, B-11. This included the following TYPE and [ ] fields:

**FIELD NUMBER 3.2:** **Type**

FIELD NAME: TYPEH

DESCRIPTION: Casing, Tubing, Green Tube, or Coupling Stock

1 = Tubing
2 = Casing
4 = Green Tube
9 = Coupling Stock

[ ]

The foregoing TYPE and [ ] field formulations have a long history spanning many OCTG proceedings. *See, e.g.*, Petitioners' BCEQR RFI at Ex. 6-B (Commerce Proposed Product Characteristics Hierarchy for 2013 OCTG Investigations).

Having fixed these default parameters, the investigation was otherwise an exercise in beginning to understand Tenaris' deeply flawed reporting within tight statutory timelines. *See* 19 U.S.C. §§ 1673b(c)(1), 1673d(a). To that end, Commerce issued ***seven*** supplemental questionnaires, each instructing Tenaris to correct and/or explain its reporting across the various sections of Commerce's questionnaire. *See* Petitioners' RFI to Tenaris' 1SQR (Oct. 4, 2024) (C.R. 319-320) at Ex. 1. These included questions about Tenaris' coding under nearly every CONNUM field, including TYPE, to which Tenaris added code [ ] for [ ]. *See id.* (Second Supp. Questionnaire (Feb. 18, 2022) at 7-8; Fourth Supp. Questionnaire (Mar. 9, 2022) at 4). However, Tenaris' questionnaire response in the Mexico investigation could not change the single, unified, default CONNUM hierarchy established at the outset of investigations into Argentina, Mexico, and Russia.

Moreover, Commerce's OCTG from Mexico verification reports do not discuss Tenaris' TYPE coding. Tenaris otherwise omitted to provide the verification exhibits on which these reports rely. *See* Tenaris SBCDEQR (Sept. 17, 2024) (C.R. 193-284) at Ex. Supp. B6, Supp. C6. Likewise, none of Commerce's final decision memoranda mentions Tenaris' TYPE coding, despite discussing other CONNUM coding issues. *See* Tenaris' Surrebuttal Information (May 16, 2024) (C.R. 145) ("Tenaris BCEQR Surrebuttal") at Ex. 3, p.3 (Preliminary Analysis Memorandum); Ex. 4, p.3-5 (Final Analysis Memorandum)); Inv. PDM at 7; *Oil Country Tubular Goods from Mexico*, 87 Fed. Reg. 59,041 (Sept. 29, 2022) (LTFV Final), IDM at Comments 3, 4 ("Inv. IDM").

Ultimately, Commerce calculated a 44.93% dumping margin for Tenaris and addressed ten different issues in the final issues and decision memorandum ("IDM"). *See* Inv. IDM at Comments 1-10. No party appealed Commerce's results.

## III. First Administrative Review

In AR1, Commerce honed in on several aspects of Tenaris's reporting that had avoided scrutiny in the original investigation.

### A. TYPE Coding

Tenaris' response to Commerce's initial questionnaire modified the structure of Commerce's CONNUM hierarchy by introducing TYPE code [ ] for [ ]. *E.g.*, Tenaris BQR (Apr. 25, 2025) (C.R. 44-50) at B-15-B-16. Petitioners supplied rebuttal factual information establishing that [ ] were the same as other OCTG casing and tubing, other than their [ ]. *See* Petitioners' BCEQR RFI at Exs. 3, 6-7. On this basis, Petitioners argued that Tenaris' *ad hoc* TYPE code for [ ] was distortive because it double-counted a physical characteristic already addressed by the [ ] field and elevated its importance in the CONNUM hierarchy. *See* Petitioners' Initial BCEQR

Deficiency Comments (May 24, 2024) (C.R. 147) (“Petitioners’ BCEQR Deficiencies”) at 1-3. Based on this record evidence, Commerce issued a supplemental questionnaire, instructing Tenaris to recode these products under existing codes for casing and tubing. *See* DOC Supplemental Questionnaire (Aug. 6, 2024) (C.R. 150) (“DOC 1SQR”) at Q.11.

Tenaris’ supplemental questionnaire response partially complied with Commerce’s instructions but also attempted to circumvent Commerce’s correction of Tenaris’ TYPE coding by introducing a new, unsolicited CONNUM field: SUBTYPE. *See* Tenaris SBCDEQR at 6. Tenaris otherwise proffered unsolicited information attempting to rehabilitate its *ad hoc* TYPE code for [ ]. *See id.* at 6-8. Recognizing that the impact of Tenaris’ unsolicited CONNUM revision was *de facto* preservation of the distortive TYPE coding that Tenaris had been directed to remove, Commerce’s preliminary results “compile{d} CONNUMs without the subtype criteria.” DOC Preliminary Analysis Memo (Nov. 29, 2024) (C.R. 326) (“Prelim Analysis Memo”) at 2.

Tenaris’ administrative case brief challenged Commerce’s removal of the SUBTYPE field, arguing that Commerce’s standard margin program selected “inappropriately [ ]” costs for [ ] when using Commerce’s established CONNUM hierarchy. *See* Tenaris Case Br. (Mar. 10, 2025) (C.R. 348-349) at 8-18. Tenaris proposed several methodologies for reintroducing its *ad hoc* TYPE code or otherwise distinguishing products by reference to the new SUBTYPE field. *See id.* at 16-18. Tenaris attempted to support its arguments by referencing an attachment containing new cost calculations. *See id.*

Commerce rejected the untimely new factual information in Tenaris’ case brief, *see* DOC Rejection Memo (June 3, 2025) (P.R. 118), and otherwise declined Tenaris’ request, reasoning

that Tenaris' unsolicited new TYPE code and SUBTYPE field merely elevated and double-counted a [ ] that the CONNUM hierarchy already covers. *See* Final IDM at Comment 7. Commerce reasoned that the matches generated by the program were the product of ordinary matching based on physical characteristics defined by the CONNUM. Thus, Commerce found, its program correctly utilizes an average cost for all CONNUMs and assigns costs based on the assigned CONNUM, not some ancillary metric. *See id.*

### B. CEP Offset

A "CEP Offset" is an "adjust{ment to} normal value to account for differences in the level of trade between" the U.S. and foreign markets. *See* DOC IQR at A-7. It is not a necessary part of Commerce's margin calculation; rather, if a respondent supplies sufficient evidence, it may request the adjustment. Here, consistent with Commerce's standard practice, it explained in the initial questionnaire that it ***only*** makes a CEP Offset when "there is a difference in the levels of trade and that difference is demonstrated to affect price comparability." DOC IQR at A-7. For respondents wishing to establish this prerequisite, Commerce requests the following information: *First*, to complete the following standard "selling functions chart" by reporting an "intensity" of 1-10 for each category for each sales channel in each market. *Id.* at A-7, A-15.

| Selling Activity/Function | Home Market Channel 1 | Home Market Channel 2 | US Channel 1 Export to US affiliate #1 (CEP sales)6 |
|---|---|---|---|
| **Provision of Sales Support** (*e.g.*, sales forecasting, strategic/economic planning, advertising, sales promotion, sales/marketing support, market research, other (list/describe)) | | | |
| **Provision of Training Services** (*e.g.*, personnel training /exchange, distributor/dealer training, other (list/describe)) | | | |
| **Provision of Technical Support** (*e.g.*, engineering services, technical assistance, other (list/describe)) | | | |
| **Provision of Logistical Services** (*e.g.*, inventory maintenance, post-sale warehousing, repacking, freight and delivery, other (list/describe)) | | | |
| **Performance of Sales Related Administrative Activities** (*e.g.*, order input/processing, rebate programs, warranty service, other (list/describe)) | | | |

*Second*, to "provide a quantitative analysis showing how the {indirect} expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability." *Id.* at A-8. *Third*, to "explain how the quantitative analysis…support{s} the claimed levels of intensity for the selling activities reported in the selling functions chart." *Id.*[2]

In response to Commerce's instructions to provide quantitative information, Tenaris' initial questionnaire response simply pointed to its total indirect selling expenses ("ISEs") for each market, without linking these broad totals to any activity-specific intensity level reported in

[2] Commerce also requests other information, less relevant here, including to: report various qualitative information, *e.g.*, a list of activities performed under each category, an explanation of their frequency, and supporting documentation, *id.* at A-7 to A-8, and "demonstrate how indirect selling expenses vary by the different levels of trade clamed," *id.* at A-8.

the selling functions chart. *See* Tenaris AQR (Apr. 2, 2024) (C.R. 11-40) at A-25, Ex. A4; Tenaris BQR at Ex. B19. Commerce issued a supplemental questionnaire instructing Tenaris to explain why it had included certain accounts as ISEs and to explain the link between each account and the selling activities reflected in the selling functions chart. *See* DOC 1SQR at 11-13. In response, Tenaris [

]. *See* Tenaris SBCDEQR at Exhibit Supp. B3.

In general, the AR1 record closed 30 days prior to Commerce's preliminary results, *i.e.*, October 30, 2024. *See* 19 C.F.R. § 351.301(c)(5); DOC Memo Extending Preliminary Results (July 18, 2024) (P.R. 56) at 2; DOC Tolling Memo (July 22, 2024) (P.R. 88) at 1. Petitioners' pre-preliminary comments, filed a week before the record closed, asserted that Tenaris provided inadequate quantitative "evidence" that the total amount of home market ISEs was accurate or reliable, and even if the reported total could be used, Tenaris failed to show how the claimed levels of intensity in the selling function chart were derived. *See* Petitioners Pre-Preliminary Comments (Oct. 22, 2024) (C.R. 323-324) at Section III.B. Tenaris submitted rebuttal comments but did not attempt to submit further supporting evidence. Tenaris Pre-Preliminary Rebuttal Comments (Oct. 31, 2024) (C.R. 325) at 23-27.

