**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TUBOS DE ACERO DE MEXICO, S.A. and TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION,<br><br>Plaintiffs,<br><br>and<br><br>UNITED STATES STEEL CORPORATION,<br><br>Consolidated Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>UNITED STATES STEEL CORPORATION, ET AL.,<br><br>Defendant-Intervenors,<br><br>and<br><br>TUBOS DE ACERO DE MEXICO, S.A. and TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION,<br><br>Consolidated Defendant-Intervenors. | Consol. Court No. 25-00221<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary Information has been deleted from the Table of Contents and from Pages 3-8 and 10-22.** |

# CONSOLIDATED DEFENDANT-INTERVENORS' RESPONSE TO CONSOLIDATED PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Gregory J. Spak
Kristina Zissis
Luca Bertazzo
Matthew W. Solomon
C. Alex Dilley

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

October 9, 2026

**NON-CONFIDENTIAL VERSION**

**TABLE OF CONTENTS**


I. INTRODUCTION ....... 1

II. STATEMENT PURSUANT TO USCIT R. 56.2 ....... 1

A. Administrative Determination Sought to Be Reviewed ....... 1

B. Issues Presented for Review ....... 2

1. Whether Commerce's reliance on TAMSA's threading codes was lawful and supported by substantial evidence. ....... 2

2. Whether Commerce's decision to decline to apply adverse facts available to TAMSA related to its proprietary thread codes because it properly determined that there was no gap in the record was lawful and supported by substantial evidence. ....... 2

III. STATEMENT OF FACTS ....... 2

IV. SUMMARY OF ARGUMENT ....... 8

V. STANDARD OF REVIEW ....... 9

VI. ARGUMENT ....... 10

A. Commerce's Reliance on TAMSA's Reported Proprietary Thread Codes Was Supported by Substantial Evidence and in Accordance with Law ....... 10

1. TAMSA's Codes Are Not "New" or "*Ad Hoc*"; They Are the Identical Codes Commerce Accepted in the Investigation ....... 11

2. Commerce Properly Determined That the Record of This Review Substantiates the Use of Codes [ ] and [ ] ....... 12

3. Consolidated-Plaintiff's Claims That the THREADH/U Codes Are Unsubstantiated Mischaracterize the Record and Rely on False Assumptions ....... 13

4. Consolidated-Plaintiff Inappropriately Seeks to Have the Court Re-Weigh the Evidence ....... 18

B. Commerce Properly Determined That TAMSA Fully Cooperated with Its Information Requests Regarding Proprietary Threading and That Application of Any Facts Available Was Not Warranted ....... 22

1. Legal Framework ....... 23

2. Commerce Properly Determined That Application of Facts Available of Any Kind Was "Not Warranted" Because TAMSA Fully Cooperated ..... 23

VII. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AK Steel Corp. v. United States*,
346 F. Supp. 2d 1348 (Ct. Int'l Trade 2004) ....23, 24

*Consolidated Edison Co. v. NLRB*,
305 U.S. 197 (1933)....9

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)....9

*Husteel Co. v. United States*,
98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ....23, 24

*Itochu Bldg. Prods. Co. v. United States*,
2017 Ct. Int'l Trade LEXIS 67 ....13

*La Molisana S.p.A. v. United States*,
138 F.4th 1353 (Fed. Cir. 2025) ....11

*La Molisana S.p.A. v. United States*,
633 F. Supp. 3d 1266 (Ct. Int'l Trade 2023) ....11, 12

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....9

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984)....9, 10, 22, 23

*Maverick Tube Corp. v. United States*,
273 F. Supp. 3d 1293 (Ct. Int'l Trade 2017) ....23, 24

*Peer Bearing Co. v. United States*,
587 F. Supp. 2d 1319 (Ct. Int'l Trade 2008) ....13

*Shenzhen Xinboda Indus. Co. v. United States*,
456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) ....13

*SKF USA Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011)....21

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ... 9

**STATUTES AND REGULATIONS**

19 U.S.C. § 1516a(b)(1)(B)(i) ... 9

19 U.S.C. § 1677e(a) ... 23, 24

19 U.S.C. § 1677e(b) ... 23

19 C.F.R. 351.307(b)(1)(v)(B) ... 12

**ADMINISTRATIVE DETERMINATIONS**

*Certain Circular Welded Non-Alloy Steel Pipe From Mexico; Final Results of Administrative Reviews*,
65 Fed. Reg. 6136 (Dep't Commerce Feb. 8, 2000),
and accompanying Issues and Decision Memorandum ... 16

*Certain Oil Country Tubular Goods from Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*,
90 Fed. Reg. 42933 (Dep't Commerce Sept. 5, 2025),
and accompanying Issues and Decision Memorandum ... passim

*Certain Oil Country Tubular Goods from Mexico: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2022-2023*,
89 Fed. Reg. 96638 (Dec. 5, 2024),
and accompanying Preliminary Decision Memorandum ... 5, 6

*Notice of Final Results of Antidumping Duty Administrative Review: Certain Polyester Staple Fiber from the Republic of Korea*,
70 Fed. Reg. 73435 (Dep't Commerce Dec. 12, 2005),
and accompanying Issues and Decision Memorandum ... 11

*Oil Country Tubular Goods From Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*,
87 Fed. Reg. 59041 (Dep't Commerce Sept. 29, 2022),
and accompanying Issues and Decision Memorandum ... 7, 11

**MISCELLANEOUS**

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
88 Fed. Reg. 90168 (Dec. 29, 2023) ... 2

## I. INTRODUCTION

On behalf of the Consolidated Defendant-Intervenors in this action, Tubos de Acero de Mexico, S.A. ("TAMSA") and Tenaris Global Services (U.S.A.) Corporation ("TGS USA"), we hereby submit this response brief in opposition to the motion for judgment on the agency record filed by Consolidated-Plaintiff United States Steel Corporation ("Consolidated Plaintiff") on April 16, 2026. Mem. Supp. Consol. Pl. United States Steel Corporation's Rule 56.2 Mot. J. Agency R. (April 16, 2026) (ECF No. 45) ("Consol-Plaint.Br."). For the reasons discussed below, Consolidated Defendant-Intervenors request that this Court deny Consolidated-Plaintiff's motion because the determination challenged is supported by substantial evidence and is otherwise in accordance with law.

