**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| TUBOS DE ACERO DE MEXICO, S.A., *et al.*<br>Plaintiffs,<br>and<br><br>UNITED STATES STEEL CORPORATION,<br>Consolidated Plaintiff<br><br>v.<br><br>UNITED STATES<br>Defendant,<br>and<br><br>UNITED STATES STEEL CORPORATION, ET AL.,<br>Defendant-Intervenors,<br><br>and<br><br>TUBOS DE ACERO DE MEXICO, S.A., *et al.*<br>Consolidated Defendant-Intervenors. | ) | Consol. Court No. 25-00221 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**


BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

MARGARET JANTZEN
Senior Trial Counsel
Commercial Litigation Branch
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-7994

Of Counsel:

JUSTIN MERHAR
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance
Department of Commerce


October 9, 2026

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................ **Error! Bookmark not defined.**

STATEMENT PURSUANT TO RULE 56.2 ................................ **Error! Bookmark not defined.**

I. The Administrative Determination Under Review ............ **Error! Bookmark not defined.**

II. The Issues Presented for Review ...................................... **Error! Bookmark not defined.**

STATEMENT OF FACTS .......................................................... **Error! Bookmark not defined.**

I. Background of Proceedings .............................................. **Error! Bookmark not defined.**

II. Preliminary Results .......................................................... **Error! Bookmark not defined.**

III. Post-Preliminary Analysis ......................................................................................7

IV. Final Results .............................................................................................................8

SUMMARY OF THE ARGUMENT ...........................................................................9

ARGUMENT ...................................................................................................................9

I. Standard of Review .....................................................................................................9

II. Commerce's Decision to Use the Proprietary Thread Codes Reported by TAMSA is Supported by Substantial Evidence and Otherwise Lawful. ..........................10

A. Legal Framework for Model Matching ..............................................................10

B. Commerce's Thread Code Determination is Consistent with its Findings in the Less Than Fair Value Investigation and Supported by Substantial Evidence ..........................................................................13

III. Commerce's Use of Product Characteristic TYPE Codes for TAMSA's Products is Supported by Substantial Evidence and Otherwise Lawful. ..........................17

IV. Commerce's Rejection of New Factual Information in TAMSA's Case Brief is Supported by Substantial Evidence and Otherwise Lawful. ................................21

A. Commerce's Rejection of TAMSA's Untimely New Factual Information was In Accordance with Statutory Authority. ..................................21

V. Commerce's Denial of a Constructed Export Price Offset in the Final Results is Supported by Substantial Evidence and Otherwise Lawful. .............................24

A. TAMSA Failed to Meet its Burden to Support its Request for a CEP Offset. ..........................................................................................24

B. Substantial Evidence Supports Commerce's Determination to Not Grant a CEP Offset in the Final Results ....................25

C. Commerce Has No Obligation to Notify TAMSA of Insufficient Submissions. ....................26

VI. Commerce's Use of a Modified Differential Pricing Methodology is Supported By Substantial Evidence and Otherwise Lawful. ....................27

A. Commerce's Use of the Modified Differential Pricing Methodology is Consistent With the Federal Circuit's Decisions in *Marmen* and *Stupp*. ....................28

1. The Federal Circuit's Decisions in *Marmen* and *Stupp* Changed Commerce's Practice. ....................28

2. Commerce's Use of the Modified Differential Pricing Methodology is Consistent with its Post-*Marman* and *Stupp* Practice. ....................30

B. Commerce's Modified Differential Pricing Methodology is Reasonable and Consistent with the Statute. ....................31

1. Commerce's Two Percent Threshold of The Price Difference Test is a Reasonable Implementation of the Statute. ....................31

2. Commerce's Two Percent Threshold of The Price Difference Test is Consistent with the Plain Meaning of the Statute ....................35

3. Commerce's Two Percent Threshold of The Price Difference Test is Reasonable and Consistent with Commerce's Practice ....................36

4. Commerce's Price Difference Test is Consistent with a Case-by-Case Analysis of Price Differences. ....................38

5. Commerce's Discontinuance of the Mixed Method Is Supported By Substantial Evidence and Otherwise In Accordance with Law. ....................40

CONCLUSION ....................45

## TABLE OF AUTHORITIES

Cases

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
616 F.Supp.2d 1354 (Ct. Int'l Trade 2009) ........ 26

*Am. Silicon Techs. v. United States*,
334 F.3d 1033 (Fed. Cir. 2003)........ 42

*Am. Silicon Techs. v. United States*,
63 F. Supp. 2d 1324 (Ct. Int'l Trade 1999) ........ 32, 43

*Apex Frozen Foods Priv. Ltd. v. United States*,
862 F.3d 1322 (Fed. Cir. 2017)........ 45

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
102 F.4th 1252 (Fed. Cir. 2024) ........ 34, 35

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984)........ 11

*Best Mattresses Int'l Co. Ltd. v. United States*,
622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ........ 17

*Bio-Lab, Inc. v. United States*,
776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025) ........ 35

*Bohler Bleche GmbH & Co. v. United States*,
324 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ........ 14

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
5 F.4th 1367 (Fed. Cir. 2021) ........ 35, 36

*BYD (H.K.) Co. v. United States*,
785 F. Supp. 3d 1359 (Ct. Int'l Trade 2025) ........ 34

*Carbon Activated Tianjin Co., Ltd. v. United States*,
No. 23-2413, 2025 U.S. App. LEXIS 11226 (Fed. Cir. May 9, 2025)........ 41

*Catfish Farmers of Am. v. United States*,
2016 Ct. Intl. Trade LEXIS 29 (Ct. Int'l Trade 2016)........ 46

*Changzhou Wujin Fine Chemical Factory Co. v. United States*,
701 F.3d 1367 (Fed. Cir. 2012)........ 42

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007)........ 11

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)........................................................................................................ 11

*Daikin America, Inc. v. United States*,
2024 WL 1171736 n.3 (Ct. Int'l Trade Mar. 14, 2024)............................................. 28, 29, 33

*Dillinger France S.A. v. United States*,
981 F.3d 1318 (Fed. Cir. 2020)........................................................................................ 44

*Dong-A Steel Co. v. United States*,
475 F.Supp.3d 1317 (Ct. Int'l Trade 2020) ............................................................... 26, 28

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015)........................................................................................ 40

*Fagersta Stainless AB v. United States,*
577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008) ........................................................ 13, 17, 20

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996)..................................................................................... 10, 35

*Garg Tube Export LLP v. United States*,
740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) ........................................................ 35, 36, 37

*Ghigi 1870 S.p.A. v. United States*,
547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021)......................................................... 14, 15, 22

*Godaco Seafood Joint Stock Co. v. United States*,
435 F. Supp. 3d 1342 (Ct. Int'l Trade 2020) ..................................................................... 23

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ..................................................................... 11

*Hor Liang Indus. Corp. v. United States*,
337 F. Supp. 3d 1310 (Ct. Int'l Trade 2018) ..................................................................... 42

*Hyundai Steel Co. v. United States*,
319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018)................................................................ 26, 27

*Jacobi Carbons AB v. United States*,
365 F. Supp. 3d 1323 (Ct. Int'l Trade 2019)..................................................................... 41

*JBF RAK LLC v. United States*,
790 F.3d 1358 (Fed. Cir. 2015)..................................................................................... 41, 44

*JTEKT Corp. v. United States,*
37 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) ................................................................. 12, 13

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ........................................................................................................ 37

*Koyo Seiko Co. v. United States*,
551 F.3d 1286 (Fed. Cir. 2008) ...................................................................... 28, 29, 33

*Manchester Tank & Equipment Co. v. United States*,
483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ........................................................ 13, 16

*Marmen, Inc. v. United States*,
slip op. 26-62 (Ct. Int'l Trade June 15, 2026) ....................................................................

*Marmen, Inc. v. United States*,
134 F.4th 1334 (Fed. Cir. 2025) ............................................................................ passim

*Matra Americas, LLC v. United States*,
681 F. Supp. 3d 1339 (Ct. Int'l Trade 2024) ................................................................ 25

*Maverick Tube Corp. v. United States,*
107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ................................................................ 13

*Melamine Chemicals, Inc. v. United States*,
732 F.2d 924 (Fed. Cir. 1984) ......................................................................................... 34

*New World Pasta Co v. United States*,
316 F. Supp. 2d 1338 (Ct. Int'l Trade 2004) ................................................................ 13

*Nexteel Co. v. United States*,
28 F.4th 1226 (Fed. Cir. 2022) ....................................................................................... 35

*NEXTEEL Co. v. United* States,
392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) ................................................................ 24

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ....................................................................................... 11

*NSK Ltd. v. United States,*
217 F. Supp. 2d 1291 (Ct. Int'l Trade 2002) ................................................................ 12

*PAM, S.p.A. v. United States*,
582 F.3d 1336 (Fed. Cir. 2009) ....................................................................................... 11

*Pesquera Mares Australes Ltda. v. United States,*
266 F.3d 1372 (Fed. Cir. 2001) ......................................................................... 12, 13, 17

*QVD Food Co., Ltd. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011) ....................................................................................... 17

*Rak LLC v. United States,*
961 F. Supp. 2d 1274 (Ct. Int'l Trade 2014) .................................................................. 13

*Shinseki v. Sanders*,
556 U.S. 396 (2009)................................................................................................... 25

*SKF USA, Inc. v. United States*,
537 F.3d 1373 (Fed. Cir. 2008).................................................................................. 13

*Smith-Corona Group v. United States*,
713 F.2d 1568 (Fed. Cir. 1983).................................................................................. 34

*Stupp Corp. v. United States*,
No. 23-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) .................................................. 42

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) ........................................................................... 33, 43, 44

*Timken Co. v. United States*,
699 F. Supp. 300 (Ct. Int'l Trade 1988) ........................................................................ 11, 17

*Timken Co. v. United States*,
968 F. Supp. 2d 1279 (Ct. Int'l Trade 2014) .................................................................. 45

*Timken Co. v. United States,*
59 F.Supp. 2d 1371 (Ct. Int'l Trade 1999) ..................................................................... 27

*Toyo Kohan Co. v. United States*,
slip op. 26-54 (Ct. Int'l Trade May 22, 2026) ........................................................ passim

*Tri Union Frozen Prods., Inc. v. United States*,
163 F. Supp. 3d 1255 (2016) ..................................................................................... 23

*Union Steel v. United States*,
753 F. Supp. 2d 1317 (Ct. Int'l Trade 2011) .................................................................. 14

*Union Steel v. United States,*
823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012) .................................................................. 13

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009)................................................................................................... 10

*Verson v. United States*,
5 F. Supp. 2d 963 (Ct. Int'l Trade 1998) ....................................................................... 46

