**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TUBOS DE ACERO DE MEXICO, S.A., ET AL.,<br>Plaintiffs,<br>and<br>UNITED STATES STEEL CORPORATION,<br>Consolidated Plaintiff,<br>v.<br>UNITED STATES<br>Defendant,<br>and<br>UNITED STATES STEEL CORPORATION, ET AL.,<br>Defendant-Intervenors,<br>and<br>TUBOS DE ACERO DE MEXICO, S.A., ET AL.,<br>Consolidated Defendant-Intervenors. | Consol. Ct. No. 25-00221<br><br>**PUBLIC VERSION** |

**REPLY BRIEF**
**OF UNITED STATES STEEL CORPORATION**

James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday
**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Ave. NW, Suite 300
Washington, DC 20037
Phone: (202) 567-2321
Email: jransdell@cassidylevy.com
*Counsel for United States Steel Corporation*

Dated: November 6, 2026

**PUBLIC VERSION**

## Table of Contents

Page

ARGUMENT ..... 4

I. Commerce Unlawfully Accepted THREAD Coding that Arbitrarily Combines Physically Distinct Products Within Individual Codes and Separates Physically Similar Products into Different Codes ..... 5

A. Commerce Did Not Invoke "Commercial Significance" to Justify Its Acceptance of Basket Category THREAD Codes; Even if Commerce Had Done So, the Standard Was Arbitrarily Applied ..... 6

1. The Government's Reliance on "Commercial Significance" Is Post Hoc ..... 7

2. Even if Commerce Had Applied Government Counsel's "Commercial Significance" Standard, Commerce Did So Arbitrarily ..... 9

B. Other Distinctions Cannot Explain Commerce's Acceptance of THREAD Codes [ ] ..... 11

C. Shortcomings of the Original Investigation Cannot Cure for the Shortcomings of the First Administrative Review ..... 12

II. The Record Contains No Evidence to Support Commerce's Group Treatment of Code [ ] Products ..... 18

III. The Government Does Not Dispute that Commerce Must Reconsider the Application of AFA in the Event of a Remand ..... 21

CONCLUSION ..... 23

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1677(16)(A) ........ 1, 7

19 U.S.C. § 1677b(a)(1)(B)(i) ........ 1, 13

19 U.S.C. § 1677e(a) ........ 19

19 U.S.C. § 1677e(b) ........ 19

Court Decisions

*Albemarle Corp. & Subsidiaries v. United States,* 821 F.3d 1345 (Fed. Cir. 2016) ........ 13

*CS Wind Vietnam Co. v. United States,* 832 F.3d 1367 (Fed. Cir. 2016) ........ 13

*Dep't of Homeland Sec. v. Regents of the Univ. of California,* 591 U.S. 1 (2020) ........ 8

*Fagersta Stainless AB v. United States*, 32 C.I.T. 889 (2008) ........ 14

*Koyo Seiko Co. v. United States,* 31 C.I.T. 1512 (2007) ........ 14

*La Molisana S.p.A. v. United States*, 138 F.4th 1353(Fed. Cir. 2025) ........ *passim*

*Manchester Tank & Equip. Co. v. United States,* 483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ........ 14

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ........ 7

Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States, 753 F.3d 1227 (Fed. Cir. 2014) ........ 20

*OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375 (Fed. Cir. 2019) ........ 19

*Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372 (Fed. Cir. 2001) ........ 8

*SKF USA Inc. v. United States,* 263 F.3d 1369 (Fed. Cir. 2001) ........ 9

*SKF USA Inc. v. United States*, 332 F.3d 1370 (Fed. Cir. 2003) ........ 9

*SKF USA Inc. v. United States*, 537 F.3d 1373 (Fed. Cir. 2008) ........ 14

*SKF USA Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011) ........ 20

Administrative Determinations

*Certain Circular Welded Non-Alloy Steel Pipe From Mexico; Final Results of Administrative Reviews,* 65 Fed. Reg. 6,136 (Feb. 8, 2000) ........ 22

*Certain Polyester Staple Fiber from the Republic of Korea: Notice of Final Results of Antidumping Duty Administrative Review,* 70 Fed. Reg. 73,435 (Dec. 12, 2005) ........ 15

*Creatine Monohydrate From the People's Republic of China: Notice of Final Determination of Sales at Less Than Fair Value*, 64 Fed. Reg. 71,104 (Dec. 20, 1999) ........ 21

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part,* 77 Fed. Reg. 63,791 (Oct. 17, 2012) ........ 20

*Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations,* 86 Fed. Reg. 60,205 (Nov. 1, 2021) ........ 14

*Oil Country Tubular Goods From Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 87 Fed. Reg. 28,808 (May 11, 2022) ........ 14

*Oil Country Tubular Goods From Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances,* 87 Fed. Reg. 59,041 (Sept. 29, 2022) ........ 14-15

*Oil Country Tubular Goods from the Russian Federation: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part*, 87 Fed. Reg. 59,045 (Sept. 29, 2022) ........ 15

*Stainless Steel Bar From India: Final Results of Administrative Review of the Antidumping Duty Order; 2017-2018*, 84 Fed. Reg. 56,179 (Oct. 21, 2019*)* ........ 21