Commerce preliminarily granted Tenaris a CEP offset, but its discussion of this issue did not acknowledge or discuss either Petitioners' pre-preliminary arguments or Tenaris' rebuttal. *See* PDM at 11. Thus, Petitioners' case brief asserted that Commerce's preliminary analysis had not meaningfully grappled with this issue and again explained how Tenaris' unserious quantitative analysis did not constitute an evidence-based justification for granting a CEP offset. *See* Petitioners Case Br. (Mar. 10, 2025) (C.R. 350-351) at Section III.B. Tenaris again submitted rebuttal argument on the issue. *See* Tenaris Rebuttal Br. (Mar. 17, 2025) (C.R. 353). In

the *Final Results*, Commerce addressed the substance of Petitioners' arguments for the first time in this administrative review and concluded that Tenaris had not met its burden of establishing its entitlement to a CEP offset, given its failure to provide quantitative support for the levels of intensity for its reported channel-specific selling functions. *See* Final IDM at 14-16; Final Analysis Memo at 4.

### C. Differential Pricing

Early in this administrative review, Tenaris voluntarily submitted "scientific literature related to the Cohen's *d* test…for Commerce's consideration in calculating a dumping margin for TAMSA." Tenaris Submission of Factual Information (June 27, 2024) (P.R. 55) at 2. After Commerce's preliminary results and the deadline for case briefs, the U.S. Court of Appeals for the Federal Circuit ("the Federal Circuit") held the "Cohen's *d*" test used in Commerce's differential pricing analysis to be unreasonable if specified statistical criteria were not met. *See generally Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025)*; Stupp Corp. v. United States*, 2025 WL 1178392 (Fed. Cir. 2025). Indeed, *Marmen* discussed at length one of the same materials that Tenaris had proffered in its earlier submission. *Compare* 134 F.4th at 1346 (discussing J. Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2d ed. 1988)), *with* Tenaris Submission of Factual Information at Ex. 2 (same document)).

Given the systemic implications of *Marmen*'s and *Stupp*'s holdings, Commerce moved quickly to solicit public comment on potential alternative methodologies for identifying price differentiation across all proceedings. *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (May 19, 2025). Neither Tenaris nor its counsel submitted comments. *See generally* Docket No. ITA-2025-0004, www.regulations.gov/document/ITA-2025-0004-0001/comment (last updated June 2, 2025) (**Exhibit 1**).

Two months later, Commerce placed two memoranda on the record of this review. The first explained that Commerce had revised the *Preliminary Results* to replace the "Cohen's *d*" test with a new methodology, dubbed the "price difference test," and described the basis for the change. *See generally* DOC Post-Preliminary Analysis Memo (July 18, 2025) (P.R. 124) ("Post-Prelim Analysis Memo"). Consequently, Tenaris' preliminary margin increased from 30.38% to 42.65%. *Compare* Prelim Analysis Memo at 1, *with* Post-Prelim Analysis Memo at 1. The second post-preliminary memorandum provided revised programming language and logs demonstrating the technical implementation of the new test. *See generally* DOC Post-Preliminary Programming Memo (July 18, 2025) (C.R. 356). Commerce thereafter requested briefing on the "price difference test." *See* DOC Post-Preliminary Briefing Memo (July 22, 2025) (P.R. 129).

Tenaris submitted a brief challenging the timing of Commerce's change, the reasonableness of the new test's two-percent threshold for price difference "significance," and the discontinuation of a "mixed" methodology for calculating dumping margins where significant price differences exist. *See* Tenaris Differential Pricing Brief (July 30, 2025) (C.R. 366) at 4-20. Ultimately, Commerce's *Final Results* maintained the "price difference test." Final IDM at Comment 9. Procedurally, Commerce noted that Tenaris had availed itself of the opportunity to make case-specific arguments concerning the new test. *Id.* Substantively, Commerce reasoned that the two-percent threshold for price difference "significance" is consistent with the statute, analogous to thresholds set by other provisions of the antidumping law, and within Commerce's reasonable discretion. *Id.* Commerce also noted that Tenaris' assertions concerning variation in U.S. market prices had not been quantified. *Id.* Commerce otherwise concluded that the now-discontinued "mixed" methodology had not been statutorily

required and its discontinuation served the ends of addressing masked dumping, consistent with statutory objectives. *Id.*

## SUMMARY OF ARGUMENT

### TYPE CODING

Tenaris declined to comment on the TYPE field during the notice-and-comment process by which Commerce designed the product characteristic hierarchy in the original investigations. Thus, consistent with other OCTG proceedings, Commerce established a TYPE field with codes for tubing (1), casing (2), green tube (4), and coupling stock (9). In AR1, therefore, Tenaris bore the burden of justifying any *ad hoc* additions that it wished to make to Commerce's framework. True, Tenaris evidently got away with introducing an *ad hoc* TYPE code in the original investigation, but Tenaris conflates ***the absence of discussion*** of that issue in Commerce's verification reports and decision memoranda with ***affirmative endorsement*** of Tenaris' approach. The issue went unanalyzed in the original investigation and was first addressed in AR1.

Here, when Tenaris attempted to introduce *ad hoc* TYPE code [ ] for [ ], Commerce considered record evidence from a variety of sources, all of which establish that the sole ***physical*** distinction between [ ] and other casing and tubing is their [ ]. Because [ ] is already covered by the [ ] field, Commerce instructed Tenaris to remove *ad hoc* code [ ] for [ ] from the TYPE field. Commerce's rationale was well-supported by the record, and its instructions were within the agency's discretion and otherwise consistent with the statutory instruction to ensure a "fair comparison" by identifying physically identical products (**Section II**).

Tenaris challenges Commerce's rejection of certain information that Tenaris proffered in support of its *ad hoc* TYPE code for the first time in its case brief. As an initial matter, Tenaris has waived this challenge for failure to identify any harm caused by the rejection. Regardless, Commerce's rejection of these data was consistent with its regulations. Tenaris emphasizes the information was "derived" from other record data, implicitly conceding that the rejected material does not exist elsewhere on the record. The CIT has consistently held that new calculations introduced for the first time in a case brief are untimely new factual information and should sustain Commerce's rejection here on similar grounds (**Section III)**.

**CEP OFFSET**

Tenaris argues that Commerce should have granted a CEP offset because (1) Commerce preliminarily granted a CEP offset, and (2) Tenaris was not "on notice" that the information it proffered in support of its offset request was "insufficient." Both arguments lack merit.

Commerce's preliminary grant of a CEP offset was erroneous, insofar as it occurred without acknowledgment or discussion of Petitioners' arguments. In any event, it is well settled that Commerce's preliminary findings are subject to change for the final results. Contrary to Tenaris' assertions, Commerce discussed Petitioners' arguments for the first time in its *Final Results* and fully explained its conclusion that Tenaris had not met its burden to quantitatively demonstrate that a CEP offset was warranted.

On appeal, Tenaris has raised no substantive challenge to Commerce's analysis, limiting itself to a procedural claim, *viz.*, whether Commerce could have changed its decision in the *Final Results* at all. But Tenaris is incorrect that it was not "on notice" that its quantitative analysis was "insufficient," when (1) Commerce had already found Tenaris entities' quantitative analysis insufficient in parallel OCTG proceedings; (2) Tenaris squandered a supplemental opportunity to

justify and support its ISE calculations; and (3) Petitioners detailed the flaws in Tenaris' quantitative analysis in initial deficiency comments and pre-preliminary comments before closure of the administrative record. Tenaris concedes that the case brief arguments on which Commerce relied in the *Final Results* were "nearly identical" to Petitioners' pre-preliminary comments, yet it was Tenaris that waived the opportunity to update its submissions before the administrative record closed. Commerce cannot be blamed for Tenaris' failure to support its CEP offset request (**Section IV**).

**DIFFERENTIAL PRICING**

Tenaris argues that Commerce should not have modified the Cohen's *d* component of its differential pricing analysis. Tenaris challenges Commerce's alteration of the preliminary methodology in the *Final Results* from a procedural standpoint. As for the substance, Tenaris attacks the two-percent "price difference" test as unlawful and otherwise attempts to constrain Commerce's discretion with respect to the "mixed" price comparison methodology. Commerce rightly rejected these challenges.

Shockingly, Tenaris's procedural argument omits to acknowledge that ***it was Tenaris itself*** that first raised Cohen's *d* as an issue, having voluntarily submitted the same literature on which the Federal Circuit relied in holding Cohen's *d* to be unlawful. Given the Federal Circuit's holdings and the overlapping record, Commerce was well within its rights to modify its differential pricing methodology. In doing so, Commerce provided Tenaris with both notice of its proposed methodological adjustment and an opportunity to comment on the same. Notably, the U.S. Court of International Trade ("CIT") recently sustained Commerce's "price difference test" under like circumstances.