## II. STATEMENT PURSUANT TO USCIT R. 56.2

### A. Administrative Determination Sought to Be Reviewed

Consolidated-Plaintiff challenges certain aspects of the final results issued by the U.S. Department of Commerce ("Commerce") in the first administrative review of the antidumping duty ("AD") order on oil country tubular goods from Mexico ("OCTG from Mexico"). *See Certain Oil Country Tubular Goods from Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42933 (Dep't Commerce Sept. 5, 2025) ("Final Results") (P.R.136)[1]; *see also* accompanying *Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order: Certain Oil Country Tubular Goods from Mexico; 2022-2023* (Sept. 2, 2025) ("Final IDM") (P.R.134).

---

[1] Citations to the administrative record indicate the public record document numbers ("P.R.XX") and confidential record document numbers ("C.R.XX").

### B. Issues Presented for Review

#### 1. Whether Commerce's reliance on TAMSA's threading codes was lawful and supported by substantial evidence.

Yes. Commerce properly relied on TAMSA's reported codes for proprietary threads in the review, consistent with its treatment in the original investigation, and its decision was in accordance with law and supported by substantial evidence.

#### 2. Whether Commerce's decision to decline to apply adverse facts available to TAMSA related to its proprietary thread codes because it properly determined that there was no gap in the record was lawful and supported by substantial evidence.

Yes. Commerce properly determined that TAMSA fully cooperated with its information requests and there was no necessary information missing from the record that would warrant imposing facts available, let alone adverse facts available ("AFA"), and its decision was in accordance with law and supported by substantial evidence.

## III. STATEMENT OF FACTS

On December 29, 2023, Commerce initiated the administrative review for the period of review ("POR") May 11, 2022 through October 31, 2023. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 90168, 90170 (Dep't Commerce Dec. 29, 2023) (P.R.4).

Commerce issued an antidumping questionnaire to TAMSA. *See* Commerce's Questionnaire (Mar. 12, 2024) (P.R.14). Commerce's questionnaire instructs parties to report field THREADH/U by using one of the five codes or to add codes:

FIELD NAME: THREADH

DESCRIPTION: Whether or not ends are threaded, and type of threading

10 = Not threaded
40 = Short thread
45 = Long thread
50 = Buttress thread
55 = Extreme Line/Integral Joint Thread

Use a distinct additional reporting code for each additional type of threaded ends. Refrain from revising the coding of existing categories. For each additional type of thread, describe in detail what distinguishes that type of thread from each of the other additional types and from each of the types listed above.

*See* Commerce's Questionnaire at B-9-10.

TAMSA reported Commerce's codes for threads comparable to API 5CT threads and added codes ([ ] and [ ]), which Commerce accepted in the investigation:

> TAMSA has reported this product characteristic of the foreign like product using the codes set forth above. In addition, as instructed by Commerce in the original investigation, TAMSA has added codes for additional types of threaded ends. Code [ ] was added to differentiate [ ], which are not comparable to the API 5CT type of threads that are proposed in the rest of the codes, and code [ ] was added to differentiate [ ]. These [ ] differ physically and as a consequence in the performance of the product.

*See* TAMSA Sections B, C, E Response, at B-19 and C-19 (Apr. 25, 2024) (C.R.44-123; P.R.36-41).

Petitioners filed Rebuttal Factual Information ("RFI") regarding TAMSA's initial response. *See* Petitioners' RFI Submission (May 9, 2024) (C.R.139-140; P.R.43-44). TAMSA responded with information from the investigation regarding [ ]. *See* TAMSA's RFI Submission at Exhibits 1-5 (May 16, 2024) (C.R.145; P.R.47).

Petitioners' deficiency comments proposed questions regarding threading. Petitioners' Deficiency Comments at 6-7 (May 24, 2024) (C.R.147; P.R.49) ("Petrs' Comments"). Commerce's supplemental questionnaire included them:

> 12) …
> A. As originally instructed, if you intend to introduce nonstandard threading codes in Field 3.7 THREADH/U, then for each additional type of thread, describe in detail what distinguishes that type of thread from each of the other additional types and from each of the existing threading types, and provide supporting documentation to document such differences.
>
> B. Explain how the differently coded threading physically differs from the preexisting threading types.
>
> C. Explain why [ ] owned by TGSUSA should be coded separately from [ ] owned by third parties.

*Compare* Commerce's Supplemental Questionnaire at 8-9 (Aug. 6, 2024) (C.R.150; P.R.57) *with* Petrs' Comments at 7.

TAMSA explained that codes [ ] and [ ] were the same ones Commerce verified and accepted in the investigation. *See* TAMSA's Supplemental Sections B-E Response at 13 (Sept. 17, 2024) (C.R.193-284; P.R.75). It stated that API 5CT includes several end finishes captured by Commerce's coding, and also allows for pipes to be made with "special end-finishes," such as the [ ]. *Id.* at 14. TAMSA described the unique characteristics of Tenaris' [ ] (*i.e.*, [ ]). *Id.* at 16-17. TAMSA assigned code [ ] to its [ ] because they are closer to, but not interchangeable or compatible with, a [ ]. *Id.* at 14, 18.