*Wuhan Bee Healthy Co. v. United States*,
31 C.I.T. 1182, 2007 WL 2071537 (2007) ....................................................................... 25

Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) .......... 10

19 U.S.C. § 1673b(b)(3) .......... 37

19 U.S.C. § 1677(16) .......... 12, 13, 17

19 U.S.C. § 1677(35) .......... 12

19 U.S.C. § 1677(a)(1) .......... 26

19 U.S.C. § 1677a(a) .......... 12

19 U.S.C. § 1677b .......... 12, 26, 40

19 U.S.C. § 1677f-1 .......... passim

19 U.S.C. § 1677m .......... 23,24, 25

Regulations

19 C.F.R. § 351.102(b)(21) .......... 23, 24

19 C.F.R. § 351.104(a)(2) .......... 23

19 C.F.R. § 351.106(b)(1) .......... 37

19 C.F.R. § 351.224(g) .......... 38

19 C.F.R. § 351.301 .......... 23

19 C.F.R. § 351.302(d) .......... 23, 24, 25

19 C.F.R. § 351.401(b)(1) .......... 28

19 C.F.R. § 351.412(f) .......... 26

Other Authorities

*Alternatives to the Use of Cohen's d; Request for Comment*,
90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025) .......... 31, 32, 38

*Certain Oil Country Tubular Goods from Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*,
90 Fed. Reg. 42,933 (Dep't of Commerce Sept. 5, 2025) .......... 2, 9, 10

*Differential Pricing Analysis; Request for Comments*,
79 Fed. Reg. 26,720 (Dep't of Commerce May 9, 2014) .......... 29, 30

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025) ........................................................ 31

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 88 Fed. Reg. 90,168 (Dep't Commerce Dec. 29, 2023) .......................................................... 3

*Lightweight Thermal Paper from Germany: Notice of Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 57,326 (Dep't Commerce Oct. 2, 2008) ............................................................ 39

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Determination for the Russian Fed*eration, 87 Fed. Reg. 70,785 (Dep't Commerce Nov. 21, 2022) ............................................................ 3

*Oil Country Tubular Goods from Argentina: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 FR 24781 (Dep't Commerce June 12, 2025) ...................................................................... 27

*Oil Country Tubular Goods from Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional* Measures, 87 Fed. Reg. 28,808 (Dep't Commerce May 11, 2022) .................................................... 18, 19

*Oil Country Tubular Goods from Mexico: Preliminary Results Recission, in Part, of Antidumping Duty Administrative Review; 2022*–2023, 89 Fed. Reg. 96,638 (Dep't Commerce December 5, 2024) ................................................ 6, 8

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| **TUBOS DE ACERO DE MEXICO, S.A., *et al.*** | ) | |
| **Plaintiffs,** | ) | |
| **and** | ) | |
| **UNITED STATES STEEL CORPORATION, Consolidated Plaintiff** | ) | |
| **v.** | ) | **Consol. Court No. 25-00221** |
| **UNITED STATES** | ) | |
| **Defendant,** | ) | |
| **and** | ) | |
| **UNITED STATES STEEL CORPORATION, ET AL.,** | ) | |
| **Defendant-Intervenors,** | ) | |
| **and** | ) | |
| **TUBOS DE ACERO DE MEXICO, S.A., *et al.* Consolidated Defendant-Intervenors.** | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motion for judgment upon the agency record filed by plaintiffs Tubos de Acero de Mexico, S.A. (TAMSA) and Tenaris Global Services (U.S.A.) Corporation (TGS USA) (collectively, plaintiffs) and the United States Steel Corporation (U.S. Steel) (consolidated plaintiffs).

As we demonstrate below, Commerce's final results are supported by substantial evidence and in accordance with law. Accordingly, we respectfully request that the Court deny plaintiffs' motions and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I. The Administrative Determination Under Review

Plaintiffs challenge *Certain Oil Country Tubular Goods from Mexico: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 42,933 (Sept. 5, 2025) ("*Final Results*"), (P.R. 136), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 137) (final results). The period of review (POR) was May 11, 2022, through October 31, 2023.

### II. The Issues Presented for Review

1. Whether Commerce's decision to use the proprietary thread codes reported by TAMSA is supported by substantial evidence and otherwise lawful;

2. Whether there is necessary information missing from the record based on TAMSA's submissions of differences in physical characteristics between the two different categories of proprietary thread types and standard thread types;

3. Whether Commerce's use of product characteristic TYPE codes for TAMSA's products is supported by substantial evidence and otherwise lawful;

4. Whether Commerce's rejection of certain information in TAMSA's case brief as untimely new factual information is supported by substantial evidence and otherwise lawful;

5. Whether Commerce's denial of a Constructed Export Price ("CEP") offset *is* supported by substantial evidence and otherwise lawful; and

6. Whether Commerce's use of a modified differential pricing methodology is supported by substantial evidence and otherwise lawful.

## STATEMENT OF FACTS

### I. Background of Proceedings

Commerce has published an antidumping duty order covering OCTG from Mexico. *Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Determination for the Russian Federation,* 87 Fed. Reg. 70,785 (Nov. 21, 2022) (*Order*).

After receiving requests for administrative review of exports of oil country tubular goods from Mexico made by TAMSA, TGS USA, and Siderca S.A.I.C., Commerce initiated this administrative review. *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 88 Fed. Reg. 90,168, 90,170 (Dec. 29, 2023) (P.R. 4). The POR was May 11, 2022, through October 31, 2023. *Id.*

On March 12, 2024, Commerce issued initial antidumping questionnaires to TAMSA and TGS USA. *See* Letter from Commerce to TAMSA, Administrative Review of the Antidumping Duty Order on Oil Country Tubular Goods from Mexico: Initial Questionnaire (Mar. 12, 2024) ("Initial Questionnaire") (P.R. 14-15); Letter from Commerce to TGS USA, Administrative Review of the Antidumping Duty Order on Oil Country Tubular Goods from Mexico: Initial Questionnaire (Mar. 12, 2024) (P.R. 16-17).

The initial questionnaire provided detailed instructions for how to code and report various product characteristics for a CONNUM hierarchy. Commerce instructed TAMSA to report product type using four codes: Tubing (code 1), Casing (code 2), Green Tube (code 4), and Coupling Stock (code 9). Initial Questionnaire (Mar. 12, 2024) (P.R. 14 at B-8, [ [redacted] ]). Commerce also instructed TAMSA to report product threading using codes: Not threaded (code 10), Short thread (code 40), Long thread (code 45), Buttress thread (code 50), and Extreme

Line/Integral Joint thread (code 55). Initial Questionnaire (Mar. 12, 2024) (P.R. 14 at B-9, B-10).

TAMSA submitted its response to section A of the Initial Questionnaire on April 2, 2024, and its response to sections B, C, and E of the Initial Questionnaire on April 25, 2024. *See* Letter from TAMSA to Commerce, TAMSA Initial Section A Questionnaire Response (Apr. 2, 2024) ("TAMSA AQR") (P.R. 25-30, C.R. 11-40); Letter from TAMSA to Commerce, TAMSA Initial Sections BCE Questionnaire Response (Apr. 26, 2024) ("TAMSA BCE QR") (P.R. 36-42, C.R. 44-123). In its comments on TAMSA's questionnaire responses, US Steel requested that Commerce request more information on the threading reporting. *See* Letter from Petitioners to Commerce, Petitioners' Initial Sections BCE Questionnaire Response Deficiency Comments (May 24, 2024) (P.R. 49, C.R. 147 at 6-7).

In a supplemental questionnaire, Commerce instructed TAMSA to recode all products assigned TYPEH/U in accordance with Commerce's initial instructions, specifically to code [[redacted] as code [[redacted]] if those products are [[redacted]] or code [[redacted]] if those products are [redacted]]." Letter from Commerce to TAMSA, Supplemental Questionnaire (Aug. 6, 2024) ("Commerce 1SQ") (P.R. 57, C.R. 150 at 8). Commerce further instructed TAMSA to provide additional information on nonstandard thread codes claimed by TAMSA, in accordance with the initial questionnaire. *Id.* at 8-9.

On August 8, 2024, TAMSA requested that Commerce "clarify or reconsider certain revised reporting instructions contained in its supplemental questionnaire." Letter from TAMSA to Commerce, Request for Clarification or Reconsideration of Certain Questions in the First Supplemental Questionnaire (Aug. 8, 2024) (TAMSA's Request for Clarification) (P.R. 58, C.R.

151 at 1). Specifically, TAMSA requested that Commerce reconsider its request for the coding for TYPE. *Id.* at 4-5. Commerce responded to TAMSA's request and provided in relevant part:

> We continue to require a response to Question 11.A and Question 15 of {Initial Questionnaire} but with the following additional instructions. With respect to Question 11.A, recode all products assigned code [redacted] to code [[redacted]] if those products are [[redacted] or code [[redacted]] if those products are [[redacted]]. However, please also ensure that you identify all [[redacted]] separate from other products in your sales, further manufacturing, and cost data, as applicable. Identify the variable(s) and code(s) that identify [redacted]], specifically and on a "one-to-one" basis, or add a variable, if necessary, to identify [[redacted]] (and only [[redacted]]).

*See* Letter from Commerce to TAMSA, Request for Clarification or Reconsideration of Supplemental Questions (Aug. 28, 2024) (Commerce's Clarification Letter) (P.R. 67, C.R. 183 at 2).

On September 17, 2024, TAMSA responded to Commerce's First Supplemental Questionnaire. *See* Letter from TAMSA to Commerce, TAMSA First Supplemental Sections B-E Response (Sept. 17, 2024) ("TAMSA B-E 1SQR") (P.R.75, C.R.193-284). On October 17, 2024, petitioners filed comments on claimed deficiencies in TAMSA's First Supplemental Questionnaire Response. *See* Letter from Petitioners to Commerce, Petitioners' Comments on Deficiencies in Tenaris' First Supplemental Questionnaire Response (Oct. 17, 2024) (P.R. 84, C.R. 322).

On October 22, 2024, Petitioners filed pre-preliminary comments and on October 31, 2024, TAMSA filed a rebuttal to Petitioners' pre-preliminary comments. *See* Letter from Petitioners' to Commerce, Petitioners' Pre-Preliminary Comments (Oct. 22, 2024) ("Petitioners' Pre-Preliminary Comments") (P.R. 85, C.R.323-324); Letter from TAMSA to Commerce, TAMSA's Pre-Preliminary Rebuttal (Oct. 31, 2024) ("TAMSA's Pre-Preliminary Rebuttal") (P.R. 86, C.R. 325).