On behalf of Plaintiff United States Steel Corporation ("U. S. Steel" or "USS"), we hereby respond in support of the motion for judgment on the agency record and accompanying brief filed by U. S. Steel in the above-captioned action, U. S. Steel Rule 56.2 Motion and Supporting Brief, ECF Docs. 45-46 (Apr. 16, 2026) ("USS Br."), addressing the response briefs filed by the United States and Tenaris. *See* United States Response in Opposition to USS Br., ECF Docs. 63, 68 (Oct. 9, 2026) ("Gov't Resp."); Tenaris Response in Opposition to USS Br., ECF Docs. 60-61 (Oct. 9, 2026) ("Tenaris Resp."). For the reasons discussed below, U. S. Steel respectfully requests that this Court remand the U.S. Department of Commerce's ("Commerce") final results of the first antidumping administrative review ("AR1") of Oil Country Tubular Goods ("OCTG") from Mexico to correct the deficiencies identified in U. S. Steel's opening brief.

Commerce failed to render final results supported by substantial evidence and in accordance with law insofar as it allowed Tenaris to (A) lump together physically different threading types within *ad hoc* THREAD code [ ]; (B) lump together physically different threading types within *ad hoc* THREAD code [ ]; and (C) code physically similar [ ] threading types under different THREAD codes. Commerce then proceeded to use these THREAD codes to select home market sales as fair "normal value" benchmarks for U.S. price. Commerce's approach is unlawful because 19 U.S.C. § 1677b(a)(1)(B)(i) and 19 U.S.C. § 1677(16)(A) require Commerce to use benchmark prices for merchandise that are "identical in physical characteristics" where available, *see* USS Br. at 15-16; *La Molisana S.p.A. v. United States*, 138 F.4th 1353, 1362 (Fed. Cir. 2025); allowing the <u>same</u> code to be assigned to <u>non</u>-identical products caused Commerce's margin program to treat <u>non</u>-identical products as preferred benchmark prices. These erroneous comparisons distorted Tenaris' dumping margin.

Commerce's approach is otherwise unsupported by substantial evidence because Commerce's administrative analysis does not explain how it ensured that (A) all threading types assigned a given THREAD code were physically identical, and (B) physically identical threading types were not arbitrarily assigned different THREAD codes. Indeed, Commerce failed to address arguments and record evidence unique to the first administrative review that demonstrated these standards were manifestly violated. Given this, Commerce's conclusion that no gap existed in the administrative record was likewise unsupported by substantial evidence.

The response briefs of the United States and Tenaris each rely extensively on *post hoc* reasoning, espouse standards for CONNUM design that flatly violate the statutory text as interpreted by the Federal Circuit in *La Molisana*, and otherwise quibble about ancillary factual points immaterial to the foregoing analysis. They repeatedly conflate the administrative record and analysis from other segments of this proceeding with the instant segment (AR1). Perhaps most notably, and in contrast to U. S. Steel's opening brief, both response briefs avoid supplying any images of the different threading types at issue, implicitly recognizing that a side-by-side view of the products coded [ ] makes it impossible to miss the haphazard—and unlawful—product mixing caused by Tenaris' decision to organize its *ad hoc* THREAD codes around intellectual property ownership. For the Court's ease of reference, we summarize a sample of these thread types below:

**FIGURE 1: Sample of Physically Distinct Threading Types Within *Ad Hoc* Codes**

Within each column, one readily can see many physically distinct thread types. But comparing across the two columns one can also see how, had Tenaris structured *ad hoc* codes according to physical characteristics, thread types with the same basic shape *might have* been combined together, such that, *e.g.*, all [ ] thread types were assigned one code and all [ ] thread types were assigned another. But it is far too late for Tenaris to change course now, as it would require not only reassigning THREAD codes but also calculating new costs for each new CONNUM.

The Court should remand Commerce's Final Results because they are distorted by an arbitrary and unlawful mix of different physical characteristics within each of the *ad hoc* THREAD codes [ ].

## ARGUMENT

The response briefs of the Government and Tenaris largely attempt to defend Commerce's administrative determination by confusing the issues. Below, U. S. Steel addresses arguments that bear on the analysis this Court must undertake, but it is equally important to clarify what is **not** at issue. *First*, this case is not about whether it was an error for Commerce to permit additional THREAD codes **at all**; rather, it concerns whether the additional THREAD codes were **structured** in a way that is unlawful and unsupported by substantial evidence. *Second*, U. S. Steel is not asking the Court to re-weigh evidence, Tenaris Br. at 18, because the root of the problem is that Commerce never considered U. S. Steel's critiques of THREAD codes [ ] in the first instance. *Third*, no party disputes that THREAD codes [ ] were **each** assigned to a variety of physically different thread forms. *See, e.g.*, Gov't Br. at 14 (Conceding "physical differences" within code [ ] and not otherwise disputing claim with respect to code [ ]); Tenaris Br. at 15 (conceding "differences" between threads assigned code

[ ]), 17 (conceding a lack of "knowledge regarding the physical characteristics" of threads assigned code [ ]). The question presented is, therefore, whether this product mixing violates statutory standards for matching physically identical merchandise or is otherwise unsupported by substantial evidence. Because it does, remand is necessary.