Commerce's revised methodology is otherwise reasonable and responsive to Federal Circuit holdings. As Commerce reasoned, its two percent threshold comports with other relevant measures of significance in its regulations and reasonably implements the statute's directive (as recently found by this Court). Furthermore, Tenaris' argument that Commerce must conduct its differential pricing analysis specific to the facts of this case is based on a misreading of the SAA that this Court has rejected. Finally, Tenaris' argument concerning Commerce's discontinuation of the "mixed method" misunderstands Commerce's methodology. Commerce made no adjustment to the statutorily relevant threshold for deviating from the "average-to-average" methodology. Commerce simply adjusted the alternative methodologies used in lieu of "average-to-average." In sum, Commerce reasonably modified its differential pricing methodology "in an effort to comply with" the Federal Circuit's decisions in *Marmen* and *Stupp* (**Section V**).

## ARGUMENT

### I. Standard of Review

The Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994). "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966). Thus, the Court must decide whether Commerce's decision was "rational" and supported by record evidence, not the weight of the evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Although Commerce must "articulate a satisfactory explanation for its action including a rational connection between the

facts found and the choice made," the court "will…'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983).

Commerce's determination is in accordance with law if it has met all constitutional, statutory, regulatory, and procedural requirements. *Huvis Corp. v. United States v. United States*, 525 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2007) (citing *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003)).

Finally, "Commerce may change its conclusions from one review to the next based on new information and arguments, as long as it does not act arbitrarily and it articulates a reasonable basis for the change." *Qingdao*, 766 F.3d at 1387.

## II. Commerce's Rejection of Tenaris' Ad Hoc TYPE Code for [ ] Was Lawful and Supported by Substantial Evidence

As set forth in Commerce's initial questionnaire, the TYPE field of the CONNUM hierarchy does not provide a separate code for [ ]. This structure for coding product characteristics was the product of notice-and-comment proceedings across multiple investigations. Although Tenaris participated in that process, no [ ] TYPE code had been advocated or added. In AR1, however, Tenaris proposed to add such a code. Commerce rightly scrutinized whether Tenaris had identified "compelling reasons" for its *ad hoc* addition and ultimately rejected the same as double-counting [ ] distinctions in both the TYPE and [ ] fields, thereby distorting the established CONNUM hierarchy. The Court should affirm Commerce's conclusions.

### A. Recognizing the Absence of Record Support, Tenaris Attempts to Hold Commerce to a Standard that Tenaris Itself Could Not Satisfy

In the original investigations, no party advocated changing the TYPE field to account for [ ] during the product characteristics comment process. *See* Final IDM at

20-21. Thus, the default CONNUM hierarchy applied to antidumping proceedings of OCTG from Argentina, Mexico, and Russia maintains four codes that have long been used for the TYPE field: (1) for threading, (2) for casing, (4) for green tube, and (9) for coupling stock. DOC IQR at B-8. Although Tenaris later introduced *ad hoc* TYPE code [ ], Commerce's verification reports and analysis memoranda did not so much as acknowledge the change. *See* Tenaris BCEQR Surrebuttal at Ex. 3, p.3 (Preliminary Analysis Memorandum); Ex. 4, p.3-5 (Final Analysis Memorandum)); Inv. PDM at 7; Inv. IDM at Comments 3, 4. In AR1, Commerce correctly rejected Tenaris' characterization of Commerce's non-analysis in the investigation as a "practice" that was "changed" in AR1. *Compare* Tenaris Br. at 1, *with* Final Analysis Memo at 11 ("Commerce did not explicitly address the appropriateness of TAMSA's re-coding of the TYPEH/U model match criteria…"). The only "practice" is the default CONNUM structure set forth in Commerce's initial questionnaire, which Commerce created through notice-and-comment proceedings. The only attempted "change" is Tenaris' belated introduction of *ad hoc* modifications to the TYPE field.

Tenaris attempts to flip the burden because its *ad hoc* revision of Commerce's CONNUM hierarchy cannot possibly satisfy the high bar for such changes, *i.e.*, whether "a compelling reason to modify the model-match methodology exists because Commerce's current methodology fails to adhere to the statutory requirement to compare goods on the basis of identical physical characteristics." *La Molisana S.p.A. v. United States*, 138 F.4th 1353, 1359 (Fed. Cir. 2025); Tenaris Br. at 12. Simply put, all record evidence points in the same direction—[ ] is the ***only*** physical distinction between [ ] and other casing and tubing. The [ ] field already covers that distinction. Because the default CONNUM hierarchy captures the sole physical distinction, there is no "compelling reason" to

accept Tenaris' proposed TYPE modification. Commerce correctly concluded as much when it considered Tenaris' proposed revision. *See* Final IDM at Comment 7.

As the Federal Circuit has held, "the statute requires the foreign like product be '*identical in physical characteristics*' to the subject merchandise in the United States," and Commerce's model-match methodology must satisfy this requirement. *La Molisana*, 138 F.4th at 1359 (emphasis in original); *see also* USS Opening Br. at 17-19 (collecting cases concerning the primacy of physical characteristics in CONNUM coding). Thus, where Commerce based CONNUM codes on *labeled* protein percentages in lieu of *actual* protein percentages, the Federal Circuit held that Commerce had "fail{ed} to compare products 'identical in physical characteristics.'" *Id.* This was so even if consumers would be unlikely to know the actual amounts. *Id.* The Federal Circuit emphasized that "the relevant inquiry…*focuses on the physical characteristics of the product*, not its packaging" and other administrative goals cannot override the "statut{ory} require{ment of} *accuracy* in comparison of the subject merchandise to like products 'identical in physical characteristics.'" *Id.* at 1359, 1361 (emphasis in original). Although Tenaris relies on the same case, *see* Tenaris Br. at 11-12, it asks the Court to force Commerce to adopt a TYPE code that would be unlawful under *La Molisana*.

### B. Commerce's Rejection of Tenaris' Ad Hoc TYPE Code Was Supported by Substantial Evidence

"Physical" is defined as "of, relating to, material things; pertaining to real, tangible objects." *Black's Law Dictionary* (12th ed. 2024); *see also* "Physical," *Merriam-Webster.com* (last accessed June 12, 2026) ("2a: having material existence: perceptible especially through the senses and subject to the laws of nature; 2b: of or relating to material things"); *Am. Express Co. v. United States*, 262 F.3d 1376, 1381 n.5 (Fed. Cir. 2001) ("It is appropriate to consult dictionaries to discern the ordinary meaning of a term not explicitly defined by statute or

regulation."). Thus, a "physical characteristic" would be some tangible characteristic of subject merchandise. *See Passenger Vehicle and Light Truck Tires from Taiwan*, 86 Fed. Reg. 28,563 (May 27, 2021) (LTFV Final), IDM at Comment 6 (rejecting proposed CONNUM characteristic because "The physical characteristics established by Commerce are intended to capture physical differences in subject merchandise, rather than collections of characteristics (including non-physical characteristics, such as performance claims)…"). Here, Commerce found that [ ] is the only "physical characteristic" distinguishing [ ] from other casing and tubing. Final Analysis Memo at 10.

The administrative record supports Commerce's finding. *First*, the [ ] both define [ ]. Tenaris AQR at Ex. A35 ([ ]); *id.* at Ex. A45 ([ ]). *Second*, these definitions are consistent with ***statements in Tenaris's own [ ] and its own [ ]***:

Tenaris describes [ ] Tenaris 1SBCDEQR at Ex. Supp. BC7.

[ ] *Id.* at Exs. Supp. BC2, Supp. [ ].

[ ]. *Id.*

*Finally*, these characterizations comport with the descriptions of several other OCTG manufacturers:

[ ]. Petitioners' BCEQR RFI at Ex. 3-A.

[ ]. *Id.* at Ex. 3-D.

[ ]. *Id.* at Ex. 3-C.

[ ]. *Id.* at Ex. 3-B.

There is a large amount of record evidence from many different sources pointing in the same direction: other than [ ], these products are physically identical to other casing and tubing.

As Commerce recognized, Final Analysis Memo at 9, the CONNUM hierarchy already contains a field tailored to account for [ ] differences. Tenaris disputes whether the [ ] field can capture [ ], Tenaris Br. at 19, but Commerce's instructions expressly contemplate adding [ ] codes: [ ]. Indeed, Tenaris introduced [ ] code [ ] for [ ], Tenaris BQR at [ ]; Tenaris CQR at [ ], meaning that the distinction was, in fact, captured.

Tenaris otherwise emphasizes the [ ] of [ ] as a distinction from other casing and tubing produced to [ ]. *See* Tenaris Br. at 21. Administratively, Tenaris mentioned [ ] once, but only as a "cost driver." Tenaris Case Br. at 10. As such, Commerce fully addressed Tenaris' point, *viz.*, "{i}t is not enough to point out that some products which would ordinarily be given the same 'type' code…have different commercially significant costs…." Final IDM at 21; *see also* Final Analysis Memo at

8-9 (excerpting relevant portion of Tenaris' administrative case brief and noting that cost is not a physical characteristic). Commerce was not obliged to say more.

Furthermore, Tenaris overstates the extent to which [ ] of [ ] is [ ]. *First*, the [ ] standard provides for [ ]. Tenaris AQR at Ex. A35 ([ ]). Thus, [ ] is not even consistent among [ ] as a group. As for Tenaris' [ ]. *Compare id.* ([ ]), *with* Tenaris 1SBCDEQR at Exs. Supp. BC2, Supp. [ ] ([ ]). *Second*, the [ ] standard permits a [ ]. *Id.* Indeed, [ ] for other casing and tubing are simply [ ]. *See id.* Put differently, the extent to which [ ], as compared to other casing and tubing, is merely a difference of degree.