TAMSA explained that, because it [ ] manufacture the [ ] threads it coded them separate from, [ ] its [ ] threads. *Id.* at 18. They were reported because "[ ]." *Id.* at 19. Also, "{t}he fact that customers have preferences and are willing to pay different prices confirms that [

].” *Id.*

Finally, TAMSA explained that the coding was not based on the owner of the [ ], but rather the fact that “the product design is physically different” justifies the [ ]. *Id.* at 18-19.

TAMSA provided a catalog of [ ] proprietary threads and graphs identifying the physical differences between them and standard API threads. *See id.* at Exhibits Supp. BC5-BC6.

Petitioners proposed Commerce seek recoding from code [ ]. *See* Petitioners’ Deficiency Comments at 3-6 (Oct. 17, 2024) (C.R.322; P.R.84). They mistakenly proposed recoding [ ] threads from [ ] to [ ], which already were coded [ ]. *Compare id.* at 4-5 *with* TAMSA’s Rebuttal Br. at 15-16 (Mar. 17, 2025) (C.R.353; P.R.112).

Petitioners filed pre-preliminary comments arguing TAMSA had not justified code [ ] for [ ] proprietary threads and requesting AFA. *See* Petitioners’ Pre-Preliminary Comments at 11-17 (Oct. 22, 2024) (C.R.323-324; P.R.85). TAMSA responded that, as in the investigation, Commerce should “{c}ontinu{e} to treat third-party proprietary threading separately from Tenaris’ proprietary threading by using code [ ] reported in field THREADH/U.” TAMSA’s Rebuttal to Petitioners’ Pre-Preliminary Comments at 2, 8-12 (Oct. 31, 2024) (C.R.325; P.R.86).

In the Preliminary Results, Commerce accepted TAMSA’s reported thread codes, stating: “We intend to issue a post-preliminary supplemental questionnaire to complete the record with respect to information pertaining to Tenaris’ proprietary threading, and third-party proprietary threading.” *See Certain Oil Country Tubular Goods from Mexico: Preliminary Results and*

*Rescission, in Part, of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 96638 (Dep't Commerce Dec. 5, 2024) (P.R.95), and accompanying Preliminary Decision Memorandum at 7 n.29 ("PDM") (P.R.90).

Commerce's post-preliminary questionnaire requested additional information regarding proprietary threads:

> 1. …
> a. You do not seem to have fully described the [ ] thread types reported under code [ ]. As originally instructed, for each type of [ ] threading, describe in detail what distinguishes that type of thread from each of the other types of [ ] threading, from each of the preexisting threading types, from each of the [ ] threading types.
>
> b. Provide catalogues for each thread type reported under code [ ].
>
> c. Explain in detail why it is appropriate to report each of the various types of [ ] threading under a single code.
>
> d. Explain in detail why it is appropriate to report each of the various types of [ ] threading under a single code.
>
> e. Explain in detail why it is appropriate to report [ ] threading under a separate code from [ ] threading.

*See* Commerce's Second Supplemental Questionnaire at 4 (Feb. 5, 2025) (C.R.336; P.R.101).

In response, TAMSA explained regarding code [ ] threads that the TAMSA OCTG plain end pipe is sent to be threaded at a [ ], and then the finished OCTG is invoiced to the customer. TAMSA's Response to Second Supplemental Questionnaire at 2 (Feb. 19, 2025) (C.R.337-342; P.R.104). Because the products are manufactured [ ] Tenaris by unrelated party [ ], TAMSA did not have access to the information to describe the [ ], but it provided a list of the [ ] threads coded [ ] for OCTG sold in the home market during the POR (and the [ ] threads coded [ ] for OCTG sold in the U.S. and home markets during the POR). *See id.* at 2,

Exhibit 1. The [ ] threads were [ ] threads [ ]. TAMSA provided publicly-available catalogues for [ ] threads from [ ]. *See id.* at 2, Exhibit 2. TAMSA sold OCTG with [ ] in the home market, and the catalogues covered [ ] of these. *See id.* at 2, Exhibit 2.

TAMSA explained that it was appropriate to report each [ ] threading type under a single code, consistent with the approach Commerce approved in the investigation, and it "avoided creating many additional codes for each [ ] thread and instead combined the [ ] threads together based on their physical differences with, and their higher performance characteristics compared to, the threading covered by the five codes." *Id.* at 3. Moreover, TAMSA explained it added code [ ] for [ ] threads due to the physical differences with the threading represented by the API 5CT thread codes in Commerce's questionnaire, and grouping [ ] threads under one code avoids creating multiple new codes. *Id.* at 7. TAMSA used separate codes for [ ] threads because Commerce approved this coding in the investigation finding that "(1) TAMSA's proprietary threads and third-party proprietary threads are distinct and uninterchangeable because customers' purchase orders specify whether they want TAMSA's proprietary thread or a third-party proprietary thread; and (2) there are unique product characteristics available in TAMSA's proprietary threads but not in third-party proprietary threads, and vice versa." *See id.* at 6 (citing TAMSA's RFI Submission at Exhibit 4 at 3-4); *id.* at 8 n.11 (citing *Oil Country Tubular Goods From Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 Fed. Reg. 59041 (Dep't Commerce Sept. 29, 2022), accompanying Issues and

Decision Memorandum at 20 ("Final OI IDM")). TAMSA provided a customer purchase order from the review period for [ ]. *Id.* at 8, Exhibit 3.

Petitioners' case brief argued that TAMSA added "new" thread codes, that the review record was not the same as in the investigation, that TAMSA's thread codes are unsubstantiated, and that Commerce should impose AFA. Petitioners' Case Brief at 9-24 (Mar. 10, 2025) (C.R.350; P.R.110).