## II. Preliminary Results

On December 5, 2024, Commerce published its preliminary results. *Oil Country Tubular Goods from Mexico: Preliminary Results Recission, in Part, of Antidumping Duty Administrative Review; 2022–2023,* 89 Fed. Reg. 96,638 (Dec. 5, 2024) (*Preliminary Results*) (P.R. 95) and accompanying Preliminary Decision Memorandum ("PDM") (P.R. 90, C.R. 326). In the accompanying PDM, Commerce made the following preliminary findings:

(1) Commerce relied on 10 criteria to match U.S. sales of subject merchandise to comparison market sales of the foreign like product: (1) seamless or welded; (2) type; (3) grade; (4) coupled; (5) upset end; (6) threaded; (7) nominal outside diameter; (8) length; (9) heat treatment; and (10) nominal wall thickness. PDM at 7.

(2) Commerce noticed its intent to issue a post-preliminary supplemental questionnaire to complete the record with respect to information pertaining to TAMSA's proprietary threading, and third-party proprietary threading. *Id.* at 7.

(3) Commerce granted a preliminary CEP offset. *Id.* at 11.

(4) Commerce used the Cohen's *d* test in its differential pricing analysis. *Id.* at 4-7.

On February 5, 2025, Commerce issued TAMSA a second supplemental questionnaire requesting that TAMSA provide detailed descriptions of the [[redacted]] thread types and why it is appropriate to categorize [[redacted]] threading and [[redacted]] threading under codes [[redacted]] and [redacted]]. *See* Letter from Commerce to TAMSA, Commerce's Second Supplemental Questionnaire (Feb. 5, 2025) ("Commerce 2SQ") (P.R. 101, C.R. 336 at 4). On February 19, 2025, TAMSA submitted its response to the Second Supplemental Questionnaire. Letter from TAMSA to Commerce, TAMSA Second Supplemental Questionnaire Response (Feb. 19, 2025) ("TAMSA 2SQR") (P.R. 104, C.R. 337-347).

On March 10, 2025, both Petitioners and TAMSA submitted case briefs. *See* Letter from Petitioners to Commerce, Petitioners' Case Brief (March 10, 2025) ("Petitioner Case Brief") (P.R. 110, C.R. 350-51); Letter from TAMSA to Commerce, Case Brief (March 10, 2025) ("TAMSA Rejected Case Brief") (P.R. 109, C.R. 348-49). On June 3, 2025, Commerce rejected TAMSA's Case Brief as it contained untimely new factual information "NFI." *See* Letter from Commerce to TAMSA, Rejection of Case Brief of {TAMSA} (June 3, 2025) ("Rejection of TAMSA Case Brief") (P.R. 117). On June 4, 2025, TAMSA resubmitted its case brief with the NFI identified by Commerce removed. *See* Letter from TAMSA to Commerce, Resubmission of Case Brief (June 4, 2025) ("TAMSA Case Brief") (P.R. 119-20, C.R. 354-55).

## III. Post-Preliminary Analysis Regarding Differential Pricing

On July 18, 2025, Commerce issued a memorandum regarding changes to its differential pricing analysis and established a briefing schedule solely for arguments related to Commerce's new methodology. *See* Memorandum, "Post-Preliminary Analysis of the Administrative Review of Certain Oil Country Tubular Goods from Mexico; 2022-2023," dated July 18, 2025 (Post-Preliminary Analysis) (P.R. 124-25, C.R. 156). Commerce explained that the Court of Appeals for the Federal Circuit decisions in *Marmen* and *Stupp* required Commerce to discontinue using the Cohen's *d* test and to replace it with the "price difference test{.}" Post-Preliminary Analysis at 1-2. Commerce further explained that it had discontinued the use of the "mixed method" as a potential alternative comparison methodology. *Id.* at 2. Commerce provided interested parties an opportunity to comment on Commerce's new differential pricing methodology. *Id.*

The parties subsequently filed case briefs commenting on the new differential pricing methodology. *See* Letter from TAMSA to Commerce, Case Brief on Differential Pricing Analysis in Post-Preliminary Analysis (July 29, 2025) (P.R. 103, C.R. 366); Letter from

Petitioners to Commerce, Petitioners' Post-Preliminary Rebuttal Brief (August 1, 2025) (P.R. 131).

## IV. Final Results

On September 5, 2025, Commerce published the final results. The results included the following findings:

(1) Commerce assigned TAMSA a weighted-average dumping margin of 26.10 percent. *Final Results*, 90 Fed. Reg. at 42,934.

(2) TAMSA had submitted sufficient factual information on the record to substantiate the physical characteristics of its THREAD coding such that it was appropriate to continue to use two categories of proprietary thread codes as used in the LTFV investigation. IDM at comment 1.

(3) Commerce continued to rely on the model matching codes for TYPE and did not use TAMSA's added "SUBTYPE" field in the margin calculations. Commerce concluded that TAMSA failed to explain why the products are physically distinct from the characteristics of other products which would be classified under the same codes under the existing model match criteria. *Id.* at comment 7.

(4) Commerce did not grant TAMSA a CEP offset because TAMSA did not support its claimed levels of intensity that are specific to reported selling functions or provide quantitative support for distinct levels of intensity for its reported channel-specific selling functions. *Id.* at comment 4.

(5) Commerce abandoned the Cohen's *d* test and instead utilized the new differential pricing methodology. *Id.* at comment 9.

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's final results. Commerce's acceptance TAMSA's modified thread codes and rejection of TAMSA's modified type codes was reasonable, supported by substantial evidence, and consistent with Commerce's model matching practice. Second, Commerce rejection of new factual information contained in TAMSA's case brief was in accordance with law. Third, Commerce also lawfully rejected a Constructed Export Price offset because TAMSA failed to demonstrate its entitlement to such offset. Commerce was under no obligation to inform TAMSA of deficiencies with its submission. Finally, Commerce's decision to abandon the Cohen's *d* test and utilize a modified differential pricing analysis, after providing the parties notice and opportunity for comment, was consistent with law.

## ARGUMENT

### I. Standard of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from

being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted). The Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it de novo. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (Court will not "weigh the adequate quality or quantity of the evidence for sufficiency").

## II. Commerce's Decision to Use the Proprietary Thread Codes Reported by TAMSA is Supported by Substantial Evidence and Otherwise Lawful.

### A. Legal Framework for Model Matching

To determine whether subject merchandise is being sold in the United States at less than fair value, Commerce compares the price at which the merchandise is sold in the United States (the export price) with the price of the product in the home market (the normal value). *See* 19 U.S.C. §1677b(a); 19 U.S.C. § 1677a(a); 19 U.S.C. § 1677b(a)(1)(A)-(B). The dumping margin is the amount by which the normal value exceeds the export price. *See* 19 U.S.C. § 1677(35)(A). To calculate the dumping margin, Commerce must identify the foreign like product that will be

compared with the subject merchandise sold in the United States. *Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372, 1375 (Fed. Cir. 2001). Foreign like product means merchandise in the first of the following categories for which a determination can satisfactorily be made:

> A. The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
>
> B. Merchandise –
> i. produced in the same country and by the same person as the subject merchandise,
> ii. like that merchandise in component material or materials and in the purposes for which used, and
> iii. approximately equal in commercial value to that merchandise.
>
> C. Merchandise –
> i. produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
> ii. like that merchandise in the purposes for which used, and
> iii. which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16)(A)-(C). The statute thus establishes a hierarchy for identifying the foreign like product where Commerce first tries to match subject merchandise sold in the United States with identical products sold in the home market. *Id.*; *JTEKT Corp. v. United States,* 37 F. Supp. 3d 1326, 1334 (Ct. Int'l Trade 2014); *NSK Ltd. v. United States,* 217 F. Supp. 2d 1291, 1299-1300 (Ct. Int'l Trade 2002).

"Identical" products do not have to be exactly the same. *Pesquera Mares,* 266 F.3d at 1383. Rather, "merchandise should be considered to be identical despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant." *Id.* at 1384. Commerce determines what constitutes "commercially significant" physical differences on a case-by-case basis. *Fagersta Stainless AB v. United States,* 577 F.

Supp. 2d 1270, 1279 (Ct. Int'l Trade 2008). If it is not possible to identify identical merchandise, then Commerce matches subject merchandise with similar products sold in the home market. *JTEKT Corp.,* 37 F. Supp. 3d at 1334.

This model-match methodology is based on a hierarchy of commercially significant product characteristics that Commerce uses to create control numbers (CONNUMS), which identify unique products for comparison. *JFB Rak LLC v. United States,* 961 F. Supp. 2d 1274, 1283-84 (Ct. Int'l Trade 2014); *Union Steel v. United States,* 823 F. Supp. 2d 1346, 1349 (Ct. Int'l Trade 2012). Commerce's model-matching methodology is therefore based on the physical characteristics of products. *See* 19 U.S.C. § 1677(16)(A). "Congress has granted Commerce considerable discretion to fashion the methodology used to determine what constitutes 'foreign like product' under the statute." *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) (internal citations omitted). In developing its model match hierarchy, Commerce has "wide latitude" in selecting relevant characteristics, and "generally will recognize physical differences that are significant in terms of cost and price differences." *Manchester Tank & Equipment Co. v. United States*, 483 F. Supp. 3d 1309, 1316 (Ct. Int'l Trade 2020) (citing *New World Pasta Co v. United States*, 316 F. Supp. 2d 1338, 1354 (Ct. Int'l Trade 2004) (internal quotations omitted)). But "differences in costs do not constitute differences in products in and of themselves." *Maverick Tube Corp. v. United States,* 107 F. Supp. 3d 1318, 1330 (Ct. Int'l Trade 2015). While price and production cost differences are relevant to the inquiry, the determination of commercial significance requires ascertaining whether such differences are "driven" by the relevant characteristic. *Bohler Bleche GmbH & Co. v. United States*, 324 F. Supp. 3d 1344, 1350 (Ct. Int'l Trade 2018); *see also Union Steel v. United States*, 753 F. Supp. 2d 1317, 1325 (Ct. Int'l Trade 2011).

"This Court and the Federal Circuit have looked for 'compelling reasons' when Commerce modifies a model-match methodology in a review after having used that methodology in previous segments of the proceeding." *Ghigi 1870 S.p.A. v. United States*, 547 F. Supp. 3d 1332, 1334 (Ct. Int'l Trade 2021) (citations omitted). "Compelling reasons require the agency to provide compelling and convincing evidence that the existing model-match criteria are not reflective of the merchandise in question, that there have been changes in the relevant industry, or that there is some other compelling reason requiring the change." *Id.* (citations and quotations removed).

**B. Commerce's Thread Code Determination is Consistent with its Findings in the Less Than Fair Value Investigation and Supported by Substantial Evidence**

U.S. Steel challenges Commerce's use of two CONNUM thread codes reported by TAMSA. However, Commerce's conclusion is consistent with its treatment of these codes in the LTFV investigation and U.S. Steel did not demonstrate any compelling reasons for Commerce to deviate from that model-match methodology.