## I. Commerce Unlawfully Accepted THREAD Coding that Arbitrarily Combines Physically Distinct Products Within Individual Codes and Separates Physically Similar Products into Different Codes

U. S. Steel challenges Commerce's reliance on the following code hierarchy for the THREAD field, insofar as it was used to identify physically identical products for purposes of analyzing whether a given U.S. sale was dumped during the period of review ("POR"):

**TABLE 1: THREAD Code Hierarchy Accepted by Commerce**

| | Thread Type | Code | Default Code? | Commerce Investigation Analysis on AR1 Record? | |
|---|---|---|---|---|---|
| | Not Threaded | **10** | Yes | N/A | |
| | API Short Thread | **40** | Yes | N/A | |
| | API Long Thread | **45** | Yes | N/A | |
| | API Buttress Thread | **50** | Yes | N/A | |
| | API Extreme Line/Integral Joint Thread | **55** | Yes | N/A | |
| [ | | | | | ][1] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |

[1] (*) indicates the inclusion of [ ]; (^) indicates the inclusion of a [ ]; (#) indicates the inclusion of [ ].

| | | | | | |
|---|---|---|---|---|---|
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |

*Sources*: Initial Questionnaire (Mar. 12, 2024) ("Initial Questionnaire") (P.R. 14) at C-8; Tenaris' Response to Post-Preliminary Supplemental Questionnaire (Feb. 19, 2025) (C.R. 337-347) at Ex. 1 ("Tenaris Post-Prelim SQR").

Unlike Commerce's default THREAD codes 10 through 55, *ad hoc* codes [ ] each combines many different thread types within a single code.

### A. Commerce Did Not Invoke "Commercial Significance" to Justify Its Acceptance of Basket Category THREAD Codes; Even if Commerce Had Done So, the Standard Was Arbitrarily Applied

The Government's defense of Commerce's approach relies primarily on the relevance of "commercial significance" when modifying codes within a CONNUM field. *See* Gov't Br. at 10-17. Commerce's IDM does not mention "commercial significance" in analyzing Tenaris' THREAD coding. *See* IDM at 5. Elsewhere, in rejecting Tenaris' attempt to modify Commerce's TYPE field, Commerce rejected Tenaris' attempted reliance on commercial significance as a standalone basis for introducing new CONNUM codes, stating:

> TAMSA has **failed to explain why the products are physically distinct** from the characteristics of other products which would be classified under the same codes under the existing model match criteria. **It is not enough** to point out that some

> products which would ordinarily be given the same "type" code (1) physically differ in ways that may be adequately accounted for by other model match criteria or (2) **have different commercially significant costs, prices, or uses** as other products with the same CONNUMs.

IDM at 21 (emphasis supplied). This aspect of Commerce's administrative analysis was faithful to the "statutory requirement to compare goods on the basis of identical physical characteristics," *LA Molisana S.p.A. v. United States*, 138 F.4th 1353, 1362 (Fed. Cir. 2025); *see also* Gov't Br. at 15 (acknowledging "physical characteristics is the primary characteristic in the analysis"), and thus precludes the introduction of CONNUM distinctions based solely on non-physical commercial characteristics, *see La Molisana*, 138 F.4th at 1360 ("By relying on the listed {instead of actual} protein content, which is rounded up under FDA rounding requirements, Commerce fails to compare products "identical in physical characteristics" in violation of the requirements of 19 U.S.C. § 1677(16)(A)."); USS Br. at 15-16 (discussing the statute).

*1. The Government's Reliance on "Commercial Significance" Is Post Hoc*

The Government argues that physically distinct products "must be sorted by other relevant characteristics – *i.e.*, commercial significance," that "not every difference should be accounted for in the CONNUM structure," and that "Commerce has discretion to determine what constitutes commercial significance." Gov't Br. at 15. Because neither Commerce's IDM nor its final analysis memorandum ever mentions commercial significance in determining to accept Tenaris' distortive THREAD coding, *see* Final IDM at 5; Final Analysis Memo at 6-8, the Court cannot affirm Commerce's approach on this basis. "{C}ourts may not accept appellate counsel's post hoc rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (internal citations omitted). "{W}e refer to this as a prohibition on post hoc rationalizations, not

advocate rationalizations, because the problem is the timing, not the speaker." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 23 (2020). Indeed, that the Government resorts to *post hoc* reasoning underscores Commerce's failure to administratively address the issue raised by U. S. Steel, *viz.*, rules concerning the treatment of physically distinct products are not observed by *ad hoc* THREAD code [ ]. *See* USS Br. at 10-12.

From a legal standpoint, while U. S. Steel accepts that the Federal Circuit held that the statutory requirement of identicality means physically "the same with minor differences," rather than "exactly the same," *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1383 (Fed. Cir. 2001), the Federal Circuit's further acceptance of "commercial significance" as a standard for determining which physical differences are "minor" was an express exercise of *Chevron* deference in a case involving salmon from Chile, *id.* at 1384. Consequently, rote invocation of "commercial significance" is not a reasoned basis for coding physically distinct products under a single code here. *Id.* ("{T}hat is not the end of the inquiry. We must also determine whether Commerce's commercial practice determination here is supported by substantial evidence and whether Commerce has provided an adequate explanation for its determination."); *see also La Molisana*, 138 F.4th at 1361 ("Commerce's goals of transparency and consistency cannot override the statutory requirement of identicality in physical characteristics."). Given that "commercial significance" is an entirely *post hoc* rationale, Commerce certainly never explained how that concept would apply to different OCTG thread types.[2]

---

[2] If, on remand, Commerce were to assert that the physical distinctions observed among the various thread types coded [ ] are not "commercially significant," Commerce must reasonably define how "commercial significance" applies to OCTG threading.