In short, as Commerce recognized, *see* Final IDM at Comment 7, Tenaris has failed to identify any way in which "Commerce's current methodology fails to adhere to the statutory requirement to compare goods on the basis of identical physical characteristics," *La Molisana*, 138 F.4th at 1359, because the sole identified physical distinction is expressly covered by the CONNUM hierarchy's existing [ ] field. No "compelling reason" exists to modify the TYPE field as Tenaris proposed.

### C. Tenaris Makes Several New Arguments for the First Time on Appeal—These Were Not Exhausted, and Do Not Change the Analysis

Before this court, Tenaris' opening brief introduces several subsidiary arguments that are missing from its administrative case brief. All should be disregarded for Tenaris' failure to

exhaust its administrative remedies. *See* 28 U.S.C. § 2637(d); *Luoyang Bearing Co. (Group) v. United States*, 450 F. Supp. 3d (Ct. Int'l Trade 2020) ("respondents in Commerce investigations are 'procedurally required to raise' all issues and arguments in case briefs to Commerce 'at the time Commerce {is} addressing the issue.'") (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010)). Regardless, none of Tenaris' new arguments alter its failure to identify even one physical characteristic of [ ] that is not already covered elsewhere in the CONNUM hierarchy.

*First*, Tenaris argues that "in the normal course of business, TAMSA treats {[ ]} as different 'types' of products in its product coding system." Tenaris Br. at 24. Administratively, Tenaris' argument made no mention of its product coding system, let alone explained how it accounts for products' physical characteristics. *See* Tenaris Case Br. at 2, 8-18. The way a product is entered into Tenaris' "product coding system" has zero impact on that product's physical characteristics.

*Second*, Tenaris argues that the API 5CT standard "separately identifies these products." Tenaris Br. at 23-24. Tenaris' administrative case brief never mentions the 5CT standard. *See* Tenaris Case Br. at 2, 8-18. Regardless, Petitioners demonstrated above that the API 5CT standard in fact defines [ ], *see* Tenaris AQR at Ex. A35 ([ ]), consistent with Commerce's analysis, *see* Final IDM at Comment 7.

*Third*, Tenaris juxtaposes the treatment of coupling stock and [ ] in the TYPE and [ ] fields. Tenaris Br. at 23. Again, Tenaris' administrative case brief makes no mention of this argument, *see* Tenaris Case Br. at 2, 8-18. Indeed, the only mention of coupling stock is an assertion that coupling stock is a [ ]. Substantively, Tenaris again misses the mark, as the administrative record

contains no evidence that [ ] is the *only* physical distinction between coupling stock and casing and tubing. For example, the [ ] spec defines "coupling stock" as [ ], Tenaris AQR at Ex. A35 ([ ]); the U.S. International Trade Commission observes that coupling stock is cut "to make coupling blanks which, in turn, are used to produce couplings," Tenaris 1SBCDEQR at Ex. Supp. BC1 p.8; and Tenaris itself contrasts [ ] as "manufactured from casing, tubing, or thick walled pipe…, whereas coupling stock is manufactured only from seamless pipe. Moreover, coupling stock is a semifinished product that is used to manufacture couplings," *e.g.*, Tenaris BQR at B-15. Thus, Commerce's treatment of coupling stock cannot reasonably determine its treatment of [ ].

*Finally*, Tenaris juxtaposes Commerce's allowance of *ad hoc* TYPE codes for [ ] with Commerce's rejection of the *ad hoc* TYPE code for [ ]. Tenaris Br. at 16, 18. Tenaris' administrative case brief makes no mention of [ ], except to acknowledge that "whether [ ] are subject to the order will be rendered moot in this review." *See* Tenaris Case Br. at 2, 6 n.9, 8-18. There was no point in Commerce harmonizing the TYPE coding of [ ] that were non-subject for temporal reasons. As for [ ], Tenaris' administrative silence was likely a strategic recognition of its exposure, given the weakness of its ad hoc TYPE code for [ ]. Petitioners did not raise the issue simply because it had no material [ ], and Commerce's administrative resources are limited. *See* Tenaris Supplemental Response (Sept. 24, 2024) (C.R. 294-318) at Ex. C1-Rev (TAMSAUS03, reporting [ ]). In any event, Tenaris itself asserted that "differences between [ ] and [ ]" warranted a TYPE code specific to [ ],

Tenaris BCEQR Surrebuttal at Ex. 1, p.4, and cannot now fault Commerce for treating them as such, *cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("judicial estoppel,…prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.").

Thus, none of Tenaris' untimely critiques undermine Commerce's analysis of the record, underscoring the strength of Commerce's reasoning.

### D. The Alternative "Characteristics" Tenaris Emphasizes Are Non-Physical

Tenaris identifies four other allegedly distinguishing characteristics of [ ]—"uses," "production facilities," "prices," and "costs"— and claims that Commerce "failed to consider" evidence relating to these other characteristics. *See* Tenaris Br. at 18-25. None of these four "characteristics" is a "tangible" aspect of any OCTG product, Black's Law Dictionary (12th ed. 2024), and the Federal Circuit recently emphasized that "the relevant inquiry…*focuses on the physical characteristics of the product*, not its packaging" and other administrative goals cannot override the "statut{ory} require{ment of} *accuracy* in comparison of the subject merchandise to like products 'identical in physical characteristics,'" *La Molisana*, 138 F. 4th at 1359, 1361 (emphasis in original). Given this, Commerce's basis for declining to adjust the CONNUM coding of [ ] based on Tenaris' four alternative characteristics was well-founded: "It is not enough to point out that some products which would ordinarily be given the same 'type' code…have different commercially significant costs, prices, or uses as other products with the same CONNUMs." Final IDM at 21; *see also* Final Analysis Memo at 10 (acknowledging the same, as well as different manufacturing facilities and processes).

Tenaris otherwise asserts that these four characteristics are "commercially significant." *See, e.g.*, Tenaris Br. at 20. To the extent Tenaris attempts to turn "commercial significance" into

a standalone basis for adjusting CONNUM codes, that was foreclosed by *La Molisana*, 138 F. 4th at 1359 (rejecting CONNUM field for "labeled" protein content, despite greater consumer familiarity with "labeled" protein content than "actual" protein content). Indeed, Commerce has long rejected non-physical variables, including many of the same on which Tenaris relies, *i.e.*, "whether the CONNUM (1) was produced at a certain factory…; (2) generated more or less waste; (3) required more or less colors, ink, or solvents; (4) was produced in smaller or larger quantities; (5) was produced off-line or on-line; and (6) required transparent or colored bags." *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1366 (Fed. Cir. 2014). The Federal Circuit sustained Commerce's approach, reasoning that Commerce "properly determined that production quantities were not physical characteristics that would drive costs." *Id.*

Commerce acknowledged each of the four alternative characteristics identified in Tenaris' case brief. *Compare* Tenaris Br. at 19-20, *with* Final IDM at 21; Final Analysis Memo at 10. However, because the only physical manifestation of the different uses, production facilities, prices, or costs of [ ] is their [ ], and Commerce fully considered the relevance of the [ ] difference, *see* Section II.B, *supra*, any further details pertaining to use, production facilities, price, or cost were insignificant to Commerce's analysis. Commerce noted as much, Final IDM at 21-22, and is not otherwise required to address arguments that are not significant.

In short, a non-physical difference is no basis for altering the CONNUM structure, even if it is commercially significant. Thus, Commerce's analysis of Tenaris' non-physical alternative characteristics was reasonable given the relative insignificance of such considerations.

### E. Commerce Rejected Tenaris' Proposal to Introduce Inaccuracy Via Surrogate Cost Selection

#### 1. *Tenaris' Adjustment to Surrogate Cost Selection Would Override Commerce's CONNUM Characteristic Hierarchy*

The cost of production is relevant to the calculation of an accurate antidumping margin. For CONNUMs produced during the POR, Commerce's program will simply match the CONNUM with its reported production cost. However, where a given CONNUM was not produced during the POR, Commerce must select a "surrogate cost." Commerce practice "assign{s} costs…by selecting a similar product, based on the hierarchy of product characteristics established in the CONNUM." *Navneet Educ.*, 2023 WL 9018387, at *8 (quoting, with approval, *Certain Lined Paper Products from India*, 87 Fed. Reg. 17,989 (Mar. 29, 2022) (AD AR Final), IDM at 8). Here, Commerce followed that practice using its established CONNUM hierarchy (*i.e.*, without Tenaris's TYPE modification for [ ]). *See* Final Analysis Memo at 10-11. Tenaris contends that this was an error. *See* Tenaris Br. at 25-28.