TAMSA responded that the codes were not "new" but were accepted in the investigation, that the investigation and review records were consistent, that TAMSA substantiated its reporting, that Petitioners mischaracterized the record and relied on false assumptions about the thread codes, and that there was no basis for imposing AFA related to the thread coding. TAMSA's Rebuttal Brief at 5-21.

In the Final Results, Commerce concluded: "we have continued to use the proprietary thread codes reported by TAMSA, and we find that the application of AFA is not warranted." *See* Final IDM at 5; *see also* Commerce's Final Analysis Memorandum at 6-8 (Sept. 2, 2025) (C.R.367; P.R.137).

## IV. SUMMARY OF ARGUMENT

The Court should uphold Commerce's decision to accept TAMSA's reported coding of [ ] for Tenaris' proprietary threads and [ ] for third-party proprietary threads. TAMSA reasonably reported this coding because it was the same coding that Commerce verified and accepted in the investigation. TAMSA provided the information that Commerce requested, and Commerce did not require TAMSA to recode the proprietary thread codes. Based on the review record, Commerce properly relied on TAMSA's reported proprietary thread codes. Commerce also properly determined that TAMSA fully cooperated with its requests for information regarding the proprietary thread reporting, that no necessary information related to these threads was missing

from the record, and, therefore, that the imposition of AFA was not warranted. Commerce's decision to accept TAMSA's thread coding was lawful and supported by substantial evidence on the record.

## V. STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an AD proceeding, the Court "shall hold unlawful any determination, finding, or conclusion found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law …." 19 U.S.C. § 1516a(b)(1)(B)(i).

In determining whether an agency's decision is "in accordance with law," the court "must exercise {its} independent judgment in deciding whether an agency has acted within its statutory authority …." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

A decision is supported by substantial evidence where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1933); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, it is not the function of the Court to re-weigh the evidence and decide whether it would have come to the same conclusion as the administrative agency, but rather to decide whether there was evidence which could reasonably lead to the agency's conclusion. *See Matsushita*, 750 F.2d at 933.

## VI. ARGUMENT

### A. Commerce's Reliance on TAMSA's Reported Proprietary Thread Codes Was Supported by Substantial Evidence and in Accordance with Law

Based on the review record, Commerce properly accepted TAMSA's proprietary thread code reporting: "For the final results, we have continued to use the proprietary thread codes reported by TAMSA, and we find that the application of AFA is not warranted." Final IDM at 5. Commerce correctly determined that this reporting was consistent with the investigation, and was substantiated on the review record:

> We find that TAMSA has submitted on the record of this administrative review the factual information to substantiate the physical characteristics that were verified in the less-than-fair value (LTFV) investigation. The record in this review demonstrates there are differences in physical characteristics between the two different categories of proprietary thread types and standard thread types, making them unique and not interchangeable with each other. Therefore, we find it appropriate to continue to treat these two categories of proprietary thread types as distinct from each other and from standard thread codes, as we did in the investigation{.}

*Id.* at 5. Commerce accepted the coding as reported.

Consolidated-Plaintiff challenges Commerce's decision to accept TAMSA's proprietary thread reporting, ignoring the fact that Commerce followed the same approach as in the investigation and arguing that Commerce should have found that TAMSA failed to satisfy certain "rules" or "propositions of fact" regarding physical differences. Consol-Plaint.Br. at 19-20. Consolidated-Plaintiff inaccurately refers to thread codes [ ] and [ ] as "new" or "*ad hoc*" and mischaracterizes the review record to attempt to support its claim that TAMSA did not substantiate the physical differences between proprietary threads. *Id.* at 15-39. Consolidated-Plaintiff seeks to have the Court re-weigh the evidence, which is not permitted. *See Matsushita*, 750 F.2d at 933.

### 1. TAMSA's Codes Are Not "New" or "*Ad Hoc*"; They Are the Identical Codes Commerce Accepted in the Investigation

Consolidated-Plaintiff's description of the proprietary thread codes as "new" or "*ad hoc*" is inaccurate. *See generally* Consol-Plaint.Br. Commerce properly recognized that these are not "new," but are the same codes reported in the investigation. Final IDM at 5.

The record confirms that proprietary codes [ ] and [ ] are neither "new" nor "*ad hoc*" creations for the review. TAMSA introduced them in the investigation to distinguish products with different physical characteristics from the products covered by Commerce's codes, and Commerce accepted them. *See* Final OI IDM at 20. ("For the final determination, we continue to treat these two proprietary thread types separately without combining them, because information on the record of this investigation demonstrates that these two proprietary thread types are physically different").

TAMSA logically followed the identical approach in the review. To depart from Commerce's approved practice by recoding without a request from Commerce, would have been a "new" approach. Based on the review record, Commerce properly continued to accept the investigation coding. *See La Molisana S.p.A. v. United States*, 138 F.4th 1353, 1359 (Fed. Cir. 2025) ("Commerce will not modify its model-match methodology unless 'compelling reasons' exist to do so"); *Notice of Final Results of Antidumping Duty Administrative Review: Certain Polyester Staple Fiber from the Republic of Korea*, 70 Fed. Reg. 73435 (Dep't Commerce Dec. 12, 2005), accompanying Issues and Decision Memorandum at Comment 1 (approving respondent's product coding of specialty products, stating the coding was consistent with prior reviews, and finding that "the case record indicates that Huvis's specialty products have distinct physical characteristics"). Consolidated-Plaintiff references the "compelling reasons" language. *See* Consol-Plaint.Br. at 18-19 (citing *La Molisana S.p.A. v. United States*, 633 F. Supp. 3d 1266,

1272 (Ct. Int'l Trade 2023)). However, it omits that the courts "have looked for 'compelling reasons' when Commerce {itself} modifies a model-match methodology in a review after having used that methodology in previous segments of the proceeding." *La Molisana S.p.A.*, 633 F. Supp. 3d at 1272. Here, Consolidated-Plaintiff seeks to modify the methodology Commerce used in the investigation without "compelling reasons."