First, US Steel mischaracterizes the THREADH/U codes reported by TAMSA as "new" for this administrative review. They are not. As Commerce explained, TAMSA submitted "factual information to substantiate the physical characteristics [[redacted]] that were verified in the less-than-fair value (LTFV) investigation." IDM at 5. The codes in dispute are TAMSA's reported code [ [redacted] ] for its proprietary thread and code [ [redacted] ] for third-party proprietary thread. Final Analysis Memo at 6. The proprietary thread types under code [ [redacted] ] were sold only in the home market, while three thread types {[[redacted]]} under [ [redacted] ] were sold in both the home and U.S. markets. *Id.* at 6-7. At the home market sales verification during the investigation, Commerce reviewed threads reported for sales with code [ [redacted] ] and code [ [redacted] ]. Final Analysis Memo at 7. These sales showed that: "(1) TAMSA's

proprietary threads and third-party proprietary threads are distinct and uninterchangeable because customers' purchase orders specify whether they want TAMSA's proprietary thread or a third-party proprietary thread; and (2) there are unique product characteristics available in TAMSA's proprietary threads but not in third-party proprietary threads, and vice versa." Final Analysis Memo at 7-8.

The parties in the investigation commented specifically on the thread code issues, and, based on those comments, Commerce determined to include the two additional thread codes. *See Order* IDM at Comment 4. Commerce therefore treated the thread coding in this review consistently with its treatment of these codes in the investigation. To deviate from its model match methodology, Commerce would need a compelling reason, such as changes in the relevant industry, that are not present in this record. *See Ghigi 1870 S.p.A.*, 547 F. Supp. 3d at 1334. U.S. Steel points to none.

In addition to the consistency in Commerce's approach, substantial evidence on this record supports using the thread codes reported by TAMSA. *See* TAMSA BCE QR (P.R. 36-42, C.R. 44-123 at B-19, C19 – C-20, and Exhibit C4); *see also* TAMSA NFI at Exhibit 1 and 4. In the Final Analysis Memorandum, Commerce discussed detailed excerpts of the physical differences specifically for thread types [ [redacted] ]. Final Analysis Memo at 6-7. U.S. Steel argues Commerce's selection of thread types was insufficient. But these thread types are those under code [redacted]] that were sold in both the home and U.S. markets. Final Analysis Memo at 6-7. Commerce further explained its rationale in terms of what made the categories physically distinct and *commercially meaningful*.

First, in the questionnaire response, TAMSA explained how the additional codes [ [redacted] ] are physically distinct from the four thread codes. *Id.* at 7. These codes represent

commercially meaningful distinctions because customers' purchase orders specify whether they want TAMSA's proprietary thread or a third-party proprietary thread. *Id.* at 7. TAMSA's proprietary threads have unique product characteristics that are not available in third-party proprietary threads, and vice versa. *Id.* And "there are only [[redacted]] CONNUMs that have a thread code of [[redacted]] ] and [ ] these CONNUMs were only sold in the home market during this review." *Id.* at 8. Commerce therefore found this to be insignificant in relation to the total sales of subject merchandise. *Id.*

Next, U.S. Steel's proffered "rules" on establishing CONNUM categories are overly restrictive. *See* U.S. Steel Br. at 19-20. Plaintiff argues that the new codes must have both: (1) insignificant physical differences among products in a code; and (2) physical differences with all products that are assigned different codes. *Id.* These assertions are unsupportable for several reasons. First, such requirements encroach on Commerce's "wide latitude" to select relevant characteristics. *See Manchester Tank*, 483 F. Supp. 3d at 1316. Importantly here, the absolute criterion on physical characteristics omits a key aspect of Commerce's analysis: *commercial significance.* Although physical characteristics is the primary characteristic in the analysis, the CONNUM system recognizes that products will not be identical and must be sorted by other relevant characteristics – *i.e.*, commercial significance. *See* 19 U.S.C. § 1677(16)(A); *Pesquera Mares,* 266 F.3d at 1383 ("It might not be possible … with certain types of merchandise to account for every conceivable physical characteristic of that merchandise") (internal quotations removed). U.S. Steel argues about the minor distinctions between various thread characteristics. *See generally* U.S. Steel Br. 29-39. But not every difference should be accounted for in the CONNUM structure. *Pesquera Mares,* 266 F.3d at 1384. Commerce has discretion to determine what constitutes commercial significance. *Fagersta Stainless,* 577 F. Supp. 2d at 1279. Here,

those commercially significant features are the lack of interchangeability and the purchase requirements of customers. Final Analysis Memo at 6-7.

Finally, U.S. Steel's arguments that the record lacked substantial evidence are unpersuasive. *See* U.S. Steel Br. 39-43. Commerce has broad discretion to evaluate the sufficiency of the administrative record and to determine whether record evidence is adequate to support a finding. *See QVD Food*, 658 F.3d at 1323 ("Commerce has broad discretion to determine the best available information for an antidumping review, given that the term 'best available information' is not defined by statute."). This Court will not "weigh the adequate quality or quantity of the evidence for sufficiency." *Timken*, 699 F. Supp. at 306. Nor is Commerce "required to address every piece of evidence submitted by the parties." *Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347 at 1369 (Ct. Int'l Trade 2023) (citations omitted). It is, instead "presumed to have considered all the evidence in the record absent a showing to the contrary." *Id*. Commerce explained that TAMSA provided catalogues related to the threading coded [ [redacted] ], the related purchase order and cost analysis, and an explanation demonstrating physical difference and not compatible with existing codes. Final Analysis Memo at 7. This information, along with TAMSA's questionnaire responses and additional factual submissions, provide substantial evidence supporting Commerce's conclusion that commercially significant features of TAMSA's thread codes support their use in this administrative review. *Id.* at 6. Plaintiff's preferred "rules" for thread coding do not undermine Commerce's reasonable determination to consider commercially significant features of TAMSA's thread codes.

### III. Commerce's Use of Product Characteristic TYPE Codes for TAMSA's Products is Supported by Substantial Evidence and Otherwise Lawful.

In identifying TAMSA's unique products for comparison in its model-match methodology, Commerce used product characteristic TYPE codes for TAMSA's products. First, TAMSA alleges that Commerce improperly changed the TYPE code in the CONNUM. *See* TAMSA Br. at 14. This is incorrect. The CONNUM hierarchy originated in the investigation. IDM at 20-21; *See Oil Country Tubular Goods from Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28,808 (May 11, 2022) (LTFV *Preliminary Determination*), and accompanying PDM at 2 and 7, unchanged in *OCTG from Mexico Final*. Commerce used this hierarchy in its initial questionnaire which established the TYPEH/U section in the second position with four codes: tubing, casing, green tube, and coupling stock; and Field [ [redacted] ] which was assigned to the [ [redacted] position. *See* Initial Questionnaire (P.R. 14-15 at B-8, C-7). TAMSA's response added additional codes to the TYPEH/U field to the four established in the CONNUM and requested by the questionnaire. IDM at 20; *See* TAMSA BCE QR (P.R. 36-42, C.R. 44-123 at B-15-B-16, Exhibit Supp. BC1, Exhibit Supp. BC 2, Exhibit Supp. BC3, and Exhibit Supp. BC4). Commerce instructed TAMSA to remove the additional codes, based on record evidence that the proposed additions did not represent OCTG products that are physically distinct from existing OCTG types. IDM at 21; *See* Commerce 1SQ (P.R. 57, C.R. 150 at 8); *see also* Commerce's Clarification Letter (P.R. 67, C.R. 183 at 2). TAMSA revised its reporting but created a new CONNUM field, "SUBTYPE," which it incorporated into the CONNUM string. IDM at 20; *See* TAMSA's B-E 1SQR at 6 of section BC Narrative (C.R. 194). TAMSA also continued to include an additional TYPE code [ [redacted] ], directly

contradicting Commerce's instructions. Commerce did not include TAMSA's new "SUBTYPE" field in the Preliminary Results margin calculation or in the Final Results. IDM at 20.

As explained above, the CONNUM is used to meaningfully establish "identical merchandise" for the purposes of Commerce's margin calculations. Consistent with Commerce's practice, the CONNUM in this case was developed in the investigation with input from interested parties. IDM at 20-21. Although the four categories of TYPEH/U codes did not change between the investigation and Commerce's initial questionnaire, TAMSA alleges that the coding was changed. TAMSA Brief at 14-15. Unlike the additional thread codes discussed above, modifications to TYPE were not discussed in the LFTV Final IDM. TAMSA's repeated attempts to add new codes into its questionnaire submissions, despite Commerce's instructions to the contrary, did not result in Commerce adopting these new codes. As Commerce explained, it is not required to re-work the existing model match criteria for individual respondents after the model match criteria and codes have been established, simply because an interested party believes other model match criteria is more appropriate. IDM at 21. Commerce may consider how best to classify atypical products under the existing model match codes or even create additional codes within model match criteria to account for products which otherwise cannot be accurately classified under existing model match criteria codes if "compelling reasons to do so" exist. *Fagersta Stainless,* 577 F. Supp. 2d at 1276 ("Compelling reasons" means "compelling and convincing evidence" that the existing model-match criteria "are not reflective of the merchandise in question," that there have been changes in the relevant industry, or that "there is some other compelling reason present which requires a change.")

Commerce reasonably utilized the model-match criteria here under the existing hierarchy. Specifically at issue is the assignment of [ [redacted] ] to TYPE code [ [redacted] ] or [ [redacted] ] [1] instead of the additional code of [ [redacted] ] that TAMSA proffers. Commerce explained that "the existing model match criteria and codes address all of the physical differences between different [redacted] ] of both [ [redacted] ] and [ [redacted] ] on the one hand and other [ [redacted] ] on the other." Final Analysis Mem. at 9. Since TAMSA identifies [redacted] ] as " '[ [redacted] ] … [ [redacted] ,'" and the record identifies "[ [redacted] as '[ [redacted] ],'" the physical characteristic field for type (TYPEH/U) sufficiently captures the distinction between [ [redacted] ] that are classified as [ [redacted] ], and coded [ [redacted] ], and [ [redacted] ] that are classified as [ [redacted] ], and coded [ [redacted] ]. *Id.* Accordingly, "otherwise identical [ [redacted] ] are treated as physically [redacted] ]. [ [redacted] ] is identified in field [ [redacted] ]." *Id.*

Commerce explained that the issues raised about [ [redacted] ] were previously addressed in the investigation when determining whether they were covered by the order. IDM at 9. Specifically, Commerce previously addressed how [ [redacted] ] are similar "to other in-scope OCTG products" and … [redacted] ] and [ [redacted] ] are [ [redacted] ] by [ [redacted] ] and [redacted] ]." *Id.* at 9-10.