### 2. *Even if Commerce Had Applied Government Counsel's "Commercial Significance" Standard, Commerce Did So Arbitrarily*

Ultimately, the Government's *post hoc* rationalization asserts that for physically distinct threading to be "commercially significant" it must cause a "lack of interchangeability" or be reflected in "the purchase requirements of customers." Gov't Br. at 15-16; *see also* Tenaris Br. at 8 (purchase orders), 17 ("not compatible"). Even if this framework had been administratively articulated—which it was not—remand would remain necessary. Commerce's "latitude" in decision-making, Gov't Br. at 15, does not permit arbitrary decisions, *see SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001), *aff'd*, 332 F.3d 1370 (Fed. Cir. 2003) ("Commerce is required to explain why it uses different definitions of 'foreign like product'…and that explanation must be reasonable…an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.") (internal quotation omitted). Yet the "commercial significance" standard described by Government counsel was arbitrarily and inconsistently applied in relation to the THREAD field.

The Government submits that Commerce found (A) the thread types coded [ ] to be non-interchangeable with all the default thread types and (B) the thread types coded [ ] to be non-interchangeable with thread types coded [ ]. Gov't Br. at 13-14. Even accepting these findings *arguendo*,[3] many of the thread types **within** code [ ] are non-interchangeable with each other; and many of the thread types **within** code [ ] are likewise non-interchangeable with each other. *See, e.g.*, **Figure 1**, *supra*; Tenaris' First Supplemental Sections B&C Questionnaire Response (Sept. 18, 2024) (C.R. 193-284) at 16-17 ("Tenaris 1SB/CQR")

[3] It is not at all clear that Commerce is correct about this. For example, [ ].

(describing physical differences among Tenaris proprietary threads); Tenaris Post-Prelim SQR at Ex. 2 (describing physical differences among third-party proprietary threads). Relying on non-interchangeability as the basis for creating a new THREAD code only to permit non-interchangeable thread types to share that new THREAD code is arbitrary. Indeed, *La Molisana* vacated a similarly inconsistent CONNUM structure when "Commerce itself designated protein content as commercially significant and a proxy for pasta quality" but failed to cure for "differences in protein content caused by rounding" in the CONNUM codes. 138 F.4th at 1361. If interchangeability were determinative, then at a bare minimum Tenaris should have broken up each *ad hoc* THREAD code.

Language in a purchase order does not alter the foregoing analysis. Commerce permitted THREAD code [ ] to capture **any** Tenaris proprietary thread type and THREAD code [ ] to capture **any** third party proprietary thread type. Final Analysis Memo at 6. But customers do not open-endedly specify [ ]. Rather, customers that specify such details will naturally [ ]. *See, e.g.*, Tenaris Post-Prelim SQR at Ex. 3 ([ ]); Tenaris' Initial Section A Questionnaire Response (Apr. 2, 2024) ("Tenaris AQR") (C.R. 11-40) at Ex. A6 ([ ]); Tenaris AQR at Ex. A8 ([ ]). A customer in need of [ ] that instead received [ ] would have non-interchangeable threading, despite the [ ]. *See id.* at Ex. 2 ([ ]).

In sum, treating non-interchangeability as a prerequisite for "commercial significance" would have yielded a very different THREAD field. To the extent Commerce applied this framework, it did so arbitrarily, and remand is required.

### B. Other Distinctions Cannot Explain Commerce's Acceptance of THREAD Codes [ ]

The Government also attempts to distinguish thread types coded [ ] on the basis that these "were only sold in the home market during this review." Gov't Br. at 15; *see also* Tenaris Br. at 20. Indeed, Tenaris reported as much, but it [ ] thread types coded [ ] were [ ]. *See* Tenaris Post-Prelim SQR at Ex. 1. By itself, the market in which something happens to be sold is no lawful basis on which to fail to account for a physical distinction in CONNUM coding, and the Government notably omitted market of sale from its asserted list of "commercially significant features." *Compare* Gov't Br. at 15 (mentioning fact), *with id.* at 16 (omitting from list). Regardless, even if market were theoretically relevant, Commerce's isolation of code [ ] thread types for lack of U.S. sales is inconsistent with [ ] U.S. sales coded [ ] code [ ] thread types sold [ ]. Commerce's approach arbitrarily yields different results based solely on whether [ ].

Tenaris (but not the Government) goes even further, asserting that distinguishing products based on intellectual property ("IP") ownership alone is viable because "the physical differences in the threading design that make them unique are the precise reason that companies like Tenaris and [ ] have been granted {IP} protection." Tenaris Br. at 14. As an initial matter, nothing in the administrative record demonstrates the ground(s) on which IP protection was granted. *See* Tenaris 1SB/CQR at 18-19. Thus, it is unknown whether the IP

relates to branding (*e.g.*, trademarks), to physical characteristics covered by the THREAD field, or to physical characteristics covered by other end finishing CONNUM fields, such as COUPLE or UPSET. *See* Initial Questionnaire at B-9, C-8. Even if Tenaris had developed the necessary factual record, its theory is backwards. The distinguishing point would be whatever underlying physical characteristic warranted the IP protection.