For all CONNUMs, assigned costs serve various purposes, including the identification of home market sales at prices below the cost of production. *See* 19 U.S.C. § 1677b(b). Tenaris' argument focuses on how costs inform the identification of a home market sale that is sufficiently "similar" to a given U.S. sale to be a probative measure of dumping. *See* Tenaris Br. at 25-28. This process is ***only*** relevant when a CONNUM sold in the United States is ***not*** identical to any CONNUM sold in the home market. To identify a home market benchmark, Commerce's program first applies the CONNUM hierarchy to identify the most physically

similar home market sale. Here, in relevant part, Commerce's *Final Results* used the CONNUM hierarchy established through notice-and-comment in the original investigations.[3]

Next, Commerce compares the costs assigned to the U.S. CONNUM against the costs assigned to the most physically similar home market CONNUM. If this analysis, known as the "DIFMER" test, shows a greater-than-20% difference in each CONNUM's respective variable production costs, then Commerce's program will reject the comparison and identify the next most similar CONNUM that passes the "DIFMER" test. Tenaris contends that *because* Commerce applied its usual practice for surrogate cost selection, [ ] were assigned [ ] costs and "passed" DIFMER tests vis-à-vis other casing and tubing that they should have "failed." *See* Tenaris Br. at 25-26. Tenaris contends that Commerce should have instead assigned surrogate costs using CONNUMs that were modified with Tenaris' *ad hoc* TYPE code and/or SUBTYPE field, because this would have assigned [ ] costs to [ ]. *See id.*

Tenaris' blatantly results-oriented proposal unsurprisingly would ***nullify*** the margin impact of removing Tenaris' *ad hoc* TYPE coding from the CONNUM. Flawed coding or not, products with identical CONNUM codes sold in both the home and U.S. markets will match to each other. Correcting the CONNUM mostly affects how Commerce selects benchmarks for U.S. sales *that lack a* home market sale of the identical CONNUM. Under Tenaris's approach, although Commerce's margin program and CONNUM structure would continue to initially recognize [ ] sold in the United States as physically similar to other casing

---

[3] Incorporating Tenaris' *ad hoc* TYPE code would prevent Commerce's margin program from deeming any [ ] most physically similar to other casing or tubing, obviating the need for a DIFMER test on such a comparison.

and tubing sold in Mexico, it would thereafter invariably discard all casing and tubing comparisons as "failing" the DIFMER test vis-à-vis [ ]. Commerce rightly rejected this proposal.

2. *Commerce Reasonably Rejected Tenaris' Failure to Justify Modifying the Surrogate Cost Selection Process*

Respondents "need to justify the use of alternate methodologies for surrogate costs." *Large Diameter Welded Pipe from Canada*, 87 Fed. Reg. 71,580 (Nov. 23, 2022) (AD AR Final), IDM at 13. Tenaris failed to do so. As Commerce recognized, "the starting place is the question of how identical CONNUMs are defined." Final IDM at 22. Here, Commerce selected surrogate costs and matched physically similar products using its established CONNUM hierarchy. "There may always be variances…in terms of specifically identified costs within identical CONNUMs," *id.*, and Tenaris "failed to explain why the {[ ]} are physically distinct from the characteristics of other products which would be classified under the same codes under the existing model criteria." *Id.* at 21. The mere fact that changes to the model matching criteria "would have significant effects on the model matching" is "not sufficient." *Id.*

Indeed, the Federal Circuit has precluded Tenaris' results-oriented approach. Congress instructed Commerce to ensure a "fair comparison" as between sales in the U.S. and comparison markets. 19 U.S.C. § 1677b(a). By statute, that "fair comparison" is intended to be the product of comparing products that are "identical in physical characteristics." *Id.* §§ 1677b(a)(1)(B)(i), 1677(16)(A). Commerce achieves such comparisons by coding all products' physical characteristics using a CONNUM hierarchy. *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 102, 107–08 (Fed. Cir. 2022). Indeed, the CONNUM hierarchy can ***only*** reflect physical characteristics. *La Molisana*, 138 F. 4th at 1359. But Tenaris' TYPE code and the SUBTYPE field only reflect the fact that a product is a [ ]. *See* Tenaris

SBCDEQR at BC-7. As explained, being a [ ] is not a discrete physical characteristic. *See* Section II.A-D. Thus, Commerce is precluded from treating a [ ] label as distinct within the CONNUM structure. *See La Molisana*, 138 F.4th at 1359. This framework governs whether product characteristic coding is being used to match products with ***physically*** similar sales, or costs, including in the application of the DIFMER test. *See* Section II.E.1, *supra*.

Commerce recognized that "{t}here may always be variances…in terms of specifically identified costs within identical CONNUMs." Final IDM at 22. Thus, the costs for [ ] sold during the POI would be averaged with the costs for otherwise identical casing and tubing and "{w}here a {product at issue} is assigned code "1" for tubing, it is compared against costs for otherwise identical tubing…" *Id.* Tenaris' surrogate cost adjustment would not prevent cost averaging POR production of [ ] and other casing or tubing with an identical CONNUM. *See* Tenaris Br. at 27. But it would prevent [ ] that were not produced from being assigned costs for other casing or tubing. This uneven result would have production timing (in-POR vs. out-of-POR) dictate entirely different CONNUM structures (including or excluding SUBTYPE) for selecting costs. As Commerce recognized, such an arbitrary result "is unwarranted." Final Analysis Memo at 11.[4]

---

[4] For the same reason, Tenaris misses the point in arguing that Commerce erred by discussing the matching of identical merchandise because "the flawed DIFMER test result…is only an issue when products are not identical." Tenaris Br. at 28. Commerce plainly recognized that Tenaris' proposal concerned "the assignment of surrogate costs for [ ] sold but not produced during the POR," Final Analysis Memo at 10, and discussed the "assign{ment of}…costs" to products "not produced during the POR" that are not "specific to the {products at issue}," Final IDM at 21. But there are [ ]. Tenaris cannot cherry-pick different matching criteria for the same type of product.

Tenaris claims that its request here is consistent with Commerce's approach in *Welded Tube from Turkey*. *See* Tenaris Br. at 27 (citing *Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 82 Fed. Reg. 49,179 (Oct. 24, 2017) (AD AR Final), IDM at Comment 3. That is not correct. As Commerce recognized here, *Welded Tube from Turkey* did not permit a respondent to design an entirely new CONNUM code or field (SUBTYPE) and use that solely to reorder surrogate cost selection. *See id.* (observing that the adjusted approach "followed the Department's matching criteria in all other respects."); Final IDM at 22 ("Commerce did not change codes within any model match criteria, or add new model match criteria to affect the adjustment). Commerce rejected Tenaris' suggestion to [

].

Commerce fulfills its obligation to "accuracy" when its comparisons comport with the statutory directive to compare physically identical products. Commerce considered Tenaris' proposal and rejected it, *see* Final IDM at 21-22; Final Analysis Memo at 8-11, and the Court should sustain Commerce in this regard.

## III. Commerce Correctly Rejected Tenaris' Untimely New Calculations; the Rejected Material Was Immaterial to Commerce's Analysis

Commerce's regulations and its memorandum setting the briefing schedule for AR1 established that "no new factual information may be submitted in either case or rebuttal briefs." *See* Briefing Schedule Letter (Mar. 3, 2025) (P.R. 108) at 1; 19 C.F.R. § 351.301. Yet, Tenaris' case brief proffered various mathematical arguments relying almost entirely on a never-before-seen "analysis" attached to Tenaris' case brief. Administratively and before this court, Tenaris acknowledges (as it must) that the new information is "*based on*" or a "*derivation of*" record data. *Compare* Tenaris Case Br. at 13, *with* Tenaris Br. at 30 (emphasis supplied).

However, new calculations that are "derived from" data found elsewhere on the administrative record are new factual information, and Commerce correctly rejected those portions of Tenaris' brief as such. DOC Rejection Memo at 1. This Court has repeatedly sustained Commerce's rejection of new calculations in a case brief, even when "a simple function of basic arithmetic." *NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276, 1291 (Ct. Int'l Trade 2019); *see also Tri Union Frozen Prods., Inc. v. United States*, 163 F. Supp. 3d 1255, 1288 (2016). The Court should affirm Commerce's rejection of Tenaris' new information here.

Separately, "{i}n the antidumping context, a party challenging a purported error by Commerce must show that it was harmed as a result of the error." *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1359 (Fed. Cir. 2020). Tenaris' challenge does not affirmatively articulate any harm associated with Commerce's rejection. *See* Tenaris Br. at 28-31. At most, it notes that the rejected information related to its argument about how the CONNUM matches were "inappropriate," *id.* at 29, yet Tenaris was able to make this argument and Commerce addressed it, *see* Final IDM at 21-22. Moreover, as explained above, *see* Section II.E, *supra*, the argument itself is irrelevant to Commerce's analysis of physical characteristics. There is no harm in the rejection of information that could not change the outcome.

## IV. Commerce Reasonably Found that Tenaris Was Not Entitled to a CEP Offset that Tenaris Did Not Carry its Burden to Substantiate

### A. Tenaris Had Adequate Notice and Opportunity to Submit a Compliant Quantitative Analysis in Support of its CEP Offset Request

Tenaris argues that Commerce should not have denied its CEP offset for the *Final Results* because (1) Commerce preliminarily granted the offset, and (2) Tenaris was not "on notice" that the information it provided to justify its CEP offset was "insufficient." Tenaris Br. at 31. Both arguments lack merit.

1. *Commerce Reasonably Changed Its Position in Response to Newly Considered Arguments*

"By definition, {a} (preliminary) determination {i}s subject to change in the final determination." *NTSF Seafoods Joint Stock Co. v. United States*, 2022 WL 1375140 (Ct. Int'l Trade Apr. 25, 2022) at *9. Thus, Commerce's preliminary results expressly provided that "the final results of this administrative review…will include the results of its analysis of issues raised in any briefs…" *OCTG From Mexico*, 89 Fed. Reg. at 96,639. Commerce's preliminary determination addressed the CEP offset issue, PDM at 11, and thus Tenaris, like the respondents in *NTSF Seafoods*, "did have a fair opportunity to argue that…Commerce should not depart from its preliminary determination." *NTSF Seafoods*, 2022 WL 1375140 at *9. However, Petitioners also submitted a case brief that challenged Commerce's preliminary grant of a CEP Offset. *See* Petitioners Case Br. at Section III.B. Commerce's reconsideration of record evidence is the natural outcome of a process that includes both <u>preliminary</u> and <u>final</u> results. If Commerce could not reverse course after parties had briefed the issues affecting its preliminary results, there would be no need for separate final results.