**2. Commerce Properly Determined That the Record of This Review Substantiates the Use of Codes [ ] and [ ]**

Consolidated-Plaintiff attempts to undermine TAMSA's use of the same thread coding as in the investigation, and Commerce's acceptance of it, by asserting that "the record of this administrative review is not remotely the same" as that of the investigation. Consol-Plaint.Br. at 28. In fact, the review record is consistent with that of the investigation.

To rebut the same allegation in the review, TAMSA detailed the information placed on the record of the review in its responses, and cited to the corresponding information from the investigation. *See* TAMSA's Rebuttal Br. at 11-14. This comparison confirms the consistency of the information on the two records.

Consolidated-Plaintiff points to certain limited differences, such as the fact Commerce did not conduct a verification in the review. Consol-Plaint.Br. at 28-29. Commerce is not required to conduct a verification in a first review, and the lack of a verification does not alter the fact the records are consistent. *See* 19 C.F.R. 351.307(b)(1)(v)(B). Also, one exhibit with information from the investigation is not on the review record, but TAMSA submitted the same document for the review. *Compare* Consol-Plaint.Br. at 28 n.5 *with* TAMSA's Rebuttal Br. at 13 (regarding "[ ] Threads Sold in Both Markets"). Further, certain documents (*i.e.*, [ ]) were only requested in the review. TAMSA's Rebuttal Br. at 13

Finally, unlike in the cases Consolidated-Plaintiff cites, TAMSA made efforts to ensure that the review record included information consistent with the investigation precisely because it recognized that "{e}ach segment of a proceeding is decided on its own record." *See* Consol-Pl.Br. at 29. The cases cited do not apply here because, unlike in those cases, the relevant information regarding threading ***is*** on the review record. *See Itochu Bldg. Prods. Co. v. United States*, 2017 Ct. Int'l Trade LEXIS 67 at *n.11 (2017) (unlike here, the evidence in question only existed on the record of a separate proceeding, and therefore Commerce would "not consider it"); *Peer Bearing Co. v. United States*, 587 F. Supp. 2d 1319, 1325 (Ct. Int'l Trade 2008) (the respondents "did not respond to the questionnaire and *failed to provide any other information relating to this review period*," and therefore Commerce did not blindly apply its approach from a previous segment (emphasis added)); *Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1285 n.22 (Ct. Int'l Trade 2020) ("Xinboda argues that the court should carefully consider not only Xinboda III but two preceding decisions concerning the fifteenth administrative review, given the similarity of issues discussed in those opinions to those presently under consideration").

### 3. Consolidated-Plaintiff's Claims That the THREADH/U Codes Are Unsubstantiated Mischaracterize the Record and Rely on False Assumptions

Consolidated-Plaintiff asserts that TAMSA's "failure to substantiate" certain "rules" or "propositions of fact" (*i.e.*, "physical sameness with all products assigned the same code" and "physical differences with all products assigned different codes") renders Commerce's decision to accept TAMSA's proprietary thread coding unreasonable and unlawful. Consol-Plaint.Br. at 19-20. These arguments mischaracterize information on the record and rely on false assumptions properly rejected by Commerce in the review.

*First*, Petitioners allege that TAMSA added code [ ] to capture "<u>all</u> threading [ ]" and code [ ] to capture "<u>all</u> threading [

] third parties." Consol-Plaint.Br. at 20. TAMSA addressed this misplaced assertion that the coding is based on [ ] ownership:

> TAMSA respectfully disagrees with the suggestion that TAMSA is coding the same threading differently based simply on the owner of the [ ]. Instead, the better way to think of this is that the product design is physically different, which is why [ ]. If the [ ]. Thus, the [ ].

TAMSA's Supplemental Sections B-E Response at 18-19. As TAMSA explained, the physical differences in the threading design that make them unique are the precise reason that companies like Tenaris and [ ] have been granted protection. TAMSA's Rebuttal Br. at 15 (citing TAMSA's Second Supplemental Response at 2-3, Exhibits 1-2).

*Second*, Consolidated-Plaintiff argues that TAMSA's first supplemental "confirmed that code [ ] was distortive," and that "the various thread types Tenaris Mexico has lumped together under code [ ]. Consol-Plaint.Br. at 21-24 (emphasis in original). These assertions are based on three false assumptions or mischaracterizations.

Consolidated-Plaintiff's objection to code [ ] as "distortive" is based in part on the incorrect assumption that TAMSA coded Tenaris' [ ] threading as code [ ]. It claims that "Tenaris has coded [ ] CONNUM code," and concludes that "this reporting distorts both the model matching program" and TAMSA's "cost reporting." *Id.* at 24. In fact, TAMSA properly reported code [ ] for [ ], not code [ ], because [ ] is a Tenaris connection that is compatible with API 5CT buttress thread. *See* TAMSA's Rebuttal Br. at 16. This reporting of code [ ] in field

THREADH can be seen on TAMSA's home market sales database by filtering field STANDARDH for products with [ ]. *Id.* Therefore, this alleged distortion regarding code [ ] does not exist.