> There, Commerce explained that " [redacted] ]." Commerce further elaborated, explaining that "[ [redacted]

[1] TAMSA may have made codes [1 and 2] public by not bracketing them in its opening brief. *See* TAMSA Brief at 15, 25. However, out of abundance of caution, because these codes were bracketed in the Final Analysis Memo, we followed the original bracketing from the proceeding.

> [redacted])].

*Id.* (internal citations omitted).

In short, Commerce had already considered TAMSA's arguments regarding [[redacted]] when it found that the existing CONNUMs appropriately incorporated the relevant physical characteristics of both. Commerce also considered that [[redacted]] and [[redacted]] differ in terms of manufacturing facilities and manufacturing processes, and that these differences are reportedly reflected in higher costs, and that [[redacted]] are products with a standard length. *Id.* at 10. But these facts did not require an alteration to the established CONNUMs.

Next, TAMSA argues that Commerce "misleadingly" omitted portions of production descriptions and offers the unabridged descriptions. TAMSA Br. at 21. For [[redacted]s], the entire description includes [redacted]] *Id.* (emphasis in original). For [[redacted]], the entire description includes [redacted]]. *Id.* (emphasis in original). TAMSA alleges that these "full description[s]" explain how [[redacted]] are different from casing and tubing. *Id.* A plain reading of these passages shows that what is being described is [[redacted]], which the existing CONNUMs already contemplate in the [[redacted]] category. *See generally* Final Analysis Memo at 9-10. TAMSA's attempts to identify additional distinguishing characteristics

are unavailing and do not demonstrate differences that are unaccounted for in the CONNUMs. It is not enough to point out that some products which would ordinarily be given the same "type" code [ [redacted] ] physically differ in ways that may be adequately accounted for by other model match criteria or [ [redacted] ] have different commercially significant costs, prices, or uses as other products with the same CONNUMs. IDM at 21. With or without the abbreviated text, the analysis is the same: [ [redacted] ] is already accounted for within the existing CONNUM structure.

TAMSA seeks to have a physical characteristic, [ [redacted] ], be considered twice in the CONNUMs – once in the [redacted] ] category and a second time in the [ [redacted] ] category. This is contrary to the purpose of separating physical characteristics by CONNUM. And TAMSA has not offered "compelling and convincing evidence that the existing model-match criteria are not reflective of the merchandise in question." *Ghigi 1870 S.p.A.*, 547 F. Supp. 3d at 1334. Indeed, TAMSA simply advocates for a change to the existing model match methodology to consider [ [redacted] ] criterion twice in the hierarchy, while continuing to consider all other criteria once. TAMSA claims Commerce dismissed record evidence and is creating an "impossible standard" that dismissed physical, cost, price, or use differences. TAMSA Brief at 20. Commerce considered these arguments and found them unpersuasive. In the absence of "compelling" reasons to modify the existing model match methodology, *Ghigi 1870 S.p.A.*, 547 F. Supp. 3d at 1334, Commerce's decision to maintain its CONNUM structure from the investigation is supported by substantial evidence and is in accordance with law.

## IV. Commerce's Rejection of New Factual Information in TAMSA's Case Brief is Supported by Substantial Evidence and Otherwise Lawful.

### A. Commerce's Rejection of TAMSA's Untimely New Factual Information was In Accordance with Statutory Authority.

Commerce's proceedings are governed by timelines set forth in 19 U.S.C. § 1677m(a), (e) and 19 C.F.R. § 351.301. When a party submits new factual information after the applicable

deadline, Commerce may reject the submission and remove it from the record. *See* 19 C.F.R. § 351.302(d)(1)(i); 19 C.F.R. § 351.104(a)(2). Commerce's authority to reject untimely filed factual information is not at dispute. *See* TAMSA Brief at 28-29. Commerce acted in accordance with statutory authority and its regulations in rejecting TAMSA's three new columns in a spreadsheet that reflected underlying formulas, along with an entirely new spreadsheet.

Factual information includes, in part, "{e}vidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party." 19 C.F.R. § 351.102(b)(21)(i). This Court will sustain Commerce's interpretation of what constitutes factual information unless an "alternative reading is compelled by the regulation's plain language or by other indications of ... intent at the time of the regulation's promulgation." *Godaco Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342, 1357 (Ct. Int'l Trade 2020) (*citing Tri Union Frozen Prods., Inc. v. United States*, 163 F. Supp. 3d 1255, 1287 (2016)).

First, TAMSA understates the extent of the untimely information in its submission. For example, TAMSA's Attachment contained three new spreadsheet columns, with underlying formulas, and an entirely new spreadsheet entitled "Summary." *Compare* TAMSA Rejected Case Br. at Attachment (P.R. 109, C.R. 348-49) *with* TAMSA Case Br. at Attachment (P.R. 119-20, C.R. 354-55). TAMSA argues that its submission was not new factual information because the information was "based on" or "derivative" of prior information. TAMSA Br. at 30. TAMSA further claims that finding its submission to be "new" information is "akin to rejecting a column that shows for the first time a value of 4, while the information on the record clearly established the component values of 3 and 1." TAMSA Brief at 30-31. This Court has rejected a nearly identical argument. *See NEXTEEL Co. v. United States,* 392 F. Supp. 3d 1276, 1291 (Ct.

Int'l Trade 2019), *aff'd in part, vacated in part on other grounds, remanded*, 28 F.4th 1226 (Fed. Cir. 2022) (rejecting an argument that information was not new factual information because it was "a simple function of basic arithmetic"). New calculations of record information are data within the meaning of 19 C.F.R. § 351.102(b)(21) and thus constitutes new factual information within the meaning of the statute. *See Id.*

Finally, TAMSA argues that Commerce was required, and failed to, provide an "explanation for finding the information was NFI," citing 19 U.S.C. § 1677m(f) and 19 C.F.R. § 351.302(d). TAMSA Br. at 30. Neither the statute nor the regulation compels what TAMSA seeks. 19 U.S.C. § 1677m(f) states in its entirety:

> If the administering authority or the Commission declines to accept into the record any information submitted in an investigation or review under this subtitle, it shall, to the extent practicable, provide to the person submitting the information a written explanation of the reasons for not accepting the information.

19 C.F.R. § 351.302(d)(2) states:

> The Secretary will reject such information, argument, or other material, or unsolicited questionnaire response with, to the extent practicable, written notice stating the reasons for rejection.

Commerce met its burden under either authority. First, the requirement is qualified by "to the extent practical." 19 U.S.C. § 1677m(f); 19 C.F.R. § 351.302(d)(2). And the requirement applies only to the reason for not accepting (*i.e.,* rejecting) the information, not as to why information was found to be new factual information. Commerce provided the reason for *rejection*: the submission contained untimely new factual information. Rejection of TAMSA Case Br. (P.R. 117 at 1). Commerce was not required to also explain why the new spreadsheets with data constituted new factual information.

Even assuming that Commerce's rejection of NFI was in error, TAMSA fails to demonstrate how it was harmed by the error. The burden of showing that an error is harmful

normally falls upon the party attacking the agency's determination. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). This burden applies to Commerce's rejection of case briefs for new factual information. *See Matra Americas, LLC v. United States*, 681 F. Supp. 3d 1339, 1366 (Ct. Int'l Trade 2024); *Wuhan Bee Healthy Co. v. United States*, 31 C.I.T. 1182, 1193, 2007 WL 2071537 (2007).

TAMSA has not identified a linkage between the absent information and any harm suffered. *See generally* TAMSA Br. at 28-31. TAMSA does not demonstrate how Commerce's alleged procedural error caused a change in Commerce's final results. Indeed, if the information was "based solely on information on the record for review" TAMSA Br. at 29, then the information was already available for Commerce to make its decision. Absent a showing that the absent information materially impacted the outcome, TAMSA cannot prevail on this claim.

## V. Commerce's Denial of a Constructed Export Price Offset in the Final Results is Supported by Substantial Evidence and Otherwise Lawful.

### A. TAMSA Failed to Meet its Burden to Support its Request for a CEP Offset.

TAMSA failed to meet its burden to provide sufficient quantitative and qualitative evidence to support its request for a constructed export price (CEP) offset. Under 19 U.S.C. § 1677(a)(1)(B)(i), Commerce will calculate, to the extent possible, the normal value (NV) based on sales at the same level of trade (LOT) as the U.S. sale. When the level of trade in the home market constitutes a more advanced stage of distribution than the level of trade of the constructed export price to the United States, but Commerce lacks sufficient data to determine whether the difference affects price comparability to grant a level of trade adjustment, Commerce will grant a CEP offset. *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1335 (Ct. Int'l Trade 2018); 19 U.S.C. § 1677b(a)(7)(B); 19 C.F.R. § 351.412(f). It is the respondent's burden to demonstrate an entitlement for a CEP offset. *See Dong-A Steel Co. v. United States*, 475 F.Supp.3d 1317, 1345 (Ct. Int'l Trade 2020); *Ad Hoc Shrimp Trade Action Comm. v. United*

*States*, 616 F. Supp. 2d 1354, 1374 (Ct. Int'l Trade 2009). Requests must be supported by both quantitative and qualitative evidence, the insufficiency of either being grounds for denial. *Id.*

To support its claim to CEP offset, TAMSA claimed that the selling functions in the United States and home market were performed at a different level of intensity. In its final results, Commerce explained that "TAMSA did not demonstrate a quantitative link between performance of selling functions and its claimed selling function intensity codes." IDM at 15. Commerce further explained that "TAMSA did not report {indirect selling expenses} ISEs by channel of distribution, did not quantify the amount of ISEs related to particular selling functions, and did not demonstrate that the level of performance claimed for each selling function TAMSA identified in its Section A Response differed proportionately with the level of ISEs TAMSA incurred." *Id.* Commerce had instructed TAMSA to provide a separate "quantitative analysis showing how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability." IDM at 14. But TAMSA's response relied solely on its ISE calculations and did not provide evidence to demonstrate its home market sales were at a more advanced level of trade than its CEP sales made to its U.S. affiliate. *Id.* In short, as Commerce explained, although TAMSA provided a description of differences in its level of performance of each identified selling function between U.S. CEP and home market sales, there is insufficient quantitative support for TAMSA's claimed differences in levels of intensity for selling functions performed in both markets. *Id.*

**B. Substantial Evidence Supports Commerce's Determination to Not Grant a CEP Offset in the Final Results**

Although Commerce preliminarily found that TAMSA had demonstrated quantitatively and qualitatively that significant differences existed in performance of selling functions sufficient to qualify for a CEP offset, for the final results, Commerce ultimately found that

TAMSA did not demonstrate a quantitative link between performance of selling function and its claimed selling function intensity codes. IDM at 15. "Commerce has the flexibility to change its position from the preliminary to the final results," provided it "explains the basis for the change" and its decision is supported by substantial evidence and in accordance with law. *Hyundai Steel*, 319 F. Supp. 3d at 1343 (*citing Timken,* 59 F.Supp.2d at 1376).