Were codes [ ] assessed as an attempt to separate thread types based on IP, the result fails for the same reason as interchangeability. *See* **Section I.A**, *supra*. Even assuming that Tenaris' threading was patented, Tenaris would not hold just one patent for [ ]. Yet Commerce has allowed all of Tenaris' proprietary thread types to be grouped under a single code. THREAD codes for physically distinct products based on IP would be specific to the IP—*e.g.*, models covered by a given patent—not the owner of the patent(s). Default THREAD codes 40, 45, 50, and 55 illustrate this. Although all four codes concern thread types whose IP is owned by the American Petroleum Institute ("API"), *see generally* Tenaris AQR at Ex. A35, Commerce did not assign a single basket code for "API Threading" because each thread type is physically distinct.

Finally, Tenaris suggests, without identifying any supporting authority, that creating basket categories merely for the sake of having fewer codes is tenable. Tenaris Br. at 8. The statute does not permit such an approach. The requirement to match physically identical products exists whether implementation necessitates two CONNUM codes or twenty.

### C. Shortcomings of the Original Investigation Cannot Cure for the Shortcomings of the First Administrative Review

The Government and Tenaris each attempt to use Commerce's acceptance of *ad hoc* THREAD codes in the original investigation to shift the burden onto U. S. Steel to identify "compelling reasons" not to reuse those *ad hoc* THREAD codes in AR1. Gov't Br. at 14; Tenaris

Br. at 10. Indeed, Tenaris goes so far as to suggest that the Court should sustain Commerce's final determination simply because Tenaris used these THREAD codes in the investigation and Commerce did not explicitly instruct Tenaris to change its codes in AR1. Tenaris Br. at 20. This line of argument ignores the standard of review, misstates the law governing product comparisons, and relies on factual assumptions that are unsupported by the administrative record.

*First*, Commerce must act lawfully and support its findings with substantial evidence on the administrative record of the segment under review. 19 U.S.C. § 1516a(b)(1)(B)(i). Those standards are not relaxed simply because Commerce allowed an *ad hoc* adjustment in an earlier segment in this proceeding. Tenaris' suggestion to the contrary contravenes the "fundamental premise of periodic administrative reviews that each 'administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.'" *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1357 (Fed. Cir. 2016); *see also* USS Response in Opposition to Tenaris Br., ECF Docs. 58-59 (Oct. 9, 2026) ("USS Resp.") at 3 (collecting cases). The record **of AR1** must establish that what Commerce did **in AR1** was lawful and evidence-based. Merely falling back on the "same approach as in the investigation," Tenaris Br. at 10, is inadequate where the arguments and record evidence differ. *See CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376-77 (Fed. Cir. 2016) ("we insist that Commerce examine the record and articulate a satisfactory explanation for its action… an agency's statement of what it 'normally' does or has done before is not, by itself, an explanation of why its methodology comports with the statute.") (internal citations omitted).

*Second*, "compelling reasons" are needed to justify deviation from the CONNUM structure set forth in Commerce's initial questionnaire, because that structure is the product of a notice-and-comment process which establishes a unified CONNUM hierarchy applied across all

simultaneous antidumping investigations for the life of those proceedings. *See Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation*, 86 Fed. Reg. 60,205, 60,206 (Nov. 1, 2021) (Initiation Notice) (opportunity to comment).[4] Tenaris and U. S. Steel each participated in that notice-and-comment process, which occurred at the outset of the original investigation. *See, e.g.*, *Oil Country Tubular Goods From Mexico*, 87 Fed. Reg. 28,808 (May 11, 2022), and accompanying Preliminary Decision Memorandum ("PDM") at 2 n.8 ("Inv. PDM") (noting Tenaris' submission of comments). Based on the comments and factual information submitted, Commerce adopted a default THREAD field with one code for unthreaded OCTG (code 10), four codes for certain API thread types (codes 40-55), and **no** separate codes for proprietary thread types. *See* Initial Questionnaire at C-8.

Nevertheless, anticipating *ad hoc* modification requests, Commerce's initial questionnaire requires that "{f}or each additional type of thread, describe in detail what distinguishes that type of thread from each of the other additional types and from each of the types listed above." *Id.* Further to this segment-specific process, Commerce accepted certain *ad hoc* THREAD codes at the end of the original investigation of OCTG from Mexico. *Oil Country*

---

[4] Tenaris relies on the CIT's vacated opinion in *La Molisana* for the proposition that courts "have looked for 'compelling reasons' when Commerce {itself} modifies a model-match methodology in a review after having used that methodology in previous segments of the proceeding." Tenaris Br. at 12 (quoting *La Molisana S.p.A. v. United States*, 633 F. Supp. 3d 1266, 1272 (Ct. Int'l Trade 2023), *vacated in relevant part*, 138 F.4th 1353 (Fed. Cir. 2025)). None of the cases on which *La Molisana* relies required "compelling reasons" to modify an *ad hoc* code used in a single prior segment. *See Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1315–16 (Ct. Int'l Trade 2020) ("Here, the original investigation is being challenged and there was no methodology from a previous segment for Commerce to alter."); *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1377, 1380 (Fed. Cir. 2008) (addressing deviation from default structure "after 14 annual reviews" and having "solicited extensive comments"); *Koyo Seiko Co. v. United States*, 31 C.I.T. 1512, 1513 (2007) (same). The final case affirmed Commerce's rejection of a respondent's request to modify the default CONNUM hierarchy by adding a product characteristic. *Fagersta Stainless AB v. United States*, 32 C.I.T. 889, 895 (2008).