Tenaris is also incorrect that Commerce did not "explain its change in course from the Preliminary Results." Tenaris Br. at 32. Commerce's preliminary results neither acknowledged nor addressed Petitioners' arguments. *See* PDM at 11. That Commerce considered the record in light of Petitioners' arguments for the first time in the *Final Results* is an ample and obvious "expla{nation}" for the different outcomes. *Compare* PDM at 11, *with* Final IDM at 14-16. Commerce explained that "TAMSA has not supported the claimed levels of intensity that are specific to reported selling functions or provided quantitative support for distinct levels of intensity for its reported channel-specific selling functions." Final IDM at 16. Commerce cited numerous shortcomings, including that Tenaris (1) did not report ISEs by channel of distribution;

(2) did not quantify the amount of ISEs related to particular selling functions; and (3) did not demonstrate that the level of performance claimed for each selling function Tenaris identified in its Section A Response differed proportionately with the level of ISEs Tenaris incurred. Final IDM at 15.

True, "the record did not change" in any relevant respect after the preliminary results, Tenaris Br. at 32, but it is sufficient that Commerce ***reconsidered*** the evidence by reference to the parties' briefing. Ultimately, Tenaris bore the burden of demonstrating its entitlement to a CEP offset under Section 773(a)(7)(B). *Ad Hoc Shrimp Trade Action Comm. v. United States*, 616 F. Supp. 2d 1354, 1374 (Ct. Int'l Trade 2009) ("{I}t is the responsibility of the respondent requesting the CEP offset to procure and present the relevant evidence to Commerce."); *see also Corus Eng'g Steels, Ltd. v. United States*, 27 C.I.T. 1286, 1290 (2003) ("Burden of proof is upon the claimant to prove entitlement {to a CEP offset}."); *see also* 19 C.F.R. § 351.401(b)(1) ("{t}he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment."). Whether Commerce identified the shortcomings in Tenaris' submissions at the preliminary or final phase makes no difference, so long as Commerce explained its rationale, which it did. *See* Final IDM at 14-16.

This is not a situation, like the cases on which Tenaris relies, *see* Tenaris Br. at 32-33, wherein Commerce "adopted a different policy, without explicitly acknowledging it as such" and "reversed course…without acknowledging any deviation from its established prior policy," *Sunpower Corp. v. United States*, 179 F. Supp. 3d 1286, 1303-04 (Ct. Int'l Trade 2016) (discussing change in how Commerce determined country of origin for AD/CVD purposes), or where Commerce announced a "Department practice" in the investigation only to apply a

contradictory "Department practice" in AR1, *compare Arch Chemicals, Inc. v. United States*, 33 C.I.T. 954, 963 (2009), *with* Inv. IDM at 17-18 (emphasizing that the "determination to grant a CEP offset is based on the record of this investigation"), *and* Final IDM at 14-16.[5] Here, Commerce undertook a fact-specific assessment of a different record and reached a different outcome based on reasoned analysis. There is no basis for remand.

2. *Tenaris Had Adequate Opportunity to Support Its CEP Offset Request*

Tenaris asserts that it was not "on notice" that it had provided "insufficient" evidence to support its CEP Offset request. Tenaris Br. at 32-33. Although Tenaris now claims to have "modeled its CEP offset submission…on its submission in the original investigation," *id.* at 32, Tenaris' initial CEP Offset reporting in AR1 made no such assertion or reference to an investigation methodology for calculating selling function intensity levels, *see* Tenaris AQR at A-18 to A-26, Ex. A4; Tenaris BQR at B-66 to B-67; Tenaris CQR at C-67. Commerce is not a mind-reader.[6]

Tenaris was otherwise on "notice" of the very issue Commerce highlighted in the Final IDM, *see* Final IDM at 15 ("TAMSA did not demonstrate a quantitative link between performance of selling functions and its claimed selling function intensity codes."), and squandered two opportunities to address the matter. *First*, Commerce issued a supplemental

---

[5] Commerce's rejection of Tenaris' CEP Offset in the *Final Results* is consistent with the first *OCTG from Argentina* administrative review, discussed in Petitioners' administrative case brief. There, Commerce determined flawed ISE calculations proffered as the "quantitative analysis" failed to entitle Tenaris to a CEP Offset. *Oil Country Tubular Goods from Argentina*, 89 Fed. Reg. 97,596 (Dec. 9, 2024), PDM at 12-13 (unchanged in final).

[6] Tenaris' silence may well have been strategic. Commerce had already found other Tenaris entities' quantitative submissions inadequate for CEP Offset purposes in the investigation of *Oil Country Tubular Goods From Argentina*. *See* 87 Fed. Reg 59,054 (Sept. 29, 2022) (LTFV Final), IDM at Comment 1.

questionnaire instructing Tenaris to "provide an explanation of the expenses recorded in each remaining general ledger account assigned to 'Indirect Selling Expenses' in Exhibit B-4 {and} explain the selling activity in Exhibit A4 {(the selling functions intensity chart)} to which the expenses relate." DOC 1SQR at Q.20.E. Tenaris's response merely listed [ ], Tenaris 1SQR at Ex. Supp. B3, but again made no assertion that it was relying on some methodology from the investigation, *see id.* at B-9, Ex. Supp. B3. *Second*, Petitioners filed comments a week before closure of the administrative record detailing the shortcomings in Tenaris' quantitative analysis. *See* Petitioners Pre-Preliminary Comments at Section III.B. Although Tenaris filed rebuttal comments, demonstrating its awareness of the concern, it made no effort to update its reporting or request an extension of time to do so before the record closed.

Tenaris focuses its "notice" argument on the period between preliminary and final results, but it fails to explain how "notice prior to issuing the Final Results" would have made any difference. *See* Tenaris Br. at 32-33. The administrative record closed 30 days ***prior to*** the preliminary results, *see* 19 C.F.R. § 351.301(c)(5), so Tenaris could not have modified its reporting regardless of Commerce's preliminary findings. Tenaris has not satisfied the requirement to "show that it was harmed as a result of the {purported} error." *SolarWorld*, 962 F.3d at 1359.

Finally, Tenaris yet again demonstrated it was "on notice" when it availed itself of the opportunity to submit arguments in rebuttal to Petitioners' case brief. *See* Tenaris Rebuttal Br. at 31-36. In sum, Commerce acted reasonably in denying Tenaris' request for a CEP offset in the *Final Results* after considering all record evidence. Commerce was not required to maintain its preliminary finding simply because Tenaris would have preferred that it do so.

### B. Tenaris Has Waived Any Substantial Evidence Challenge to Commerce's CEP Offset Analysis

As detailed above, Tenaris' challenge is purely procedural in nature, insofar as it attacks Commerce for having "changed its approach" in the *Final Results*. Tenaris Br. at 31. Tenaris does not discuss the reasons ***why*** Commerce rejected Tenaris' quantitative analysis in support of its CEP Offset request. *See* Tenaris Br. at 31-34. As such, Tenaris has waived any substantive challenge to Commerce's denial of Tenaris's CEP offset, *e.g.*, for want of substantial evidence. *See, e.g.*, *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (finding argument waived for failure to present the argument in principal summary judgment brief).

## V. The *Final Results* Used a Reasonable Differential Pricing Methodology

In response to adverse Federal Circuit decisions, *see Marmen, Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025); *Stupp Corp v. United States*, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) at *4, Commerce announced changes to its differential pricing analysis. *See* Memorandum from Commerce, "Post-Preliminary Analysis Memorandum for Tubos de Acero de Mexico S.A." (Jul. 8, 2025) (C.R. 356) ("Post-Prelim Calc. Memo") at 1. Specifically, Commerce discontinued the Cohen's *d* test, and instead (1) adopted a modified "price difference" test with a two-percent significance threshold, and (2) discontinued its use of the "mixed method" as a potential alternative comparison methodology. Tenaris incorrectly argues that Commerce should not have implemented a modified differential pricing analysis here. Broadly, Tenaris raises procedural arguments against altering the existing test; substantive attacks on Commerce's two-percent threshold; and attempts to constrain Commerce's discretion with respect to the "mixed method." As explained herein, Commerce's revised methodology is reasonable and responsive to holdings of the Federal Circuit—and more recently by the CIT—as well as <u>*Tenaris' own requests*</u> in the underlying administrative review.

### A. Commerce Was Justified in Modifying its Differential Pricing Analysis

Tenaris argues that Commerce's reconsideration of its differential pricing analysis is procedurally improper. *See* Tenaris Br. at 36-38. Yet, early this same review, Tenaris itself introduced the issue when it submitted "scientific literature related to the Cohen's *d* test…for Commerce's consideration in calculating a dumping margin for TAMSA." *See* Tenaris Submission of Factual Information at 2 (containing some of the exact materials relied upon in *Marmen* and *Stupp*). Having voluntarily raised the issue, Tenaris cannot reasonably complain that Commerce considered it. Similarly, because Commerce afforded Tenaris the opportunity to brief the proposed change, Tenaris' claim that it lacked "notice" falls flat. *See* DOC Post-Preliminary Briefing Memo at 1. There is no procedural irregularity in Commerce's notice-and-comment approach.