Consolidated-Plaintiff also mischaracterizes two threads in code [ ] as [ ]. In [ ] *Compare* Consolidated-Plaintiff's Br. at 22 *with* TAMSA's Supplemental Sections B-E Response at Exhibit Supp. BC6. In [ ]. *Compare* Consolidated-Plaintiff's Br. at 22 (emphasis added) *with* TAMSA's Supplemental Sections B-E Response at Exhibit Supp. BC6. TAMSA explained the physical differences between both its [ ] and [ ] threads, which are reported as [ ], and code [ ] buttress threads. *See* TAMSA's Supplemental Sections B-E Response at 16.

Further, Consolidated-Plaintiff points to differences between [ ] proprietary threads, which are both code [ ] in field THREADH/U. Consol-Plaint.Br. at 21-23. TAMSA has acknowledged that code [ ] includes various [ ] threads. However, absent specific instructions from Commerce to recode, it would have been inappropriate for TAMSA to suddenly introduce new codes. In the review, when Commerce wanted TAMSA to recode a product characteristic field, it instructed TAMSA to recode, and TAMSA complied even if it disagreed, as with field TYPEH/U. *See* TAMSA Rule 56.2 Brief at 11-28 (ECF Nos. 49-50). Commerce made no such request to recode field THREADH/U, and

TAMSA reasonably followed the investigation coding. TAMSA's approach is consistent with Commerce's practice, which recognizes following the approach in a prior segment is reasonable when Commerce "has not requested that it alter its reporting methodology." *See Certain Circular Welded Non-Alloy Steel Pipe From Mexico; Final Results of Administrative Reviews*, 65 Fed. Reg. 6136 (Dep't Commerce Feb. 8, 2000), accompanying Issues and Decision Memorandum at Comment 2 ("the Department did not request that Hylsa alter its reporting methodology in this review. Consequently, application of {best information available} for this review is not warranted").

*Third*, Consolidated-Plaintiff complains that TAMSA's first supplemental response "failed to provide even a single document establishing any physical differences in the thread type or types coded [ ] and thread types assigned other codes under field THREADH/U." Consol-Plaint.Br. at 24. TAMSA explained it was unable to provide the same detailed information provided for its own [ ] threads because "TAMSA [ ] manufacture these threads," but that it "coded [ ] separate from, [ ], based on [ ]." TAMSA's Supplemental Sections B-E Response at 18. As with code [ ], TAMSA followed the approach from the investigation and Commerce did not request it recode the code [ ] sales.

*Fourth*, Consolidated-Plaintiff claims with respect to TAMSA's second supplemental questionnaire that TAMSA failed to provide certain documentation, and that the response "confirmed that code [ ] was distortive and otherwise relied on non-physical differences." Consol-Plaint.Br. at 25-26. It argues that TAMSA "failed to provide documentation for [ ] covered by code [ ]," "made no representation that it attempted to obtain this information from its supplier," and "provided no narrative description whatsoever." *Id.* at 26.

TAMSA explained that it acted to the best of its ability to provide the information for the threads of [ ], an unaffiliated party and competitor, and it could not provide catalogues for [ ] threads that were not publicly available. TAMSA's Second Supplemental Response at 2-3. Moreover, TAMSA explained that, because "{t}he products are manufactured [ ] Tenaris by [ ]{,} … TAMSA does not have access to the information to describe the [ ]." *Id.* at 2. Also, sales of OCTG with code [ ] threads were only made in the home market and represented a negligible [ ] percent by quantity of total home market sales. *See id.*; TAMSA's Rebuttal Br. at 18.

*Fifth*, Consolidated-Plaintiff claims that the documentation TAMSA provided "reinforces the conclusion that lumping thread types together based on [ ] … yield{s} distortive comparisons." Consol-Plaint.Br. at 27. It attempts to compare diagrams of Tenaris and [ ] threads. *Id.* Although it might be possible to infer certain information from the [ ] catalogues about the threads and their physical characteristics, TAMSA does not have firsthand knowledge regarding the physical characteristics of these threads. TAMSA only knows that they are [ ], and, therefore, are not compatible with API threads (unless the catalogue explicitly states they are compatible, as in the case of Tenaris' [ ]). Moreover, even if the [ ] threads look similar to Tenaris [ ] threads, they are not compatible. This is why TAMSA's customers such as [ ] specify [ ] threads in their purchase orders rather than Tenaris [ ] threads. TAMSA's Second Supplemental Response at Exhibit 3. Accordingly, Commerce properly found that following the same approach as in the investigation of using code [ ] in the review was reasonable.

#### 4. Consolidated-Plaintiff Inappropriately Seeks to Have the Court Re-Weigh the Evidence

Consolidated-Plaintiff claims that, despite pointing out the alleged defects with TAMSA's reporting and its request that Commerce take an adverse inference, Commerce "took no corrective measures," and that this renders the Final Results unlawful and unsupported by substantial evidence. Consol-Plaint.Br. at 19-20. The record contradicts Consolidated-Plaintiff's claim. It shows that Commerce requested information in the review from TAMSA and, based on this information, properly decided to accept TAMSA's reported codes [ ] and [ ] following its approach in the investigation. Consolidated-Plaintiff inappropriately seeks to have this Court re-weigh the evidence and second guess Commerce's decision.

As discussed in Section VI.A.1-3, Consolidated-Plaintiff's claim that TAMSA's reporting was defective is incorrect. The record confirms that Commerce proactively requested information from TAMSA regarding proprietary threads, including the supplemental information that Petitioners requested. *Compare* Commerce's Supplemental Questionnaire *with* Petrs' Comments at 7. Commerce also issued a post-preliminary second supplemental questionnaire to collect additional information on proprietary threads. *See* PDM at 7 n.29; Commerce's Second Supplemental Questionnaire at 4. Based on TAMSA's responses to these requests, Commerce concluded that "TAMSA fully cooperated with our request for information regarding third-party proprietary thread types" and "there is no necessary information missing from the record that would warrant application of facts available…." Final IDM at 5.