In the final results, Commerce explained that its recent determination from *OCTG Argentina,* specifies the burden of a respondent to "provide quantitative support for distinct levels of intensity for its reported channel-specific selling functions." IDM at 15 citing *Oil Country Tubular Goods from Argentina: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 24,781 (June 12, 2025). And "TAMSA has not supported the claimed levels of intensity that are *specific* to reported selling functions or provided quantitative support for *distinct* levels of intensity for its reported channel-specific selling functions." IDM at 16 (emphasis added).

**C. Commerce Has No Obligation to Notify TAMSA of Insufficient Submissions.**

TAMSA argues that Commerce did not provide notice that its quantitative support for the CEP offset was insufficient. TAMSA Br. at 32-33. Commerce was under no obligation to do so. This Court has specifically held that "the burden falls to the party seeking the CEP offset to provide the requisite evidence," and "Commerce had no obligation . . . to work with {plaintiff} to correct for 'deficiencies' in the record." *Dong-A Steel Company*, 475 F. Supp. 3d at 1347 n.22 (citation omitted); *see also Daikin America, Inc. v. United States*, 2024 WL 1171736 at *3 n.3 (Ct. Int'l Trade Mar. 14, 2024) ("There are no facts available, adverse or otherwise, for the Department to employ when a respondent fails to carry its burden of showing eligibility for a constructed export price offset. Instead, the agency's duty is to simply deny the offset.").

The regulation requires the interested party who possesses relevant information to establish, to the *satisfaction* of the Secretary, the amount and nature of a particular adjustment." 19 C.F.R. § 351.401(b)(1) (emphasis added). "Under this standard, the decision whether to accept a proposed allocation lies *primarily within Commerce's discretion*." *Koyo Seiko Co. v. United States*, 551 F.3d 1286, 1292 (Fed. Cir. 2008) (emphasis added). When there is, in Commerce's view, "a lack of an adequate explanation by {a respondent} . ., Commerce act{s} within its discretion in rejecting" a CEP offset request. *Id*.

In fact, even on a comprehensive record, Commerce may still determine that a CEP offset is not warranted. Indeed, Commerce explained here that "{w}hile record evidence does not directly contradict TAMSA's description of differences in its level of performance of each identified selling function between U.S. CEP and home market sales, there is insufficient quantitative support for TAMSA's claimed differences in levels of intensity for selling functions performed in both markets." IDM at 15. The question is not whether the record was deficient, but whether TAMSA had met its burden and sufficiently supported its request for a CEP offset. It had not.

## VI. Commerce's Use of a Modified Differential Pricing Methodology is Supported By Substantial Evidence and Otherwise Lawful.

Commerce's decision to use the modified differential pricing methodology was reasonable, supported by substantial evidence, and in accordance with law. This Court has now sustained Commerce's revised differential pricing methodology on multiple occasions. *See Stupp Corp. v. United States*, Slip Op. 26-113, at 11 n.3 (Ct. Int'l Trade Sept. 15, 2026); *Maquilacero S.A. de C.V. v. United States*, Slip Op. 26-111, at 23 (Ct. Int'l Trade Sept. 14, 2026); *Marmen Inc. v. United States*, Slip Op. 26-62, at 24 (Ct. Int'l Trade June 15, 2026); *Toyo Kohan Co. v. United States*, Slip Op. 26-54 (Ct. Int'l Trade May 22, 2026). The Court should do so again here.

### A. Commerce's Use of the Modified Differential Pricing Methodology is Consistent With the Federal Circuit's Decisions in *Marmen* and *Stupp*.

#### i. The Federal Circuit's Decisions in *Marmen* and *Stupp* Changed Commerce's Practice.

Beginning in 2013, Commerce applied the Cohen's *d* test in all antidumping proceedings to evaluate whether U.S. prices differ significantly within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B). *See Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720, 26,722-23 & n.12 (Dep't of Commerce May 9, 2014) (citing six proceedings applying the Cohen's *d* test, including *Xanthan Gum from the People's Republic of China*, 78 Fed. Reg.33351 (Dep't of Commerce June 4, 2013) (final AD determination), and issues and decision memo. comment 3)). Commerce also used a ratio test to assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. *Id.* at 26,722-23. If the Cohen's *d* test and the ratio test demonstrated a pattern of prices that differed significantly such that an alternative comparison method should be considered, then Commerce examined whether using only the A-to-A method can appropriately account for such differences. *Id.* at 26,723. In considering this question, Commerce determined whether using an alternative comparison method (such as the A-to-T method) yielded a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. *Id.* Together, the Cohen's *d* test, the ratio test, and the meaningful difference test, comprised Commerce's differential pricing analysis, *id.*, until *Marmen*.

In *Marmen*, the Federal Circuit reviewed Commerce's application of the Cohen's *d* test as part of the differential pricing analysis. The Federal Circuit held that "it was unreasonable to rely on the Cohen's *d* test to determine whether prices differ significantly" when the underlying data did not satisfy certain statistical assumptions. *Marmen*, 134 F.4th at 1348. The Federal

Circuit further held that on remand "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on the Cohen's *d* test for data sets like those here." *Id.*

*Marmen* affected hundreds of segments of antidumping proceedings before Commerce. Consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce applies its differential pricing analysis to determine which comparison method – average-to-average (A-to-A) or average-to-transaction (A-to-T) – is appropriate. Because the statistical assumptions discussed by the Federal Circuit in *Marmen* are unlikely to be valid in exporters' pricing data, as a practical matter, the Federal Circuit's decision to condition the use of the Cohen's *d* test on such assumptions, rendered the Cohen's *d* test unusable in antidumping proceedings.

Following *Marmen*, Commerce changed its practice. First, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B)(i), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods. *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025). Commerce discontinued the Cohen's *d* test in antidumping proceedings and adopted the "price difference" test to determine whether price differences among purchasers, regions, or time periods are significant. *See, e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025) (final results 2022-2023 admin. review), and accompanying issues and decision memo at 2-5 (applying the price difference test for the first time). Additionally, and concurrent with this change, Commerce also discontinued use of the "mixed method" – a hybrid version of two available comparison methods (A-to-A and A-to-T) – in antidumping proceedings, aligning its practice

more closely with the statutory language.[2] In other words, Commerce has discontinued the use of the Cohen's *d* test and the "mixed method" as a matter of administrative policy for all its antidumping proceedings, and has introduced the price difference test to examine whether U.S. prices differ significantly.

**ii. Commerce's Use of the Modified Differential Pricing Methodology is Consistent with its Post-*Marman* and *Stupp* Practice.**

TAMSA claims that Commerce's decision to use the modified differential pricing methodology for this review is "arbitrary and contrary to established principles of administrative fairness" and that "{a}ny methodology that Commerce applies should be confirmed by *Marmen* and *Stupp* before it is applied, as appropriate, in any remand involving the First Review." TAMSA Br. at 36. There is no legal basis for what TAMSA claims.

First, agencies should not treat materially similar matters differently without providing a reasonable explanation. *See Am. Silicon Techs. v. United States*, 63 F. Supp. 2d 1324, 1332 (Ct. Int'l Trade 1999) (holding that "it is especially important for all parties that consistent methods be sustained when possible"). Here, Commerce's Cohen's *d* method was found to be unreasonable as a matter of law. *Marmen*, 134 F.4th at 1348. In response to this ruling, Commerce proposed and adopted the price difference test. *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025). Commerce

[2] The relevant statutory provision does not reference the "mixed method," which Commerce used under the old practice, but rather authorizes Commerce to use the average-to-transaction comparison method if certain conditions are satisfied. 19 U.S.C. § 1677f-1(d)(1)(B) ("The administering authority *may determine* whether the subject merchandise is being sold in the United States at less than fair value *by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions* for comparable merchandise, if ….") (emphasis added).

then proceeded to apply this analysis as its standard practice that applies in all proceedings, including this one.

TAMSA's claim that Commerce's adoption of a price difference test was premature or should not have been applied in this instance would require Commerce to both ignore the Federal Circuit's mandate and apply its methodology inconsistently across proceedings. Commerce correctly abandoned the Cohen's *d* test in favor of current differential pricing methodology here. Commerce explained its current differential pricing methodology, the reasoning for the change in methodology, and how the methodology applied to the present case. Post-Preliminary Memorandum (C.R. 356; P.R. 124). Further, Commerce provided the parties with an opportunity to comment and considered those comments before reaching a final decision. *Id.*

**B. Commerce's Modified Differential Pricing Methodology is Reasonable and Consistent with the Statute.**

**ii. Commerce's Two Percent Threshold of The Price Difference Test is a Reasonable Implementation of the Statute.**

This Court has recently sustained Commerce's current differential pricing analysis, including the price difference test, and found that "Commerce's two percent price difference test reasonably implements{19 U.S.C. §} 1677f-1(d)(1)(B)'s directive." *Toyo Kohan Co. v. United States*, Slip Op. 26-54, Court No. 24-00261, at 18, 21 (Ct. Int'l Trade May 22, 2026); *see Marmen Inc. v. United States, S*lip Op. 26-62, at 17 (Ct. Int'l Trade June 15, 2026) ("Commerce's adoption of the 2% threshold in the first stage of its differential pricing analysis in the new 'price difference test' is reasonable…"); *Stupp Corp. v. United States*, Slip Op. 26-113, at 11 (Ct. Int'l Trade Sept. 15, 2026) ("Adopting a standard based on past experience in a similar context is reasonable in this instance."); *Maquilacero S.A. de C.V. v. United States*, Slip Op. 26-

111, at 23 (Ct. Int'l Trade Sept. 14, 2026) ("Commerce's 'price difference test' is reasonable and in accordance with law.). TAMSA's arguments to the contrary are unavailing.

First, TAMSA cites *Loper Bright* in support of a "best reading of the statute" standard. TAMSA Br. at 38-39. This misses the point, as there is no dispute regarding what the statute says or how to best interpret it; the dispute is whether Commerce's differential pricing analysis reasonably implements the statutory requirements. *Loper Bright* did not disturb the standard for reviewing Commerce's differential pricing analysis: "the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness." *Stupp*, 5 F.4th at 1353; *Marmen*, 134 F.4th at 1338 (same). Indeed, as explained in *Marmen*, which was decided after *Loper Bright*, "this case begins where *Stupp* ended – Was it *unreasonable* for Commerce to use the Cohen's *d* test as part of its differential pricing analysis." *Marmen*, 134 F.4th at 1345 (emphasis added). It was a *reasonableness* standard that served as the basis to remand use of the Cohen's *d* test in the first place. *Marmen*, 134 F.4th at 1348 (holding that "it was *unreasonable* to rely on Cohen's *d* test to determine whether prices differ significantly ….") (emphasis added).