*Tubular Goods From Mexico*, 87 Fed. Reg. 59,041 (Sept. 29, 2022), and accompanying Issues and Decision Memorandum at Comment 4 ("Inv. IDM"). However, such THREAD codes were absent from the simultaneous investigation of OCTG from Russia, *see generally Oil Country Tubular Goods from the Russian Federation*, 87 Fed. Reg. 59,045 (Sept. 29, 2022), and accompanying IDM, and Commerce's unified initial questionnaire remained unchanged, including both the default THREAD codes and the requirement that respondents explain the need for any *ad hoc* codes, Initial Questionnaire at C-8. Tenaris cites *Polyester Staple Fiber*, *see* Tenaris Br. at 11, which demonstrates the relevant principle. There, Commerce thoroughly scrutinized the respondent's introduction of an *ad hoc* CONNUM code through multiple supplemental questionnaires, despite that respondent having "used the same designation for its specialty products" in prior reviews. *Certain Polyester Staple Fiber from the Republic of Korea*, 70 Fed. Reg. 73,435 (Dec. 12, 2005) (AD AR Final), accompanying IDM at Comment 1. Here, likewise, Commerce's initial AR1 questionnaire did not mention THREAD codes [ ]. *See* Initial Questionnaire at C-8. Tenaris first introduced those proposed *ad hoc* codes in its response. *See* Tenaris Mexico Response to Sections B and C of the Antidumping Duty Questionnaire (Apr. 24, 2025) (C.R. 44-50) at B-19. In doing so, Tenaris' burden to show "compelling reasons" for its preferred CONNUM modification was no less than it had been in the original investigation.

*Third*, the Government's focus on bare code numbers, Gov't Br. at 14; *see also* Tenaris Br. at 11, fails to grapple with the statutory question, which concerns the physical characteristics of *the products to which those codes were assigned*. *See La Molisana*, 138 F.4th at 1362. True, the *ad hoc* THREAD codes used in AR1 were numbered like the *ad hoc* THREAD codes used in the investigation (*i.e.*, [ ]). However, by Tenaris' design, each *ad hoc* code was

assigned to a [ ] different thread types. *See* **Table 1**, *supra*. Yet, nothing on the AR1 administrative record shows that identical *products* were assigned code [ ], respectively, in both segments. As U. S. Steel explained in its opening brief, *see* USS Br. at 31, merely re-using a **code number** does not establish repeat treatment for a **product**.

The Government does not address or dispute this. *See* Gov't Br. at 14-16. Attempting to sow doubt, Tenaris observes that the "home market and U.S. sales verification reports from the investigation" and Commerce's "final analysis memorandum from the investigation" are on the AR1 record. Tenaris Br. at 19. None of these documents establishes that all the **thread types** presented in AR1 were assigned the same code in the original investigation. To begin with, neither verification report names any specific thread type. *See* Tenaris 1SB/CQR at Exs. Supp. B6, Supp. C6. Commerce's investigation analysis memorandum is little better, analyzing only [ ] thread types by name: [ ]. Tenaris Rebuttal Factual Information Submission (May 16, 2024) (C.R. 141-144) ("Tenaris RFI") at Ex. 4, p.4. However, Tenaris reported AR1 sales of [ ]. *See* **Table 1**, *supra*. There is no indication that Commerce considered [ ] in the investigation, *see* Tenaris RFI at Ex. 4, p.4, nor does the AR1 record show that, during the investigation, Commerce analyzed **<u>any</u>** of AR1's [ ] thread types coded [ ], *see* **Table 1**, *supra*.

The final thread type named in the materials Tenaris cites is [ ]. *See* Tenaris RFI at Ex. 4 n.13. Setting aside the absence of any discussion of its physical characteristics, *see id.*, Tenaris [ ], *compare id.* at 4 n.13 (mentioning [ ]), *with* **Table 1**, *supra* (mentioning only the

[ ]). Thus, this merely confirms the variation in thread types coded [ ] between the two segments.

Tenaris otherwise cites its administrative rebuttal brief, *see* Tenaris Br. at 12, which in turn acknowledges that Tenaris never documented the physical characteristics of the third-party proprietary threads on the record of the investigation, *see* Tenaris Mexico Rebuttal Brief (Mar. 17, 2025) (C.R. 353) "Tenaris Admin. Rebuttal Br.") at 13 ("there is no investigation corollary"), and otherwise mentions an exhibit **<u>that Tenaris did not provide in AR1</u>** which purportedly listed the thread types coded [ ] in the investigation, *see id.* (citing Tenaris RFI at Ex. 1, p.10 (referencing Exhibit Supp3. B6 from the investigation, which is **<u>not</u>** part of the AR1 record)). The Court should not be fooled by this attempted sleight of hand.[5] The AR1 record does not establish that the basket THREAD categories [ ] were applied to the same thread types in both the investigation and AR1.