Rather, as Commerce's post-preliminary analysis memorandum explained, the Federal Circuit's *Marmen* and *Stupp* decisions obliged Commerce to reevaluate its use of the Cohen's *d* test to uncover pricing patterns that differ significantly. Post-Prelim Analysis at 1. Specifically, the Federal Circuit rejected the Cohen's *d* prong of Commerce's differential pricing analysis and instructed that Commerce "may re-perform a differential pricing analysis" that does not rely on Cohen's *d*. *See Marmen*, 134 F.4th at 1348. Just as Commerce's regulations contemplate, "Federal court decisions" are "binding authority" for which Commerce's decisions should account. *See Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766, 20,780 (Mar. 25, 2024); 19 C.F.R. § 351.301(c)(6)(iii).

Accepting Tenaris's position would require Commerce to continue using a methodology known to be unlawful in however many proceedings concluded prior to the end of remand proceedings in *Marmen* and *Stupp*. This makes neither practical nor logical sense, and Tenaris

identifies no authority for the proposition that Commerce is discouraged—much less precluded—from updating its methodologies in response to court decisions. Every determination incorporating the Cohen's *d* methodology would be vulnerable to appeal, proceedings that drain time and resources from all parties. Addressing the matter at the administrative level is a better approach to governance, and that is exactly what Commerce has done here. *See* Post-Prelim Analysis at 1 n.7 ("{I}n an effort to comply with the Federal Circuit's holdings, Commerce has discontinued the use of the Cohen's d test and has discontinued the use of the 'mixed method' as a potential alternative comparison methodology.").

Moreover, Tenaris is incorrect that Commerce's new methodology has not been "validated by the court." Tenaris Br. at 38. In June, this Court first sustained Commerce's modified differential pricing analysis (including the new "price difference test" and discontinuation of the mixed method) and affirmed Commerce's discretion to fashion a reasonable methodology in the Second Remand Redetermination of *Marmen*. *See Marmen Inc. v. United States*, 2026 WL 1726609 (Ct. Int'l Trade June 15, 2026) at *7 ("*Marmen Second Remand*") ("Commerce's adoption of the 2% threshold in the first stage of its differential pricing analysis in the new 'price difference test' is reasonable and complies with *Marmen III*."); *id*. ("Commerce permissibly revised its differential pricing analysis to discontinue use of the 'mixed method' and to apply the 'ratio test' in accordance with *Marmen III*."); *see also Toyo Kohan Co., Ltd. v. United States*, 2026 WL 1459170 (Ct. Int'l Trade May 22, 2026) at *9 ("The language of the statute affords Commerce discretion to fashion its methodology"); *Government of Canada et al. v. United States,* 2026 WL 2161176 (Ct. Int'l Trade July 27, 2026) at *5 ("Commerce's adoption of the 2% threshold in the first stage of its differential pricing analysis in the new 'price difference test' is reasonable and complies with *Marmen III*.").

As the Court recently noted in the *Marmen Second Remand*, the Federal Circuit empowered Commerce to revisit its differential pricing analysis, which is what Commerce did here; thus, like *Marmen,* "Commerce's determination to alter its 'mixed method' within its differential pricing analysis was reasonable when refashioning a new analytical framework to implement 19 U.S.C. § 1677f-1(d)(1)(B)." *See Marmen Second Remand* at *9. Similarly, this Court found in *Toyo Kohan* that the Federal Circuit's holding in *Marmen* left Commerce discretion to amend its differential pricing analysis so long as "the resulting analysis is itself justified as sound for gauging differences in the data sets at issue." *Marmen*, 134 F.4th at 1348. And the Court held that Commerce's new methodology does just that, "reasonably implement{ing} section 1677f-1(d)(1)(B)'s directive." *Toyo Kohan*, 2026 WL 1459170 at *8. This Court has therefore sustained Commerce's revised differential pricing methodology on multiple occasions.

Here, Commerce was plainly justified in discontinuing a differential pricing methodology that the Federal Circuit had held unlawful in favor of a new differential pricing methodology that this Court subsequently upheld. Tenaris' preferred course of action is illogical and wasteful.

**B. Commerce's Price Difference Test Used a Lawful Threshold for "Significance"**

Tenaris takes issue with Commerce's modified significance threshold for its differential pricing analysis, arguing that it is "contrary to the plain language of the statute which requires that prices 'differ significantly' among purchasers, regions, or periods." Tenaris Br. at 38. As noted above, this Court has upheld Commerce's two-percent price difference test, finding that it "reasonably implements {the statute's} directive." *Toyo Kohan*, 2026 WL 1459170 at *8. Here, like the plaintiff in *Toyo Kohan*, Tenaris merely "sho{t} arrows at Commerce's price difference test" without "explain{ing} how the test may be improved or propos{ing} a meaningful alterative." *Id*. Administratively, Tenaris opined that 25 percent "would be a more reasonable

threshold" than two percent. Tenaris Differential Pricing Br. at 14. However, rather than endorse 25 percent as viable, Tenaris instead insisted that "Commerce{'}s two choices" were to either "continue to apply the methodology used in the *Preliminary Results*" or "use the A-A comparison method in the final results." *Id.* at 19-20. Thus, while Tenaris attacked the two percent threshold, Commerce was never asked to consider an alternative.

Commerce reasonably explained its reliance on the two percent threshold. *See* Final IDM at 26-28. Although Tenaris never introduced a dictionary definition in its administrative arguments, *see* Tenaris Differential Pricing Br. at 11-16, it belatedly attempts to override regulatory sources by reference to the OXFORD ENGLISH DICTIONARY, which defines "significant" as "sufficiently great or important to be worthy of attention; noteworthy; consequential, influential," Tenaris Br. at 39. As noted, courts may reference dictionaries to define statutory terms, *Am. Express*, 262 F.3d at 1381 n.5, but American dictionaries are more probative of the meaning of statutes drafted by the United States Congress. Such sources suggest a threshold akin to "meaningful" or "noticeable." *See, e.g.*, "Significant," *Merriam-Webster.com* (last visited June 12, 2026) ("1: having meaning, *esp*., full of import: suggestive; 2a: having or likely to have influence or effect: important, *also* large enough to be noticed or to have an effect"); "Significant," *Black's Law Dictionary* (12th ed. 2024) ("1: embodying or bearing some meaning; having or expressing a sense"). In any event, this court has already determined that the two-percent threshold in this context is appropriate and in line with the statute. *See Toyo Kohan*, 2026 WL 1459170 at *8; *Government of Canada et al.*, 2026 WL 2161176 at *5.

Tenaris otherwise overlooks every instance in which a two percent threshold is consistent with regulatory measures of "significance." *See* Tenaris Br. at 39-46. Contrary to Tenaris' position, Commerce reasonably considered its arms-length test to be probative. *See* Final IDM at

27. 19 C.F.R. § 351.403(c) requires Commerce to determine that sales between affiliated parties are not at arm's length and fall outside of the ordinary course of trade when prices are not within two percent of market prices (*i.e.*, within 98 to 102 percent). Commerce has similarly found that affiliate sales prices that differ by at least two percent and therefore fail the arm's length test **"differ significantly"** from market prices. Final IDM at 27; *see also, e.g.*, *Large Diameter Welded Pipe From the Republic of Turkey*, 84 Fed. Reg. 6,362 (Feb. 27, 2019), IDM at Comment 4. This is probative because the arm's length test compares affiliate sales prices to market prices to measure whether an affiliate's prices are distorted; this process is like the first step of the differential pricing analysis, which compares and measures differences in the sales prices among purchasers, regions, or time periods.

Additionally, as Commerce reasoned, two percent is the threshold for determining whether a margin is *de minimis*, *see* Final IDM at 27; 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4), perhaps the most consequential threshold in the entire dumping law, and Commerce has explicitly described non-*de minimis* rates as significant when discussing the extent of dumping. *See, e.g., Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (June 6, 2019) (AD AR Final), IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-de minimis) amount of dumping …."); *see also* Final IDM at 27 ("If a weighted-average difference of two percent between U.S. prices and normal value is significant enough to warrant an affirmative determination of sales at less-than-fair-value, then it is reasonable to conclude that a two-percent price difference is significant within the context of section 777A(d)(1)(b)(ii) of the Act."). Thus, as Tenaris concedes, the *de minimis* threshold is a "floor below which any finding of dumping is too insignificant to matter." Tenaris Br. at 40.

Consequently, margins greater than two percent are "significant," just as the "price difference test" only finds price differences to significant if greater than two percent in either direction.

While Tenaris emphasizes past decisions not to use a two-percent threshold, *see* Tenaris Br. at 39, it failed to present these for Commerce's consideration. "If an ACCESS barcode number is not included in the citation…the Secretary may decline to consider the cited decision document," 19 C.F.R. § 351.104(a)(6), and Tenaris omitted the ACCESS barcodes for these decisions, *see* Tenaris Differential Pricing Br. at 13 n.28, thus failing to exhaust the argument, *see* 28 U.S.C. § 2637(d). In any event, Tenaris' dated precedent is inapposite. *LWRP from Mexico* acknowledges use of "the two-percent test from CFS Paper Korea," only declining to apply it because "Petitioners' sole explanation…is that coated free sheet paper, like LWR, is a commodity product." *Light-Walled Rectangular Pipe and Tube from Mexico*, 73 Fed. Reg. 35,649 (June 24, 2008) (LTFV Final), IDM at Comment 2. Thus, *LWRP from Mexico* did not address any of the bases on which Commerce relied to adopt a two-percent threshold here. *Compare id.*, with Final IDM at 26-28. Tenaris next cites a countervailing duty proceeding, which is irrelevant to targeted *dumping* analyses. *See* Tenaris Br. at 39 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 73 Fed. Reg. 40,480 (July 15, 2008) (CVD Inv. Final)).