Moreover, the additional points that Consolidated-Plaintiff makes to attempt to criticize Commerce's Final IDM and Final Analysis Memorandum also rely on mischaracterizations of the record. It claims that Commerce's Final IDM "appears to intimate that the investigation verification reports and verification exhibits on which those reports rely are on the record of this

administrative review," and it objects to Commerce's reliance on "a summary characterization of its verification findings from its final analysis memorandum in the original investigation." Consol-Plaint.Br. at 30. This is another mischaracterization. The home market and U.S. sales verification reports from the investigation in fact ***are*** on the record. *See* TAMSA Supplemental Response, Exhibit Supp. B6, Exhibit Supp. C6. The final analysis memorandum from the investigation also ***is*** on the record. *See* TAMSA's RFI Submission at Exhibit 4. Even if they were not on the record, the fact Commerce described the verification findings and explained the relevance for the review is sufficient to establish the similarity between the coding and facts in the two segments.

Consolidated-Plaintiff also speculates regarding the Final IDM that, although TAMSA used codes [ ] and [ ] in the investigation and review, "Commerce cannot reasonably assume that whatever group of threading types may have been present during the investigation were identical to the threading types present during the first administrative review." Consol-Plaint.Br. at 31-32. In fact, the record supports consistency in the threading types between segments. *See* TAMSA's Rebuttal Br. at 12 ("TAMSA [ ] Threads Narrative Description and Explanation of Use of Codes [ ] and [ ]"); TAMSA's RFI Submission at Exhibit 4 at 3-5 (describing the code [ ] and code [ ] threads of TAMSA and [ ] examined at verification).

In addition, Consolidated-Plaintiff claims that Commerce's Final Analysis Memorandum confirms the defects in Commerce's Final IDM. Consol-Plaint.Br. at 32-39. However, it misstates Commerce's analysis, claiming for threads coded [ ] that "Commerce first inaccurately states that [ ] were the only [ ] thread types sold during the review." *Id.* at 33. Commerce did not state these were the only threads coded [ ], but rather that these were the [ ] thread types "sold in both the home and U.S. markets." Final Analysis

Memo at 6. This statement is correct and Commerce's focus is reasonable given the implications for matching. *See* TAMSA's Second Supplemental Response at Exhibit 1.

With respect to the code [ ] threads sold only in the home market (*i.e.*, [ ]), which Consolidated-Plaintiff calls the "unaddressed threads," they are coded [ ] because they are not comparable to API 5CT threads due to different thread form and geometry and certain "special features," [ ]. *See* TAMSA's Supplemental Sections B-E Response at 15-17. Consolidated-Plaintiff's speculation that the "unaddressed threads" should have been "differently coded" is contradicted by the record. Consol-Plaint.Br. at 33. Contrary to the claim that [ ] should have been coded [ ], TAMSA explained it physically differs from API buttress thread with [ ]. *See* TAMSA's Supplemental Sections B-E Response at 17. Although Consolidated-Plaintiff claims that the physical aspects of [ ] do not appear on the record, it cites to TAMSA's response that describes their unique physical features including [ ]. Consol-Plaint.Br. at 33 n.6; TAMSA's Supplemental Sections B-E Response at 17.

Consolidated-Plaintiff also asserts that for the [ ] thread types Commerce did consider, it focused only on the differences from API 5CT threads, but not how they differ from each other. Consol-Plaint.Br. at 34. TAMSA reasonably coded the threads as in the investigation and Commerce did not request recoding in the review. TAMSA's coding and Commerce's acceptance of this coding was therefore reasonable.

Consolidated-Plaintiff raises several objections to Commerce's treatment of code [ ] threads. Regarding Commerce's observation that they were "only sold in the home market," it asserts that "to the extent that market-of-sale formed the basis for Commerce's acceptance of

Tenaris' code [ ]," it violates the statute and should be remanded. Consol-Plaint.Br. at 36. In the investigation, Commerce explained the reason this consideration is important. Based on the same facts (*i.e.*, code [ ] sales only in the home market, code [ ] sales in both markets), to avoid distortions, Commerce determined it was not appropriate to combine codes [ ]: "{C}ombining codes [ ] and [ ] into code [ ] can distort the margin calculation by matching subject merchandise with substantially more expensive foreign like product with physically distinct and uninterchangeable threading." *See* TAMSA's RFI Submission at Exhibit 4 at 5.

Consolidated-Plaintiff complains again that TAMSA could not obtain catalogues for [ ] code [ ] thread types. Consol-Plaint.Br. at 36. As discussed in Section VI.A.3, the record confirms these were not publicly available and represented a negligible portion of home market sales.

Consolidated-Plaintiff also asserts that Commerce "understates that problem" that TAMSA could only provide limited descriptions of code [ ] threads when it stated that this was "due to the specifications being third-party proprietary." *Id.* at 36. The record supports Commerce's decision. TAMSA explained that "The products are manufactured [ ] Tenaris by [ ]. For this reason, TAMSA does not have access to the information to describe the [ ]." TAMSA's Second Supplemental Response at 2. The courts have recognized it is unfair to penalize a respondent for its inability to provide information pertaining to an unaffiliated third party. *See SKF USA Inc. v. United States*, 630 F.3d 1365, 1375 (Fed. Cir. 2011) ("Use of adverse inferences may be unfair considering SKF has no control over its unaffiliated supplier's actions").