Nor does it follow from *Loper Bright* that Commerce is owed no deference. Indeed, the Supreme Court "did not throw out the administrative discretion baby with the *Chevron* deference bathwater." *BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359, 1377 (Ct. Int'l Trade 2025). As this Court has recognized, "{i}t will sometimes be the case that the best reading of the statute is that it delegates discretionary authority to an agency. Broad and open-ended grants of authority … are incapable of precise definition not because they are ambiguous, but because they unambiguously convey discretion." *Id.* As this Court concluded, "{i}n those circumstances …

the {C}ourt's role is to ensure that the {agency's} action is both reasonable and reasonably explained." *Id.*

Here, there is an open-ended grant of authority by way of "general" statutory language. *See Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1261 (Fed. Cir. 2024) (*Asemesa*). As the Federal Circuit has recognized, statutes are often written in general terms because Congress is not "prescient" and cannot anticipate in legislation all the factual and legal intricacies that may arise in each proceeding. *See Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 930 (Fed. Cir. 1984). For this reason, Commerce has "broad discretion in executing the law" in line with the "general standards" set by Congress. *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) (decided one year prior to *Chevron*). Commerce's discretion to develop methodologies within its delegated authority to carry out general statutory directives is distinct from *Chevron* deference:

> This court has recognized that the antidumping statute "reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts. This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous.

*Fujitsu*, 88 F.3d at 1039 (internal citations omitted, applying this distinct deference separately from and concurrently with *Chevron* deference); *accord Nexteel Co. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) ("Commerce has selected a methodology consistent with the statutory language, which we afford greater deference than under the *Chevron* framework") (citing *Fujitsu*, 88 F.3d at 1039); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast*

*Iron Pipe Co.*, 5 F.4th 1367, 1374-75 (Fed. Cir. 2021). Terms such as "significant," "appropriate," or "comparable" provide Commerce with authority and flexibility to implement the dictates of the statute. *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025). Section 1677f-1(d)(1)(B), is written in such terms and allows Commerce to assess whether a "pattern" exists and whether prices differ "significantly." This is the type of general statutory language that indicates that Congress "intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." *Asemesa*, 102 F.4th at 1259

The language of the statute also affords Commerce discretion to fashion its methodology. *Toyo Kohan,* Slip Op. 26-54, at 20 *citing Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355 at 1367 (Ct. Int'l Trade 2024) ("Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context."); *see Stupp Corp.*, Slip Op. 26-113, at 11 n.3 ("…Congress has delegated to Commerce 'the power to use its discretion when determining whether prices differ significantly.'") (citations omitted). This Court observed that the SAA provides that Commerce will proceed on a case-by-case basis, which confirms the flexibility provided by the words of the statute. *Garg Tube* at 1367 (citing SAA at 843). Finally, this Court found that the context in which the phrase "differ significantly" appears alongside the subsection that allows Commerce to decline taking into account insignificant adjustments, 19 U.S.C. § 1677f-1(a), and another subsection that exclusively allows Commerce to select averages and statistically valid samples, 19 U.S.C. § 1677f-1(b) – all of which confirms that Congress meant to afford the agency with flexibility and discretion. *Id.* Therefore, this Court held that "Congress delegated to Commerce the power to use its discretion when determining whether prices differ significantly under 19 U.S.C. § 1677f-1." *Id.*

Indeed, in addressing this issue, this Court has recently held:

> The Federal Circuit's holding in Marmen also leaves Commerce discretion to amend its differential pricing analysis: The court "[did] not preclude Commerce from fashioning and justifying a statistical analysis that uses some of the ideas underlying [the Cohen's d] analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue." Marmen at 1348. The court left Commerce the option to "re-perform a differential pricing analysis" that does not rely on Cohen's d for data sets that were not normally distributed, equally variable, and equally and sufficiently numerous. Id. Commerce took the latter route: Rather than apply the ideas underlying Cohen's d, Commerce constructed a new price difference test. As already discussed, the language of the statute affords Commerce discretion to fashion its methodology. *See Garg Tube Export*, 740 F. Supp. 3d at 1367 ("Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context.")…

*Toyo Kohan,* Slip Op. 26-54, at 20.

**ii. Commerce's Two Percent Threshold of The Price Difference Test is Consistent with the Plain Meaning of the Statute**

TAMSA's argues that Commerce's two percent threshold test is contrary to the plain language of the statute because it "fails to indicate that prices differed significantly based on the plain meaning of the term 'significantly.'" TAMSA Brief at 39 (citing the Oxford English Dictionary's definition of "significantly.") Without further analysis, TAMSA simply concludes that the two-percent test is contrary to plain meaning. *Id.* This Court has rejected d similar "plain language" arguments in Marmen, finding them "not persuasive." *See Marmen*, Slip Op. 26-62, at 24. And in sustaining Commerce's price difference test, this Court held that "Congress has not delineated exactly how Commerce shall assess whether there is a "pattern of export prices . . . differ{ing} significantly among purchasers, regions, or periods of time." *Toyo Kohan,* Slip Op. 26-54, at 14. In *Garg Tube,* this Court also held that in the context of 19 U.S.C. § 1677f-1(d)(1)(B) the "word 'significantly' is an open-ended qualifier, akin to 'appropriate' or 'reasonable.'" *Garg Tube*, 740 F.Supp.3d at 1366-67 (citing *Kisor v. Wilkie*, 588 U.S. 558, 632

(2019)). "Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context." *Id.* Thus, far from being contrary to a plain reading of the statute as TAMSA claims, Congress provided Commerce with the flexibility to determine what is "significant." TAMSA fails to explain how the two percent threshold, which the statute and Commerce use as the *de minimis* threshold to determine whether an antidumping duty order should be imposed and in applying the arms-length test to determine whether the sales should be excluded from calculations as not being made in the ordinary course of trade, is not "noticeable" or "consequential." *See* 19 U.S.C. § 1673b(b)(3); 19 C.F.R. § 351.106(b)(1).

**iii. Commerce's Two Percent Threshold of The Price Difference Test is Reasonable and Consistent with Commerce's Practice**

Commerce began applying the modified differential pricing analysis after notice and opportunity to comment on alternatives to the Cohen's *d* test. *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025). Commerce provided a detailed explanation for its decision to use the analysis and its rationale for the two-percent threshold. IDM at 27.

TAMSA argues that a 25-percent difference threshold, which is used for deciding whether to correct certain ministerial errors, should be used instead of Commerce's two-percent threshold. TAMSA Br. at 41. The 25 percent threshold is taken from 19 C.F.R. § 351.224(g), which defines a significant ministerial error. The significant ministerial error standard applies to differences in weighted-average dumping margins, not differences in prices for subject merchandise. And the 25 percent threshold is used in the differential pricing analysis as part of the meaningful difference test, which compares the weighted-average dumping margins calculated using the standard A-to-A method and the alternative A-to-T method.

TAMSA also points to the basis for finding that a foreign market is experiencing "high" inflation, and the justification for using quarterly costs rather than annual average costs. TAMSA Br. at 41. TAMSA offers no explanation for why a threshold for measuring "high" inflation would be more appropriate than a threshold adopted for determining whether price among purchasers, region and time periods differ significantly.

TAMSA also incorrectly asserts that in using the two-percent threshold in the price difference test Commerce "attempt{s} to resurrect" the "P/2" test. *Id.* at 39-40. These are different tests that function differently. *Toyo Kohan,* Slip Op. 26-54, at 12 & n.9. ("The government adds that, specifically, the P/2 test is different from the two percent price difference test because it covered more steps in the analysis than the price difference test now before the court."). The price difference test at issue here examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted average net price to all other purchasers, regions or time periods. The P/2 test only examined the weighted-average prices of targeted sales that were two percent lower than the weighted-average prices of non-targeted sales with the aim of identifying targeted dumping, even though there was no comparison with normal value. *See* IDM at Comment 9; *see also Lightweight Thermal Paper from Germany: Notice of Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 57,326 (Dep't Commerce Oct. 2, 2008), and accompanying Issues and Decision Memorandum at Comment 2. The price difference test does not purport to identify targeted sales (or dumping) but only whether U.S. prices differ significantly among purchasers, regions and time periods. IDM at Comment 9. In addition to oversimplifying Commerce's methodology from 2008, this Court has found that such a comparison is not relevant to the reasonableness of Commerce's decision to use the price difference test. *See Toyo Kohan,* Slip Op. 26-54, at 12 n.9 ("Whether

Commerce previously used and rejected the two percent price difference test does not influence the court's reasoning on the reasonableness of the test." (citations omitted)).

**iv. Commerce's Price Difference Test is Consistent with a Case-by-Case Analysis of Price Differences.**

The revised differential pricing test considers prices on a case-by-case basis and is consistent with language in the SAA. TAMSA argues that the two-percent threshold in the differential pricing test is "rigid" and fails to take into take perform an analysis on a case-by-case basis. TAMSA Brief at 41-42. TAMSA is wrong and misstates the analysis conducted by Commerce. On multiple occasions, this Court has held that the price difference test is applied on a case-by-case basis. *See Stupp Corp.*, Slip Op. 26-113, at 9 ("…Commerce ensures a differential price analysis that differentiates on a case-by-case basis."); *Maquilacero*, Slip Op. 26-111, at 23 ("Because Commerce applied the new "price difference test" on a case-by-case basis …Commerce reasonably determined that prices differed significantly.")

Commerce explained here that the differential pricing analysis "evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists." Post Preliminary Memo at 2. And "meaningful difference" test provides additional tailoring of the differential pricing analysis to the specifics of each respondent. IDM at 28. These two tests exist in concert and determining whether the A-A method or the A-T method is warranted is specific to the administrative segment as well as the respondent under examination. *Id.*

TAMSA takes particular issue with the two-percent threshold as a fixed percentage which cannot be considered "tailoring." *See* TAMSA Br. at 42. But TAMSA fails to identify any industry-specific facts that would warrant a departure from the two percent threshold here. TAMSA relies on *Jacobi Carbons*, in making this argument. The reliance is misplaced. In

*Jacobi Carbons AB v. United States*, this Court assessed Commerce's determination that Thailand was a significant producer of comparable merchandise because it was a net-exporter.[3] In remanding Commerce's determination, this Court held that "Commerce has not supplied the court with a well-reasoned explanation supporting its consideration of total or net exports as a substitute for *production*" and that "numbers must be placed in context." 365 F. Supp. 3d 1323, 133-32 (Ct. Int'l Trade 2019) (emphasis in original). In contrast, when Commerce applies the price difference test, it does not substitute prices with something else. Indeed, since *Jacobi Carbons* was decided, the Federal Circuit has resolved any statutory ambiguity and held that Commerce may rely on the net exporter criterion. *Carbon Activated Tianjin Co., Ltd. v. United States*, No. 2023-2413, 2025 U.S. App. LEXIS 11226, 2025 WL 1354994, at *3 (Fed. Cir. May 9, 2025) ("We see no error in Commerce's reliance on the net exporter criterion of the Policy Bulletin.").