*Fourth*, even if U. S. Steel were required to identify "compelling reasons" to revisit *ad hoc* codes [ ], U. S. Steel has explained at length how a "compelling reason to modify the model-match methodology exists because Commerce's current methodology fails to adhere to the statutory requirement to compare goods on the basis of identical physical characteristics." *La Molisana*, 138 F.4th at 1362. *See* USS Br. at 20-39. Commerce's investigation analysis did not address the key issues identified by U. S. Steel in AR1 regarding the need to keep physically similar thread types together in a single code and also separate physically different thread types in different codes. *See* Inv. IDM at Comment 4; Tenaris RFI at Ex. 4, p.3-5. Indeed, Commerce could not have possibly addressed evidence concerning the thread types coded [ ], which

---

[5] Despite Tenaris' intimations to the contrary, *see* Tenaris Br. at 12, footnote 5 to U. S. Steel's opening brief is accurate as written.

Tenaris conceded was [ ]. *See* Tenaris Admin. Rebuttal Br. at 13. Commerce's investigation analysis merely considered whether *ad hoc* THREAD codes [ ] "should be combined under one thread code" and declined on the basis that "each of these two thread types is unique and they are not interchangeable." Inv. IDM at Comment 4. Commerce made no mention of "commercial significance," *see id.*; Tenaris RFI at Ex. 4, p.3-5, and its erroneous characterization of the basket categories as relating only to "two thread types," Inv. IDM at Comment 4, is symptomatic of Commerce's subsequent failure in AR1 to address the commingling of [ ] of physically different thread types under [ ] *ad hoc* codes, *see* **Table 1**, *supra*. The Government's attempt to equate these distinct questions, *see* Gov't Br at 14, underscores Commerce's incomplete grasp of U. S. Steel's AR1 arguments.

## II. The Record Contains No Evidence to Support Commerce's Group Treatment of Code [ ] Products

The Government's only response to U. S. Steel's assertion that record evidence does not support Commerce's treatment of the thread types coded [ ] is that Tenaris "provided catalogues for threading coded [ ], the related purchase order and cost analysis, and an explanation demonstrating physical difference and not compatible with existing codes." Gov't Br. at 16. As U. S. Steel explained, however, Tenaris' catalogues did not cover [ ] of the proprietary thread types, USS Br. at 36, a point that Tenaris concedes, *see* Tenaris Br. at 17. As for "purchase orders" and "cost analysis," neither of these materials address the physical characteristics of the thread types. *See* Final Analysis Memo at 7 n.10 (citing Tenaris Post-Prelim SQR at Ex. 3)

As for the Government's reliance on Tenaris' "explanation," Gov't Br. at 16, Tenaris admits that it "does not have firsthand knowledge regarding the physical characteristics of these threads," Tenaris Br. at 17. Thus, absent corroborating documentation, Tenaris' bare

"explanation" is speculation, and "{m}ere speculation is not substantial evidence." *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019). Regardless, Tenaris' administrative narrative did not describe the physical characteristics of any particular thread type coded [ ], instead relying exclusively on generalized conclusions about, *e.g.*, the group's supposed "physical differences," "performance," and "{in}compatibility." *See* Final Analysis Memo at 7 n.10 (citing Tenaris February 19, 2025, SQR at 3-9). Commerce is required to match products identical in physical characteristics, *see* USS Br. 15-20, yet the record contains absolutely no information about the physical characteristics of [ ] thread types coded [ ], which renders Commerce's treatment of **all** thread types coded [ ] unsupported by substantial evidence, as nothing can possibly establish that **all** group members are physically identical. Commerce erred in concluding that "there is no necessary information missing from the record," Final IDM at 5, and in failing to comport with the statutory mandate ("shall") to "use the facts otherwise available" when confronted with such a gap, 19 U.S.C. § 1677e(a).[6]

Tenaris moves on to a further question that Commerce never reached administratively (but must reach on remand), as to whether Tenaris failed to act to the best of its ability, thus warranting application of an adverse inference. *See* 19 U.S.C. § 1677e(b). Tenaris asserts that it did act to the best of its ability because it "*could not* provide catalogues," Tenaris Br. at 17 (emphasis supplied), but the administrative record merely demonstrates that Tenaris *did not* provide catalogues. Underscoring just how little effort Tenaris devoted to establishing the characteristics of code [ ] thread types, the documentation that Tenaris ultimately submitted in

---

[6] Although this mandate is "subject to 1677m(d)," neither the Government nor Tenaris asserts that 19 U.S.C. § 1677m(d) was not observed, as Commerce provided Tenaris with multiple opportunities to submit information concerning the thread types coded [ ]. *See* USS Br. at 6-9.

its February 2025 supplemental questionnaire response was taken from "the [ ] for [ ]," Tenaris Post-Prelim SQR at 2, and was thus equally available to Tenaris at the time of its April 2024 response to Commerce's initial questionnaire. As for the [ ] undocumented code [ ] thread types, Tenaris simply characterized the materials as "not publicly available." Tenaris Post-Prelim SQR at 3. Before the court, but not administratively, Tenaris claims that it could not "control" entities with the necessary information and attempts to treat this as the beginning and end of the "best of its ability" analysis. *See* Tenaris Br. at 21 (quoting *SKF USA Inc. v. United States*, 630 F.3d 1365, 1375 (Fed. Cir. 2011)). The statute contains no such bright line rule. Rather, the Federal Circuit has held that "the statute **does not preclude** reliance on inducement or evasion considerations in calculating {a cooperating respondent's} rate…We leave it to Commerce…{to} balance the need to calculate an accurate rate for {respondent} and {respondent}'s status as a cooperating party with other potentially relevant concerns." *Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1236 (Fed. Cir. 2014) (emphasis supplied). Here, Commerce never undertook a balancing analysis in the first instance.