As further counterexamples, Tenaris invokes ancillary thresholds unrelated to price comparisons. *See* Tenaris Br. at 41. First, the preliminary ministerial error threshold is largely a matter of administrative convenience to determine whether an error requires immediate attention or can be addressed in the course of briefing. 19 C.F.R. § 351.224(e). Likewise, the high inflation threshold concerns currency valuation changes over time; **some** inflation is nigh inevitable, and while **any** inflation may be significant in a practical sense, a threshold for "high"

inflation necessarily speaks to extraordinary situations. *See* 19 C.F.R. § 351.224(g). This compares apples and oranges. Something may be "significant" without being "high." Beyond citing examples, Tenaris does not articulate ***why*** these thresholds are relevant to the significance of price differences, *see* Tenaris Br. at 41, and administratively did not suggest they presented a viable alternative, *see* Tenaris Differential Pricing Br. at 19-20. The comparisons are thus unhelpful in evaluating the reasonableness of Commerce's modified methodology. Commerce, by contrast, reasonably explained why a two-percent significance threshold is appropriate here, particularly in the absence of any other reasonable alternative methodology. Final IDM at 28 ("{T}he Post-Preliminary Analysis offered parties the opportunity to make case-specific arguments…while parties have commented that Commerce does not demonstrate how a two-percent threshold is a significant in comparison to the normal variance that may exist across prices of the 'base group,' no party attempted to demonstrate how Commerce could identify and quantify the so-called 'normal' variance that might exist among prices in the U.S. market.").

Finally, Tenaris argues that Commerce must formulate a case-specific pricing analysis. Tenaris Br. at 41. Tenaris' argument relies on a misreading of the SAA, which notes the "inten{t}" that "in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis." SAA at 4177–78. However, the CIT has explained at length that this language does not impose the hyper-specific burden that Tenaris envisions:

> the SAA's explanation that "Commerce will proceed on a case-by-case" to determine whether the price differences are significant, does not mandate that Commerce amend the test at every application. Instead, it is enough that the resulting methodology is able to detect differences of significant variances across a variety of cases.
>
> The Respondents claim that the SAA demonstrates Congress' intent for Commerce to "tailor" its analysis to the different industry or product under investigation or

> review, and to not indiscriminately apply the same test across all cases. The Respondents point to nothing in the statute that requires Commerce to construct such a test…Respondents also argue that…Commerce's final determination is not supported by substantial evidence because the statute requires Commerce to consider information regarding a specific product or industry in running the differential pricing analysis, and Commerce's analysis does not. Commerce, however, was not required to consider industry-wide information and the Respondents' argument does not demonstrate that what Commerce did was unreasonable.

*Soc Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329, 1338-39 (Ct. Int'l Trade 2018) (internal citations omitted). Commerce's revised methodology fits within the reasonable and administrable standard described by the CIT. Tenaris' arguments are indistinguishable from those that the CIT rejected in *Soc Trang*. Commerce's *Final Results* rightly rejected Tenaris' arguments regarding the two-percent test as a "one size fits all" approach. *See* Tenaris Post-Prelim Br. at 14-15. Commerce explained that "the 'meaningful difference' test provides additional tailoring of the differential pricing analysis to the specifics of each respondent" as "{t}he question of whether the A-A method or the A-T method is warranted is specific to the administrative segment as well as the respondent under examination." Final IDM at 28. In that way, "{i}f the selection of the alternative A-T method does not result in a meaningful difference in the weighted-average dumping margins, then that is evidence that the respondent's pricing behavior in the U.S. market can be adequately addressed through the standard A-A methodology. Accordingly, Commerce's determination of whether the A-T method is permitted under section 777A(d)(1)(B) of the Act is determined on a case-specific basis." *Id*. Commerce considered and rejected Tenaris' argument that Commerce's methodology was not sufficiently tailored to the facts of this case.

### C. Commerce's Decision to Discontinue the "Mixed Method" is Reasonable

Tenaris also takes issue with Commerce's non-use of the "mixed method" of calculating Tenaris' dumping margin. *See* Tenaris Br. at 44. Yet Tenaris identifies no authority that would

contravene Commerce's approach. Tenaris does not—and could not—suggest that the statute or Commerce's regulations require application of the "mixed method," and no such mandate can be found anywhere in 19 U.S.C. § 1677f-1(d) or 19 C.F.R. § 351.414. Commerce is on firm legal ground in discontinuing the "mixed method," as it explained in the *Final Results*. *See* Final IDM at 26 ("The statute does not require Commerce to use a 'mixed' method as a comparison methodology."). Indeed, Tenaris asks the court to compel an unlawful result. Whereas 19 U.S.C. § 1677f-1(d) provides for average-to-average calculations and average-to-transaction calculations, it never contemplates mixing the two. A "mixed" methodology thus contravenes the statute's "best reading." *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024); *see also* Final IDM at 26 ("Commerce's new policy aligns more closely with the statutory text, which permits Commerce to use the A-T method when certain conditions set forth in section 777A(d)(1)(B) of the Act are satisfied.").

Commerce otherwise explained how its decision to discontinue the "mixed method" is reasonable and in keeping with the Federal Circuit's instructions, which afforded Commerce discretion to modify its differential pricing analysis as long as it "uses some of the ideas underlying Cohen's analysis of group differences." *Marmen*, 134 F.4th at 1348; *see* Final IDM at 26. Nowhere did *Marmen*'s or *Stupp*'s instructions prohibit Commerce from using its discretion in conducting its differential pricing analysis in this case; in fact, as Tenaris concedes, *Stupp* explicitly provides that Commerce may use its "discretion to do as {the respondent} wishes…but also, ***if it prefers***" to use a different differential pricing analysis. Tenaris Br. at 44 (citing *Stupp*, 2025 WL 1178392 (emphasis added)).

No matter how Commerce alters its methodology, a different analytical framework will inevitably tend to yield differing proportions of "passing" U.S. sales. It is therefore reasonable

that Commerce would revisit the thresholds at which it applies different methodologies, which is why Commerce cited "compl{iance} with" the Federal Circuit decisions (as well as "public comment regarding alternatives to the use of the Cohen's *d* test") in connection with discontinuing the "mixed method." Post-Prelim Analysis at 1; *see also* Final IDM at 26 ("Commerce does not consider it necessary to continue to use the mixed method, particularly when discontinuation of the 'mixed' method enhances the ability to address masked dumping, which is consistent with the objective of the statute, and more closely aligns with the statutory language that expressly authorizes the use of the A-T comparison method when the conditions set forth in section 777A(d)(1)(B) of the Act are satisfied.").

By the same rationale, Tenaris' attempt to constrain Commerce to continue using the 66 percent threshold by reference to Commerce's characterization of the various thresholds under the now-discontinued differential pricing test is inapposite. *See* Tenaris Br. at 45. Nor did the Federal Circuit state (or Tenaris claim) that the prior thresholds are the **only** possible option, simply labeling them "a reasonable choice." *Id*. (quoting *Stupp*, 5 F.4th at 1355). But there are, of course, other reasonable choices, including what Commerce adopted in its post-preliminary analysis. *See* Final IDM at 26 (reasoning that although the statute permits different comparison methodologies, Commerce's modified approach enhances its ability to address masked dumping and is thus more aligned with statutory objectives). Indeed, at proportions above 33 percent "there exists a pattern of prices that differ significantly," sufficient to trigger consideration of the average-to-transaction method, *Stupp*, 5 F.4th at 1355, and Commerce's post-preliminary methodology continues to recognize as much. *See Stupp Corp. v. United States*, Slip Op. 26-113 at 15-18 (Ct. Int'l Trade Sept. 15, 2026).

In sum, Commerce's revised differential pricing methodology is reasonable and responsive to the holdings of both the Federal Circuit and, more recently, the CIT. Commerce did not err in using this approach in the *Final Results*.

**CONCLUSION**

For the reasons set forth above, Defendant-Intervenors respectfully request that this Court deny Tenaris's motion for judgment on the agency record and hold Commerce's *Final Results*, to the extent challenged by Tenaris, to be lawful and supported by substantial evidence.

Respectfully submitted,

/s/ Roger B. Schagrin
Roger B. Schagrin
Luke A. Meisner
Nicholas C. Phillips*
**SCHAGRIN ASSOCIATES**
900 Seventh Street NW, Suite 500
Washington, D.C. 20001
Phone: (202) 516-5257
Email: rschagrin@schagrinassociates.com
*Counsel to Benteler Steel & Tube, et al.*

*Only admitted in New York. Practice limited to matters before federal courts and agencies.

/s/ James E. Ransdell
James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday
**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Ave. NW, Suite 300
Washington, DC 20037
Phone: (202) 567-2321
Email: jransdell@cassidylevy.com
*Counsel for United States Steel Corporation*

October 9, 2026

**PUBLIC VERSION**

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response brief contains 13,998 words, exclusive of the table of contents, table of authorities, square braces ("[ ]"), any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ James E. Ransdell
James E. Ransdell