Consolidated-Plaintiff also criticizes Commerce for relying on the record evidence TAMSA provided to support the separate treatment of code [ ], including the [ ]

catalogues, the fact customer [ ] ordered [ ], and the cost analysis demonstrating the [ ] cost of these threads. *See* Consol-Plaint.Br. at 36-38; Final Analysis Memo at 7; TAMSA's Second Supplemental Response at 2, 8, Exhibit 2-3. However, Commerce properly treated this information as evidence of differences in physical characteristics and cited to its analysis in the investigation, which relied on the same evidence for this purpose. *See* Final Analysis Memo at 7-8. Commerce relied on the fact that only [ ] CONNUMs have a [ ] thread code and that this was "insignificant in relation to the total sales of subject merchandise." *Id.* at 8.

Consolidated-Plaintiff objects, as it did for code [ ] threads, to the inclusion of different thread groups in code [ ]. *See* Consol-Plaint.Br. at 39. Based on the record evidence, Commerce reasonably followed the same approach as in the investigation, and determined that "combining codes [ ] and [ ], or recoding the codes into existing codes, would be inappropriate as the products have physically distinct and uninterchangeable threading." Final Analysis Memo at 8.

This Court should reject Consolidated-Plaintiff's allegations of defects in TAMSA's reporting and in Commerce's analysis. It relies on mischaracterizations, false assumptions, and speculation. The record supports Commerce's decision, and this Court is not permitted to re-weigh the evidence on the record. *See Matsushita*, 750 F.2d at 933.

**B. Commerce Properly Determined That TAMSA Fully Cooperated with Its Information Requests Regarding Proprietary Threading and That Application of Any Facts Available Was Not Warranted**

Consolidated-Plaintiff repeats its allegations of deficiencies in the record to request that "{t}he Court should order Commerce to reconsider its approach in light of the foregoing, and make clear that Commerce may apply an adverse inference to fill any gap in the administrative record." Consol-Plaint.Br. at 39-43. Notably, it does not address the statute or case law to support its

request. *See id.* Commerce properly determined that there was no basis for applying facts available of any kind under the statute. Final IDM at 5.

### 1. Legal Framework

The statute provides that Commerce "shall" use facts otherwise available if (1) necessary information is not available on the record, or if (2) a party (A) withholds requested information, (B) fails to provide such information by the appropriate deadlines or in the form and manner requested, (C) significantly impedes a proceeding, or (D) provides the requested information, but the information is incapable of being verified. 19 U.S.C. § 1677e(a). Commerce "may" apply adverse inference in selecting the facts otherwise available if an interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information." *See* 19 U.S.C. § 1677e(b).

As confirmed by this Court, "Commerce has discretion over whether to apply or not apply AFA." *Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1352 (Ct. Int'l Trade 2015) (citing *AK Steel Corp. v. United States*, 346 F. Supp. 2d 1348, 1355 (Ct. Int'l Trade 2004)). Further, "Commerce is not required 'to prove that {a party} cooperated to the best of its ability every time that the agency decides not to apply adverse facts available.'" *Id.* The Court also concluded that "No interested party can be found to have failed to cooperate for not answering questions it was not asked." *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1313 (Ct. Int'l Trade 2017).

### 2. Commerce Properly Determined That Application of Facts Available of Any Kind Was "Not Warranted" Because TAMSA Fully Cooperated

In the Final Results, Commerce properly rejected Petitioners' request to apply AFA: "For the final results, we have continued to use the proprietary thread codes reported by TAMSA, and we find that the application of AFA is not warranted." Final IDM at 5. Commerce explained:

> We find that TAMSA has submitted on the record of this administrative review the factual information to substantiate the physical characteristics that were verified in the less-than-fair value (LTFV) investigation…. We also find that TAMSA fully cooperated with our request for information regarding third-party proprietary thread types. Thus, there is no necessary information missing from the record that would warrant application of facts available under section 776(a) of the Act, let alone facts available with an adverse inference under section 776(b) of the Act. Thus, we continue to rely on TAMSA's reported thread codes for these final results.

*Id.* at 5.

Consolidated-Plaintiff asserts deficiencies on the record, and that "insofar as Commerce's determination not to apply an adverse inference was premised on Commerce's erroneous failure to discern the gap in the administrative record, Commerce's determination not to apply an adverse inference was likewise unsupported by substantial evidence and contrary to law." Consol-Plaint.Br. at 43. Commerce properly requested, reviewed, and relied on the information on the review record to accept the same proprietary thread coding that it verified and approved in the investigation. Petitioners' arguments regarding a gap in the record are misplaced and based on mischaracterizations of the record. Commerce correctly concluded the record was not missing necessary information, and, therefore, the statutory requirement to apply facts available was not triggered under 19 U.S.C. § 1677e(a). Final IDM at 5.

Even if Commerce had decided that facts available was warranted, the plain language of the statute provides Commerce with discretion to apply AFA. *See* 19 U.S.C. § 1677e(a); *see also* *Husteel*, 98 F. Supp. 3d at 1352 (citing *AK Steel Corp.*, 346 F. Supp. 2d at 1355). Moreover, to the extent a respondent such as TAMSA did not provide information that was not requested, it is not a basis to apply AFA. *Maverick Tube Corp.*, 273 F. Supp. 3d at 1313.

## VII. CONCLUSION

For the reasons set forth above, Consolidated Defendant-Intervenors respectfully request that the Court deny the Consolidated-Plaintiff's motion for judgment on the agency record.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Kristina Zissis
Luca Bertazzo
Matthew W. Solomon
C. Alex Dilley

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Tubos de Acero de Mexico, S.A. and Tenaris Global Services (U.S.A.) Corporation.*

October 9, 2026

## CERTIFICATE OF COMPLIANCE

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers procedures. The word count for the Response Brief of Consolidated Defendant-Intervenors, as computed by the White & Case word processing system (Microsoft Word 2016), is 6,993 words.

/s/ Gregory J. Spak

Gregory J. Spak