TAMSA also misunderstands the purpose of the price difference test in its assertions that the price difference was caused by changes in the U.S. dollar/Mexican peso exchange rate or that U.S. sales prices are tied to [[redacted]]. *See* TAMSA Br. at 43. There is no statutory requirement that Commerce examine the reasons why prices differ significantly. Imposing such requirements "would create a tremendous burden on Commerce that is not required or suggested

---

[3] In antidumping proceedings involving nonmarket economy countries, the statute requires that Commerce to "determine{} normal value by valuing the 'factors of production' used in producing the merchandise in a comparable market economy." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374-75 (Fed. Cir. 2015) (quoting 19 U.S.C. § 1677b(c)(1)(B)). In selecting the appropriate surrogate country, Commerce, to the extent possible, chooses from a list of potential countries assembled by the Office of Policy that are at a level of economic development comparable to that of the NME and that are significant producers of comparable merchandise. *See* 19 U.S.C. § 1677b(c)(4); *see also* Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html.

by the statute." *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (internal quotations omitted).

**v. Commerce's Discontinuance of the Mixed Method Is Supported By Substantial Evidence and Otherwise In Accordance with Law.**

As an initial matter, TAMSA incorrectly asserts that Commerce went beyond the Court's instructions in *Marmen* and *Stupp* by discontinuing the mixed method. TAMSA Br. at 44. TAMSA overlooks the fact that Commerce's determination here is an administrative review, in which Commerce followed its post-*Marmen* practice that applies in all administrative determinations. Commerce's current practice does not use Cohen's *d* test, which was the issue in *Marmen*, and is fully consistent with *Marmen*. Even without a judicial order, "Commerce may change longstanding practices at any time" for good reason. *Hor Liang Indus. Corp. v. United States*, 337 F. Supp. 3d 1310, 1328 (Ct. Int'l Trade 2018).

In *Marmen*, the Federal Circuit explicitly permitted Commerce to reconsider its differential pricing analysis:

> We therefore vacate Commerce's calculated dumping margin based on the unreasonable use of Cohen's d test to justify the A-to-T methodology. On remand, *Commerce may re-perform a differential pricing analysis*, and that analysis may not rely on Cohen's d test for data sets like those here.

*Marmen*, 134 F.4th at 1348 (emphasis added). The court did not otherwise prescribe the contours of what differential pricing analysis was to be performed. *See id.* Understanding that the differential pricing analysis comprises three tests, the Federal Circuit's express authorization for Commerce to "re-perform *a* differential pricing analysis" necessarily contemplates that Commerce may reevaluate the differential pricing analysis to be performed. *Marmen*, 134 F.4th at 1348 (emphasis added); *accord Stupp Corp. v. United States*, No. 2023-1663, 2025 WL 1178392 at *3, n.1 (Fed. Cir. Apr. 23, 2025) (*Stupp II*) (nonprecedential) ("{Commerce} has the

opportunity, if it prefers, to re-perform a differential pricing analysis without using Cohen's *d*."). The only limit the court placed on Commerce's reconsideration of its differential pricing analysis was that Commerce could not use the Cohen's *d* test. TAMSA's overly restrictive interpretation of the holdings *Marmen* and *Stupp* runs counter to the principle that "limited remands" are "disfavored.". *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) (citing *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1038-39 (Fed. Cir. 2003)). Finally, this Court has considered and dismissed similar arguments where "{t}he CAFC's decision permitted Commerce to utilize a different analysis." *See Maquilacero, Slip Op. 26-111, at 19* ("{A}bsence of statutory language referring to a mixed method supports Commerce's determination to discontinue the use of its "mixed method."); *see also Stupp Corp.*, Slip Op. 26-113, at 13 (Sustaining "Commerce's determination regarding the modification of the ratio test and its abandonment of the mixed methodology…"); *Marmen*, Slip Op. 26-62, at 25 ("Marmen's argument that the "ratio test" and change in methodology by discontinuing the "mixed method" as an alternative comparison methodology was not in accordance with law is not persuasive.").

TAMSA next claims that Commerce provided an insufficient explanation of its decision to discontinue the mixed methodology. TAMSA Br. at 45. Commerce provided an explanation for discontinuation of the mixed method as part of the overall change to its administrative practice with respect to its differential pricing analysis. IDM at 26. As explained above, although the statute permitted Commerce's prior policy of using the hybrid version of the two available comparison methods, the mixed method is not statutorily required. To align more closely with the statute, Commerce discontinued the mixed method as a matter of administrative policy for all its antidumping proceedings. *Id.* Commerce further highlighted that the Federal

Circuit has recognized Commerce's "growing experience" in applying section 777A(d)(1)(B) of the Act as a basis for establishing what ratio justifies application of an alternative methodology. IDM at 26 *citing Stupp,* 5 F.4th at 1355. Accordingly, Commerce is applying its revised differential pricing methodology including its discontinuation of the mixed method consistently. *See Am. Silicon Techs. v. United States*, 63 F. Supp. 2d 1324, 1332 (Ct. Int'l Trade 1999) (holding that "it is especially important for all parties that consistent methods be sustained when possible" and that "the agency demonstrated a consistent administrative practice which is reasonable and permitted by the statute.").

The purpose of section 1677f-1(d)(1)(B) is to permit Commerce to address masked dumping. *See* SAA at 842-83 (discussing 19 U.S.C. § 1677f-1(d)(1)(B)). The ratio test helps Commerce to determine whether conditions described in 19 U.S.C. § 1677f-1(d)(1)(B) exist in which masked dumping could potentially be occurring when using the A-to-A method. Specifically, the ratio test "assess{es} the extent of the significance price differences" of those sales passing the price difference test to identify whether there is a *pattern* of prices that differ significantly as contemplated by 19 U.S.C. § 1677f-1(d)(1)(B)(i). Final Remand Results 10. Both *before and after* Commerce's revision of the differential pricing analysis pursuant to *Marmen*, the ratio test finds evidence that a pattern exists when more than 33 percent of the total sales value pass the price difference test, *i.e.*, these sales are at prices that differ significantly. Commerce need only to determine that there is a pattern of significant price differences,[4] and the Federal Circuit has sustained the use of a "ratio test" to make that determination. *See Dillinger*

[4] Commerce is not required "to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods." *JBF RAK*, 790 F.3d at 1368. Such a requirement "would create a tremendous burden on Commerce that is not required or suggested by the statute." *Id.*

*France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020); *see also Stupp*, 5 F.4th at 1355-56.

Discontinuing the mixed method does not "effectively result{} in a reduction from 66 percent to a new low 33 percent ratio threshold{}" as TAMSA contends. TAMSA's Br. at 45. The mixed method did not determine whether a pattern existed because Commerce previously employed the mixed method only *after* the "ratio test" had confirmed there was a pattern. Indeed, Commerce has used the same 33 percent threshold in the "ratio test" to identify if there is a *pattern* of significant price differences even before it eliminated the mixed method. Once the requisite pattern was established (*i.e.*, the 33 percent threshold of ratio test was satisfied), if the A-to-A method could not adequately account for the pricing behavior of the respondent in the U.S. market, then Commerce could considered the mixed method as an alternative comparison methodology when between 33 percent and 66 percent of the sales value of the respondent's U.S. sales were found to be at prices that differ significantly. *See* 19 U.S.C. § 1677f-1(d)(1)(B) ("The administering authority *may* determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if ….") (emphasis added); *see also Timken Co. v. United States*, 968 F. Supp. 2d 1279, 1290 (Ct. Int'l Trade 2014) ("{R}elying on the word 'may' in the statute … {t}he sufficiency test serves as a tool to guide Commerce's exercise of its discretion in choosing whether to depart from its normal practice of using the {A-to-A} methodology."). Nor did Commerce abuse its discretion by aligning its application of the alternative A-to-T method more closely with the statutory language by discontinuing the mixed method and replacing it with A-to-T method for all sales as a matter of administrative policy in its antidumping proceedings. *See*

*Apex*, 862 F.3d at 1333 (expressly rejecting the argument that the statute limits the A-to-T method to only sales that were found to be "targeted" under the previous "*Nails* test" and cannot be applied to the remaining sales, explaining: "The statute defines the preconditions for applying the {A-to-T} methodology, but it does not limit in any way the application of the {A-to-T} methodology, should the preconditions be met."). This Court has found "Commerce's choice to apply an A-to-T comparison to all sales once significant price differences exceed 33 percent of the total value of all sales, rather than only those which fail the price difference test, to deter targeted dumping, {to be} reasonable because of the underlying remedial purpose of the antidumping duty regime." *Stupp Corp.*, Slip Op. 26-113, at 17.

Finally, the elimination of the mixed method would have no effect here. The percentage of TAMSA's sales that passed the price difference test is 68.63%. That exceeds the 66 percent threshold above which the mixed method was not applicable even under the old methodology. Post-Preliminary Analysis at 24. Thus, on this record, the mixed method would not have applied to TAMSA. Accordingly, there is no actual injury to TAMSA from Commerce's determination to eliminate the mixed method in this administrative review. *See Verson v. United States*, 5 F. Supp. 2d 963, 967 (Ct. Int'l Trade 1998) (dismissing claims on the grounds that, where the duty margin remains unchanged regardless of the methodology applied, "no live case or controversy exists because there is no actual injury that can be redressed by a favorable judicial decision"); *Catfish Farmers of Am. v. United States*, 2016 Ct. Intl. Trade LEXIS 29, *24-25 (Ct. Int'l Trade 2016) (holding that an actual controversy no longer remained because even if the Court decided the issue in plaintiff's favor, such determination would not alter the duty margin).

**CONCLUSION**

For these reasons, we respectfully request this Court to deny the motions for judgment on the agency record and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

s/ *Margaret J. Jantzen*

MARGARET JANTZEN
Trial Counsel
Commercial Litigation Branch
Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-7994

Of Counsel:

JUSTIN MERHAR
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance
Department of Commerce

October 9, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief contains 13,524 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

*s/Margaret J. Jantzen*

MARGARET J. JANTZEN