Unlike other scenarios where Commerce has applied neutral facts available for missing information in the possession of third parties, *see, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Oct. 17, 2012) (LTFV Final), and accompanying IDM at Comment 19 ("Trina documented its ongoing efforts to obtain FOPs from its solar cell suppliers and tollers"), the administrative record contains **no** evidence of, *e.g.*, attempted-but-unsuccessful search queries, rebuffed requests to customers or to [ ] to provide brochures, or anything at all to demonstrate that—had Tenaris done more than [ ]—it couldn't have

located relevant materials. In circumstances such as this, Commerce has consistently applied an adverse inference, *see, e.g.*, *Creatine Monohydrate From the People's Republic of China*, 64 Fed. Reg. 71,104, 71,108-09 (Dec. 20, 1999) (LTFV Final) (applying AFA where "Freemen provided no documentation confirming its efforts, or the supplier's refusals."); *Stainless Steel Bar From India*, 84 Fed. Reg. 56,179 (Oct. 21, 2019) (AD AR Final), and accompanying IDM at Comment 2 ("we would expect a respondent in the Venus Group's situation to take a number of steps to ensure that it could obtain the {requested} information, including, but not limited to…{listing several options}"), and should do so here as well.

## III. The Government Does Not Dispute that Commerce Must Reconsider the Application of AFA in the Event of a Remand

The Government does not contest U. S. Steel's assertion that, in the event of a remand, Commerce must reconsider whether to apply an adverse inference to remedy the gaps in the administrative record discussed above. *Compare* USS Br. at 39-43 (arguing that, if a gap exists, Commerce must reconsider the application of AFA), *with* Gov't Br. at 10-16 (disputing the existence of a gap in the record). Thus, the Court should consider any such objection waived and specifically order Commerce to reconsider the application of an adverse inference in filling gaps in the administrative record related to Tenaris' *ad hoc* THREAD coding.

Evidently seeking to preempt Commerce's AFA analysis, Tenaris asserts that "absent specific instructions from Commerce to recode, it would have been inappropriate for TAMSA to suddenly introduce new codes." Tenaris Br. at 15. As explained above, Tenaris did **introduce codes**—*i.e.*, THREAD [ ]—in its initial questionnaire response. *See* **Section I.B**, *supra*. Neither code existed in Commerce's initial questionnaire. *See* Initial Questionnaire at C-8. Tenaris cannot reasonably invoke the flaws of its own *ad hoc* creation as a shield, especially when those flaws had been so thoroughly uplifted on the AR1 record.

Tenaris cites *Circular Welded Pipe from Mexico* for the proposition that Commerce "recognizes following the approach in a prior segment is reasonable when Commerce 'has not requested that {a respondent} alter its reporting methodology." Tenaris Br. at 16 (citing *Certain Circular Welded Non-Alloy Steel Pipe From Mexico*, 65 Fed. Reg. 6,136 (Feb. 8, 2000) (AD AR Final), and accompanying IDM at Comment 2). That case concerned a cost reporting methodology, not the attempted reuse of an *ad hoc* CONNUM code for a new mix of products. Given Commerce's initial questionnaire instructions for the THREAD field and the overarching need to identify "compelling reasons" to justify modification of the default CONNUM hierarchy, it would contravene the standard of review for Commerce to permit a respondent to simply fall back on prior practice that is not supported by substantial record evidence, and unlawful for a respondent to assume that Commerce's past failure to correct a problem *ipso facto* renders the respondent's reporting reasonable.

Nor did Tenaris adopt such a self-serving "hands off' approach with respect to other aspects of its reporting. Tenaris proffered several other changes and corrections that Commerce did not explicitly mandate. *See, e.g.*, Tenaris Mexico's First Supplemental Questionnaire Response (Sept. 18, 2024) (C.R. 193-284) at Section B, p.1-2; Section C, p.1-2; Section D, p.1-3; Section E, p.1. Tenaris could not validly cherry pick which of Commerce's instructions it understood as encouraging Tenaris to maintain a distortive methodology.

**PUBLIC VERSION**

**CONCLUSION**

For the reasons set forth above, U. S. Steel respectfully requests that this Court grant its motion for judgment on the agency record and remand Commerce's *Final Results* to address the problems with Tenaris' *ad hoc* THREAD coding, including through the application of AFA.

Respectfully submitted,

/s/ James E. Ransdell
James E. Ransdell
Thomas M. Beline
Myles S. Getlan
Margaret E. Monday
**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Ave. NW, Suite 300
Washington, DC 20037
Phone: (202) 567-2321
Email: jransdell@cassidylevy.com
*Counsel for United States Steel Corporation*

November 6, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response brief contains 6,117 words, exclusive of the table of contents, table of authorities, square braces ("[ ]"), any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ James E. Ransdell
James E. Ransdell